William L. Osterhoudt (SBN 43021)
Frank S. Moore (SBN 158029)
Dolores T. Osterhoudt (SBN 215537)
Law Offices of William L. Osterhoudt
135 Belvedere Street
San Francisco, CA 94117
Telephone: (415) 664-4600
Email: osterhoudt@aol.com

Attorneys for Defendant
NAUM MORGOVSKY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>NAUM MORGOVSKY, et. al,<br><br>Defendants | Case No. Cr-16-0411 VC<br><br><br><br><br>Date:  October 26, 2017<br>Time:  2:00 p.m.<br>Place: Hon. Vince Chhabria |

**DEFENDANT NAUM MORGOVSKY'S OMNIBUS MOTION TO SUPPRESS EVIDENCE ILLEGALLY SEIZED BASED ON FACIALLY INVALID WARRANTS; AND FOR A HEARING PURSUANT TO *FRANKS V. DELAWARE* WITH RESPECT TO MATERIAL MISSTATEMENTS AND OMISSIONS**

1

## **TABLE OF CONTENTS**

2
PAGE

3

Table of Authorities ........................................................................................... iv

4

Introduction ........................................................................................................ 1

5

Argument ............................................................................................................ 4

6

7   I.   The 2016 Search Warrant Affidavit Fails to Establish Legal Probable Cause for
         the Search and Relies Upon Material Misrepresentations and Omissions ............... 6

8

9        A.   The Affiant's Summary of Probable Cause Is Unsupported by
              Allegations Within the Body of the Affidavit ......................................... 6

10
11       B.   The Affiant Downplays or Ignores Defendant Naum Morgovsky's
              Domestic Night Vision Business Activities ............................................ 8

12       C.   The Affidavit Is Rife with Innuendo That Defendant's Business
13            Activities Are Dominated by Nefarious Foreign, and Particularly
              Russian Connections .............................................................................. 10

14       D.   The Affidavit Unjustifiably Links Defendants Purchase Orders for
15            Controlled Night Vision Technology to Sales that She Contends
              Without Support Included Controlled Products  ...................................... 13

16
17            1.   The Affiant Engages in Speculation Regarding Image
                   Intensifier Tubes in a Vain Attempt to Create a Nexus
18                 That Does Not Exist ........................................................... 13

19            2.   Material Omissions by the Affiant Severely
                   Undermines Her Speculative Nexus Regarding the
20                 Image Intensifier Tubes ..................................................... 16

21            3.   The Affiant Suggests Defendant Lied to a Supplier
22                 With No Evidence to  Support the Suggestion.................................. 18

23            4.   The Affiant Falsely Equates Without Support a Request for
                   a Quote for a Product to Integrate With Defendants' Domestic
24                 Business, with an Intent to Purchase Possibly Controlled Products
                   for Possible Export ............................................................ 19
25
26       E.   The Affidavit Falsely Suggests That Resale of Night Vision
              Products is the Equivalent to Resale of Controlled Products ................... 22
27

F.   The Facts Cited By The Affiant Do Not Support Her Claim of
     Probable Cause To Believe Naum Morgovsky Was Seeking To Purchase
     Controlled Lenses From Janos Technologies to Integrate Them With
     Thermal Cores Made by FLIR Systems, or that He
     Exported Them To Russia. These Claims Are Manifestly Untrue.…........ 24

     1.   In Seeking to Show that the Defendant Exported Controlled
          FLIR Technology to Russia the Affiant Relies on an E-mail
          that Does Not Support Her Conclusion.………………………......... 25

     2.   The Affiant Omitted Material Information and Provided a False
          Conclusion to Support the Contention that Infratech was
          Using FLIR TAU Cores Providing a False Inference that Such
          Cores were Furnished by Defendants ………………………….....…29

     3.   The Two Page Document Typed in Russian Obtained
          Illegally from Naum Morgovsky's Trash Was Also Materially
          Misconstrued by the Affiant in Support of a False Claim that
          Infratech Utilized Thermal Imaging Cores Made by FLIR Systems ... 32

     4.   The Purported Erased Serial Number is Implausibly Attributed
          To Defendant ……………………………………………………… 34

G.   The Affidavit for the Second Search Warrant Contains False Representations
     About Defendants Shipments to Infratech.……………………………… 34

H.   The Affidavit for the Second Search Warrant Contains False Representations
     That Defendant Attempted to Deceive Customs Officials.…………………… 40

I.   The Affidavit for the Second Search Warrant Suggests that Defendants
     Routed Controlled Products from China to Russia with no Evidentiary
     Support.……………………………………………………………....… 42

J.   The March 2016 and all Other "Trash Pull[s]" were Illegal Searches,
     and the Products Therefrom Cannot be Considered to Establish Probable
     Cause ………………………………………………………………….… 43

II.   Material false Statements and Omissions Described Above Undermine
      the Probable Cause Showing Attempted in the Affidavit, Requiring that
      a Franks Hearing be Held and the Motion be Granted …….………………..………… 45

III.  Without the Requisite Probable Cause, the Warrants for Morgovskys' Residence
      and Storage Unit Were Nothing but an Illegal Fishing Expedition ………………… 48

IV.   The Warrants For The Morgovskys' Residence and Storage Unit Were Issued
      Without Probable Cause As To The Places To Be Searched …………………………..49

V.     The 2016 Warrants For The Morgovskys' Residence and Storage Unit Lacked
       the Specificity Required By The Fourth Amendment ......................................51

VI.    The Statements of Confidential Source Should Not be Considered in
       Determination of Probable Cause ...........................................................53

VII.   The 2015 Warrant Shares Many of the Same Deficiencies as the 2016 Warrant
       Outlined Herein ................................................................................56

# TABLE OF AUTHORITIES

**Cases** PAGE(S)

*Aguilar v. Texas*, 378 U.S. 108 (1964) ...............................................................55

*Andresen v. Maryland*, 427 U.S. 463 (1976) .......................................................4

*California v. Greenwood*, 486 U.S. 35 (1988) .....................................................44

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ..............................................4

*Draper v. United States* (1959) 358 U.S. 307 ...................................................55

*FTC v. Am. Tobacco Co.*, 264 U.S. 298 (1924) ...................................................48

*Gillespie v. United States*, 368 F.2d 1 (8th Cir. 1966) .......................................51

*Giordenello v. United States* 357 U.S. 480 (1958) .........................................50,55

*Illinois v. Gates*, 462 U.S. 213 (1983) ...................................................... passim

*In re Grand Jury Subpoenas*, 926 F.2d 847 (9th Cir. 1991) ................................52

*Marron v. United States*, 275 U.S. 192 (1927) ...................................................4

*Maryland v. Garrison*, 480 U.S. 79 (1987) .......................................................48

*Mendez v. County of Los Angeles*, 815 F.3d 1178 (9th Cir. 2016) ........................44

*Murray v. United States*, 487 U.S. 533 (1988) ...................................................56

*Nathanson v. United States*, 290 U.S. 41 (1933) ............................................49,55

*Samson v. California*, 547 U.S. 843 (2006) .......................................................13

*United States v. Cardwell*, 680 F.2d 75(9th Cir. 1982) ...................................52.53

*United States v. Carpenter.* 360 F.3d 591 (6th Cir. 2004) ...................................50

*United States v. Crozier*, 777 F.2d 1376(9th Cir. 1985) .....................................52

*United States v. Drebin*, 557 F.2d 1316, 1322 (9th Cir. 1977) ..............................4

*United States v. Elliott*, 893 F.2d 220(9th Cir. 1990)  .......................................55

*United States v. Grandstaff*, 813 F.2d 1353 (9th Cir. 1987) ...................................44

*United States v. Grubbs*, 547 U.S. 90 (2006) .......................................................5

*United States v. Hernandez-Escarsega* (9th Cir. 1989) 886 F.2d 1560 ....................... 54

*United States v. Kow*, 58 F.3d 423 (9th Cir. 1995) ..............................................53

*United States v. Leary* (10th Cir. 1988) 846 F.2d 592 ..........................................53

*United States v. Leon*, 468 U.S. 897 (1984) .......................................................55

*United States v. Long*, 176 F.3d 1304 (10th Cir. 1999) ..........................................44

*United States v. Peck*, 317 F.3d 754 (7th Cir. 2003) ..............................................5

*United States v. Spilotro*, 800 F.2d 959 (9th Cir. 1986) .....................................51,52

*United States v. Underwood*,  725 F.3d 1076 (9th Cir. 2013) ...................................50

*United States v. Weaver*, 99 F.3d 1372 (6th Cir. 1996) ..........................................51

*United States v. Weber*, 923 F.2d 1338 (9th Cir. 1990) ..........................................51

*United States v. Zapata-Galvez*, 9 F.3d 1555 (9th Cir. 1993) ..................................50

*Warden v. Hayden*, 387 U.S. 294 (1967) ............................................................ 48

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ................................................... 50

## INTRODUCTION

This motion challenges two search warrants issued against defendant Naum Morgovsky and his wife, Irina Morgovsky, and seeks suppression of the fruits of searches conducted pursuant to these warrants. The first of these warrants was issued on October 30, 2015, based on an affidavit of probable cause presented by FBI Special Agent Natalie Rezai-zadeh. That warrant was directed to Yahoo and sought the production of two Yahoo email accounts maintained by Mr. Morgovsky. The second warrant was issued on August 24, 2016, and authorized a search of the Morgovskys' residence at 1423 Avondale Road in Hillsborough, California. This warrant also authorized search of a storage locker located in Hayward, California which was discovered pursuant to a "trash pull" conducted by agents at the Morgovsky residence, as set forth in Agent Rezai-zadeh's affidavit in support of the 2016 warrant. The 2016 warrant affidavit relied in part on emails produced by Yahoo pursuant to the 2015 warrant, and contained many of the same allegations of probable cause that were presented in support of the 2015 warrant which were cut and pasted into the 2016 warrant. Defendant Naum Morgovsky contends herein that both of these warrants were constitutionally infirm and that all evidence resulting from them should be suppressed.

Although the warrant for Mr. Morgovsky's Yahoo email accounts was obviously earlier in time, and resulted in the production of some email evidence that was used in support of the later warrant, in this motion we initially challenge the 2016 warrant for Mr. Morgovky's home and the Hayward storage locker. The 2016 warrant and the affidavit supporting it are more comprehensive and resulted in the seizure of a large quantity of evidence from the Morgovsky home, and from their storage locker. In response to defendant's request under F.R.Crim.Proc. 12 (b)(4)(B), the government has declared its intention to use items seized from the home and locker against Morgovskys at the trial of this case. Thus the detailed challenges in this memorandum are directed, for the most part, to the 2016 warrant and the seizures pursuant to it. At the conclusion of this

discussion, we shall address the 2015 email seizures and the independent grounds for suppressing them.

Defendant Naum Morgovsky asserts a number of grounds for suppressing evidence seized as a result of the 2016 search warrants (hereafter "the 2016 warrants"), not necessarily presented in this order: The warrants were constitutionally overbroad and failed to particularize the items to be seized. As a result, they constituted general warrants forbidden by the Fourth Amendment and, unsurprisingly, the search conducted pursuant to those warrants was likewise general and constitutionally overbroad. The warrants were tainted by the inclusion in the agent's supporting affidavits of evidence allegedly seized from and as a result of warrantless searches of trash containers at the Morgovskys' residence. The agent's affidavits on their face fail to allege that these seizures occurred outside the curtilage of the residence and thus the seizures took place within that zone of constitutionally protected privacy.[1]  The 2016 warrants, despite their length, verbosity, and apparent, though mostly immaterial, detail, were utterly lacking in legal probable cause to support the searches of Morgovskys' home and storage facility.

Moreover, many of the allegations presented by the agent in support of these warrants were materially false and misleading, constituting what appears to be a conscious effort to mislead the issuing magistrate judge as to the legality of Mr. Morgovsky's purchases and sales of night-vision related items and exports of items largely unspecified in the affidavits. Overlaying the material misstatements and omissions that permeate the search warrant affidavits is a sinister implication that exports to and imports from Russia are somehow corrupt and contrary to American interests. This feeling is undoubtedly due to tension between this country and Russia that has arisen in recent years,

---

[1] The second warrant was also tainted in part by email evidence derived from the search pursuant to the 2015 warrant because, in our view, the earlier warrant was not based on legal probable cause to search Mr. Morgovsky's email accounts. We defer discussion of this issue, however, until we address the 2015 warrant in detail.

based on the Russian invasion of the Ukraine which caused deterioration of relations between the two countries. However, it overlooks the fact that at all times relevant to exports listed in the search warrant affidavit, between June 1992 and October 2014, Russia enjoyed "most-favored nation status" receiving the benefits of that status including the lowest possible U.S. tariffs on its goods. This status and its benefits were enforced when Mr. Morgovsky established long-term business relationships with a number of Russian companies and when he founded Hitek in 1993.

An orderly presentation of the related defects consisting of the absence of probable cause and material misstatements and omissions requires that we undertake a careful examination of the allegations in the warrant affidavits. We are mindful that under modern practice it is often customary to view the affidavit as a whole to determine whether the "totality of circumstances" supports a probable cause determination. In this case, based on all of the circumstances relied on by the Affiant, and especially a large number of misstatements, omissions, innuendos, and half-truths in the affidavits, dictate that many of the statements in the affidavits must be viewed individually. Only in this way can we demonstrate that none of the individual allegations presented by the Affiant demonstrate illegal conduct by defendants, and thus, the "totality" of such allegations fails to support the issuance of the warrants.

In addressing these allegations, both for their sufficiency and truthfulness, we rely in part on the declaration of Naum Morgovsky presented herewith. It may appear unusual for a defendant to make such a presentation on his own behalf, but we believe it is justified here. Mr. Morgovsky has been involved in the night-vision industry for approximately 24 years. As a result, he is intimately familiar with the technical specifications of optical devices in general and night vision devices and components in particular, and with the business concerns, in the United States and abroad, pertaining to optical and night vision devices and components. He is aware of the often confusing statutory scheme under which manufacturers and customers struggle to determine which items are "controlled"

for export purposes and which are not.  He is familiar with shipping practices involving Shipper's

Export Declarations (SEDs) and their electronic counterparts (AESs) filed not by the shipper but by

the freight forwarders who typically generically describe the contents of shipments.  Under these

circumstances, we believe it is helpful and necessary to include Mr. Morgovsky's very

knowledgeable input within this motion to suppress. In the event the Court grants an evidentiary

hearing pursuant to *Franks v. Delaware* to determine whether the affidavits indeed contained material

misrepresentations and/or omissions, we will present appropriate expert testimony when necessary.

