William L. Osterhoudt (SBN 43021)
Frank S. Moore (SBN 158029)
Dolores T. Osterhoudt (SBN 215537)
Law Offices of William L. Osterhoudt
135 Belvedere Street
San Francisco, CA 94117
Telephone: (415) 664-4600
Email: osterhoudt@aol.com

Attorneys for Defendant
NAUM MORGOVSKY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff<br><br>v.<br><br>NAUM MORGOVSKY, et. al,<br><br>           Defendants | Case No. Cr-16-0411 VC<br><br><br><br>Date: October 26, 2017<br>Time: 2:00 p.m.<br>Place: Hon. Vince Chhabria |

I, Naum Morgovsky, hereby declare:

1. I am the defendant named in this action. I make this declaration on my own personal knowledge, except of matters stated on information and belief, and, as to those matters, I believe them to be true. If called as a witness, I would testify competently thereto. I submit this declaration in support of my motion to suppress.

2. I came to the United States as a refugee from the Ukraine when it part of the former Soviet Union in 1979. I have an equivalent of an MS in engineering from an institute in Russia and worked as a leading design engineer for many years in the Ukraine. I also worked as a senior

engineer for a major corporation in the United States following a short stint as a dishwasher and bus boy in a Chinese restaurant in San Francisco. I have been involved in the optics and night-vision industry since 1993. As a result, I am intimately familiar with the technical specifications of night vision equipment and with the business concerns, in the United States and abroad pertaining to optical and night vision devices and components.  I am aware of the often confusing statutory scheme under which manufacturers and customers struggle to determine which items are "controlled" for export purposes and which are not.  I am familiar with shipping practices involving Shipper's Export Declarations (SED's) and their electronic counterparts (AESs) filed not by the shipper but by licensed freight forwarders who generically describe the contents of shipments. My company, Hitek International, and related entities engage in the design and sale of optical and night vision devices for domestic consumption (which includes obtaining products from abroad) and sometimes exporting optical and night vision devices[1].   I have never attempted to conceal this lawful activity.

3. At all times relevant to exports listed in the warrant affidavits and beyond, between June 1992 and October 2014, Russia was given a temporary most-favored nation status receiving most-favored-nation benefits - the lowest possible U.S. tariffs on its goods, which was only terminated on October 7, 2014 in connection with Russia's invasion of Crimea.  In fact, it was Russia's most-favored nation status after the fall of the Soviet Union that prompted me to establish long-term business relationships with a number of Russian companies, including but not limited to Infratech, starting in 1993 when I founded Hitek International. I do not have an ownership interest in Infratech as represented by the Affiant.

4. The affidavits for search warrants state that in May 2012 the FBI received a complaint from a person at Las Vegas-based Trans Western Sales (which markets and sells night vision

---

[1] Contrary to assumptions by many people, not all night vision devices and components are controlled for export. In fact, many are not.

equipment) about receiving an unspecified "purchase request for export restricted night vision equipment" from a person representing Hitek that he (the Trans Western Sales representative) "never heard of." (US-000179, 28).  For unknown reasons, this individual allegedly became "suspicious that the company might unlawfully intend to ship the night vision equipment overseas or provide it to foreign persons in the United States."  I am widely known in the industry and many call me, correctly or not, a "grandfather of night vision."  The last time I was introduced as such by the owner of a prominent U.S.- based company specialized in night vision to a group of industry executives from foreign countries at a major industry trade show in Las Vegas in January 2014, where I displayed my products sharing a display with a prominent U.S.- based night vision company which has been in the business longer than I have.

5. When the affiant made these statements in the affidavit for the second search warrant, she was in possession of emails obtained pursuant to the 2015 warrant for my Yahoo email accounts. Those emails establish that Hitek International did not purchase from the "PRC-based night-vision equipment manufacturer/re-sellers" any night vision equipment but rather purchased generic parts which could be used for any kind of digital cameras or scopes, not only thermal scopes.

6. The items contained within the December 16, 2010 shipment to Infratech referred to by the Affiant in paragraph 54 of her affidavit could not have consisted of the items ordered from Tactical Light Solutions per invoice number 20912.  Attached hereto as Exhibit 1 and incorporated herein by reference is the relevant portion of the affidavit in support of a search warrant provided to me by my attorney, against co-defendant Mark Migdal (2016 Affidavit Re MM). This affidavit was based on an affidavit by the same Affiant who provided the affidavits in support of the search warrants directed against me. In Paragraph 58 of the Migdal Warrant (Exh. 1 hereto), the Affiant revealed that she knew that the subject of the December 16, 2010 shipment consisted of six boxes that were sent to Auto Export Group, a freight forwarder, on December 14, 2010 by FedEx.