Moreover, in the instances where the affiant refers to documents in Russian or websites in Russia, at

this juncture Mr. Morgovsky's fluency in both Russian and English languages and technical

terminologies will aid significantly in clarifying the statements made in the affidavits, especially that

the Affiant alleged using in some instances machine translations from Russian into English of highly

technical information and in other instances failed to mention the means of translations at all. In that

regard, we will present translations by certified personnel when necessary.

We present Mr. Morgovsky's declaration here in the nature of a proffer concerning the

matters it addresses.

## **ARGUMENT**

Under the Fourth Amendment, a search warrant must "particularly describ[e] the place to be

searched, and the person or things to be seized." U.S. Const. amend. IV. The Constitution prohibits

the issuance of general warrants that would lead to "exploratory rummaging in a person's belongings.

. . ." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) quoting *Coolidge v. New Hampshire*, 403 U.S.

443 (1971). The purpose of particularizing the items to be seized is to insure that when the warrant is

executed, nothing is left to the officer's discretion. *United States v. Drebin*, 557 F.2d 1316, 1322 (9th

Cir. 1977), cert. denied, 436 U.S. 904 (1978); *Marron v. United States*, 275 U.S. 192 (1927).

A warrant is only valid if it is based "upon probable cause, supported by Oath or affirmation..." U.S. Const. Amend. IV. When an affidavit is the only evidence presented to a judge in support of a warrant, then the validity of the warrant rests solely on the strength of the affidavit. *United States v. Peck*, 317 F.3d 754, 755 (7th Cir. 2003). In that regard, the affidavit must provide the judge with a substantial basis for determining that probable cause exists. *Illinois v. Gates*, 462 U.S. 213, 228 (1983).

"When analyzing probable cause, the key consideration is whether the affidavit establishes that 'evidence will be found when the search is conducted'." *United States v. Grubbs*, 547 U.S. 90, 95 (2006).

There are two separate 2016 affidavits, one in support of the 2016 warrant pertaining to Morgovsky's residence, and another in support of the 2016 warrant pertaining to their storage unit. These two affidavits and two warrants are identical. The only exception between the two affidavits is that the 2016 affidavit pertaining to their residence includes attachments and the 2016 affidavit pertaining to the storage unit does not. The 2016 warrants pertaining to their residence are also identical and consist primarily of the attachments to the 2016 affidavit pertaining to their residence, with the only exception that one of them includes an attachment with photographs of their residence and another one the photographs of the storage unit. For simplicity, we will refer only to the 2016 affidavit pertaining to their residence, especially that includes the attachments, and will refer only to the 2016 affidavit pertaining to their residence.

Special Agent Rezai-zadeh's ("SA" or "Affiant") 2016 affidavit in support of the 2016 warrant is organized as follows: (1) "Purpose and Summary of Affidavit" (US-000166-171); (2) "Affiant Background" (US-000171-172); (3) "Overview of Relevant Laws and Regulations" (US-000172-178); (4) "Probable Cause" (US-000179-222); (5) "Probable Cause Summary" (US-000222-225); (6) "Protocol for Searching Devices or Media That Store Data Electronically" (US-000225-

226); (7) "Request for Sealing" (US-000226-227); and (8) "Conclusion" (US-000227-228).

Defendant's motion focuses on sections (1), (4) and (5), each of which contains allegations or

conclusions that lack factual support or are materially false or misleading.  The resulting search

warrant is a general warrant, unsupported by the affidavit, and utterly lacking in the specificity

required by the Fourth Amendment.  It also fails to show probable cause that the Morgovskys

engaged in criminal activities in the night vision-related businesses, and we address this failure first.

I.     **The 2016 Search Warrant Affidavit Fails to Establish Legal Probable Cause for the Search and Relies Upon Material Misrepresentations and Omissions**

A.     **The Affiant's Summary of Probable Cause Is Unsupported by Allegations Within the Body of the Affidavit**

The first section -- "Purpose and Summary of Affidavit" – summarizes the "probable cause to

believe that evidence of export violations, tax offenses, identity theft and bank fraud are located in

the home of NAUM MORGOVSKY and IRINA MORGOVSKY as well as in a storage facility

rented by NAUM MORGOVSKY using a false identity."  While the affidavit touches upon all of

these allegations of wrongdoing, it focuses upon export violations and smuggling by Mr. Morgovsky,

which are alleged to be violations of the Arms Export Control Act ("AECA") 22 U.S.C. § 2778, the

International Emergency Economic Powers Act ("IEEPA") 50 U.S.C. §§ 1701-1706, the Export

Administration Regulations ("EAR") 15 C.F.R. pts. 730-74, smuggling in violation of 18 U.S.C. §

554 and conspiracy in violation of 18 U.S.C. § 371. (US-000167).  This is the heart of the affidavit,

upon which the warrant ultimately depends.

SA's summary of probable cause for the export violations emphasizes Naum Morgovsky's

ownership interest in a California-based night vision company, Hitek International, and his alleged

partial ownership in a Russia-based night vision company, Infratech, as well as his and his wife's

ownership of a night vision company, VisionTech, and sale/shipping transactions involving the same.

The Affiant claims that "there is probable cause to believe that NAUM MORGOVSKY together with IRINA MORGOVSKY and others are exporting Hitek products which include controlled technology" and "exporting controlled night vision equipment." (US-000168.)  This assertion is based on the following:

- Bank records associated with Hitek International indicate that Hitek International regularly receives substantial payments through wire transfers from off-shore companies with reference to payment for optical goods;

- Shipping and billing records illustrate a consistent pattern of ongoing shipments transiting from VisionTech to Russian-based Infratech;

- No record of an export license of file with the Department of Commerce (DOC) to export controlled products exists for NAUM MORGOVSKY, Hitek or IRINA MORGOVSKY;

- No Shippers Export Declarations (SEDs) on file for Hitek since 2010, but SEDs filed under VisionTech reveal eight shipments being sent to Russia including to addresses associated with Infratech;

- NAUM MORGOVSKY's regular email communications with a US-based company which produces sensitive electronics and optics indicates that he was seeking to purchase controlled lenses to integrate with thermal  imaging cores made by FLIR Systems;

- The controlled sophisticated lenses combined with the FLIR imaging core are a controlled night vision technology;

- Confidential source reporting has confirmed at least one instance of Infratech selling abroad "an identical US-controlled technology item";

- In the particular instance of Infratech selling abroad the purported "identical US-controlled technology item" had its unique serial number placed by FLIR on the sensitive core "scratched off";

- NAUM MORGOVSKY's email accounts were used to "purchase controlled night vision technology," to communicate with colleagues associated with Infratech in Russia and to contact freight forwarders to arrange shipments of multiple boxes of goods to Infratech in Russia.

(US-000168-170, ¶¶1-6.)

A similar summary is restated later in the affidavit. (US-000222-225, ¶¶138-139.)

As demonstrated below, the specific statements contained in the "Probable Cause" section of SA's affidavit (US-000179-222) do not support the conclusions contained in either summary section. This failure is due primarily to defects in many of the facts presented by the Affiant, and in the conclusions she draws and asks the magistrate judge to accept.

**B.    The Affiant Downplays or Ignores Defendant Naum Morgovsky's Domestic Night Vision Business Activities**

In the "Probable Cause" section of the affidavit (US-000179-222) there is mention that defendant was and is the President of Hitek International, a U.S. company (US-000184, ¶39). When detained and interviewed by the government in 2013, Mr. Morgovsky described Hitek as a company specializing in night vision devices. (US-000179, ¶29). The fact that Naum Morgovsky is openly involved in a business specialized in night vision devices in the United States is certainly not a predicate for probable cause in regard to his alleged involvement in unlawful exports of controlled night vision products.

The affidavit states that in May 2012 the FBI received a complaint from a person at Las Vegas-based Trans Western Sales (which markets and sells night vision equipment) about receiving an unspecified "purchase request for export restricted night vision equipment" from a person representing Hitek that he (the Trans Western Sales representative) "never heard of." (US-000179, ¶28). For unknown reasons, this individual allegedly became "suspicious that the company might unlawfully intend to ship the night vision equipment overseas or provide it to foreign persons in the United States." This generalized and unfocused "suspicion" on the part of someone whose reliability and credibility are completely unknown,[2] do not even begin to show probable cause, nor even a

---

[2]    Trans Western Sales is not a seller of night vision related products recognized in the industry, has no website that can discern its specialty, and according to a recent conversation of Naum Morgovsky with Rocky Green, is not in the business of selling night vision or other related products. In the event the Court finds that the information in this paragraph is material to the affiant's statement

1    founded suspicion that Hitek, a California company engaged in the sale of night vision equipment, is

2    acting in violation of the export laws. (See Naum Morgovsky Declaration.

3         The affidavit mentions several bank accounts connected to companies associated with

4    defendants (US-000180, ¶32), as well as business records, shipping records and financial records

5    pertaining to Hitek International, VisionTech and others seized from the defendants' trash.  These

6    confirm that business was conducted on behalf of these companies at the defendants' residence. (US-

7    000181-184, ¶36).  The affidavit mentions the defendant acknowledged that Hitek International does

8

9    not have a website and is primarily a design company that works with select customers to design a

10   product and then have it manufactured for distribution by other companies or license it to them. (US-

11   000184-185, ¶40).

12        Much attention is paid by the affiant to various bank and financial transactions involving

13   Hitek International and companies "which FBI investigation has confirmed as retailers of night vision

14   equipment" (US-000185-187, ¶¶43-46).  This is hardly surprising given that Hitek International

15   engages in the design and sale of night vision devices for domestic consumption (which includes

16   obtaining products from abroad).  Defendant has never attempted to conceal this lawful activity.

17   Listing of payments made to U.S. companies identified as retailers of night vision equipment provide

18

19   no evidence and no basis for finding probable cause in relation to allegedly unlawful export activities.

20        Moreover, allegations concerning financial transactions related to two Chinese (PRC)-based

21   night vision manufacturers/sellers does not specify whether any of these transactions were export-

22   related. The Affiant fails to specify that whatever was imported was subject to U.S. export or import

23   controls.  These statements provide no evidence and no basis for finding probable cause in relation to

24   allegedly unlawful export activities.  The only financial transactions that ever took place were

25

26

27   of probable cause, the affiant's failure to disclose the above information about Trans Western Sales
     that was readily available to the affiant represents a material and deliberate omission.

payments made by his companies to PRC-based companies were for items exported by PRC-based companies. On the contrary, payments to the "PRC-based night-vision equipment manufacturer/re-sellers" indicate that defendants were involved in importation rather than exportation and do not indicate that the equipment purchased from them was, in fact, night vision equipment or that it was controlled either for export or for import.

When the affiant made these statements in the affidavit for the 2016 search warrant, she was in possession of emails obtained pursuant to the 2015 warrant for Mr. Morgovsky's Yahoo email accounts. Those emails establish that defendants did not purchase from the "PRC-based night-vision equipment manufacturer/re-sellers" any controlled items but rather generic parts which could be used for any kind of digital cameras or scopes, not only night vision devices. Said statements in the affidavit are materially misleading and constitute intentional material omissions undermining the validity of the warrant, considering potentially sensitive distinction between the two.

## C.   The Affidavit Is Rife with Innuendo that Defendant's Business Activities Are Dominated by Nefarious Foreign, and Particularly Russian, Connections

The affidavit focuses on records revealing that defendants "have received substantial amounts of wire transfer deposits from foreign companies." (US-000187, ¶47). The list of foreign companies come from Europe, Asia, Central America, New Zealand and the British Virgin Islands, as well as from Russia (Infratech). (US-000188, ¶47). The affiant claims that the companies listed, because they are foreign companies, are "offshore companies, sometimes referred to as shell companies" which are presumptively "utilized to transfer money anonymously for illicit purposes such as money laundering and tax evasion." (US-000189, ¶48).

This broad general statement does not attempt to explain how such money laundering and tax evasion by offshore companies is related to defendant's business activity. The affiant states that she is "aware" of FBI investigations in which "individuals," without specifying whether these "individuals" were foreign or domestic, "utilized foreign bank accounts and shell companies" for the

purpose of "obfuscating the transfer of technology" and the like. The affiant makes no effort to explain how this relates to defendants. In essence, the affiant implies that "offshore companies" from Singapore, British Virgin Islands, Belize, Norway, the United Kingdom, Poland, New Zealand, Hong Kong, the Seychelles, the Marshal Islands and Scotland were all involved in "obfuscating transfer of technology" involving controlled night vision devices without any evidence and with no attempt to explain why individuals would use shell companies to disguise their transactions with defendants to avoid U.S. taxes on these transactions, which appears nonsensical to begin with.

Moreover, SA asserts that her research revealed that three of the listed offshore companies "have ties to Russia", as if this fact carries with it a presumption of illegality. (US-000189, ¶49.) Yet, the affiant fails to reveal the fact that other companies listed have active websites such as Volans Enterprises Limited (http://volans-pro.com/) in Greek and Russian, touting itself as a "Professional Logistics Partner," and Teno Astro, a company engaged in the sale of night vision products with a website in Norwegian (http://www.tenoastro.no/main.aspx?guest=yes) doing business in Norway. Furthermore, there is a strong suggestion in SA's affidavit for the 2016 Search Warrant, again through innuendo, that payments to defendants from "offshore companies" or "shell companies" are for goods shipped to Russia, rather than for domestic sales or sales to non-Russia based companies abroad, without an iota of evidence to support the suggestion. This is a theme throughout all of the affidavits authored by SA Rezai-zadeh: a bias against Russia while downplaying the broader international business engagement defendant has with the rest of the world.