3

7. These items were sent to Auto Export Group not by my wife, Irina Morgovsky dba VisionTech, but rather by Mark Migdal's secretary Leila Freeman. This was because my wife and I were not in the country at the time, having flown to London on December 12, 2010. Arrangements for this travel at that time were clearly referenced in e-mails from my naummorgovsky@yahoo.com account by en email from the airline confirming my reservation, which had been seized by the government pursuant to the 2015 search warrant and therefore have been in the possession and knowledge of the government since that seizure. A copy of the email confirming my reservation is attached hereto as Exhibit 2 and incorporated herein by reference.

8. From the shippers export declaration (SED), or rather its' electronic equivalent (AES) filled out and submitted by the freight forwarder, the December 16, 2010 shipment consisting of 6 large boxes weighed 290 lbs, with a total value of $6,407.30, and was thus in no way a "small" shipment subject to falsification as the Affiant attested, or rather speculated based on her "training and experience" (US-000201, 80.)  The commercial invoice was readily available to the Affiant either through the freight forwarder or commercial carrier. Moreover, this invoice that I sent to the secretary of Mr. Migdal, Leila Freeman unsigned, was included within my emails from my nmorgovsky@yahoo.com account seized in 2015 and a its copy with the signature of Leila Freeman returned to me later signed by her is included within the same email account and was also seized in 2015[2]. Said invoice includes a very particular description of all items included in that shipment, inconsistent with Affiant's theory that it contained the 10 pieces of image intensifier tubes I ordered from Tactical Light Solutions, which collectively weighed approximately 1.5 lbs. Leila also sent to

---

[2] The government provided to me within the discovery tens of thousands emails seized from both email accounts in 2015. Most of the seized emails, many thousands or tens of thousands of them, had nothing to do with my businesses but were very personal communications with my friends, relatives, and family members. In fact, most of them contained jokes, anecdotes, and copies of published stories, pictures, and links to articles published on the web having nothing to do with my businesses.

me an email with the weight of the shipment.

9. As a result of the Yahoo search the invoice was definitely in the government's possession long before the August 24, 2016 warrant applications for my residence and storage unit. It was also included in the discovery containing my emails provided by the government. Because of our absence from the country on the date of shipment (December 16, 2010), the commercial invoice was ultimately signed by Leila Freeman. Attached hereto as a collective Exhibit 3 and incorporated herein be reference are the commercial invoice signed by Leila Freeman and the email she sent to me with the weight of the shipment which was almost 290 lbs.

10. In paragraph 64 of her 2016 affidavits, the Affiant states: "IDSS has informed me that NAUM MORGOVSKY was interested in purchasing laser rangefinders to integrate with NAUM MORGOVSKY's weapon sighting products." (US-000195, 64.) I dispute this contention. I was not interested in purchasing laser rangefinders from IDSS and I so informed its CEO by email, expressing my opinion that they were too bulky, outdated, and severely overpriced. Attached hereto as Exhibit 4 and incorporated herein be reference is a true copy of said email. In the 2016 affidavits, the Affiant stated that I provided to the IDSS CEO "manuals" on my products. This is untrue. In fact, I sent to its CEO by email the AIT-USA color product brochures of its night vision and thermal imaging products, which included their detailed specifications including the resolutions of its thermal imaging products. The Affiant implied in its affidavits that these products were exported by defendants to Infratech. In the AIT-USA brochures of its thermal imaging products none of their resolutions matched the resolutions of Infratech thermal imaging products posted on the Infratech website, including but not limited to the website pages referenced by SA in her affidavits.

11. The Affiant's claim that exports of clip-on night vision weapon sights are controlled by virtue of them being able to be mounted on weapons is simply untrue. In order to classify a sight as a weapon sight subject to export controls, the sight must incorporate a reticle, which in laymen's

terms is called cross-hair. Clip-on sight is mounted in front of a day weapon sight and do nothing more than utilize a reticle from the day site. As such, the clip-on sight it is not classified as a weapon sight because it is no different than a monocular viewer and can be used as such outside of the weapon. In fact, thermal imaging scopes do not become weapon sights until firmware including an electronic reticle is programmed into them. If they utilize a thermal core that is not subject to export control and optics that are not subject to export control, as is the case of most lenses I purchased from Janos Technology, and do not include firmware with an electronic reticle programmed into them, they do not require an export license for export to Russia or elsewhere because at that point they are no more than non-functioning monocular viewers.