There is nothing nefarious about an American Russian-speaking citizen of Russian (in this case Ukrainian) extraction conducting a small business engaged in domestically-based trade in night vision devices and international sales of non-controlled products. Exports to Russia of the items purchased by defendants in the United States are not controlled any differently than exports to most other countries in the world, including the NATO countries, with the only exceptions being Iran,

North Korea, Sudan, Cuba, Libya, Serbia (excluding Kosovo), and Syria. (See 15 CFR 30.55(h)(2)(i).) By singling out Russia as she does in all of her affidavits, it is unmistakably clear that potential bias was being exploited, considering the sentiment against Russia and "Russians" that has been wide spread since Russia invaded Crimea in 2014, particularly given the fact that the affidavits are completely devoid of any evidence that any of defendants' exports to Russia specifically, or any other country in general, were in any way unlawful. This is especially true because no export laws or regulations pertaining to exports of the items purchased by defendants in the United States have changed even after Russia invaded Crimea.

On the contrary, at all times relevant to exports listed in the affidavits and beyond, between June 1992 and October 2014, Russia was given a temporary most-favored nation status receiving most-favored-nation benefits - the lowest possible U.S. tariffs on its goods, which was only terminated on October 7, 2014 in connection with Russia's invasion of Crimea. In fact, it was Russia's most-favored nation status which prompted Naum Morgovsky to establish long-term business relationships with a number of Russian companies, including but not limited to Infratech, starting in 1993 when he founded Hitek International.

Other than an expired California resale certificate (US-000185, ¶41) and the allegation that no records were found for Hitek, AIT and VisionTech with California Employment Development Division EDD[3] (US-000185, ¶42), the affidavits authored by SA Rezai-zadeh are devoid of any mention that defendant's domestic-based business activity is completely lawful. The Affiant makes no attempt to explain how payments to defendants by three companies having "ties to Russia" implicates defendants in allegedly unlawful exports. Rather, through innuendo, SA's affidavits strongly suggest that criminality should be suspected because defendant "is part owner of a night

---

[3] The information provided to the FBI by the California EDD in October 20, 2015 is not current enough to be considered in regard to 2016 Application and should therefore be stricken.

vision company located in Moscow, Russia called Infratech" which designs and manufactures night vision devices supporting army special forces and law enforcement and that defendant travels to Russia periodically to meet with Infratech. (US-000179-180, ¶¶30, 31). Aside from everything else, the references to Infratech's business and its support of army special forces and law enforcement is totally undated and it cannot be concluded from the affidavits that Infratech's business at the times relevant to the affidavits was the same as it was at the time the affidavits were made. This only indicates that the warrants are stale because they were made years after the latest any exports alleged in the affidavits. Moreover, these allegations are completely irrelevant to the probable cause determination, for they make no claim that his "ties to Russia" or alleged interest in Infratech, has any connection to allegedly unlawful exports.

> **D.** **The Affiant Unjustifiably Links Defendants Purchase Orders for Controlled Night Vision Technology to Sales that She Contends Without Support Included Controlled Products.**

In sections entitled "Morgovsky Purchased Controlled Night Vision Technology" (US-000189-195, ¶¶50-65) and "Morgovsky Re-sells Night Vision Goods" (US-000196-197, ¶¶66-68), SA engages in classic sophistry as a means of establishing a false predicate for further erroneous conclusions she draws about Infratech products in the next section of her Affidavit. (US-000197-199, ¶¶69-78) which will be addressed later in this brief, which represents a combination of "faulty syllogism with circular reasoning", as the Supreme Court described a similar practice in *Samson v. California*, 547 U.S. 843 (2006).

> **1.** **The Affiant Engages in Speculation Regarding Image Intensifier Tubes in a Vain Attempt to Create a Nexus That Does Not Exist**

The Affiant focuses on purchases of image intensifier tubes on May 7, 2010, June 24, 2010, and November 11, 2010. (US-000189-192, ¶¶50-55.) The affiant provides no information that any of the image intensifier tubes or any products containing image intensifier tubes purchased were exported or attempted to be exported by defendants, to Russia or any other country.

At the outset, the affiant's attempt to establish that these tubes were controlled products in 2010 is woefully inadequate. The affiant claims she determined that there existed a "first level license determination" that Exelis Image Intensifier Generation 3 18-mm F9810SLG was controlled on the United States Munitions List under Category XIIc on April 3, 2015. (US-000190, ¶51.) However, she fails to explain what "first level license determination" means, how conclusive it is, and whether "first level license determination" made on or about April 3, 2015, is applicable to the times relevant to her claim that defendants' were exporting these products to Infratech. The phrase "first level license determination" is not used in any of the applicable statutes and regulations, nor case law concerning the subject.

In addition, the Affiant asserts that defendants' June 24, 2010 purchase of a Gen 2 image intensifier tubes manufactured by Photonis (located in France) "appear to be controlled" attributed to the Vice President of Sales and Business Development, Photonis, USA "on or about April 2, 2015." The affiant fails to explain why this opinion is qualified by the phrase "appear to be controlled" and how that less than definitive determination resulted in the affiant's conclusion that such tubes are, in fact, controlled.

Assuming, *arguendo*, that all of the image intensifier tubes ordered or purchased from Tactical Light Solutions were indeed controlled articles, the affidavit fails to provide reasonable suspicion that these tubes were unlawfully exported or planned to be exported to Russia or any other country. This failure is particularly glaring in light of the fact that throughout the relevant period defendants were engaged with businesses which specialized in night vision products sold in the United States. Thus there is no basis for the conclusion that these purchases in 2010 were acquired for export or were, in fact, exported.

The Affiant attempts to make a nexus between defendants' December 7, 2010 purchase of 10 items of supposedly controlled image intensifier tubes, with a shipment to Infratech in Russia of

1   "optical parts and accessories" on or about December 16, 2010.[4] To create this tenuous nexus, the

2   Affiant speculates that after the prepayment of the invoice on or about December 7, 2010, as Tactical

3   Light Solutions estimated, it either sent the products Hitek ordered or made them available for in

4   person pick up.  This speculation is unwarranted. According to Tactical Light Solutions, if it did not

5   have the products, it would have to pay for the items and only then would they be shipped to Tactical

6   Light Solutions from its' supplier located in Pennsylvania, a process which could take up to one week

7   before the order would be ready for pickup. This fact was known to the affiant. (US-000191, ¶54.)

8       Thus, despite the lack of foundation that order number 20912 was actually in the possession

9   

10  of the defendants in time, the affiant speculates that the December 16, 2010-shipment to Infratech, by

11  "Irina Morgovsky dba VisionTech" and described in the SED as "optical parts and accessories," was

12  in fact the 10 pieces of supposedly controlled image intensifier tubes referenced in order number

13  20912. No evidence is presented that this was actually the case. Such a series of speculations cannot

14  possibly serve as a basis to support probable cause for issuance of a search warrant.

15      The circumstantial "evidence" provided by the affiant is based on a number of unfounded

16  

17  assumptions and is merely a feeble attempt to correlate the time period when the purportedly

18  restricted commodity was obtained by defendants with a shipment of unspecified commodities made

19  on or about December 16, 2010, which the affiant surmises are one and the same.  No invoice and/or

20  packing list containing a specific description of items pertaining to the December 16, 2010 shipment

21  to Infratech is provided, no weight or value of the shipment was provided, and no dates when Tactical

22  Light Solutions received the purportedly restricted commodity and when they were purportedly

23  picked up and by whom are provided in the Affidavit for 2016 search warrant. The mere proximity of

24  

25  

26  [4] This purchase contains Tactical Light Solutions Invoice for order number 20912, which indicated

27  that the product was scheduled for pickup (US-000191, ¶54) pre-paid by Naum Morgovsky.

dates between when possible controlled products were picked up by defendants and the shipment of December 16, 2010, is insufficient to support probable cause.

### 2. Material Omissions by the Affiant Severely Undermines Her Speculative Nexus Regarding the Image Intensifier Tubes

Regrettably, the Affiant omitted from her affidavit for the 2016 search warrant facts showing what was contained within the December 16, 2010 shipment to Infratech and why this shipment could not have consisted of the items ordered from Tactical Light Solutions per invoice number 20912. On August 24, 2016 the government obtained a search warrant directed at Mr. Morgovsky's former codefendant herein, Mark Migdal (2016 Affidavit Re MM). This search warrant was based on an affidavit by the same SA who provided the affidavit in support of the search warrants directed against Mr. Morgovsky. In Paragraph 58 of the Migdal Warrant (Exh. 1 NM Decl.), the Affiant revealed that she knew the subject of the December 16, 2010 shipment consisted of six boxes that were sent to Auto Export Group, a freight forwarder, on December 14, 2010 by FedEx. These items were sent to Auto Export Group not by Irina Morgovsky dba Vision Tech, but rather by Mark Migdal's secretary Leila Freeman. This was because the Morgovskys were not in the country at the time, having flown to London on December 12, 2010. Arrangements for this travel at that time were clearly referenced in e-mails from Naum Morgovsky's Yahoo! account, which had been seized by the government pursuant to the 2015 search warrant and therefore had been in the possession and knowledge of the government since that seizure (NM Decl. ¶ 7 incl. Exh. 2). Moreover, from the shippers export declaration (SED), or rather its' electronic equivalent filled out and submitted by the freight forwarder (AES), Affiant well knew that the December 16 2010 weighed 290 lbs, with a total value of $6,407.30, and was thus no way a "small" shipment subject to falsification as the Affiant attested, based on her "training and experience" (US-000201, ¶80.)

The commercial invoice was readily available to the affiant either through the freight forwarder or commercial carrier. Moreover, the omitted invoice signed by Mr. Migdal's secretary

Leila Freeman, which Ms. Freeman emailed to Mr. Morgovsky's email account naummorgovsky@yahoo.com, was included in the emails from that account seized by the government pursuant to the 2015 search warrant and thus in the Affiant's hands at the time the 2016 warrants were prepared by her (NM Decl. ¶ 9, including Exh 3). The invoice includes a very particular description of all items in that shipment, which are not compatible with affiant's theory that it contained the 10 pieces of image intensifier tubes ordered from Tactical Light Solutions and weighing a total of approximately 1.5 lbs (NM Decl. ¶ 8). Because of the Morgovskys' absence, the commercial invoice was ultimately signed by Leila Freeman. Indeed, in her 2016 affidavit in support of the Migdal search, the Affiant stated that "Mark Migdal's secretary Leila Freeman sent 6 FedEx shipments on December 14, 2010 to Oleg Shkoda, Auto Export Group). In contrast, the affidavit in support of the 2016 Morgovsky residence search, Affiant asserted that the shipper of these items was Irina Morgovsky dba Vision Tech.

Under these circumstances, the Affiant misled the issuing magistrate with respect to material matters. Affiant knew from the 2015 Yahoo! E-mail seizures and possibly other sources that Naum and Irina Morgovsky flew to London on December 12, 2010 and thus it was virtually impossible for them, before their departure, to pick-up the image intensifier tubes from Tactical Light Solutions, and include these tubes with a shipment they left with Leila Freeman to be sent to Auto Export Group and ultimately to Infratech. Affiant also had full access to the actual commercial shipping documents disclosing the nature of the shipment and the items shipped, which were inconsistent with her speculation that the shipment constituted an unlawful export of image intensifier tubes. Accordingly, the descriptions by the Affiant of the entire related series of events constituted material misrepresentations and omissions.

### 3. The Affiant Suggests Defendant Lied to a Supplier With No Evidence to Support the Suggestion

The Affiant states that "[s]everal of the orders" placed by Naum Morgovsky and Hitek between May 2012 and 2014 contain invoices including a warning that the articles are controlled by ITAR (US-000193, ¶58.), but the Affiant fails to explain which of the listed items may be controlled and which "several orders" contained the warning. This is especially important considering that the table provided in the 2016 affidavit lists many lenses which are dubbed "commercial."  The Affiant claims in paragraph 59 that these lenses "are controlled on the United States Munitions List under Category XII(e)" (US-000194, ¶59), which states as follows: "Components, parts, accessories, attachments and associated equipment specifically designed or modified for the articles in paragraphs (a) through (d) of this category, except for such items as are in *normal commercial use*." (Emphasis added).

As the affiant states, Naum Morgovsky responded to the Janos Technologies "ITAR survey" by affirming that "[t]he supplied ITAR products are for domestic use". The suggestion that this statement was a lie to Janos for the purpose of concealing an intent to engage in illegal exporting of Janos Technologies' controlled lenses is entirely unwarranted, and actually is devoid of any factual support.  There is no evidence the Affiant furnishes that the supposedly controlled lenses contained in "several" orders were exported or intended for export.

The contrary inference is much stronger: that these orders were for Naum Morgovsky's own products in the United States.  The Affiant provides no evidence that the Janos Technology lenses were intended for export that would in any way support a finding of probable cause.  Rather, the Affiant seeks to draw an unfounded inference that any purchase by defendants, who commercially market their products in the United States, from Janos Technology or anyone else, of any controlled lenses or any other controlled items, were intended for export.

4. **The Affiant Falsely Equates Without Support a Request for a Quote for a Product to Integrate with Defendants' Domestic Business, with an Intent to Purchase Possibly Controlled Products for Possible Export**

In ¶ 63 of the affidavits, the Affiant stated that Naum Morgovsky engaged in "requesting a quote for the Laser range finder" modules. (US-000194, ¶63.) These laser range finder modules were never purchased by defendants. Yet, the government went to the trouble of seeking "a first level determination", a term of art that is never explained by the Affiant, but stated with a level of authority suggesting confirmation that the modules were "controlled," in order to state as fact that the laser range finder modules were controlled by ITAR. Given that defendant never purchased any of them, it seems the government's purpose of including this non-purchase in the affidavit was to create another innuendo creating an unwarranted inference of wrongdoing when none existed. Indeed, the Affiant converts the terms "requesting a quote" to "sought to purchase" a possibly controlled product, to establish a predicate which was misleading.