12. In paragraph 68, subparagraph (ii), under the heading "Goods sold to CEK," the affiant states: "[t]he supply agreement executed on December 10, 2013, between VisionTech Co (Seller) and Limited Liability Company CEK (buyer) indicated that the total amount of payments made under this agreement is $1,000,000 USD." (US-000196, ¶68.) This statement is untrue. The Affiant uses the term "made" in the past tense, meaning that the supply agreement executed on December 10, 2013, had been fully performed. This supply agreement was never implemented beyond several small shipments to CEK listed in paragraph 79 of the 2016 affidavits for search warrants, and possibly another small shipment, all totaling approximately $7,000. The remaining portion of the supply agreement never crystalized, so the total amount of payments made by CEK was not $1,000,000, but exactly reflected the value of the shipments I actually sent to CEK.

13. The Affiant then stated in paragraph 68: "Invoice No. 2036 cost of goods sold was $1,441.82 and Invoice No. 1215 cost of goods sold was $106,025." The part of the supply agreement pertaining to invoice No. 1215 in the amount $106,025 also never crystalized and no corresponding shipment to CEK and payment from CEK were ever made. CEK is a competitor of Infratech.

14. In the part of the 2016 affidavits, under the heading "Infratech Products Contain U.S.

Technology Manufactured by FLIR" (US-000197-199, ¶¶69-78), it is represented by the Affiant that I "was seeking to purchase controlled lenses to integrate with thermal imaging cores made by FLIR Systems." (US-000169, 5(d)4).) An explanation of the technical specifications, particularly the resolution numbers, of certain products manufactured by FLIR Systems, and the language I used in an inquiry sent to Janos Technologies demonstrates that this representation is false.

15. In paragraph 69, the Affiant stated: "Hitek placed several orders for controlled lenses from Janos Technology. An April 12, 2012 email from naummorgovsky@yahoo.com to Janos Technology states: "Pursuant to our telephone conversation, please quote ASAP for immediate delivery 1 to 5 pieces of 50mm, 100mm, and if you can find at least 1 ea. in a size between 50mm and 100mm (like 60, 70, or 75mm) 8-12um lenses for 17um FLIR TAU cores, 320x240 and 640x480." (US-000197, ¶69.)

16. In paragraph 71, the Affiant stated: "Infratech's websites, www.infratech.ru/en/produkciya/100/ and http://infratech.ru/en/produkciya/88/, market 30Hz thermal scopes. Two such scopes, Infratech IT - ITWS-310AH and Infratech IT - ITWS- 315AH, are described as thermal scopes with a 640x480 resolution at 30Hz. The resolution of the thermal scopes is the same measurement which NAUM MORGOVSKY listed in my email to Janos Technology when trying to acquire lenses compatible with FLIR TAU cores" (US-000197, ¶71). From this the Affiant draws the inference, and urges the magistrate to do so, that I unlawfully exported controlled technology - thermal scopes with FLIR TAU cores, to Infratech in Russia. This inference is false.

17. My first e-mail contact with Janos Technology was on April 25, 2012, not on April 12, 2012 as claimed in the affidavits. This e-mail, sent from the naummorgovsky@yahoo.com email account, is only partially quoted in Special Agent Rezai-zadeh's (SA) affidavits. Specifically, my reference to the resolution 640x512 pixels was omitted. This omission is central to an understanding of this issue. A true copy of my April 25, 2012 email is attached hereto as Exhibit 5 and

incorporated herein by reference.

18. There are recognized nominal industry standards for any sensors made by companies worldwide, either for regular cameras or thermal ones, including but not limited to FLIR, which are intended to send images to video displays. Depending on their technological processes, companies may sometimes match these nominal standards for video displays exactly, or may have their own peculiar resolutions which somewhat differ from these nominal industry standards for video displays.

19. In my April 25, 2012 email, I used generic resolution numbers to describe resolutions of FLIR TAU thermal imaging cores when I requested information from Janos Technology about its lenses compatible with FLIR TAU cores.  I referred to 320x240 and 640x480 pixels because these numbers reflected the nominal industry standards for video displays, which are represented by a line 80, 160, 320, 640, 1080, etc., with 1080 being the nominal standard for, inter alia, HD TV monitors.