In paragraph 64, the Affiant states: "IDSS has informed me that NAUM MORGOVSKY was interested in purchasing laser rangefinders to integrate with NAUM MORGOVSKY's weapon sighting products." (US-000195, ¶64.) While defendant disputes this, it is important to note that the affiant does not state that IDSS's CEO informed her that Mr. Morgovsky was interested in purchasing laser rangefinders to integrate with his weapon sighting products for *export to Russia or anywhere else*. Yet, that is precisely the inference the affiant seeks to draw.

As is evident from his declaration., Naum Morgovsky was not interested in purchasing laser rangefinders from IDSS and so informed its CEO by email, expressing his opinion that they were too bulky, outdated, and severely overpriced (NM Decl. ¶ 10, incl. Exh. 4). Said email was also seized from Naum Morgovsky's Yahoo email account and thus in the hands of the Affiant when she prepared the 2016 affidavits. It is not clear from the affidavits then whether IDSS misinformed the Affiant or the Affiant misinformed the magistrates in the affidavits. In her affidavits, SA stated that

Mr. Morgovsky provided to IDSS "product manuals". This is also untrue, because Mr. Morgovsky, in fact, sent to its CEO by email the AIT-USA color product brochures of its night vision and thermal imaging products, which included their detailed specifications including the resolutions of its thermal imaging products (NM Decl. ¶ 10). Without any evidentiary support, the Affiant implied in its affidavits that these products were exported by defendants to Infratech. Nevertheless, none of the resolutions of its thermal imaging products matched the resolutions of Infratech thermal imaging products posted on the Infratech website, including but not limited to the website pages referenced by SA in her affidavits. Defendant therefore respectfully submits that SA intentionally misnamed the brochures as "product manuals", which would ordinarily not include the resolutions of the thermal imaging devices, and did not attach copies of the brochures to the affidavits in order to mislead the magistrate and conceal the fact that the resolutions of the AIT-USA devices did not match the resolutions of similar devices sold by Infratech.

Then, in paragraph 65 of the 2016 affidavits, the Affiant stated: "Hitek has developed (1) a clip-on weapon sight with dedicated thermal weapon sight capabilities; and (2) a clip-on night vision weapon sight. The Department of Commerce has advised me that night vision components that are designed or modified to be used as optical sighting devices for firearms, such as night vision rifle scopes, are classed under ECCN OA987 such that they would require export licenses *if shipped to Russia*. The AIT-USA manual markets its optical sighting devices as integrating with (i.e., clipping on to) high caliber firearms."(US-000195, ¶65 [emphasis added].)

In order to classify a sight as a weapon sight subject to export controls, the sight must incorporate a reticle, which in laymen's terms is called cross-hair. Clip-on sights are mounted in front of a day weapon sight and do nothing more than utilize a reticle from the day sight. As such, the clip-on sight it is not classified as a weapon sight because it is no different than a monocular viewer and can be used as such outside of the weapon. In fact, thermal imaging scopes do not become weapon

1   sights *until firmware including an electronic reticle is programmed into them* (NM Decl. ¶). If they

2   utilize a thermal core that is not subject to export control and optics that are not subject to export

3   control, as in the case of most lenses Naum Morgovsky purchased from Janos Technology, and do

4   not include firmware with an electronic reticle programmed into them, they do not require an export

5   license for export to Russia or elsewhere.[5]

6       Nothing in the above paragraph indicates that Naum Morgovsky did anything that would

7   resemble a violation or an attempt to violate export laws. What the above paragraph indicates is that

8   Mr. Morgovsky had his own night vision products in the U.S. and marketed them in the U.S.

9   Moreover, by downplaying defendants' domestic business, the above paragraph glosses over the fact

10  that there was a valid reason for Naum Morgovsky to purchase arguably controlled image intensifier

11  tubes, arguably controlled Janos lenses, and FLIR TAU cores, whether controlled or not, to utilize

12  them in the products marketed in the U.S.  Indeed, the absence of any action by defendants to export

13  these goods reflects that the "evidence" presented in both affidavits was a brazen attempt to equate

14  defendants' inquiries and purchases of possibly controlled components in the U.S. as supporting

15  probable cause of illegality in the absence of any evidence whatsoever that any of controlled products

16  were exported or attempted to be exported by defendants to Russia or elsewhere. If the allegations in

17  these affidavits are found to support probable cause, then any all domestic companies that use,

18  purchase, or sell domestically any components subject to any export controls, which would number in

19  millions, would be subject to searches, seizures, and possibly arrests because probable cause would

20  automatically exist in that regard.

---

[5] This information is not intended to imply that defendants exported thermal scopes even without
reticles and without controlled lenses to Russia or elsewhere or intended to do so. Naum Morgovsky
was actually much more interested to import thermal imaging scopes from Infratech in Russia rather
than exporting them and is still planning to do so.

1 Furthermore, the fact that the affiant obtained an advice from the Department of Commerce

2 "that night vision components that are designed or modified to be used as optical sighting devices for

3 firearms, such as night vision rifle scopes...require export licenses if shipped to Russia" clearly

4 reflects the affiant's fixation on exports to Russia alone, strongly suggesting an attempt to inject

5 political bias by exploiting the deteriorated relations between U.S. and Russia, which in any event

6 occurred after all or most of the activities described by SA in the affidavits took place.

7
**E.    The Affidavit Falsely Suggests That Resales of Night Vision Products is the**
8 **Equivalent to Resales of Controlled Products**

9 In the next section of the 2016 affidavits, under the heading subparagraph D, "Morgovsky Re-

10 sells Night Vision Goods," SA states: "Hitek International was used to place several orders for

11 various night vision equipment *some of which* was *controlled* for export." (US-000195, ¶66

12 [emphasis added].) This obviously couched language is noteworthy given that the agent never

13 identifies the "controlled" night vision equipment in her affidavit that defendants are alluded to have

14

15 "re-sold," but uses the euphemism "night vision" in place of the word "controlled" as reflected in the

16 heading in subparagraph D as a false predicate to suggest that the defendants ordered *controlled* night

17 vision equipment for sale abroad by pointing again to the "incoming wire transfers from offshore

18 holding companies." (*Id.*)

19 Yet, in the next subparagraph (i) under the heading "Goods sold to Infratech," the Affiant

20 points to innocuous parts from China referred to as "housing components" sold to Infratech in Russia

21

22 to suggest that defendants are "re-selling" controlled night vision equipment without establishing any

23 basis for the inference. (US-000196, ¶67.) More importantly, SA admits that defendant Morgovsky's

24 email "contained payment information" and that such information shows payment was made by "000

25 NPK Infratech in Moscow Russia" (*id*) and not one of the "offshore holding companies" listed in the

26 table in paragraph 47 (US-000188, ¶47), as she originally claimed in paragraph 67.  In short, the

27 Affiant here uses a transaction without any basis for suspicion, wherein the products described are

not controlled items and were paid for directly by the purchaser, to suggest that it should be viewed suspiciously because the buyer is in Russia and that defendants had accepted payment in the past from what she refers to as "offshore holding companies." The Affiant did not indicate in any way that "housing components manufactured in China" were defense articles subject to ITAR which required Naum Morgovsky to obtain an export license for shipping them to Russia.

The next subparagraph (ii) under the heading "Goods sold to CEK" offers another example of deception. In paragraph 68, the Affiant states: "[t]he supply agreement executed on December 10, 2013, between VisionTech Co (Seller) and Limited Liability Company CEK (buyer) indicated that the total amount of payments *made* under this agreement is $1,000,000 USD." (US-000196, ¶68 [Emphasis added].) This statement is materially false and misleading. The Affiant uses the term "made" in the past or perfect tense, meaning that the supply agreement executed on December 10, 2013, had been fully performed, when no evidence to support this phrasing exists. Indeed, as is evident from Mr. Morgovsky's declaration (NM Decl. ¶ 13), this supply agreement was never implemented beyond several small shipments to CEK listed in paragraph 79 of the 2016 affidavits and possibly another small shipment totaling approximately $7,000. The remaining portion never crystalized, so the total amount payments made by CEK was not $1,000,000. Accordingly, the Affiant could not possibly have any evidence that amount of payments made under this supply agreement was $1,000,000 USD.

The Affiant then stated in paragraph 68: "Invoice No. 2036 cost of goods sold was $1,441.82 and Invoice No. 1215 cost of goods sold was $106,025." The part of the supply agreement pertaining to invoice No. 1215 in the amount $106,025 also never crystalized and no corresponding shipment to CEK and payment from CEK were made. The only reason the Affiant could possibly have for mentioning the invoice No. 1215 in the amount $106,025 in the 2016 affidavits was to mislead the

1   magistrate into believing that the corresponding shipment in that amount was actually made, which

2   was untrue.

3       Again, the agent uses facially innocuous transactions with CEK, a competitor of Infratech,

4   and imbues them with suspicion based upon innuendo and false predicates. The fact that CEK is a

5   competitor of Infratech also calls into serious question the confidential source's (SC) claim, for which

6   the Affiant offered no corroboration whatsoever, that Naum Morgovsky had an ownership in

7   Infratech.

8

9   **F.     The Facts Cited by The Affiant Do Not Support Her Claim of Probable Cause to
        Believe that Naum Morgovsky was Seeking to Purchase Controlled Lenses from
        Janos Technologies To Integrate Them With Thermal Cores Made by FLIR
        Systems, or that He Exported Them to Russia. These Claims Are Manifestly
        Untrue**

10

11

12      This section of the argument requires a careful explanation of the technical specifications,

13  particularly the resolution numbers, of certain products manufactured by FLIR Systems, and

14  language used by Mr. Morgovsky in an inquiry sent to Janos Technologies. When these matters are

15  fully understood, it becomes clear that the Affiant deliberately misled the issuing magistrate by

16  falsely suggesting that Mr. Morgovsky exported arguably controlled FLIR Thermal Cores to

17  Infratech in Russia. This part of the 2016 affidavits, under the heading **"Infratech Products Contain**

18  

19  **US. Technology Manufactured by FLIR"** (US-000197-199, ¶¶69-78) is where the Affiant

20  regrettably uses deception to conclude in her summary that Naum Morgovsky "was seeking to

21  purchase controlled lenses to integrate with thermal imaging cores made by FLIR Systems." (US-

22  000169, ¶5(d)4).)  As in her treatment of defendants' inquiries to Janos Technologies, the Affiant

23  relies heavily on innocuous conduct of the defendants to make inferences that do not hold up under

24  scrutiny.

25

26

27

1. **In Seeking to Show that the Defendant Exported Controlled FLIR Technology to Russia the Affiant Relies on an E-mail that Does Not Support Her Conclusion.**

In paragraph 69, the Affiant stated:

"Hitek placed several orders for controlled lenses from Janos Technology. An April 12, 2012 email from naummorgovsky@yahoo.com to Janos Technology states: "Pursuant to our telephone conversation, please quote ASAP for immediate delivery 1 to 5 pieces of 50mm, 100mm, and if you can find at least 1 ea. In a size between 50mm and 100mm (like 60, 70, or 75mm) 8-12um lenses for 17um FLIR TAU cores, 320x240 and 640x480."

(US-000197, ¶69.)

In paragraph 71, the affiant stated:

"Infratech's websites, www.infratech.ru/en/produkciya/100/ and http://infratech.ru/en/produkciya/88/, market 30Hz thermal scopes. Two such scopes, Infratech IT - ITWS-310AH and Infratech IT - ITWS- 315AH, are described as thermal scopes with a 640x480 resolution at 30Hz. *The resolution of the thermal scopes is the same measurement which NAUM MORGOVSKY listed in his email to Janos Technology when trying to acquire lenses compatible with FLIR TAU cores.*"

(US-000197, ¶70 [emphasis added].)   In other words, the Affiant is claiming that the resolution cited by Infratech for its' 30 Hz scopes (640 x 480) is the same as that cited by the defendant in his April 12, 2012 e-mail to Janos Technology. From this the Affiant draws the inference, and urges the magistrate to do so, that Mr. Morgovsky unlawfully exported possibly controlled technology – thermal scopes with FLIR TAU cores, to Infratech in Russia.. When carefully examined, the connection drawn by the Affiant does not withstand scrutiny and is actually false and misleading..

Mr. Morgovsky's first e-mail contact with Janos Technology was on April 25, 2012, not on April 12, 2012 as claimed in the affidavits. This e-mail, sent from the naummorgovsky@yahoo.com email account, is only partially quoted in SA's affidavits. Specifically, Mr. Morgovsky's reference to the resolution 640x512 pixels was omitted.  (NM Decl., ¶ 17, Exhibit 5 thereto). As we shall see, this omission is central to an understanding of this issue.

Importantly, there are recognized nominal industry standards for any sensors made by companies worldwide, either for regular cameras or thermal ones, including but not limited to FLIR, which are intended to send images to video displays. Depending on their technological processes, companies may sometimes match these nominal standards for video displays exactly, or may have their own peculiar resolutions which somewhat differ from these nominal industry standards for video displays.

In Naum Morgovsky's April 25, 2012 email, he used generic resolution numbers to describe resolutions of FLIR TAU thermal imaging cores when he requested information from Janos Technology about its lenses compatible with FLIR TAU cores. He referred to 320x240 and 640x480 pixels, because these numbers reflected the nominal industry standards for video displays, which are represented by a line 80, 160, 320, 640, 1080, etc., with 1080 being the nominal standard for, *inter alia*, HD TV monitors. (NM Decl., ¶ 19). The fact that Mr. Morgovsky used the generic numbers representing nominal resolutions of video displays in his inquiry to Janos Technologies in reference to FLIR TAU cores does not mean that FLIR TAU cores, which are not video displays, but sensors designed to send images to standard video displays, are identical to nominal resolutions of video displays which are, inter alia, 160x120, 320x240 (QVGA) and 640x480 (VGA), 1080x960, etc. In fact, as is evident from the table published on the FLIR website listing resolutions of FLIR TAU cores[6],http://www.flir.com/cores/display/?id=54717&pi_ad_id=138565408952&gclid=EAIaIQobCh MI7Mvrvo3t1QIViGF-Ch3GtAgZEAAYASAAEgKPDPD_BwE , do not match the standard resolutions of video displays, but are 336x256 pixels (TAU2 336 - QVGA) and 640x512 pixels (TAU2 640 - VGA), respectively (NM Decl., ¶ 20, Exhibit 6 thereto).