20. The fact that I used the generic numbers representing nominal resolutions of video displays in my inquiry to Janos Technologies in reference to FLIR TAU cores does not mean that FLIR TAU cores, which are not video displays, but sensors designed to send images to standard video displays, are identical to nominal resolutions of video displays which are, inter alia, 160x120, 320x240 (QVGA) and 640x480 (VGA), 1080x960, etc.  In fact, as is evident from the table published on the FLIR website listing resolutions of FLIR TAU cores, http://www.flir.com/cores/display/?id=54717&pi_ad_id=138565408952&gclid=EAIaIQobChMI7Mvrvo3t1QIViGF-Ch3GtAgZEAAYASAAEgKPDPD_BwE, the resolutions of FLIR TAU cores do not match the standard resolutions of video displays, but are 336x256 pixels (TAU2 336 - QVGA) and 640x512 pixels (TAU2 640 - VGA), respectively.  A true copy of the table published on the FLIR web page0ᵃºø listing resolutions of FLIR TAU cores is attached hereto as Exhibit 6 and incorporated herein by reference.

21.     The generic resolutions of 320x240 pixel (QVGA) and 640x480 pixels (VGA) that I mentioned in my April 25, 2012 email (Ex. 5 hereto) to Janos Technology thus do not represent the true resolutions of FLIR TAU cores. The other resolution I cite in my email to Janos, 640x512 pixels, represents a true resolution of FLIR TAU VGA cores, but the Affiant omitted this resolution from her description of my e-mail.  The resolution of 640x480 pixels cited by the Affiant represents only one of the resolutions referenced by Infratech on its' website, specifically the resolution of the VGA core used by Infratech. The generic resolutions 320x240 pixels (QVGA) and 640x480 pixels (VGA) that I casually mentioned in my April 25, 2012 e-mail do not represent the true resolutions of FLIR TAU cores, but the resolution of 640x512, which was excised by the Affiant from my April 25, 2012 email to Janos Technology (Exh. 2 hereto), does represent the true resolution of the FLIR TAU VGA core.

22.     All companies which sell thermal imaging devices worldwide, including my company and Infratech, offer them with both QVGA and VGA cores. At all relevant times, on its website, Infratech displayed its thermal devices with VGA resolution on the web pages mentioned in paragraph 71 of the affidavits, and its QVGA thermal devices on its other web page(s). The web page pertaining to both, the Infratech's QVGA thermal sights having the resolution of 384x288 pixels and VGA thermal sights having the resolution of 640x480 pixels referenced by the Affiant in ¶ 71 of the 2016 affidavits, at the pertinent times appeared at the following web address: http://infratech.ru:80/en/produkciya/teplovizionnye_pricely/. It showed two Infratech thermal sights with the resolution of 384x288 pixels, Infratech model numbers IT-1TWS-615A and IT-1TWS-610A, together with both Infratech thermal sights referenced by the Affiant in ¶ 71 of the 2016 affidavits, model numbers 1TWS-310AH and IT-1TWS-310AH. A true copy of said web page is attached hereto as Exhibit 7 and incorporated herein by reference.

23.     The two web pages referenced by the Affiant in in ¶ 71 of the 2016 affidavits pertaining to Infratech VGA thermal sights with the resolution of 640x480 pixels, model numbers

1TWS-310AH and IT-1TWS-310AH, and the web page pertaining to both, Infratech QVGA and VGA thermal sights (Ech. 7 hereto), which I referenced above, are no longer available on the Infratech website, though new pages are shown on the current Infratech website that show the same QVGA and VGA models with the same resolutions, 384x288 pixels, and 640x480 pixels, as the older web pages, so Infratech did not utilize FLIR TAU cores in the past and does not utilize them now. Nevertheless, a company called Wayback Machine stores over 300 billion web pages, including older ones which are no longer available on the websites were they previously appeared. One can go to Wayback Machine website and find most of older web pages. The Wayback Machine stores these web pages by crawling the Internet on an ongoing basis. The web pages referenced by the Affiant pertaining to the Infratech VGA thermal sights 1TWS-310AH and IT-1TWS-310AH can be accessed at the following Wayback Machine pages:

https://web.archive.org/web/20160315155311/www.infratech.ru/en/produkciya/100/ and https://web.archive.org/web/20150716032515/www.infratech.ru/en/produkciya/88/. True copies of these web pages referenced by the Affiant in ¶ 71 of the 2016 affidavits are attached hereto as respective Exhibits 8 and 9 and incorporated herein by reference.  The web page pertaining to both, Infratech QVGA thermal sights and VGA (Exh. 7 hereto) can be accessed at the following Wayback Machine page:

https://web.archive.org/web/20150716051601/http://infratech.ru:80/en/produkciya/teplovizionnye_pricely/. The Wayback Machine even shows the dates whet it saved those pages. The first of the two pages referenced by the Affiant was saved on May 25, 2015; March 15, 2016, and Aug 27, 2016, and the second one on July 14, 2015 and July 16, 2015. The page I referenced above (Exh. 7 hereto) was saved on July 16, 2015; April 16, 2016, and August 6, 2016.

24. As is evident from Exhibits 7, 8, and 9 hereto, the resolutions of both VGA and QVGA thermal sights offered by Infratech do not match the resolutions of both VGA and QVGA

FLIR TAU cores, contrary to the assertions made by the Affiant in the 2015 and 2016 affidavits in support of search warrants. Infratech has utilized in its thermal imaging products thermal imaging "cores" or, as it calls them "modules" made for it in Russia and China, utilizing thermal imaging sensors made by ULIS, a French company. ULIS sensors are made with amorphous silicon technology, while FLIR TAU sensors are made with vanadium oxide technology. FLIR usually does not sell sensors, but only sells complete cores incorporating its sensors which, combined with the electronics, comprise its cores. ULIS only sells sensors, and the users are responsible for finding suppliers which can build cores to their specifications utilizing ULIS sensors.  ULIS sensors have resolutions 384x288 pixels (QVGA) and 640x480 pixels (VGA). A true copy of a table listing ULIS sensors including their specifications is attached hereto as Exhibit 10 and incorporated herein by reference. These resolutions of ULIS sensors match those of the Infratech thermal sights appearing on the Infratech older (Exh. 7, 8, and 9 hereto) and current websites and do not match the resolutions of the FLIR TAU cores.

25. Though the web page showing both VGA and QVGA Infratech thermal sights (Exh. 7 hereto) was available at all times relevant to the 2015 and 2016 affidavits in support of search warrants, the Affiant only mentioned the Infratech VGA thermal sights in ¶ 71 of the 2016 affidavits and matching ¶ 52 of the 2015 affidavit, which matched the generic resolution of 640x480 pixels I casually mentioned in my April 25, 2012 email to Janos Technology (Exh. 5 hereto), from which the Affiant excised the resolution of 640x512 pixels included in the same email.

26. It is widely considered in the industry that sensors made with vanadium oxide technology utilized by FLIR have higher performance than those made with amorphous silicone technology utilized by ULIS, specifically having less noise from technical standpoint and thus sharper image, as is evident from one of many articles published on the Internet in that regard, a true copy of which is attached hereto as Exhibit 11 and incorporated herein by reference.

11

27. In my April 25, 2012 email to Janos Technology (Exh. 5 hereto), and in all other communications with Janos Technology where I was seeking loose lenses from it, I never sought "controlled lenses." When I wrote the April 25, 2012 email (Exh. 5 hereto), which was my first written contact with Janos Technology, I did not know that Janos Technology offered controlled lenses. I was only seeking lenses compatible with FLIR TAU cores, which, in fact, would be compatible with any QVGA or VGA cores, whether they utilized FLIR or ULIS or any other thermal sensors. That is why I used the generic numbers for the resolutions. It did not matter. The only reason I also mentioned the resolution of 640x512 pixels in said email (Exhibit 5 hereto) was that someone from from Janos Technology either provided to me or mentioned to me one of the resolutions that was used in Janos drawings of its lens assemblies, which at some point was provided to me by Janos. A true copy of said drawing is attached hereto as Exhibit 12 and incorporated herein by reference. Though this drawing pertains to Janos lens assembly internally designated by its compliance department as mil-spec or ITAR, there was no designation on its face. Said drawing showed two numbers for the resolutions it was designed for, 640x512 pixels and 320x240 pixels. That was why I used both generic numbers 640x480 and 320x240 along with 640x512.