The generic resolutions 320x240 (QVGA) and 640x480 (VGA) pixels that Naum Morgovsky mentioned in his April 25, 2012 email (Exh. 5) to Janos Technology thus do not represent the true

---

[6] In 17mk pixel pitch referenced in the 2016 affidavits.

resolutions of FLIR TAU cores. The Affiant seized on these numbers, however, because they are

consistent with only one of the resolutions of Infratech scopes appearing on the Infratech website,

suggesting to the magistrate that Mr. Morgovsky acquired the FLIR cores about which he inquired to

Janos Technologies, and unlawfully exported them to Infratech for use in its' sights. This, as we have

seen, is clearly erroneous because those generic resolution values are not used in FLIR cores, but

without more it could be merely a careless mistake.

However, undercutting good faith of the affiant is that the other resolution cited by Mr.

Morgovsky in his email to Janos, 640x512 pixels does represent a true resolution of FLIR TAU

cores, but the Affiant omitted this resolution from her description of Mr. Morgovsky's e-mail because

*it does not represent the resolutions referenced by Infratech on its' website.*  In other words, the

generic resolutions 320x240 (QVGA) and 640x480 (VGA) pixels that Naum Morgovsky mentioned

in his April 25, 2012 e-mail do not represent the true resolutions of FLIR cores, but the resolution

640x512 pixels does. Nevertheless, the Affiant conveniently omitted the corresponding part of Naum

Morgovsky's April 25, 2012 email referring to 640x512 pixels obviously because it did not match the

resolution of one of the Infratech sights appearing in paragraph 71 of her affidavits.

All companies that sell thermal imaging scopes worldwide, including defendants' company

and Infratech, offer them with both QVGA and VGA sensors. At all relevant times, on its website,

Infratech displayed its thermal scopes with VGA resolution on the web pages mentioned in paragraph

71 of the affidavit, and its QVGA thermal scopes on its other web page (NM Decl., ¶ 23-25, Exhibits

7-9 thereto). As is evident from **Exhibits 7-9** the resolutions of both VGA and QVGA thermal scopes

offered by Infratech do not match the resolutions of both VGA and QVGA FLIR TAU cores[7],

contrary to assertions made by the Affiant.

----

[7]  A thermal core is a complete modular assembly for a thermal device, including electronics
with firmware, incorporating a thermal sensor.

In the real world, Infratech has utilized in its thermal imaging products thermal imaging "cores" or, as it calls them "modules" made for it in Russia and China, based on thermal imaging sensors made by ULIS, a French company. ULIS sensors are made with amorphous silicon technology while FLIR TAU sensors are made with vanadium oxide technology. It is widely considered in the industry that sensors made with vanadium oxide technology have higher performance than those made with amorphous silicone technology utilized by ULIS, specifically, having less noise from technical standpoint and thus sharper image, as is evident from one of many articles published on the Internet in that regard. (NM Decl., ¶ 24, Exhibit 10 thereto).

The resolution shown on the Infratech website for its other thermal scopes utilizing lower resolution QVGA cores, Infratech models IT-1TWS-615AH and IT-1TWS-615A, is 384x288 pixels (Exh. 7) which does not match the resolution used in Naum Morgovsky's inquiry to Janos Technology where he used the generic number of 320x340 pixels. ULIS sensors have resolutions of 640x480 pixels (VGA) and 384x288 pixels (QVGA), respectively (NM Decl., ¶ 26, Exhibit 11 thereto).

As a result, had SA cared to present a truthful and accurate presentation to the magistrate, it would have been impossible for her to conclude in her summary that Naum Morgovsky "was seeking to purchase controlled lenses to integrate with thermal imaging cores made by FLIR Systems." (US-000169, ¶5(d)4.)  The Affiant could not honestly match the resolution of Infratech IT-1TWS-615AH and IT-1TWS-615A scopes with either true resolution of FLIR TAU cores, 336x256 pixels, or with the generic resolution of 320x240 pixels appearing in Naum Morgovsky's inquiry to Janos Technology without revealing that Infratech was, in fact, not utilizing FLIR TAU cores.

2.    **The Affiant Omitted Material Information and Provided a False Conclusion to Support the Contention that Infratech was Using FLIR TAU Cores Providing a False Inference that Such Cores were Furnished by Defendants**

The inference that the Affiant was engaged in purposeful deception is supported by the fact that she omitted a reference to the Infratech's thermal scopes utilizing ULIS 384x288 pixels QVGA sensors, which would reveal that Infratech is not using FLIR TAU cores, especially that that resolution did not match the resolution of 320x240 pixels mentioned in Naum Morgovsky's April 25, 2012 email to Janos Technology. SA included in her affidavits only a reference to the Infratech thermal scopes utilizing the ULIS VGA sensors, because the resolution of the ULIS VGA sensors accidently coincided with the generic number of 640x480 pixels that Naum Morgovsky used in his April 25, 2012 email to Janos Technology (Exh. 5). The Affiant used this coincidence to falsely demonstrate to the magistrate that Infratech was using FLIR TAU cores, undoubtedly misleading the magistrate into believing that Naum Morgovsky supplied Infratech with FLIR TAU cores which the Affiant described as a FLIR "sensitive cores" in her summary. (US-000169, ¶5(d)4). Additionally, SA excised from Naum Morgovsky's April 25, 2012 email to Janos Technology the resolution 640x512 pixels, the true resolution of VGA FLIR TAU cores and the true resolutions of both, QVGA and VGA FLIR TAU cores appearing in the FLIR specifications.

Again, in the sweeping conclusion she makes in her summary, the Affiant claimed that Naum Morgovsky sought to purchase from Janos Technology "controlled lenses to integrate with thermal imaging cores made by FLIR Systems", stating that "controlled sophisticated lenses combined with the FLIR imaging core are a controlled night vision technology" (US-000169, ¶5(d)4)), which, taken together with the alleged uncorroborated claim by the CS that Infratech used FLIR TAU cores, was undoubtedly meant to create an inference that Naum Morgovsky supplied such "controlled night vision technology" to Infratech. Yet, the claim that Naum Morgovsky sought to purchase from Janos Technology "controlled lenses" was simply untrue. In his April 25, 2012 email to Janos Technology

(Exh. 5), and in all other communications with Janos Technology where Naum Morgovsky was seeking lenses from it, he never sought "controlled lenses."

When Naum Morgovsky wrote the April 25, 2012 email (Exh. 5), which was his first contact with Janos, he did not know that Janos offered controlled lenses. Naum Morgovsky was only seeking loose lenses compatible with FLIR TAU cores[8] and not lens assemblies. It so happened that Janos offered to Naum Morgovsky lenses which its compliance department internally designated as ITAR-controlled by mere virtue of Janos Technology using them in lens assemblies designed for use in weapon sights. In any event, Naum Morgovsky did *not* inform Janos Technology in his April 25, 2012 email that he contemplated to use its lenses in weapon sights (NM Decl., ¶ 28).

It turned out that Janos Technology did not offer loose lenses that Naum Morgovsky was seeking and only offered assembled objective lens it sold for a weapon sight and because of that considered it mil-spec. After lengthy negotiations in response to his April 25, 2012 email, Janos Technology agreed to sell to Naum Morgovsky loose lenses, which it deemed ITAR-controlled only because it used them in an objective lens assembly intended to be used in weapon sights, though using a lens in a weapon sight does not automatically make it controlled or mil-spec. (NM Decl., ¶ 34).

After Naum Morgovsky discovered that Janos Technology considered the lenses it offered to him ITAR-controlled, he sent an email informing Janos Technology that he was not interested in controlled or mil-spec lenses and preferred non-controlled lenses for greater flexibility in consideration of future exports. He then he doggedly pursued Janos Technology for a long period of time requesting it to provide him with non-controlled lenses (NM Decl., ¶¶ 27-38, Exhibits 12-23

---

[8] Lenses compatible with FLIR TAU cores are compatible with substantially all other similar cores available on the world market, including but not limited to cores utilizing ULIS sensors and sensors made in China.

thereto).  All of these communications were in the possession of SA when she drafted the 2016 affidavits by virtue of the successful execution of the 2015 Warrant from Naum Morgovsky's Yahoo email accounts[9].  None of these e-mails, firmly establishing Mr. Morgovsky's efforts *not* to acquire controlled ITAR controlled lenses were included in the search warrant affidavits or presented to the magistrate, while SA misrepresented to the magistrate that Mr. Morgovsky was seeking "controlled lenses."

From that point on, Naum Morgovsky purchased from Janos Technology predominately those lenses developed for security camera applications, which Janos Technology considered "Non-ITAR", and the total quantity of those non-controlled lenses purchased from Janos Technology significantly exceeded the quantities of lenses Naum Morgovsky purchased which Janos Technologies considered ITAR-controlled by mere virtue of them being used in lens assemblies designed for weapon sights. Hence, SA assertion in her summary of probable cause in her affidavit that Naum Morgovsky "was seeking to purchase controlled lenses" from Janos Technology (US-000169, ¶5(d)4)) was false and actually contradicting by the totality of the evidence she had in her possession.

The Affiant also failed to disclose that FLIR offered FLIR TAU cores in Russia through its exclusive distributor for Russia, Lahoux Optics based in the Netherlands, on its Russian language website(s) (NM Decl., ¶ 39-41, Exhibit 24 thereto).  The Affiant also failed to disclose that Armasight, and Archer, with Armasight owned and Archer actively sponsored by FLIR, openly offer in Russia their thermal imaging weapon sights controlled for export utilizing FLIR TAU cores (NM Decl., ¶ 42). There are many companies in Russia selling them, and the corresponding voluminous documentation will be provided at the hearing on the motion.

---

[9] Based on the allegations in the 2015 affidavit and SA's communications including references to
Mr. Morgovsky's email, it is inevitable that she as well had access to Mr. Morgovsky's subsequent
emails to Janos when she drafted the 2015 affidavit seeking Mr. Morgovsky's emails.

It is thus manifestly misleading for the Affiant to implicate Naum Morgovsky, especially

considering his very few exports to Infratech which, according to the Affiant, ended in 2014, in

export activities in connection with FLIR TAU products while Infratech does not utilize FLIR TAU

cores in its products, but utilizes lower performance thermal cores based on ULIS thermal sensors

and competes in Russia with many other companies that, in fact, utilize FLIR TAU cores having

higher performance than thermal cores based on ULIS thermal sensors utilized by Infratech. The

mere fact that the Affiant failed to disclose that FLIR TAU cores and devices utilizing FLIR TAU

cores are available in Russia and even offered by the exclusive FLIR distributor in Russia, has

created an impression that Naum Morgovsky was the only one capable of exporting FLIR TAU cores

to Russia or that FLIR TAU cores are impossible to obtain in Russia without Mr. Morgovsky's

involvement.

### 3.   The Two Page Document Typed in Russian Obtained Illegally from Naum Morgovsky's Trash Was Also Materially Misconstrued by the Affiant in Support of a False Claim that Infratech Utilized Thermal Imaging Cores Made by FLIR Systems

In paragraph 72, the Affiant stated:

> "On or about April 15, 2014, I conducted a trash cover on the home of NAUM MORGOVSKY and IRINA MORGOVSKY, at 1423 Avondale Road, Hillsborough, California. I found a two page document typed in Russian, the first sentence of which read, "Root module with dimensions 38x38 unifies thermal imaging module with FLIR module."

(US-000197, ¶72.)

In that paragraph, the Affiant is obviously presenting evidence of Infratech's use of FLIR

cores, which, in turn, is meant to suggest that Naum Morgovsky illegally exported "sensitive" FLIR

cores to Infratech in Russia. Setting aside the illegality of conducting a trash cover on defendants'

residence without a search warrant. The Affiant stated that the document found in the trash consisted

of two pages, which is untrue. As is evident from the discovery provided by the government, the

document consists of four pages and even then is incomplete (NM Decl., ¶ 43-44, Exhibits 27-28 thereto).

While the Affiant stated that the document was "typed in Russian," the Affiant quoted the first sentence of the second page in English without disclosing the method of translation. Based on the statement in paragraph 31 of the 2016 affidavits (US-000180, ¶31) that the Affiant conducted "machine translation" of the Infratech website, it is logical to conclude that translation of this document was also done through "machine translation".

Thus, it is obvious from the greeting appearing in the document which translates "Good morning, Naum!!!" that the text quoted in paragraph 72 of the 2016 affidavits cannot be "the first sentence", but appears on the second page.  More importantly, the translation is inaccurate and misleading by translating the Russian word which correctly translates as "standardized" or "made interchangeable" as "unifies" which means "combines." As a result, the affidavits would lead the reader to believe that Infratech combined some kind of 38x38 mm "module" with a FLIR "module" instead of being made interchangeable with FLIR module, which would properly suggest that Infratech was not combining FLIR core with anything (NM Decl., ¶ 43-44, Exh. 27-28 thereto).

The translation of the following sentence clearly stated that it "would allow to use a new module in existing designs intended to utilize FLIR."  Thus, proper translation of the true first page and of the first two pages clearly indicates that this document represented a review of by Infratech of photographs provided by ATN[10] of a new core designed for in the Ukraine and China, and this document conveys recommendations to ATN on how it can improve the physical configuration of the new core by making it more compact and interchangeable with FLIR cores previously used by ATN in its thermal imaging products.  In fact, on page two of the document, the same page described by the Affiant as the first page, the author makes multiple recommendations and is asking eight

---

[10] ATN is a U.S. company whose CEO is Naum Morgovsky's stepson.

questions clearly indicating that the document represents a set of recommendations to ATN in improving the design of its new core. The third page of the document contains photographs of the new core taken from all sides, and the fourth page contains a drawing of a more compact configuration proposed by the writer, who, as is clear from the text in the first two pages, is a competent engineer (NM Decl., ¶ 43-44, Exhibits 27-28 thereto). If the Affiant did not quote only one incorrectly translated sentence but the entire document, it would be manifestly clear even if said sentence was incorrectly translated, that Infratech was not combining any "module" with a FLIR "module". Accordingly, the Affiant's use of glaringly incomplete excerpt from said document which was also incorrectly translated, represents material representations and omissions made with reckless disregard to the truth.