28. At the time of my April 25, 2012 inquiry, I did not know that Janos Technology did not sell loose lenses but only objective lens assemblies. For that reason, Janos offered to me complete objective lens assemblies instead of loose lenses I was seeking. It was unknown to me at that time that Janos compliance department internally designated objective lens assemblies as ITAR-controlled by mere virtue of Janos having designed those complete assemblies for use in mil-spec weapon sights and did not even consider a designation for loose lenses because it did not offer them. I was not interested in lens assemblies, but only in loose lenses. I did not inform Janos Technology in my April 25, 2012 email (Exh. 5 hereto) that I contemplated to use lenses in weapon sights. After lengthy negotiations in response to my April 25, 2012 email, Janos agreed to sell to me loose lenses and sent

12

to me by email a quotation including several types of loose lenses and a couple of lens assemblies. A true copy of that quotation is attached hereto as Exhibit 13 and incorporated herein by reference. While this quotation included lenses with part numbers appearing in ¶ 58 of the 2016 affidavits as controlled, it did not reveal on its face that any of those lenses were mil-spec or ITAR-controlled or even designated internally as such.

29. On September 18, 2012, in my email, I expressed to Janos my preference for non-mil-spec lenses. A true copy of said email is attached hereto as Exhibit 14 and incorporated herein by reference.

30. On October 1, 2012, I informed Janos by email that I was willing to initially purchase mil-spec lenses but preferred that Janos would design for me lenses which would not be mil-spec. A true copy of said email is attached hereto as Exhibit 15 and incorporated herein by reference.

31. On October 12, 2012, I informed Janos by email that I would like to sell some kind of a thermal camera in Europe and would want Janos to supply to me non-ITAR lenses and that otherwise I would have them designed for me in China or Singapore. A true copy of said email is attached hereto as Exhibit 16 and incorporated herein by reference.

32. I then started discussing with Janos specific designs of non-ITAR lenses, which the Janos representative called Euro-lenses. The email exchange in that regard between October 12 and October 14, 2012 is attached hereto as Exhibit 17 and incorporated herein by reference.

33. On February 19, 2013, I sent to Janos by email my drawings for non-controlled lenses I was interested in Janos designing for me. A true copy of the email accompanying those drawings is attached hereto as Exhibit 18 and incorporated herein by reference.

34. On February 20, 2013, Janos asked me if it was ITAR or non-ITAR project and I responded that it was a non-ITAR project. A true copy of said email exchange is attached hereto as Exhibit 19 and incorporated herein by reference. I did not ask Janos to develop a design for a weapon

sight, but the response I received from Janos that "Our compliance guy told me that if we develop a brand new design for a weapon sight that that falls under ITAR restrictions." In that email, Janos informed me that it developed a brand new lens for security camera applications which it did not consider ITAR-restricted. A true copy of said email is attached hereto as Exhibit 20 and incorporated herein by reference. It became clear to me that Janos compliance department was stuck with a wrong idea that if it perceived that if a customer wanted Janos to make camera lenses, even to the customer specifications, which the customer wanted not to be export-controlled, these lenses would be considered by Janos to be ITAR-controlled just because Janos compliance department thought in its mind that they were intended to be used in weapon sights. Unfortunately, because of vagueness of the export regulations and fear of prosecution, this attitude was prevalent in the industry.

35.   I immediately expressed interest in those lenses which Janos designated as non-controlled. A true copy of my email to Janos in that regard is attached hereto as Exhibit 21 and incorporated herein by reference.

36.   On May 23, 2013, I asked Janos if it had in stock those non-ITAR lenses. A true copy of said email is attached hereto as Exhibit 22 and incorporated herein by reference.

37.   On November 6, 2013, I asked Janos what were the parameters on the non-ITAR lenses and Janos responded that they were the same as ITAR lenses. A true copy of said email is attached hereto as Exhibit 23 and incorporated herein by reference.

38.   From that point on, I purchased from Janos Technology predominately those lenses developed for a security camera application, which Janos Technology considered "non-ITAR" and the total quantity of those non-controlled lenses purchased from Janos Technology significantly exceeded the quantities of lenses I purchased which Janos that it considered ITAR-controlled by mere virtue of them being used in weapon sights.

39.     The Affiant also failed to disclose that FLIR offers FLIR TAU cores in Russia through its exclusive distributor for Russia, Lahoux Optics, based in the Netherlands, on its Russian language websites. Lahoux Optics was also exclusive distributor for Russia of Photonis image intensifier tubes of the same and higher performance than those I purchased from Tactical Light Solutions in the U.S.