### 4.   The Purported Erased Serial Number is Implausibly Attributed to Defendant

As to the part of the 2016 affidavits containing the uncorroborated statement provided by the CS about the "scratched part" of the FLIR TAU core "where the serial number was erased", as somehow the responsibility of the defendant, the contention is wholly lacking.  Serial numbers are affixed by FLIR to its TAU cores with tiny paper adhesive labels, which can be easily removed with a fingernail without scratching the metal surface of the core where the label is affixed. It defies common sense that either Naum Morgovsky or Infratech intimately familiar with complex technical aspects of thermal imaging devices would be scratching off small paper labels with a sharp object when they could do it with a fingernail, if they decided to do so with ulterior motives (NM Decl., ¶ 45).

### G.   The Affidavit for the Second Search Warrant Contains False Representations About Defendants Shipments to Infratech

In paragraph 79 of the 2016 affidavit (US-000200), the Affiant stated that "Vision Tech's SED's identify the following exports . . . ", followed by a table listing exports made between

4/30/2010 and 3/6/2014, with three shipments identified only as "Optical parts and accessories,", two shipments as "Parts for binoculars," one shipment as "Collimator, Laser engraving cutting machine, laser printer, LCD monitor, Infrared, Security Camera", one shipment as "Housing assembly (parts and accessories for photographic cameras)", and one shipment as "LCD display." These shipments are large in size, a fact easily determinable and omitted from the affidavits. The omission is material, particularly since SA led the magistrate to believe that these shipments were small in size.

Indeed, the Affiant stated in the following paragraph that, based on her training and experience, as follows:

> "[O]ne of the techniques used by persons who illegally export USML articles is to prepare false documents for *small shipments* which they export through commercial courier services *such as FedEx and UPS.* The combination of false misleading or generic descriptions of the merchandise *small shipment size* and the speed and volume of merchandise moving through the courier services increases the likelihood that illegal shipments will avoid scrutiny by export enforcement authorities. Further in the event that a parcel is inspected it is often the case that the misleading or generic descriptions are effective in disguising many complex and not immediately identifiable USML or CCL articles recognizable as controlled items".

(US-000201, ¶80 [emphasis added].)

As the Affiant stated, Shippers Export Declarations (SEDs) pertaining to all of the shipments at issue were filed which were required for goods valued over $2,500, demonstrating that values of all of them exceeded $2,500 per shipment. An SED is an official form (Form 7525-V) promulgated by the U.S. Department of Commerce – Economics and Statistics Administration – U.S Census Bureau – Bureau of Export Administration. The SED form requires the shipping company to place specific information on the form, among other things, shipping weight and value in U.S. dollars. (*Id.*) The filing of SED in hard copy or electronically through AES is required not only for defense articles but for any non-defense articles as long they are not deemed "small" shipments and are valued at over $2,500. (See 15 CFR 758.1(b)(3) and 15 CFR 30.55(h)(1)). This is an important distinction not disclosed by the affiant.

Furthermore, by the time the Affiant submitted her 2016 affidavits, she had access to the commercial invoices and/or packing lists which are included with all shipments regardless of their value and thus undoubtedly had access to information demonstrating that all of the shipments listed in the table (US-000200, ¶79) were not small shipments and that none of them were shipped through FedEx or UPS, but most or all of them were shipped by commercial airlines through freight forwarders, as is required to be shown on SEDs and their electronic equivalents (AES)[11].  The Affiant failed to disclose this information.  The omissions are material.

Moreover, commercial invoices and some packing lists pertaining to most of these shipments were included in Naum Morgovsky's emails seized pursuant to the 2015 search warrant from Yahoo and, if the Affiant attached them to the 2016 affidavits or listed their contents, it would be manifestly apparent that these shipments were highly unlikely to include controlled items described in the affidavits.

The SEDs or rather their electronic equivalents AESs all showed that the shipments listed in paragraph 79 of the affidavits were by no means small shipments, with the following weights and values which are easily derived from the airway bills and other available information for four out of

---

[11]     The Automated Export System (AES) is the electronic way to file the Shipper's Export Declaration (SED) and the ocean manifest information directly to U.S. Customs. Electronic Export Information (EEI) filing is generally required by the U.S. Customs and Border Protection for U.S. exports that contain a single commodity's value exceeding $2,500.00. All EEI information is provided to the U.S. Census Bureau and is used for export compliance and governmental reporting.  The EEI is filed electronically with the U.S. Customs and Border Protection (ACE), either by the sender independently, or by the shipper on the sender's behalf. Up until November 30, 2015, an exporter could file the EEI electronically to the AES using the AESDirect website, the AESPCLink software, or other AES-compatible applications. However, after the 2015 launch of the Automated Commercial Environment (ACE), all legacy AESDirect and other users must register and submit the EEI to ACE. After an EEI/SED is successfully filed and processed, the shipper receives an Internal Transaction Number (ITN) to put on the shipping documents, as a confirmation to any government agent inspecting the cargo prior to departure.  In most cases a shipper can also authorize its freight forwarder, courier company, or other third-party logistics agent to file the EEI on its behalf.

eight shipments, including the shipment made by Leila Freeman as described above, for which the Affiant had access to the information because it was available from my Yahoo email, as follows:

| Shipment Date | Weight (lb) | Value ($) |
|---|---|---|
| 12/16/2010 | 290 | $6,407 |
| 10/09/2013 | 99 | $3,975 |
| 01/17/2014 | 559.9 | $106,025 |
| 01/22/2014 | 419.3 | $8,654 |

(NM Decl. ¶ 48). The government failed to include copies of the SEDs or AESs referenced in paragraph 79 with the discovery.

Nevertheless, the Affiant failed to include in her affidavits any of the commercial invoices and/or packing lists which listed with particularity every item in the shipments including its quantity, description, and value, with weights and dimensions shown in the available packing lists. Even FedEx and UPS small shipments always include these figures. Had the Affiant included this information from the commercial invoices and/or packing lists, it would be manifestly clear that these shipments could in no way be considered small shipments which completely undermines the Affiant's "experience and training" assertion that a common method of shipping controlled products surreptitiously is through the use of "small shipments" which was used to persuade the magistrate to reasonably conclude that the shipments were "small shipments" likely to conceal controlled items. These are deliberate material omissions and half-truths intended to deceive or at least recklessly indifferent to the truth.

Indeed, the Affiant used the list of shipments and her representations in paragraphs 79-80 of her affidavits to create the false impression that defendants were engaged in a well established method of using "small shipments" to evade export controls when the opposite was the case based on the facts that were known or readily available to the Affiant. The misdirection is egregious, given that the content of the commercial invoices and/or packing lists disclose the non-controlled nature of those shipments to Russia, not the "misleading or generic descriptions" as the Affiant characterized was the usual case with small shipments.

Furthermore, even the characterization of the defendants' shipping information as constituting Shippers Export Declarations (SEDs) was itself misleading because no SEDs were filed by the defendants with regard to the shipments identified by her, but only their electronic equivalents filed through the AES by defendants' shipping agents, licensed freight forwarders. Indeed, the Affiant hints at this in paragraph 79 (the DOC "conducted a check *related* to SED filings and *other records for Hitek or Visiontech*" [US-000200, ¶79 (emphasis added)], but clearly chose to attribute the shipping information as SEDs authored by the defendants ("Vision Tech's SEDs" [US-000200, ¶79].)

The misrepresentation is material since it implies, at the very least, that it was the defendants who filled out the SEDs which were, in fact, AESs. Indeed, the Affiant failed to disclose to the magistrate that all such electronic filings through the AES were made not by defendants but by the respective freight forwarders who filed them on behalf of the defendants and, due to the automated nature of the AES, the defendants were not and could not be attributed to placing the generic nature of the descriptions in these filings. Affiant had at her disposal the commercial invoices and/or packing lists which contain very definitive descriptions of the products in them[12] which revealed sufficiently detailed information to take them out of the "generic" description.

_____

[12] See, inter alia, copies of commercial invoices included by Defendants with some of the shipments listed in paragraph 79 of the Affidavit for 2nd Search Warrant attached as Exhibits __ through __

Thus, it is curious that the Affiant relied on her "training and experience" to describe a common method and means of transmitting false shipment information when, those who know the basics of the AES, would know that, as a rule, when electronic equivalents of SEDs are filed by the freight forwarders, they customarily use generic descriptions, such as "Optical parts and accessories," "Parts for binoculars," and the like, because the Schedule B of the universal Harmonized Tariff Schedule (HTS) does not contain a harmonized code for each article, but contains mostly catch-all generalized harmonized codes, which results in the freight forwarders using generic descriptions for the entire shipments in their electronic filings rather than specific descriptions of each item.

As a result, when the Affiant included the list of shipments to Russia in paragraph 79 of her affidavits using only generic descriptions of the exported items, she excluded the specific descriptions made by defendants in pertinent commercial invoices and packing lists.  Again, the Affiant appears to have compounded the deceit outlined above about "small shipments" by falsely attributing to defendants authorship of the "generic descriptions" when that simply was not the case. Evidence was at her disposal that would have disabused her of those representations to the magistrate.

In total, the Affiant appears to have deliberately omitted material information pertaining to specific content of the shipments in question, characterized the shipments as "small shipment size" when the contrary was true, and falsely attributed defendants' authorship to SEDs when AESs were used in their stead which were authored by freight forwarders.  The purpose of so doing was to mislead the magistrate of the existence of suspicious activity where none existed.  This effort was clearly a building block by the Affiant to paint a picture of probable cause of unlawful exports.

The same is true of the shipments listed in paragraph 82 of the affidavit (US-000201-202).

The Affiant's reliance on email correspondence from Naum Morgovsky (US-000202-203, ¶83) only demonstrates that there is confusion in the industry of what conduct constitutes violations of the export laws. It demonstrates that due to such confusion United States companies are paranoid of being harassed by the government and possibly prosecuted for even such innocuous acts as sending emails with basic information which does not even represent transfer of technology to their US customers or associates at their US-based email addresses while these customers or associates are on a cruise overseas. Presenting this chain of emails, the Affiant failed to include the first email in the chain sent by Naum Morgovsky to Bill Grube, which would explain the totally innocuous nature of his request (NM Decl., ¶ 32). There can be no doubt that the omission of the first and the only email material to that exchange represented a material omission.

**H.    The Affidavit for the Second Search Warrant Contains False Representations That Defendant Attempted to Deceive Customs Officials**

In paragraph 92 of the 2016 affidavits, under the heading "Use of Freight Forwarder to Ship Boxes to Infratech" (US-000205-206), the Affiant made the following statement regarding email communications between Naum Morgovsky and American Royal International, Naum Morgovsky's freight forwarder and customs broker:

> "The second attachment was a two-page shipping document which showed the shipper to be VisonTech, the consignee was listed as TPK ARGUS NY, Kosinkaya Street7 Moscow, 111538, Russia (the address used by Infratech). The document indicated that 25 pieces were sent and the description for the goods stated, "parts of binoculars." Under license details it stated no license required and the second page was stamped in bold with, "DO NOT SUBMIT TO CUSTOMS." American Royal International was listed as the freight forwarder on the document".

(US-000206, ¶92.)

This statement is materially misleading. As is evident from NM Decl., the affiant omitted from the Affidavit for 2nd Search Warrant that on January 16, 2014, KC Khorrami, the principal of American Royal International, sent to Naum Morgovsky the following email: "As I was filling the

AES, it seems like the laser engraving machine and the collimator are controlled items for Russia. Do

have the ECCN for these items?", and that on January 20, 2014 Naum Morgovsky responded as

follows:

> "I have checked with SORL, the manufacturer of the off-axis collimator, and other multiple sources, as well as with multiple sources pertaining to the laser engravers (ours is imported from China), and confirmed that there are no export restrictions on either device. I was told that EAR99 is to be used for the ECCN numbers for both of them. Please file the export declaration accordingly".

(NM Decl., ¶ 53-54, Exh. 30 thereto).

The classification of EAR99 in the EAR, Department of Commerce Regulations, means "no

license required."  The above email from Naum Morgovsky demonstrates that he confirmed with the

manufacturers of the items that no license was required for their export. SA had at her disposal all of

Naum Morgovsky's emails from his email account naummorgoysky@yahoo.com by virtue of the

successful execution of the 2015 warrant from Naum Morgovsky's Yahoo email accounts.  As a

material omission, she did not state that Naum Morgovsky was wrong and that the export was

unlawful. The description of the items provided by Naum Morgovsky was very specific and in no

way misleading and could be very easily confirmed, which the Affiant must have confirmed before

including said accusatory statement in the 2016 affidavits or, if not, was recklessly indifferent to the

truth of the matter she was representing to the magistrate.

As the Affiant's use of "Use of Freight Forwarder to Ship Boxes to Infratech" as the

subheading to this portion of her affidavit makes undisputable, she was aware that the AES was filed

by the freight forwarder and licensed customs broker, not Naum Morgovsky, and there was no

communication that Naum Morgovsky requested the freight forwarder to classify the items as "parts

of binoculars."  It is clear from the communication from the freight forwarder that he did not have

"the ECCN for these items" and that he used his discretion to arbitrarily assign the classification as

"parts of binoculars" into the AES without a request from Naum Morgovsky.

Consequently, the statement "no license required" was entirely proper and not nefarious as the Affiant suggests. The Affiant also omitted from the 2016 affidavits that the second page stamped in bold with "DO NOT SUBMIT TO CUSTOMS," as is evident from NM Decl., ¶ 56, Exh. 31 thereto, was a copy of the AES which the freight forwarder submitted electronically to the United States Customs. Thus, his notation for his employees "DO NOT SUBMIT TO CUSTOMS" was entirely proper and, in fact, required because the AES was already filed electronically.