40.     True copies of Lahoux Optics web pages offering the FLIR TAU cores and Photonis tubes in Russia are attached hereto as a collective Exhibit 24 and incorporated herein by reference.

41.     In the affidavits for search warrants, the Affiant failed to disclose that FLIR TAU cores and Photonis image intensifier tubes were sold in Russia by FLIR and Photonis, respectively.

42.     The affiant also failed to disclose that a U.S. company Armasight wholly owned by FLIR and Ukrainian company Archer actively sponsored by FLIR, openly offer in Russia their thermal imaging weapon sights controlled for export utilizing FLIR TAU cores. Supporting documents are voluminous and will be made available at the hearing on the motion.

43.     In paragraph 72 of the 2016 affidavits, the Affiant stated: "On or about April 15, 2014, I conducted a trash cover on the home of NAUM MORGOVSKY and IRINA MORGOVSKY, at 1423 Avondale Road, Hillsborough, California. I found a two page document typed in Russian, the first sentence of which read, "Root module with dimensions 38x38 unifies thermal imaging module with FLIR module." (US-000197, ¶72.)  In that paragraph, the Affiant stated that the document found in the trash consisted of two pages, which is untrue. As is evident from the discovery provided by the government, the document consists of four pages and is not complete, with the second page, which the Affiant represented to be the first page, ending in mid-sentence. A true copy of the the four pages of the subject document, produced by the government in discovery, with the four pages being in the sequence it was produced, is attached hereto as Exhibit 27 and incorporated herein by reference.

44. The greeting appearing in the document which translates "Good morning, Naum!!!" demonstrates that the text quoted in ¶ 72 of the 2016 affidavits cannot be "the first sentence" but is supposed to appear on the second page. More importantly, the translation is inaccurate and misleading by presenting the Russian word which correctly translates as "standardized" or "made interchangeable" by the Affiant as "unifies" which means "combines." As a result, the affidavits would lead the reader to believe that Infratech combined some kind of 38x38 mm "module" with a FLIR "module" instead of being made interchangeable with FLIR module, which would properly suggest that Infratech was not combining FLIR core with anything. The translation of the following sentence clearly stated that it "would allow to use a new module in existing designs intended to utilize FLIR." Thus, proper translation of the true first page and of the first two pages clearly indicates that this document represented a review by Infratech of a new core designed for ATN[3] in the Ukraine and China, and this document conveys a recommendation to ATN by a Russian engineer on how it can improve the physical configuration of the new core by making it more compact and interchangeable with FLIR cores previously used by ATN in its thermal imaging products. It is also clear from the document that this set of recommendations was made based on the set of photographs of the newly designed core provided by ATN for consultation. In fact, on page two of the document, the author makes four recommendations and is asking eight questions clearly indicating that the document represents a set of recommendations to ATN in improving the design of its new core. The third page of the document contains photographs of the new core taken from all sides, and the fourth page contains a drawing of more compact configuration proposed by the writer, who, as is clear from the text in the first two pages, is a competent engineer. A true copy of said document I translated into English, consisting of properly sequenced four pagers, is attached hereto as Exhibit 28 and

---

[3] ATN is a leading U.S. corporation specialized in night vision and related products, whose CEO and majority stockholder is my stepson.

incorporated herein by reference.

45. Serial numbers are affixed by FLIR to its TAU cores with tiny paper adhesive labels, which can be easily removed with a fingernail without scratching the metal surface of the core where the label is affixed. If I were to try to remove a serial number on a TAU core, which I did not, I would not need to scratch off small paper labels with a sharp object when I could do it with a fingernail.

46. An SED is an official form (Form 7525-V) promulgated by the U.S. Department of Commerce - Economics and Statistics Administration - U.S Census Bureau - Bureau of Export Administration. The SED form requires the shipping company to place specific information on the form, among other things, shipping weight and value in U.S. dollars. The filing of SED in hard copy or electronically through AES is required not only for defense articles but for any non-defense articles as long they are not deemed "small" shipments and are valued at over $2,500 (See 15 CFR 758.1(b)(3) and 15 CFR 30.55(h)(1).