The Affiant's deliberate failure to identify said document as a copy of the AES which was already submitted to customs electronically and, in fact, was not to be submitted to customs in hard copy, was undeniably misleading to the magistrate who could only conclude from the information provided by the Affiant that Naum Morgovsky intended to mislead the United States Customs by withholding an export document from being submitted to the United States Customs.

The deliberate conduct by the Affiant described above thus constituted active acts of material omissions and misrepresentations made with reckless disregard to the truth with intent to mislead the magistrate.

## I.    The Affidavit for the Second Search Warrant Suggests that Defendants Routed Controlled Products from China to Russia with no Evidentiary Support

In paragraph 93 of the Affidavit for 2nd Search Warrant under the heading "Morgovsky Directs Chinese Manufacturing Companies To Ship Goods to Infratech," the affiant stated in pertinent part:

> "Email communications show NAUM MORGOVSKY placing orders with companies in China and directing those companies to send the shipments to Russia. On or about March 9, 2014 NAUM MORGOVSKY sent an email to Zhou Qingchun of Norin Night Vision. In the email NAUM MORGOVSKY stated, "Dear Zhou, please send the 300 sets of the urgent parts you promise to send tomorrow, on March 11 as follows: 1. 200 sets to Hitek International at the same address in the United States as you sent all previous shipments by DHL Express ... 2. 100 sets to it freight forwarder in China who will then take them to Moscow by a truck which is leaving for Moscow on Thursday, March 13".

(US-000206-207, ¶93.)

In paragraph 94 of the 2016 affidavits, the Affiant stated in pertinent part: "Another company NAUM MORGOVSKY ordered manufactured parts from in China was called Wuhan Aten Optics and Electronics . . . . The components being shipped consisted of housing units, brackets, frames, diopter rings, threaded rings, screws, washers, and screens". (US-000207, ¶94).

The only evidence presented in paragraphs 93-94 was that Naum Morgovsky purchased innocuous parts from China and had some of them shipped to the United States for use in his own domestically sold products in the United States and some of them sold to Infratech in Russia. The Affiant did not indicate in any way that those parts were defense articles subject to ITAR which required Naum Morgovsky to obtain an export license for shipping them to Russia from China and/or to obtain permission from the United States Department of State to import them to the United States. On the contrary, said evidence further indicates that Naum Morgovsky sold his own products in the United States and neither he nor Infratech needed him to export them to Russia. It also explains some payments received by defendants from abroad for the items sold to Russia from entities in Russia or connected to Russia.  Said evidence provides no support to finding probable cause for the issuance of search warrants and could only have been included to unduly influence the magistrate's perception.

> **J.** **The March 2016 and all Other "Trash Pull[s]" Were Illegal Searches,**
> **and the Products Therefrom Cannot be Considered to Establish Probable**
> **Cause**

In paragraph 134 of the affidavits, the Affiant stated in pertinent part:

> "In March of 2016, a trash pull was conducted at the residence of Naum
> Morgovsky and Irina Morgovsky located at 1423 Avondale Road, in
> Hillsborough, California. Two of the items retrieved from the trash receptacle
> were SafKeep Storage payment receipts for units 4001 and 4004 addressed to
> the customer Edward A. Joseph, 4900 Fulton Street, #110, San Francisco,
> California; [r]eview of records obtained from SafKeep Storage located at 1650
> Winton Ave, in Hayward, California show storage unit 4001 as still being
> rented by the tenant EdwardA. Joseph. Storage unit 4004 was vacated by the
> tenant in August of2015. Additional records provided by SafKeep Storage
> included photo copy of a photo ID badge from American General Group for

Edward A Joseph. The hire date listed on the badge was September 6, 1993. The photo was black and white and the photo quality was poor. The physical description for Edward A. Joseph was 5'5"143 pounds with Black hair and brown eyes. Naum Morgovsky' California driver's license lists him as 5'6", 140 pounds with Black hair and brown eyes."

In *California v. Greenwood*, 486 U.S. 35, 40-42 (1988), the Supreme Court held that trash was required to be abandoned for collection outside the curtilage of the home in order for an officer's search through it to be constitutional, see also *United States v. Long*, 176 F.3d 1304 (10th Cir. 1999). In *Mendez v. County of Los Angeles*, 815 F.3d 1178, 1193 (9th Cir. 2016), the Court defined "curtilage" as follows:

> "Curtilage" is the area immediately adjacent to a home. Four factors used to determine whether an area lies within the curtilage are "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). The general rule is that the curtilage includes all outbuildings used in connection with a residence, such as garages, sheds, and barns connected with and in close vicinity of the residence. *Id.* at 307-08. A "backyard" — a small, enclosed yard adjacent to a home in a residential neighborhood — is "unquestionably such a 'clearly marked' area 'to which the activity of home life extends.'" *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010) (citation omitted)."

Based on the applicable statutory and case law, the Court can only evaluate the affidavit based on the evidence presented within the four corners of the affidavit in support of a search warrant. See *United States v. Grandstaff*, 813 F.2d 1353 (9th Cir. 1987) stating in pertinent part:

> "We are in as good a position as was the district court to assess the legal sufficiency of the redacted affidavit. See United States v. Anderson, 453 F.2d 174, 175 (9th Cir. 1971) ("all data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath"); United States v. Rubio, 727 F.2d 786, 795 (9th Cir. 1983) (following Anderson). This assessment involves an application of the probable cause standard that is governed by McConney. See United States v. McConney, 728 F.2d at 1203, cert. denied, 469 U.S. 824, 83 L. Ed. 2d 46, 105 S. Ct. 101 (1984). Hence de novo review of the district court's decision is appropriate."

The Affiant did not show in paragraph 134 that the trash was abandoned for collection outside the curtilage of defendants' residence. Consequently, such trash cover required a search warrant. Affiant did not indicate that a search warrant was obtained to conduct the "trash pull . . . at the

residence of Naum Morgovsky and Irina Morgovsky" in March of 2016. Consequently, based on the evidence contained within the four corners of the 2016 affidavits, the "trash pull" at defendant's residence was illegal and as such, paragraph 134 must be stricken and any evidence that led to the search of defendants' storage unit discovered as the result of the illegal "trash pull" and any evidence seized from the storage unit must be suppressed and any and all property of defendants seized from the storage unit must be returned to defendants.

II.     **Material False Statements and Omissions, Described Above, Undermine the Probable Cause Showing Attempted in the Affidavit, Requiring that a *Franks* Hearing be Held and the Motion be Granted**

The affiant leaves out of her affidavit an obvious, but nevertheless material, fact that defendant has for years been engaged in domestic sales of night vision products, including controlled products, which do not require export licenses when sold domestically.  This material omission along with a gross misstatement that Mr. Morgovsky's email communications indicates that he was seeking to purchase controlled lenses "to integrate" with thermal imaging cores made by FLIR Systems, makes her affidavit extremely misleading. (**See argument at pages 6-6; 21-32**) Indeed, this latter contention is oxymoronic since lenses that are controlled need not be "integrated" with thermal imaging cores to be considered "a controlled night vision technology."  The lenses themselves remain controlled whether or not they are combined with FLIR thermal imaging cores which may, or may not, be controlled themselves.

The numerous other false statements and omissions detailed above require that the Court set a Franks hearing and, upon taking evidence hold that these actions were intentional or reckless and material, and excise the offending allegations from the affidavit and restore information that was wrongfully omitted.

A. The omission of information apparent in the Yahoo emails seized as a result of the 2015 Yahoo search warrant, that Mr. Morgovsky did not purchase night vision equipment from

PRC based businesses, but rather purchased generic parts which could be used for any kind of digital camera or scope. ( argument, p.8)

B.  The omission of material facts in the government's possession or readily available to the government  concerning the December 7, 2010  prepayment for the purchase of image intensifier tubes from Tactical Light Solutions, and a December 16, 2010 shipment to Infratech in Russia, which the affiant wrongfully suggested contained these tubes.

(**Argument, pp. 14-15**) These omitted facts were (a) that there were shipping documents and commercial invoices available to the affiant, from defendant's seized emails and other sources, which described the weight and contents of the shipment, all inconsistent with the affiant's claim that this was among the "small" shipments used by the defendants to disguise unlawful transfers of controlled equipment; (b) that the generic descriptions affixed to the shipments, which the affiant found suspicious for their failure to assign detailed descriptions of the contents, were supplied, in accordance with custom, not by the shipper but by the Freight Forwarder engaged by the shipper to facilitate the shipment; The commercial invoices prepared by the shipper, to which the affiant had immediate access, contained precise descriptions of the items shipped, but the electronic document filed by the freight forwarder ( the electronic counterpart of a Shippers Export Declaration (SED),  customarily used brief generic language; the fact, known by the affiant, (c) that the Morgovskys were not even in the country when the December 16, 2010 shipment went out, having flown to London on December 12, 2016, as a result of which, as the affiant knew, one Leila Freeman ( Mark Migdal's secretary  ) sent this shipment to the Freight Forwarder (Auto Export Group) on December 16, and  (d) the Morgovskys simply did not have time to pick up the intensifier tubes from Tactical Light Solutions, given the delay in that company actually receiving the

items from its supplier for pick up, before they boarded their flight to London; all this was known to the affiant.

C.  The affiant sought to mislead the magistrate judge into believing that Mr. Morgovsky was seeking to purchase controlled lenses to integrate with thermal imaging cores made by FLIR Systems, and that he illegally exported such technology to Infratech in Russia. ( **Argument, pp. 22-26)**

D.  The affiant omitted material information in an effort to support her contention that Infratech was using FLIR TAU cores unlawfully exported by the defendants. This effort is detailed at **pp. 26-30 of the argument.**  It is apparent that the affiant carefully avoided providing the magistrate judge with information showing that Infratech was definitely not using FLIR TAU cores, and that it was not using items unlawfully exported by Mr. Morgovsky.

E.  The affiant mischaracterizes and incorrectly translates part of a document seized from the Morgovsky's trash at their residence (**Argument, pp30-32)** When the translation is corrected and the entire document (not merely the two pages addressed by the affiant) it is clear that the nefarious inferences promoted to the magistrate judge are without merit.

F.  The affiant wrongfully suggests that the defendant "erased" the serial number on a purported FLIR TAU core by scratching it out.  She omits reference to the fact that labels are attached to these products with tiny adhesive paper labels that can be easily removed without "scratching" the product in any way. ( **Argument, p. 32)**

G.  The affiant made materially false statements about the defendant's shipments to Russia, suggesting that these were "small shipments" using courier services such as FedEx or UPS and describing the items in vague and general terms to conceal the controlled nature of the goods shipped. ( **Argument, pp. 32-38)** As explained in the argument ( p. 34, n.11) the Automated Export System (AES) is the electronic way to file the Shippers Export Declaration

47

(SED) but it is filed by the freight forwarder and customarily uses general or generic language to describe the nature of the shipment. That is what transpired here. The affiant had access to the commercial invoices and packing lists that were more descriptive, and demonstrated that the shipments were not "small" nor were they shipped using FedEx or UPS. The affiant failed to inform the magistrate judge of these material facts.

H. The affidavit contains false representations that the defendant tried to deceive Customs officials. **(Argument, pp. 38-40)**

**III. Without the Requisite Probable Cause, the Warrants for Morgovskys' Residence and Storage Unit Were Nothing but an Illegal Fishing Expedition**

A "nexus," or connection, must be shown between the items in question and criminal behavior to justify a search under the Fourth Amendment. See *Warden v. Hayden*, 387 U.S. 294, 307 (1967). Without such nexus, the warrants were purely gratuitous and totally unsupported by probable cause. Accordingly, there can be only one reasonable conclusion, that these warrants constituted an unlawful "fishing expedition" As Justice Holmes observed, conduct of this sort is fundamentally anathema to the letter and spirit of the Fourth Amendment. *FTC v. Am. Tobacco Co.*, 264 U.S. 298 (1924). He stated:

> "Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire, and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime.... It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up. *Id.* (internal citations omitted)."

Put simply, the Fourth Amendment does not authorize the issuance of warrants to conduct fishing expeditions to find evidence that could assist officers in prosecuting suspects. See cf. *Maryland v. Garrison*, 480 U.S. 79, 85.

The wallet seized from the storage unit with all of the identification documents it contained, including but not limited to the passport subject to Count 6 of the Superseding Indictment must be suppressed and returned to Irina Morgovsky.  The affidavits contained no probable cause for this seizure.

## IV.   The Warrants For The Morgovskys' Residence and Storage Unit Were Issued Without Probable Cause As To The Places To Be Searched

In *Gates, supra.,* at 238, the Supreme Court held that law enforcement must convince a court that there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place.

In *Nathanson v. United States,* 290 U.S. 41 (1933) the Supreme Court stated:

> "It is argued that searches for goods smuggled into the United States in fraud of the revenue, based upon affidavits of suspicion or belief, have been sustained from the earliest times; that this practice was authorized by the Revenue Act of July 31, 1789, 1 Stat. 43, also subsequent like enactments. But we think nothing in these statutes indicates that a warrant to search a private dwelling may rest upon mere affirmance of suspicion or belief without disclosure of supporting facts or circumstances."

In paragraph 139 of the Affidavit for the 2016 Storage Warrant, the affiant alleged:

> "There is probable cause to believe that evidence, fruits, and/or instrumentalities of export violations, tax violations, and aggravated identity theft violations will be found in a 20x30 storage unit 4001 located at SafKeep Storage, 1650 Winton Ave, Hayward, California (Attachment A-2).
>
> a.   NAUM MORGOVSKY used the alias Edward A. Joseph to obtain a lease for a 20x30 storage unit 4001 located at SafKeep Storage, 1650 Winton Ave, Hayward, California. NAUM MORGOVSKY was seen entering the gates of the storage facility and payment receipts for the storage unit were recovered from the trash located at NAUM MOROGVSKY's residence (1423 Avondale Road, Hillsborough, CA).
>
> b.   There is probable cause that NAUM MORGOVSKY fraudulently used an ID in the name of Edward A. Joseph to rent the storage unit 4001 in an attempt to conceal criminal activities. NAUM MORGOVSKY has shown a pattern of behavior of engaging in identity theft and *there is reason to believe that evidence of aggravated identity theft as well as the other criminal violations maybe found in the storage unit 4001 located at SafKeep Storage, 1650 Winton Ave, Hayward, California.*" (Emphasis added).