47. By the time the Affiant submitted her 2016 affidavits search warrants, she had access to the commercial invoices and/or packing lists which are included with all shipments regardless of their value and thus undoubtedly had access to information demonstrating that all of the shipments listed in the table in the affidavits (US-000200, ¶79) were not small shipments and that none of them were shipped through FedEx or UPS, but most of them were shipped by commercial airlines through licensed freight forwarders as is required to be shown on SED and its electronic equivalent, the AES.

48. No SEDs were filed by me or my wife with regard to the shipments identified by the Affiant, but only their electronic equivalents were filed through the AES by our freight forwarders . The or electronic equivalents of the SEDs, AESs, all showed that the shipments listed in ¶79 of the 2016 affidavit (US-000200) were by no means small shipments, with the following weights and values which I derived from the airway bills and other information presently available to me for five

out of eight shipments:

| Shipment Date | Weight (lb) | Value ($) |
|---|---|---|
| 12/16/2010 | 290 | $6,407 |
| 10/09/2013 | 99 | $3,975 |
| 01/17/2014 | 419.3 | $8,654 |
| 01/23/2014 | 559.9 | $106,025 |

49.    True copies of the documents supporting the above numbers which were within my Yahoo emails will be provided at the hearing on the motion.

50.    As a rule, when electronic equivalents of SEDs are filed by the freight forwarders, they customarily use generic descriptions, such as "Optical parts and accessories," "Parts for binoculars," and the like, because the Schedule B of the universal Harmonized Tariff Schedule (HTS) does not contain a harmonized code for each article, but contains mostly catch-all generalized harmonized codes, which results in the freight forwarders using generic descriptions for the entire shipments in their electronic filings rather than specific descriptions of each item.

51.    There is confusion in the industry of what conduct constitutes violations of the export laws. As a result of such confusion, United States companies are paranoid of being harassed by the government and possibly prosecuted for even such innocuous acts as sending emails with basic information which does not even represent transfer of technology to their US customers or associates at their US-based email addresses while these customers or associates are on a cruise overseas.

52.    In paragraph 92 of the 2016 affidavits under the heading "Use of Freight Forwarder to Ship Boxes to Infratech" (US-000205-206), the Affiant made statements regarding email communications between me and American Royal International, my freight forwarder and customs broker. These statements are misleading. On January 16, 2014, KC Khorrami, the principal of American Royal International, sent me the following email: "As I was filling the AES, it seems like

the laser engraving machine and the collimator are controlled items for Russia. Do have the ECCN for these items?"

53. On January 20, 2014, I responded as follows: "I have checked with SORL, the manufacturer of the off-axis collimator, and other multiple sources, as well as with multiple sources pertaining to the laser engravers (ours is imported from China), and confirmed that there are no export restrictions on either device. I was told that EAR99 is to be used for the ECCN numbers for both of them. Please file the export declaration accordingly." A true copy of this email is attached hereto as Exhibit 30 and incorporated herein by reference.

54. The classification of EAR99 in the EAR, Department of Commerce Regulations, means "no license required." The above email (Exh. 30 hereto) demonstrates that I confirmed with the manufacturers of the items that no license was required for their export. SA had at her disposal all of my emails from email account naummorgoysky@yahoo.com by virtue of the successful execution of the 2015 Warrant from my Yahoo email accounts.

55. I made no communication requesting the freight forwarder to classify the items as "parts of binoculars." It is clear from the communication from the freight forwarder that he did not have "the ECCN for these items" and that he used his discretion to arbitrarily assign the classification as "parts of binoculars" into the AES without a request from me. Consequently, the statement "no license required" was entirely proper.

56. The Affiant also omitted from the 2016 affidavits that the second page stamped in bold with "DO NOT SUBMIT TO CUSTOMS" was a copy of the AES which the freight forwarder submitted electronically to the United States Customs. Thus, his notation for his employees "DO NOT SUBMIT TO CUSTOMS" was entirely proper and, in fact, required because the AES was already filed electronically. A true copy of said AES is attached hereto as Exhibit 31 and incorporated herein by reference.

57.     In paragraph 83 of the 2016 affidavits, the Affiant described my communications with Bill Grube and, by omitting my original email with my request to him, she materially distorted the nature and purpose of my communications with him. A true copy of the initial email I sent to Bill Grube containing my request is attached hereto as Exhibit 32 and incorporated herein by reference. This email will demonstrate that the nature of my request was materially distorted.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed at Hillsborough, California, on August 19, 2017.

By:   /s/ Naum Morgovsky
       Naum Morgovsky