An affidavit in support of probable cause must demonstrate that there is "a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*. 360 F.3d 591, 594 (6th Cir. 2004)(en banc) (quotations omitted). Specifically, "the affidavit must suggest 'that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought' and not merely 'that the owner of the property is suspected of a crime.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978); *United States v. Zapata-Galvez*, 9 F.3d 1555 (9th Cir. 1993), although the affidavit recounted conduct typical of narcotics traffickers, the court noted that the affidavit contained no evidence connecting the apartment to the items sought.

In *United States v. Underwood*, 725 F.3d 1076, 1081-82 (9th Cir. 2013), the Ninth Circuit stated:

> Conclusions of the affiant unsupported by underlying facts cannot be used to establish probable cause. See United States v. Cervantes, 703 F.3d 1135, 1139–40 (9th Cir. 2012) (affording little if any weight to detective's conclusory statement that, based on his training and experience, the box in defendant's possession came from a suspected narcotics stash house); see also Spinelli v. United States, 393 U.S. 410, 418 (1969); Gates, 462 U.S. at 241. An affidavit must recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the central basis of the probable cause determination. United States v. Ventresca, 380 U.S. 102, 108–09 (1965); Giordenello v. United States, 357 U.S. 485, 486 (1958) ("The Commissioner must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime.") (emphasis added); United States v. Rubio, 727 F.2d 786, 795 (9th Cir. 1983) ("The magistrate must be provided with sufficient facts from which he may draw the inferences and form the conclusions necessary to a determination of probable cause.") (emphasis added); United States v. Dubrofsky, 581 F.2d 208, 212 (9th Cir. 1978) ("A search warrant may not rest upon mere affirmance or belief without disclosure of supporting facts or circumstances.").

A warrant must be upheld as long as the "magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing . . . ." *Gates, supra,* at 236. In order to be able to properly determine whether probable cause exists sufficient to issue a warrant, the magistrate must be presented with an affidavit containing adequate supporting facts about the underlying circumstances, either from the direct knowledge and observations of the affiant or from

reliable hearsay information; bare conclusions are not enough. *United States v. Weaver,* 99 F.3d 1372, 1377 (6th Cir. 1996).

In *Gillespie v. United States,* 368 F.2d 1 (8th Cir. 1966), the court stated:

> The officer's affidavit that he believed and had good reason to believe that the gambling devices enumerated in the printed form were located on the premises was, of course, as held by the District Court, not sufficient by itself to constitute probable cause, since the statement was purely conclusory on the part of the officer, in that it did not set out any "underlying circumstances" which could provide basis or reason for a belief. *United States v. Ventresca,* 380 U.S. 102, 108-109, 85 S. Ct. 741, 746, 13 L. Ed. 2d 684.

The conclusory statement in paragraph 139 of the 2016 affidavits emphasized above utterly fails to provide a sufficient probable cause to search the Morgovskys' storage unit, and any evidence seized from the storage unit must be suppressed and any and all property of defendants seized from the storage unit must be returned to defendants.

The same lack of factual support pertains to the lack of the nexus shown between the Morgovskys' residence and the alleged criminal behavior in paragraph 138 of the 2016 affidavits. The boilerplate statements in that regard do not suffice. See *United States v. Weber,* 923 F.2d 1338, 1345 (9th Cir. 1990) ("if the government presents expert opinion about the behavior of a particular class of persons, for the opinion to have any relevance, the affidavit must lay a foundation which shows that the person subject to the search is a member of the class").

Accordingly, any evidence seized from the Morgovsky's residence must be suppressed and any and all property of defendants seized from their residence must be returned to them.

## V.   The 2016 Warrants For The Morgovskys' Residence and Storage Unit Lacked The Specificity Required By The Fourth Amendment

"The Fourth Amendment requires that a warrant particularly describe both the place to be searched and the person or things to be seized." *United States v. Spilotro,* 800 F.2d 959, 963 (9th Cir. 1986). As *Spilotro* explained, "[t]he description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized." Id. The purpose of

the breadth requirement is to limit the scope of the warrant "by the probable cause on which the warrant is based." *In re Grand Jury Subpoenas,* 926 F.2d 847, 856-57 (9th Cir. 1991). Both the particularity and breadth requirements prevent "general, exploratory rummaging in a person's belongings." *Id.* at 857 (quotation marks and citations omitted).

In *Marron, supra.,* at 196, the Supreme Court effectively summarized the purpose of the particularity clause: "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." See also *Galloway, Fourth Amendment Ban on General Searches and Seizures,* 10 SEARCH & SEIZURE L. REP. 141 (1983) note 2, at 144.

The warrants in the present case required to seize many general categories of documents based on violations of long list of criminal statutes.

In *United States v. Cardwell* (9th Cir. 1982) 680 F.2d 75, 77, the court ruled that the search warrant was not sufficiently particular because it contained no guidelines to aid officers in determining what may or may not constitute evidence of a violation of the statute. *Id.* at 77-78. For similar reasons, in *United States v. Crozier* (9th Cir. 1985) 777 F.2d 1376, 1381, the Ninth Circuit held overbroad a warrant that authorized seizure of "evidence of a violation [of] 21 U.S.C. §§ 841, 846."

In *Spilotro,* like in the present case, the Ninth Circuit invalidated a warrant that authorized a search for, among other things: "[E]vidence of violations of 18 U.S.C. § 1084, 1952, 1955, 892-894, 371, 1503, 1511, 2314, 2315, 1962-1963". The warrant failed to distinguish between items that could be used lawfully and those that the government had probable cause to believe were part of the criminal enterprise at issue, and it "authoriz[ed] wholesale seizures of entire categories of items not generally evidence of criminal activity." *Id.* at 964.

1   When a business is searched for documents or records, enough specificity is required to

2   ensure that only those documents that pertain to the crime will be seized, and that other papers will

3   remain private. *United States v. Leary* (10th Cir. 1988) 846 F.2d 592. Leary, citing *Cardwell* and

4   *United States v. Fuccillo* (1st Cir. 1987) 808 F.2d 173 in support, is especially important because in

5   *Leary* the defendant was also accused of violating the Arms Export Control Act ("AECA") 22 U.S.C.

6   § 2778, and thus specification of wide categories of documents specified in the 2016 warrants herein

7   are as inappropriate as virtually identical ones found overbroad and lacking in particularity in *Leary*.

8

9   The warrant in the present case also failed to specify a particular time frame for the

10   documents to be seized. In *Cf. United States v. Kow*, supra, 58 F.3 at 427 the Ninth Circuit

11   invalidated a warrant where the affidavit indicated that the criminal activity began at a specific time

12   period but the warrant was not limited to a particular time frame. The failure to specify a particular

13   time frame while the 2016 covered a particular time frame is in itself fatal to the 2016 search

14   warrants herein, especially that in the present case, the affidavits were not attached to or incorporated

15   into the 2016 warrants. Accordingly the 2016 warrants lacked the requisite specificity, being

16   overbroad and lacking the requisite particularity, and thus the seizures from defendants' residence

17   and storage unit must be suppressed and any property seized from defendants must be returned to

18   them.

19

20   **VI.    The Statements of Confidential Source Should Not be Considered in Determination of Probable Cause**

21

22   In issuing a search warrant, a magistrate judge must look to the "totality of the circumstances"

23   to determine whether the supporting affidavit establishes probable cause. *Illinois v. Gates, supra,* at.

24   230.  In determining probable cause, the magistrate should consider an informant's veracity,

25   reliability and basis of knowledge to resolve the "commonsense, practical question whether there is

26   'probable cause' to believe that contraband or evidence is located in a particular place." *Id.* The

27   totality of the circumstances approach "permits a balanced assessment of the relative weights of all

the various indicia of reliability (and unreliability)" surrounding informants' tips. *Id.* at 234. Even if the reliability of a confidential source is not clearly established, the credibility of the statement is "enhanced" when the statement gives a detailed account of events that is corroborated by the statements of other confidential informants. *United States v. Hernandez-Escarsega* (9th Cir. 1989) 886 F.2d 1560, 1566 ("Although the reliability of several of [the] confidential sources was not clearly established, the detailed nature of many of their statements and the interlocking nature of their stories enhanced their credibility.").

"To credit a confidential source's information in making a probable cause determination, the affidavit should support an inference that the source was trustworthy and that the source's accusation of criminal activity was made on the basis of information obtained in a reliable way." *United States v. Landis*, 726 F.2d 540, 543 (9th Cir. 1984), cert. denied, 467 U.S. 1230. Although the tip in this case came from a CS who was alleged in a conclusory fashion to have demonstrated reliability, without any factual support whatsoever. Had the affiant presented something about the basis of upon which the CS made his or her report, she might properly have credited it, but the affiant presented nothing pertaining to the basis of knowledge of the CS.

In the present case, no time or even time frame was attributed to the statements of the CS. Moreover, none of totally unsupported information allegedly provided by the CS was attributed to defendants, their residence, or their storage unit. The affidavit did not even contain any allegations that FLIR TAU core allegedly contained in allegedly Infratech unit allegedly sold abroad were controlled for export. Nor the affiant alleged in general that FLIR TAU cores were controlled. In that regard, the allegation that FLIR TAU cores in combination with controlled lenses are controlled for export, especially considering the allegation that the lenses themselves are controlled, does not warrant a consideration with regard to probable cause. This is especially true because the affiant did

1   not allege that the thermal unit subject of the tip attributed to the CS contained a combination of a

2   FLIR TAU core and controlled lens(es) that would arguably make it subject to export controls.

3        The details attributed to the CS's reliability herein were totally unspecific, unlike those that

4   were held sufficient to demonstrate reliability in *Draper v. United States* (1959) 358 U.S. 307.

5        In addition, evidence obtained by firsthand observation carries particularly

6   high indicia of reliability. *United States v. Elliott* (9th Cir. 1990) 893 F.2d 220, 223, amended, 904

7   F.2d 25 (9th Cir. 1990), cert. denied, 498 U.S. 904, but no first-hand observation by the affiant or

8

9   even the CS was alleged in the affidavits herein.

10       Holdings of the Supreme Court illustrate the limits beyond which a magistrate may not

11  venture in issuing a warrant. A sworn statement of an affiant that "he has cause to suspect and does

12  believe" that liquor illegally brought into the United States is located on certain premises will not do.

13  *Nathanson v. United States* (1933) 290 U.S. 41 (1933). An affidavit must provide the magistrate with

14  a substantial basis for determining the existence of probable cause, and the wholly conclusory

15  statement at issue in *Nathanson* failed to meet this requirement. An officer's statement that "[affiants]

16

17  have received reliable information from a credible person and do believe" that heroin is stored in a

18  home, is likewise inadequate. *Aguilar v. Texas*, 378 U.S. 108 (1964).  As in *Nathanson*, this is a mere

19  conclusory statement that gives the magistrate no factual basis at all for making a judgment regarding

20  probable cause. Sufficient information must be presented to the magistrate to allow that official to

21  determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.

22  In order to ensure that such an abdication of the magistrate's duty does not occur, courts must

23  continue to conscientiously review the sufficiency of affidavits on which warrants are issued. *Gates,

24  Id.* at 239. Accord, *United States v. Leon,* 468 U.S. 897, 915 91984); *Giordenello v. United States*

25  357 U.S. 480 (1958). The affiant did not allege herein that the information provided by CS was first

26  hand.  Nor is it alleged that the informer provided a particularly detailed description of the alleged

27

1    wrongdoing, or his/her history of reliability.  And, of course, corroboration is entirely lacking. *United*

2    *States v. Lucas*, 990 F.2d 1263 (9th Cir. 1993).  Based on the foregoing, the statements in the

3    affidavits attributed to the CS should be stricken.

4    **VII.    The 2015 Warrant Shares Many of the Same Deficiencies as the 2016 Warrant**
         **Outlined Herein**

5

6         The first warrant of two Yahoo email accounts issued on October 30, 2015, based on the

7    affidavit of probable cause presented by FBI Special Agent Natalie Rezai-zadeh, tracks the same

8    language used in the second warrant issued on August 24, 2016, by the same SA which authorized a

9    search of the Morgovskys' residence at 1423 Avondale Road in Hillsborough, California.  The main

10   paragraphs that are the same between the 2015 and 2016 affidavits are as follows:

11   ¶23/2015/¶28/2016; ¶24/2015/¶29/2016; ¶33/2015/¶46/2016;  ¶35/2015/¶48/2016;

12   ¶37/2015/¶79/2016; ¶38/2015/¶80/2016-82/2016; ¶42/2015/¶50/2016;  ¶43/2015/¶51/2016;

13   ¶44/2015/¶52/2016; ¶45/2015/¶53/2016; ¶46/2015/¶54/2016; ¶47/2015/¶55/2016;

14   ¶49/2015/¶58/2016; ¶50/2015/¶69/2016; ¶53/2015/¶72/2016; ¶56/2015/¶59/2016;

15   ¶59/2015/¶62/2016; ¶60/2015/¶63/2016; ¶61/2015/¶64/2016; and ¶62/2015/¶65/2016.

16        A careful reading of the 2015 affidavit shows that there was an utter lack of probable cause to

17   believe that either of Mr. Morgovsky's Yahoo! email accounts contained evidence of criminality

18   justifying the search and seizure.  Hence, without "independent sources" for the information that are

19   the same between the two affidavits, the government may not legally rely on evidence that is

20   previously "tainted" by the first warrant, in order to obtain the second. See *Murray v. United States*,

21   487 U.S. 533 (1988).

22   Date:  September 19, 2017                              Respectfully submitted,

23

24

25         /s/  William L. Osterhoudt, Esq.
          WILLIAM L. OSTERHOUDT
          Attorney for Naum Morgovsky