1   BRIAN J. STRETCH (CABN 163973)
    United States Attorney
2
    BARBARA J. VALLIERE (DCBN 439353)
3   Assistant United States Attorney
    Chief, Criminal Division
4
    JOHN H. HEMANN (CABN 165823)
5   COLIN C. SAMPSON (CABN 249784)
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
7       FAX: (415) 436-7234
        John.hemann@usdoj.gov
8
    Attorneys for United States of America
9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                      SAN FRANCISCO DIVISION
12

13   UNITED STATES OF AMERICA,            )   CASE NO.  3:16-CR-00411-VC-1
                                          )
14          Plaintiff,                     )
                                          )
15      v.                                 )   UNITED STATES' RESPONSE IN OPPOSITION
                                          )   TO DEFENDANT NAUM MORGOVSKY'S
16   NAUM MORGOVSKY,                       )   MOTION TO SUPPRESS (DOC. NO. 115) AND
     IRINA MORGOVSKY, and                  )   MOTION TO EXCEED PAGE LIMITATIONS
17   MARK MIGDAL,                          )
                                          )
18          Defendants.                    )   Date:      October 26, 2017
                                          )   Time:      10:30 a.m.
19                                         )   Courtroom:  4, 17th Floor, San Francisco
                                          )
20   _____)

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     BACKGROUND ...........................................................................................................2

III.    ARGUMENT ................................................................................................................3

a.      Morgovsky Lacks Standing to Challenge the Search of the Storage Locker. ................3

b.      The Search Warrant was Supported by Probable Cause. ................................................4

        1.      Supposed Omission of Emails Regarding Innocuous Purchases. ......................10

        2.      Supposed Omission of Facts Regarding the December 2010 Shipment to
                Infratech in Russia. ..........................................................................................11

        3.      Supposed Omission of the Weight of the Shipments...........................................11

        4.      Supposed Omission of "Customs" Regarding Electronic Export Information.................13

        5.      Supposed Omission of the Morgovsky's Whereabouts on the Date of the
                December 2010 Export. .....................................................................................16

        6.      Claimed Misrepresentations Regarding the Purchases and Exports of Lenses
                for Thermal Imaging Devices. ...........................................................................17

        7.      The Constitutionality of the Trash Retrieval. ...................................................20

        8.      Claimed Mistranslations of Documents Abandoned in the Morgovskys' Trash..............20

        9.      Supposed Omission Regarding the Obliteration of Serial Numbers on a FLIR
                TAU Core...........................................................................................................21

        10.     The Affidavits Established Probable Cause that Evidence Would be Found in
                the Places To Be Searched..................................................................................23

        11.     The Affidavits and Attachments Were Sufficiently Particular. ..........................23

        12.     The Reliability of the Confidential Source. ......................................................24

        13.     Alleged Deficiencies in the 2015 Warrants and their Effect on the 2016
                Warrants. ...........................................................................................................26

c.      Defendant is not Entitled to a *Franks* Hearing. .........................................................26

d.      The Executing Officers Relied in Good Faith on the Validity of the Search Warrants................27

e.      The Search Warrants Were Not Overbroad. .................................................................28

IV.     CONCLUSION...........................................................................................................28

1

2

# TABLE OF AUTHORITIES

Cases:

*Illinois v. Gates*,
462 U.S. 213 (1983) ............................................................................... 5, 7, 25, 27

*Illinois v. Krull*,
480 U.S. 340 (1987) ................................................................................... 28

*Jones v. United States*,
362 U.S. 257 (1960) ..................................................................................... 4

*Katz v. United States*,
389 U.S. 347 (1967) ..................................................................................... 3

*Lyall v. City of Los Angeles*,
807 F.3d 1178 (9th Cir. 2015) ..................................................................... 4

*Mancusi v. DeForte*,
392 U.S. 364 (1968) ..................................................................................... 3

*Maryland v. Garrison*,
480 U.S. 79 (1987) ..................................................................................... 27

*Massachusetts v. Upton*,
466 U.S. 727 (1984) ..................................................................................... 5

*Minnesota v. Olson*,
495 U.S. 91 (1990) ....................................................................................... 4

*Rakas v. Illinois*,
439 U.S. 128 (1978) ..................................................................................... 3

*Rawlings v. Kentucky*,
448 U.S. 98 (1980) ....................................................................................... 3

*Shamaeizadeh v. Cunigan*,
338 F.3d 535 (6th Cir. 2003) ....................................................................... 3

*Simmons v. United States*,
390 U.S. 377 (1968) ..................................................................................... 3

*Smith v. Maryland*,
442 U.S. 735 (1979) ..................................................................................... 3

*United States v. Angulo-Lopez*,
791 F.2d 1394 (9th Cir. 1986) ..................................................................... 6

*United States v. Bennett*,
219 F.3d 1117 (9th Cir. 2000) ................................................................... 27

*United States v. Caymen*,
404 F.3d 1196 (9th Cir. 2005) ................................................................. 3, 4

*United States v. Craighead*,
539 F.3d 1073 (9th Cir. 2008) ..................................................................... 8

*United States v. Cunag*,
386 F.3d 888 (9th Cir. 2004) ....................................................................... 4

*United States v. Dozier*,
844 F.2d 701 (9th Cir. 1988) ............................................................... 25, 27

*United States v. Espriella*,
781 F.2d 1432 (9th Cir. 1986) ................................................................... 20

*United States v. Gonzalez*,
365 F.3d 656 (8th Cir. 2004) ..................................................................... 21

1

### <u>TABLE OF AUTHORITIES</u>

Cases

*United States v. Gourde,*
   440 F.3d 1065 (9th Cir. 2006) ........................................................................ 5

*United States v. Greany,*
   929 F.2d 523 (9th Cir. 1991) .......................................................................... 5

*United States v. Hendershot,*
   614 F.2d 648 (9th Cir. 1980) .......................................................................... 6

*United States v. Huguez-Ibarra,*
   954 F.2d 546 (9th Cir. 1992) .......................................................................... 6

*United States v. Ippolito,*
   774 F.2d 1482 (9th Cir. 1985) ...................................................................... 27

*United States v. Jacobsen,*
   466 U.S. 109 (1984) ........................................................................................ 3

*United States v. Johns,*
   948 F.2d 599 (9th Cir. 1991) ....................................................................... 5, 8

*United States v. Johnson,*
   584 F.3d 995 (10th Cir. 2009) ........................................................................ 4

*United States v. Johnson,*
   641 F.2d 652 (9th Cir. 1980) .......................................................................... 6

*United States v. Kelley,*
   482 F.3d 1047 (9th Cir. 2007) ........................................................................ 5

*United States v. Kovac,*
   795 F.2d 1509 (9th Cir. 1986) ...................................................................... 20

*United States v. Kow,*
   58 F.3d 423 (9th Cir. 1995) .......................................................................... 24

*United States v. Lefkowitz,*
   618 F.2d 1313 (9th Cir. 1980) ...................................................................... 26

*United States v. Leon,*
   468 U.S. 897 (1984) ............................................................................... 7, 27, 28

*United States v. Meling,*
   47 F.3d 1546 .................................................................................................. 26

*United States v. Michaelian,*
   803 F.2d 1042 (9th Cir. 1986) ........................................................................ 6

*United States v. Motz,*
   936 F.2d 1021 (9th Cir. 1991) ........................................................................ 5

*United States v. Pitts,*
   6 F.3d 1366 (9th Cir. 1993) ............................................................................ 5

*United States v. Reeves,*
   210 F.3d 1041 (9th Cir. 2000) ........................................................................ 9

*United States v. Robinson,*
   62 F.3d 1325 (11th Cir. 1995) ........................................................................ 6

*United States v. Ross,*
   456 U.S. 798 (1982) ...................................................................................... 27

*United States v. Rusher,*
   966 F.2d 868 (4th Cir. 1992) .......................................................................... 3

1

## TABLE OF AUTHORITIES

Cases:

*United States v. Salvucci,*
   448 U.S. 83 (1980) .................................................................................................... 3
*United States v. Sarkisian,*
   197 F.3d 966 (9th Cir. 1999) ................................................................................... 3
*United States v. Shryock,*
   342 F.3d 948 (9th Cir. 2003) ................................................................................... 3
*United States v. Sokolow,*
   490 U.S. 1 (1989) ..................................................................................................... 7
*United States v. Spilotro,*
   800 F.2d 959 (9th Cir. 1986) ........................................................................... 23, 24
*United States v. Taketa,*
   923 F.2d 665 (9th Cir. 1991) ................................................................................... 4
*United States v. Taylor,*
   716 F.2d 701 (9th Cir. 1983) ................................................................................... 6
*United States v. Underwood,*
   725 F.3d 1076 (9th Cir. 2013) ........................................................................ passim
*United States v. Wong,*
   334 F.3d 831 (9th Cir. 2003) ................................................................................... 6
*United States v. Wright,*
   215 F.3d 1020 (9th Cir. 2000) ................................................................................. 5

Statutes:

18 U.S.C. § 1084 ...................................................................................................... 24

Rules:

Fed. R. Crim. P. 41(d)(1) .......................................................................................... 5

Regulations:

15 C.F.R. § 30.1 ...................................................................................................... 13
15 C.F.R. § 30.2(a)(1) ............................................................................................. 13
15 C.F.R. § 30.3(a) .................................................................................................. 14
15 C.F.R. § 30.3(c)(1)(ii) ......................................................................................... 14
15 C.F.R. § 30.3(f) ................................................................................................... 14
15 C.F.R. § 30.6 ...................................................................................................... 15
15 CFR 30.55(h)(l) .................................................................................................. 12
15 CFR 758.1( ) ....................................................................................................... 12

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   INTRODUCTION

The Court should deny defendant Naum Morgovsky's motion to suppress evidence seized pursuant to two warrants issued by Magistrate Judges in this district:  a 2015 e-mail search warrant and an August 2016 search of his home and a storage locker.  The motion is based on defendant's belief that warrants should not be based on whether the totality of the circumstances demonstrate a reasonable probability that evidence of crimes will be located in the places to be searched.  Instead, defendant asserts and then demonstrates his view that affidavits should be parsed and that individual allegations should be judged in hindsight through the lens of the defendant's own conclusory statements.  The legal standards he proposes are anathema to settled law.

Morgovsky's factual arguments are so convoluted as to make a point-by-point response virtually impossible.  To do so would be an errand and of minimal value to the Court in resolving the issue at hand.  The Memorandum contains numerous demonstrable falsehoods, occasionally in diametric opposition to one another.  Moreover, the facts claimed in the Memorandum vastly exceed the facts contained in Morgovsky's declaration.  For example, notably absent from Morgovsky's Declaration are statements about the Morgovsky's businesses being: (1) "for years . . . engaged in domestic sales of night vision products;" (2) "Hitek International engages in the design and sale of night vision devices for domestic consumption" (3) "these orders were for Naum Morgovsky's own products in the United States;" and (4) "Morgovsky had his own night vision products in the U.S. and marketed them in the U.S.." <u>Motion to Suppress</u>, Doc. No. 115, pp. 51, 15, 24, 27.  Defendant further improperly asserts that he will be providing "voluminous documentation" at the hearing, and not beforehand. *Id.*, p. 37. The motion is so devoid of substance that Morgovsky attaches only 3 pages from one of the search warrant affidavits for the Court to review.  *See* Doc. No. 116-1.

A common sense reading of the affidavits submitted in support of both search warrants show that they easily support the magistrate judge's probable cause determination.  Nothing in Morgovsky's rambling and conclusory attack on the affidavits shows otherwise.  The motion to suppress should be denied.[1]

---

[1] The United States requests permission to exceed the page limits set by Local Rule 7-3(a) by four pages, given Defendant's 56-page Motion.  Counsel for Defendant does not oppose the United

## II.    BACKGROUND

The original three-count Indictment charged Morgovsky with conspiring with Marc Migdal to defraud Countrywide Home Loans (in the case of 112 Walaka Street, #305, Kihei, Hawaii) and First Horizon Home Loan Corporation (in the case of 112 Walaka Street, #404, Kihei, Hawaii), by using the identity of Gary Piper, a deceased individual, as a straw buyer for the property.  The Indictment alleges that Morgovsky held the Gary Piper identity and accounts in the name of that individual, allowing Migdal to pose as Gary Piper in order to induce the banks to sell the properties to the stolen identity for approximately half the amount owed on the mortgages, and later Morgovsky, acting as Gary Piper, transferred title to the properties to Migdal's wife.

On April 27, 2017, the Grand Jury returned an eleven-count First Superseding Indictment.  The First Superseding Indictment added the following charges: aggravated identity theft charges against both Naum Morgovsky and Mark Migdal for their use of the Gary Piper identity (Counts 4 and 5), possession of a false passport by an additional defendant, Irina Morgovsky (Count 6), two counts of making false statements to a federally insured financial institution against Mark Migdal (Counts 7 and 8), conspiracy to violate the AECA against Naum Morgovsky and Irina Morgovsky (Count 9), two counts of money laundering against Naum Morgovsky, and forfeiture allegations.

Several search warrants were executed in the investigation of the Morgovskys and Mark Migdal, including four locations on August 25, 2016, and several e-mail accounts.[2] Two of the physical locations, 1423 Avondale Road, Hillsborough, which is the Morgovsky's residence but is curiously titled in the name of their Russian associate Serguei Sofine (perhaps because of the Morgovskys' unpaid taxes on the order of $10 Million), and a Saf Keep storage locker in Hayward, California, held in the name of yet another stolen identity person whose identity Naum Morgovsky stole.  Several e-mail accounts associated with Naum Morgovsky were also searched.

Defendant has previously filed two Motions for Bills of Particulars, which the Court has denied.

---

States' request.

[2] Google, Inc. has refused to obey Judge Spero's June 1, 2017 search warrant for an e-mail account connected to an associate of Morgovsky.  That matter remains pending and has been related to this case. The government has opposed the e-mail account holder's motion to quash, and has obtained an Order to Show Cause against Google.

1   *See* Doc. Nos. 40, 56, 85, 93.  Defendant has also filed a Motion for Severance of Counts 1 through 4

2   from Count 9, a Motion to Dismiss Counts 1 through 4, and a Motion to Dismiss Count 9.

3   //

4   **III.    ARGUMENT**

5       **a.  Morgovsky Lacks Standing to Challenge the Search of the Storage Locker.**

6       Naum Morgovsky stole the Edward Joseph identity and used it to rent the storage locker.  *See*

7   Rezai-Zadeh 2016 Affidavit, ¶¶ 134-137.  "The Fourth Amendment protects individuals from

8   "unreasonable searches and seizures."  U.S. Const. Amend. IV.  However, a subjective expectation of

9   privacy is only legitimate if it is "one that society is prepared to recognize as reasonable." *United States*

10  *v. Cunag*, 386 F.3d 888 (9th Cir. 2004) (quoting *Minnesota v. Olson*, 495 U.S. 91, 95-96 (1990))

11  (quotations omitted).

12      It is well settled that a defendant may only contest the admission of illegally obtained evidence if

13  the defendant's own constitutional rights have been violated.  The rights assured by the Fourth

14  Amendment are personal in nature, and may not be vicariously asserted.  *Simmons v. United States*, 390

15  U.S. 377, 389 (1968); *Rakas v. Illinois*, 439 U.S. 128, 138 (1978).  A defendant bears the burden of

16  establishing a legitimate expectation of privacy in the area searched.  *Rawlings v. Kentucky*, 448 U.S. 98,

17  104 (1980); *United States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999).  A defendant must make a

18  two-part showing: (1) whether the individual, by his conduct, has "exhibited an actual (subjective)

19  expectation of privacy," and (2) whether the subjective expectation of privacy is "one that society is

20  prepared to recognize as reasonable." *Katz*, 389 U.S. at 361; *Smith v. Maryland*, 442 U.S. 735, 740

21  (1979); *United States v. Shryock*, 342 F.3d 948, 978 (9th Cir. 2003).  It is the defendant's burden to

22  prove both elements.  *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

23      It is because the Fourth Amendment rights are personal in nature that a defendant may not claim

24  an expectation of privacy merely because of that defendant's "status" with regard to the premises

25  searched or items seized.  *See, e.g., Shamaeizadeh v. Cunigan*, 338 F.3d 535, 545 (6th Cir. 2003)

26  (landlord of basement leased to another may not assert standing based upon status as owner of property);

27  *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992) (husband may not assert standing as to search

28  of wife's purse based on marital status).  Ownership, and other status-based relationships to the areas

search and items seized, are not decisive in evaluating privacy interests. *United States v. Salvucci*, 448 U.S. 83, 91 (1980). The Supreme Court has stated, "[C]apacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place, but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion." *Mancusi v. DeForte*, 392 U.S. 364, 368 (1968).

Here, Defendant has not met his burden of establishing facts supporting his standing to challenge the search of the storage locker.[3] Nor has he claimed that he was "legitimately on the premises where a search occur[red]" for purposes of establishing standing to challenge the search warrant. *Jones v. United States*, 362 U.S. 257, 267 (1960); *see also Lyall v. City of Los Angeles*, 807 F.3d 1178, 1186 (9th Cir. 2015) ("a defendant has standing to raise the Fourth Amendment only if it was *his* person, house, paper, or effect searched.") (emphasis in original); *see United States v. Taketa*, 923 F.2d 665, 670-71 (9th Cir. 1991) (in denying standing, emphasizing fact that defendant was not present at time of search).

Naum Morgovsky stole the identity of Edward Joseph and used it to rent to storage locker. The Tenth Circuit, presented with the question of whether a person has a reasonable expectation of privacy in a storage unit rented in a stolen identity, answered in the negative. *United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2009) ("Even assuming that Johnson established that he had a subjective expectation of privacy in the storage unit, we conclude that he did not show that his expectation of privacy was one that society would recognize as objectively reasonable"); (citing *United States v. Caymen*, 404 F.3d 1196, 1200-01 (9th Cir. 2005) ("The Fourth Amendment does not protect a defendant from a warrantless search of property that he stole, because regardless of whether he expects to maintain privacy in the contents of the stolen property, such an expectation is not one that 'society is prepared to accept as reasonable.'")). Thus, even assuming that Naum Morgovsky had some possessory interest in the storage locker, the use of a stolen identity to store evidence of his crimes is not one which society is prepared to recognize as legitimate for purposes of Fourth Amendment standing.

### b.  The Search Warrant was Supported by Probable Cause.

---

[3] The government does not, for purposes of this motion, dispute that the Morgovskys had a reasonable expectation of privacy in the residence they lived in which was titled under the name of Serguei Sofine.

1
*i. Background and Law Regarding Search Warrants.*

2
    A United States Magistrate Judge is authorized to issue a warrant upon receipt of an affidavit

3
which establishes probable cause that a federal crime has been committed. *See* Fed. R. Crim. P.

4
41(d)(1). To establish probable cause, an affidavit must establish that there is a "'fair probability' that

5
contraband or evidence is located in a particular place." *United States v. Kelley*, 482 F.3d 1047, 1050

6
(9th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Whether there is a fair

7
probability depends upon the totality of the circumstances, including reasonable inferences, and is a

8
'commonsense, practical question.'" *Id.* (quoting *United States v. Gourde,* 440 F.3d 1065, 1069 (9th

9
Cir. 2006).

10
    However, once a warrant issues, "the task of a reviewing court is not to conduct a *de novo*

11
determination of probable cause, but only to determine whether there is substantial evidence in the

12
record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727,

13
728 (1984). The issuance of a search warrant is reviewed for clear error. *United States v. Wright*, 215

14
F.3d 1020, 1025 (9th Cir. 2000). Likewise, a prior determination of probable cause will not be reversed

15
by the reviewing court absent a finding of clear error. *See United States v. Pitts*, 6 F.3d 1366, 1369 (9th

16
Cir. 1993). Thus, the reviewing court is "required to accord deference to the … finding of probable

17
cause and to uphold the [finding] if there is a substantial basis for concluding that the affidavit in support

18
of the warrant established probable cause." *United States v. Greany*, 929 F.2d 523, 524 (9th Cir. 1991);

19
*see also Illinois v. Gates*, 462 U.S. 213, 236 (1983) (rejecting *de novo* standard of review for probable

20
cause determinations and applying deferential "substantial basis" test); *Upton*, 466 U.S. at 733 ("A

21
grudging or negative attitude by reviewing courts toward warrants is inconsistent both with the desire to

22
encourage use of the warrant process by police officers and with the recognition that once a warrant has

23
been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise

24
may be the case.") (citation and internal quotation omitted). In marginal, or even "doubtful" cases, the

25
reviewing court should give preference to the validity of the warrant. *United States v. Johns*, 948 F.2d

26
599, 602 (9th Cir. 1991). The reviewing court's task is simply to ensure that the magistrate or judge had

27
a "substantial basis for concluding that the affidavit in support of the warrant established probable

28
cause." *United States v. Angulo-Lopez*, 791 F.2d 1394, 1396 (9th Cir. 1986). A reviewing court is

1  generally limited to an examination of the "four corners" of the affidavit.  *United States v. Huguez-*

2  *Ibarra*, 954 F.2d 546, 552 (9th Cir. 1992).

3        It is well settled that an affidavit in support of a search warrant need only enable the issuing court

4  to conclude that it would be reasonable to seek the evidence in the place indicated.  *See United States v.*

5  *Wong*, 334 F.3d 831, 836 (9th Cir. 2003); *United States v. Taylor*, 716 F.2d 701, 706 (9th Cir. 1983);

6  *United States v. Johnson*, 641 F.2d 652, 659 (9th Cir. 1980); *United States v. Hendershot*, 614 F.2d 648,

7  654 (9th Cir. 1980).  Thus, the affidavit need not establish that it was "more likely than not" that

8  evidence would be found on the premises.  *Taylor,* 716 F.2d at 705.  Nor must the affidavit preclude

9  other possibilities that the evidence might be found elsewhere or not at all.  *Id*. at 706.

10        Importantly, the opinions and conclusions of an experienced agent are a proper factor in the

11  probable cause determination.  *See United States v. Michaelian*, 803 F.2d 1042, 1045 (9th Cir. 1986);

12  *see also United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995); *United States v. Motz*, 936

13  F.2d 1021, 1024 (9th Cir. 1991) (stating that the conclusions of an agent "regarding a set of facts are

14  properly a factor in the probable cause equation under the Gates totality of the circumstances approach")

15  (quotations and citations omitted).

16                     *ii.   The 2015 and 2016 Search Warrants Are Supported by Probable Cause.*

17        Naum Morgovsky's main tactic is to parse out individual allegations in the search warrant

18  affidavit and claim that each alone does not constitute probable cause.  Mr. Morgovsky then argues, in

19  effect, that since those facts do not constitute probable cause individually, they cannot constitute

20  probable cause collectively.  Mr. Morgovsky can prevail only if the Court adopts an inventive new legal

21  standard that runs counter to well-settled law:

22       We are mindful that under modern practice it is often customary to view the affidavit as a
        whole to determine whether the "totality of circumstances" supports a probable cause

23       determination.  In this case . . . many of the statements in the affidavits must be viewed
        individually.  Only in this way can we demonstrate that none of the individual allegations

24       presented by the Affiant demonstrate illegal conduct by defendants, and thus, the
        "totality" of such allegations fails to support the issuance of warrants.

25

26  Def's. Mot., at 3.

27

28

1    Viewing the totality of the circumstances in determining probable cause is not merely

2    "customary;" it is well-settled law.  "[P]robable cause means a fair probability that contraband or

3    evidence of a crime will be found[.]"  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Illinois v.*

4    *Gates*, 462 U.S. 213, 238 (1983)).  Probable cause "is not readily, or even usefully, reduced to a neat set

5    of legal rules. . . . [W]e must consider the totality of the circumstances—the whole picture." *Id.* (internal

6    quotes and citations omitted).  "[I]nnocent behavior will frequently provide the basis for a showing of

7    probable cause, and . . . in making a determination of probable cause the relevant inquiry is not whether

8    particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of

9    noncriminal acts."  *Id.,* at 10 (quoting *Gates*, at 243-44).  In reviewing a magistrate's determination of

10   probable cause, the U.S. District Courts owe "great deference to [the] magistrate's determination."

11   *United States v. Leon*, 468 U.S. 897, 914 (1984).

12   The evidence discussed within the four corners of the 2015 affidavit was more than sufficient to

13   support the Magistrate Judge's probable cause determination. Defendant is so committed to the incorrect

14   position that the Court should not consider the totality of the affidavits that he did not even bother to

15   submit them for the Court's review.  Instead, defendant submits only a few pages from one of the

16   affidavits, along with over a hundred pages of his own information he believes undermine the few pages

17   he selected.  He fundamentally – though likely consciously – misapprehends the exercise.  The starting

18   point is a deferential review of the totality of that which was presented to the magistrate judge.

19   Accordingly, the government submits both warrants and respectfully requests that the Court read them.

20   Declaration of Colin Sampson, Exhibit 1 (2015 email application and affidavit) and Exhibit 2 (2016

21   storage locker application and affidavit).

22   The 2015 affidavit establishes the following:  (1) Mr. Morgovsky owned a variety of businesses

23   in the U.S., Including Hitek International ("Hitek"); (2) Irina Morgovsky ("Mrs. Morgovsky") was an

24   officer of Hitek; (3) Mrs. Morgovsky owned a variety of businesses in the U.S. including VisionTech;

25   (4) None of Mr. Morgovsky's or Mrs. Morgovsky's U.S. companies had production facilities of any

26   kind within the U.S. or employees (after 2003); (5) Nevertheless, Mr. Morgovsky's and Mrs.

27   Morgovsky's U.S. companies purchased hundreds of ITAR-controlled night vision and thermal device

28   components from U.S. retailers; (6) Mr. Morgovsky had an interest in manufacturing facilities in Russia

1   through his partial ownership of Infratech; (7) Mr. Morgovsky was in communication with employees of

2   Infratech using the subject account; (8) Mr. Morgovsky and Mrs. Morgovsky's companies made

3   numerous shipments overseas, including to addresses affiliated with Infratech; and (9) Mr. Morgovsky

4   and Mrs. Morgovsky's companies received significant payments from foreign bank accounts; and (10)

5   Infratech sold products that contained a FLIR TAU core (many of which are controlled for export by the

6   Commerce Department).  On the strength of just a few of those premises, it was reasonable to conclude

7   that the overseas shipments contained defense articles that had been exported to Russia without a license

8   for incorporation into finished night vision and thermal imaging devices, and that evidence of that

9   malfeasance was to be found in the subject accounts and at Morgovsky's residence and storage locker.

10      In fact, voluminous evidence of precisely this scheme was found in the subject e-mail accounts.

11   The 2016 affidavit contained everything in the 2015 affidavit plus what was found in the subject e-mail

12   accounts and more.  Consequently, the 2016 affidavit contained the same probable cause that a crime

13   had occurred, only with significant additional fidelity.

14      There is simply no basis for Mr. Morgovsky's averment that the affidavits lacked probable cause

15   to believe he was engaged in the illegal export of night vision and thermal imaging components.

16   Defendant's attempts to litigate the evidence against him by way of his Motion is at best rooted in a

17   gross misunderstanding of the law, or an attempt to elicit the government's best evidence, and may in

18   fact be a highly inappropriate attempt to inject his testimony into the proceedings without taking the

19   stand.

20           *iii.   The Search Warrant Affidavit Contains No False Statements or Material*
             *Omissions.*

21

22      In several places in his Motion, Defendant points to certain facts he contends would have

23   negated a finding of probable cause had they been included in the Affidavit.  In several other places he

24   accuses SA Rezaizadeh of making false statements.

25      At the outset, we note that "[t]he government need not include all of the information in its

26   possession to obtain a search warrant,[and] [a]n affidavit need only show facts adequate to support a

27   finding of probable cause."  *United States v. Johns*, 948 F.2d 599, 606 (9th Cir. 1991).  Indeed, Special

28   Agent Rezai-Zadeh's Affidavit states as much in Paragraph 6.  Furthermore, "[i]t is true that deliberate

or reckless omissions of facts that tend to mislead can be grounds for a *Franks* hearing. . . .   However, the omission rule does not require an affiant to provide general information about every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief that probable cause existed for the search."   *United States v. Craighead*, 539 F.3d 1073, 1081 (9th Cir. 2008) (internal quotes and citations omitted).   SA Rezaizadeh conducted a diligent and thorough investigation in a good faith effort to uncover the truth no matter where the evidence led her.   However, she is not omniscient, nor does the law require her to raise and disprove every possible alternative theory tending to negate probable cause.

Mr. Morgovsky is only entitled to a *Franks* hearing if he "can make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information."   *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).   As shall be shown, none of the supposed false statements or omissions enumerated in Mr. Morgovsky's Motion meet either prong of this test.

Before examining Mr. Morgovsky's accusations one by one, it must be highlighted that the highly irregular – even bizarre – way that Mr. Morgovsky filed his motion actually militates against granting the relief he seeks.   Mr. Morgovsky filed a Declaration with 32 Exhibits, a total of 125 pages of additional information, to accompany his Motion.   According to Mr. Morgovsky:

> In addressing these allegations, both for their sufficiency and truthfulness, we rely in part on the declaration of Naum Morgovsky presented herewith. It may appear unusual for a defendant to make such a presentation on his own behalf, but we believe it is justified here. Mr. Morgovsky has been involved in the night-vision industry for approximately 24 years. As a result, he is intimately familiar with the technical specifications of optical devices in general and night vision devices and components in particular, and with the business concerns, in the United States and abroad, pertaining to optical and night vision devices and components. He is aware of the often confusing statutory scheme under which manufacturers and customers struggle to determine which items are "controlled" for export purposes and which are not. He is familiar with shipping practices involving Shipper's Export Declarations (SEDs) and their electronic counterparts (AESs) filed not by the shipper but by the freight forwarders who typically generically describe the contents of shipments. Under these circumstances, we believe it is helpful and necessary to include Mr. Morgovsky's very knowledgeable input within this motion to suppress.

Def's Mot., at 3-4.   In summary, Mr. Morgovsky is of the opinion that the Court could not possibly comprehend why SA Rezaizadeh's allegations were wrong without him including 125 pages of his

1   expertise to illuminate the inquiry.  Of course, such an argument (even if it were true), is entirely self-

2   defeating—if 24 years of expertise and 125 pages are necessary to discerns the absence of probable

3   cause, it cannot be shown that SA Rezaizadeh made "intentionally or recklessly false statements" or

4   engaged in purposeful omissions in her affidavits of probable cause.  *See Reeves*, at 1044.  Stated

5   another way, if Mr. Morgovsky is the only one smart enough to understand why he is innocent (such that

6   not even his lawyer can explain it), then SA Rezaizadeh and the Magistrate who found probable cause in

7   her suspicions were both acting in good faith, and the warrant should stand.  *See United States v.*

8   *Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013) (Under "good faith" exception, which is satisfied if an

9   officer acts in objectively reasonable reliance on search warrant, evidence seized pursuant to a defective

10   warrant will not be suppressed). However, Morgovsky's expertise in the field does not establish that any

11   of the facts stated in the Affidavits were false or intentionally misleading.

12   1.   Supposed Omission of Emails Regarding Innocuous Purchases.

13   In the 2016 Affidavits, SA Rezaizadeh details two purchases Mr. Morgovsky made from Chinese

14   manufacturers.  *See* 2016 Affidavit, ¶¶ 93-94.  In both transactions, at least some of the purchased goods

15   were to be delivered to Infratech in Russia, and in one, the remainder of the goods was to be delivered to

16   Hitek in the U.S.  Defendant takes issue with the fact that SA Rezaizadeh did not specify whether the

17   goods were ITAR-controlled.  He claims it was a material omission to exclude information from emails,

18   supposedly in the government's possession at the time, indicating, "that defendants did not purchase

19   from the 'PRC-based night-vision equipment manufacturer/re-sellers' any controlled items but rather

20   generic parts which could be used for any kind of digital cameras or scopes, not only night vision

21   devices."  Def's Mot., at 10.

22   Mr. Morgovsky either grossly misunderstands, or is intentionally obfuscating, the purpose of this

23   language in the 2016 Affidavits.  SA Rezaizadeh did not assert, implicitly or explicitly, that the

24   transactions with the Chinese firms constituted an export of defense articles.  As Mr. Morgovsky himself

25   wrote, "payments to the 'PRC-based night-vision equipment manufacturer/resellers' indicate that

26   defendants were involved in importation rather than exportation and do not indicate that the equipment

27   purchased from them was, in fact, night vision equipment or that it was controlled either for export or

28

for import."[4]  Def's Mot., at 10.  The clear purpose of discussing the transactions with the Chinese firms was to show that Mr. Morgovsky was conducting business on Infratech's behalf, supporting the inference that Mr. Morgovsky had an ownership interest in Infratech, supporting the inference that Mr. Morgovsky had a motive to illegally export defense articles from the United States on other occasions. The information Mr. Morgovsky avers is missing is immaterial; its omission is of no consequence.

2.  <u>Supposed Omission of Facts Regarding the December 2010 Shipment to Infratech in Russia.</u>

In Paragraphs 42-46 of the 2015 Affidavit and Paragraphs 50-54 of the 2016 Affidavits, SA Rezaizadeh reported that Hitek International placed an order for at least one defense article on November 11, 2010, made the payment for the order on December 7, 2010, and that Mrs. Morgovsky's company, VisionTech, made a shipment to Infratech containing "optical parts and accessories" on December 16, 2010.  Mr. Morgovsky avers the allegation omits several material facts.  He provides no proof whatsoever that the facts were intentionally or recklessly omitted, and these supposed "material facts" are supported only by the conclusory statements in his self-serving declaration.  Furthermore none of the alleged intentionally-omitted facts were actually material.

3.  <u>Supposed Omission of the Weight of the Shipments.</u>

Mr. Morgovsky avers:

> [T]here were shipping documents and commercial invoices available to the affiant, from defendant's seized emails and other sources, which described the weight and contents of the shipment, all inconsistent with the affiant's claim that this was among the "small" shipments used by the defendants to disguise unlawful transfers of controlled equipment.

Def's Mot., at 46.  In Paragraph 80 of her 2016 Affidavits, SA Rezaizadeh included a description of smuggling tactics she has encountered during her law enforcement career.  She stated, "[O]ne technique used by [smugglers] is to prepare false documents for small shipments, which are then exported through commercial courier services such as FedEx and UPS."

At the outset, it is obvious that her general statement of "one [criminal] technique" was not

---

[4] If the items involved were defense articles, the transactions with the Chinese firms could have been a violation of the ITAR Brokering Amendments.  <u>See</u> 22 C.F.R., Part 129.  Nevertheless, it is not a theory of liability SA Rezaizadeh put forth in any of her affidavits, nor is it one the United States is currently pursuing in Naum's prosecution.

1    intended as a precise characterization of the Defendants' exports on any particular occassion.  SA

2    Rezaizadeh included her description of common smuggling techniques a full 11 pages after first

3    mentioning the December 16, 2010 export, in the process of discussing the December 16, 2010 shipment

4    in context with at least eight other of the Defendants' exports, undoubtedly of varying size.

5         Further, Defendant makes far too much out of the term "small shipments."  At one point in his

6    Motion, Mr. Morgovsky goes so far as to claim, "The filing of [a shipper's export declaration] in hard

7    copy or electronically through [the Automated Export System] is required not only for defense articles

8    but for any non-defense articles *as long they are not deemed 'small' shipments* and are valued at over

9    $2,500. (See 15 CFR 758.1( )(3) and 15 CFR 30.55(h)(l)). This is an important distinction not disclosed

10   by the affiant."  Def's. Mot., at 35 (emphasis added).  Morgovsky also misleadingly conflates "small"

11   value with "small" weight or size.  The implication is that the term "small shipment" has some sort of

12   legal definition providing an exemption to SED requirements.  In fact, the term "small shipment" does

13   not appear in the regulations Mr. Morgovsky cited, anywhere else in the Foreign Trade Regulations

14   (FTR"), the Export Administration Regulations ("EAR"), or, for that matter, anywhere in Title 15 of the

15   Code of Federal Regulations.  Nor does it appear anywhere in the International Traffic in Arms

16   Regulations ("ITAR"), the regulations actually at issue in this case.  SA Rezaizadeh's axiomatic

17   comments that a "small" shipment is less likely to be noticed than a "large" one was never meant to

18   convey or invoke any sort of legal standard, and it is unreasonable – even inexplicable – to read it as

19   such.

20        Mr. Morgovsky points out that the December 16, 2010 export weighed 290 lbs.  He therefore

21   argues it "was . . . no way a 'small' shipment[.]" Def's Mot., at 16.  There is simply no way to make

22   such a claim as there no legal or practical definition of "small."  It is all relative -- 290 lbs. is certainly

23   large compared to a typical letter, but dwarfed by the typical contents of a standard shipping container –

24   40 feet long with a cargo capacity in excess of 45,000 lbs.

25        Mr. Morgovsky uses the premise that the 290 lbs. shipment was not small to conclude that it was

26   not "subject to falsification."  *Id.*  It is a total non sequitur.  That a "small" shipment is generally less

27   noticeable than a "large" one does not meant that a "large" shipment cannot be exploited for smuggling.

28   In fact, it is readily possible that a "large" shipment of innocuous goods could be used to secret

1   relatively "small" contraband, the weight of the contraband masked by the comparative heft of the

2   legitimate cargo. Indeed, 290 pounds divided among several boxes could easily have concealed only a

3   few pounds of controlled items.

4       The omitted facts about the weight of the shipment are in no way material. Mr. Morgovsky's

5   contentions otherwise are inane.

6                           4.   Supposed Omission of "Customs" Regarding Electronic Export
                                 Information.
7

8       In Paragraphs 4(c)(3) and 37of the 2015 Affidavit and Paragraphs 5(d)(3), 54, and 79 of the 2016

9   Affidavits, SA Rezaizadeh discussed shipper's export declarations ("SED") filed on shipments the

10  Defendants sent overseas. The SEDs showed that from 2010 to 2014 Mrs. Morgovsky's company,

11  VisionTech, sent eight shipments to Russia, most to Infratech or its successors. The descriptions of the

12  commodities shipped were "optical parts and accessories," "parts for binoculars," or other equipment,

13  usually including at least one optics-related item.

14      Acting as an expert, Morgovsky takes numerous exceptions to the discussions of the SEDs. First

15  he claims SA Rezaizadeh made a material omission when she "failed to disclose to the magistrate that

16  all such electronic filings through the AES were made not by defendants but by the respective freight

17  forwarders who filed them on behalf of the defendants and, due to the automated nature of the AES, the

18  defendants were not and could not be attributed to placing the generic nature of the descriptions in these

19  filings." Def's Mot., at 38. Defendant also takes exception to the fact that SA Rezaizadeh called the

20  filed export information "SEDs" rather than "AESs." *See Id.*

21      First, there is no material distinction between SEDs and the electronic export information

22  ("EEI") filed in the Automated Export System" ("AES"). "The [AES] is the electronic system for

23  collecting [SEDs] (or any successor document) information from persons exporting goods from the

24  United States . . . . For purposes of the regulations in this part, the SED information shall be referred to

25  as EEI." 15 C.F.R. § 30.2(a)(1).

26      More importantly, Mr. Morgovsky's implication that the freight forwarder is responsible for the

27  commodity descriptions contained in the EEI is egregiously false. For purposes of their illegal

28  shipments, and the EEI filed for the shipments, the Morgovskys and their companies were the "U.S.

principal party in interest" ("USPPI").  *See* 15 C.F.R. § 30.1.  The various freight forwarders the

Defendants used were their "authorized agents."  *Id.*  Therefore, the Defendants were responsible for the

information filed in AES, both legally and as a matter of industry practice.  "The EEI shall be filed

through the AES by the [USPPI], [or] the USPPI's authorized agent . . . ."  15 C.F.R. § 30.2(a)(1).  "The

parties [to the export transaction] shall ensure that all information needed for reporting to the AES,

including correct export licensing information, is provided to the U.S. authorized agent for the purpose

of correctly preparing the EEI." 15 C.F.R. § 30.3(a).

> When the USPPI authorizes an agent to file the EEI on its behalf, the USPPI is
> responsible for: (A) Providing the authorized agent with accurate and timely export
> information necessary to file the EEI[;] (B) Providing the authorized agent with a power
> of attorney or written authorization to file the EEI . . . [;] (C) Retaining documentation to
> support the information provided to the authorized agent for filing the EEI.

15 C.F.R. § 30.3(c)(1)(ii).

> In cases where an authorized agent is filing EEI to the AES, the agent shall obtain a
> power of attorney or written authorization from a principal party in interest to file the
> information on its behalf. A power of attorney or written authorization should specify the
> responsibilities of the parties with particularity and should state that the agent has
> authority to act on behalf of a principal party in interest as its true and lawful agent for
> purposes of creating and filing EEI in accordance with the laws and regulations of the
> United States.

15 C.F.R. § 30.3(f).  No matter who actually entered the EEI in AES, the Defendants were still patently

responsible for its accuracy.  There is simply no credibility to the claim that it is a common industry

practice for freight forwards to pluck commodity descriptions out of thin air without input from the

exporters—doing so would unnecessarily expose them to liablity.

To be sure, EEI is frequently entered into the AES by the freight forwarder rather than the

exporter.  However, the overwhelmingly common practice is for the freight forwarder to enter the EEI

based on information given to it by the exporter in a shipper's letter of instruction, or "SLI."  *See* The

International Trade Administration, https://www.export.gov/article?id=What-is-a-Shipper (Sep. 22,

2017, 4:50 PM EDT); National Customs Brokers & Forwarders Association of America,

http://www.ncbfaa.org/Scripts/4Disapi.dll/4DCGI/cms/review.html?Action=CMS_Document&DocID=

16032&MenuKey=pubs (Sep. 22, 2017, 4:51 PM EDT).  The absurdity of any claim to the contrary is

1   illustrated by the exchange Mr. Morgovsky had with, KC Khorrami, the Principal of American Royal

2   International, which Mr. Morgovsky described in some detail just a few pages later in his Motion.  *See*

3   Def's. Mot., at 40-41.  Mr. Morgovsky explicitly admits he gave Mr. Khorrami the information

4   necessary for American Royal Internationl to file the export declaration on his behalf.  *Id.*

5         Relatedly, Mr. Morgovsky takes particular exception to SA Rezaizadeh's claim that including

6   purposefully generic descriptions of commodities in EEI is a common tactic for those smuggling

7   controlled commodities.  According to him:

8         [T]hose who know the basics of the AES, would know that, ***as a rule,*** when electronic
        equivalents of SEDs are filed by the freight forwarders, they customarily use generic
9         descriptions, such as "Optical parts and accessories," "Parts for binoculars," and the like,
        because the Schedule B of the universal Harmonized Tariff Schedule (HTS) does not
10        contain a harmonized code for each article, but contains mostly catch-all generalized
        harmonized codes, which results in the freight forwarders using generic descriptions for
11        the entire shipments in their electronic filings rather than specific descriptions of each
        item.

12

13   Def's Mot., at 39 (emphasis added).  His is an interesting choice of words because "the rules" in fact

14   state exactly the opposite.  15 C.F.R. § 30.6, "Electronic Export Information data elements," specifies

15   that "[f]urnishing the correct Schedule B or [Harmonized Tariff Schedule ("HTSUSA")] number does

16   not relieve the USPPI or the authorized agent of furnishing a complete and accurate commodity

17   description.." *Id.*, at § 30.6(a)(12).  It also instructs exporters and their agents to:

18        Report the description of the goods shipped in English in sufficient detail to permit
        verification of the Schedule B or HTSUSA number. Clearly and fully state the name of
19        the commodity in terms that can be identified or associated with the language used in
        Schedule B or HTSUSA (usually the commercial name of the commodity), ***and any and***
20        ***all characteristics of the commodity that distinguish it from commodities of the same***
        ***name covered by other Schedule B or HTSUSA classifications***.

21

22   *Id.*, at § 30.6(a)(13) (emphasis added).  Again, there is simply no credibility to the claim that it is a

23   common industry practice for freight forwarders to choose ambiguous commodity descriptions.

24         Moreover, the omission of these discussions from SA Rezaizadeh's affidavits was irrelevant.  No

25   matter who filed the SEDs or the EEIs, the descriptions of the commodities contained within them are

26   the kind one would expect to see from someone attempting to ship ITAR-controlled night vision and

27   thermal imaging components under the guise of innocuous optical equipment, particularly from

28   someone who claims to be the "grandfather of night vision," Def's Dec, ¶ 4, but lays no claim to

expertise over "photographic cameras," *see* 2016 Affidavits, ¶ 79.  The fact that data entry is performed by the freight forwarder was not an intentional omission—it is entirely without relevance.  Indeed, Mr. Morgovsky's suggestion that he did not supply the information is demonstrably false based on his own affidavit.

5.   <u>Supposed Omission of the Morgovsky's Whereabouts on the Date of the December 2010 Export.</u>

Mr. Morgovsky deserves just a bit more credit for his claim regarding the supposedly material omissions about his and Mrs. Morgovsky's whereabouts just prior to, and during the December 16, 2010 shipment to Russia.  However, he in no way deserves a hearing on the issue, much less the relief that he seeks.

In Paragraphs 37, 45, and 46 of the 2015 Affidavit and Paragraphs 53, 54, and 79 of the 2016 Affidavits, SA Rezaizadeh mentions that Mr. Morgovsky paid for an order with Tactical Light Solutions ("TLS") containing ten controlled commodities on December 7, 2010, that the order was either delivered to Hitek at its P.O. box or scheduled for a Hitek employee to pick it up from TLS.  She also represented that the order could have taken up to one week before the order was ready for pickup.  Further, Mrs. Morgovsky's company, VisionTech made a shipment to Infratech on December 16, 2010.  The implication was that there was probable cause to believe that the Defendants had exported the controlled commodities from the TLS purchase in the December 16, 2010 shipment.

According to Mr. Morgovsky, the discussion was incomplete.  First, he states that Mr. and Mrs. Morgovsky were travelling overseas at the time the TLS order was either delivered or picked up and at the time of the December 16, 2010 shipment.  *See* Def's Mot., at 14-17, 46.  In support of his claim, Mr. Morgovksy produced an email containing a receipt for his and Mrs. Morgovsky's travel from Budapest to London scheduled for December 12, 2010.  *See* Def's Declaration, Exhibit 2.

In fact, Mr. and Mrs. Morgovsky were not in the United States at the time the TLS order was likely fulfilled or on December 16, 2010.  Mr. and Mrs. Morgovsky left the United States on November 17, 2010 and did not return until January 1, 2011.  This is irrelevant and immaterial.  SA Rezaizadeh outlined a wealth of information to show that there was probable cause to believe that the Morgovskys caused the acquisition of 10 defense articles from TLS and subsequently directed that they be included

in the December 16, 2010 shipment to Russia.  She included more than enough of that information to establish probable cause to believe as much within the four corners of her affidavits.  Mr. and Mrs. Morgovsky's whereabouts, even if known by SA Rezaizadeh at the time, were not material, and the omission of their travel history in no way affected the probable cause determination.  The fact that the Morgovskys were out of the country at the time the TLS order was received, and on October 16, 2010, when the boxes were shipped to Russia, has barely a scintilla of weight on whether they caused those transactions.  There is no dispute that Hitek paid for the TLS shipment.  There is no dispute that Mrs. Morgovsky's company, VisonTech, was the USPPI for the December 16, 2010 shipment.  Mr. Morgovsky readily admits that Leila Freeman, Mark Migdal's secretary, shipped boxes for the December 16, 2010 shipment to the freight forwarder.  Those facts are within the four corners of SA Rezaizadeh's affidavits and more than sufficient to establish probable cause that the Morgovskys caused the acquisition and shipment, regardless of their physical location at the time.  For these same reasons, it follows that SA Rezaizadeh was acting in good faith and not intentionally omitting a material fact.

Further, additional recent revelations about information in SA Rezaizadeh's possession at the time of her affidavit provide additional evidence that the Morgovskys were responsible for the TLS purchase and the export of defense articles in the December 16, 2010 shipment.  In fact, reexamination of numerous documents, including emails, obtained from the freight forwarder, Auto Export Group, show that a "Serguei Seleznev" coordinated the December 16, 2010 shipment.  "Serguei Seleznev" is an identity Naum Morgovsky occasionally used.  Also, the phone number "Serguei" provided in his emails with the freight forwarder is Mr. Morgovsky's cell phone.  It was unnecessary for the Morgovsky's to be physically present in the U.S. to cause the December 16, 2010 shipment.

6. Claimed Misrepresentations Regarding the Purchases and Exports of Lenses for Thermal Imaging Devices.

In Paragraphs 49-58 of the 2015 Affidavit and Paragraphs 69-78 of the 2016 Affidavits, SA Rezaizadeh discussed certain facts tending to show that Infratech was building thermal imaging rifle scopes and the Defendants were supplying them with the parts for that operation, including FLIR TAU cores and specially designed Janos lenses, the latter being  defense articles on the USML.  The discussion included that Mr. Morgovsky emailed Janos seeking lenses for FLIR TAU cores of a certain

1   resolution, that Infratech advertised the sale of thermal imaging riflescopes of the same resolution, and

2   that a confidential source disassembled an Infratech thermal imaging rifle scope and recovered a thermal

3   imaging core with an obliterated serial number, that an engineer from FLIR later visually identified as a

4   FLIR TAU core.

5        Mr. Morgovksy argues the discussion was intentionally misleading and wanting on account of

6   several material omissions.  *See* Def's Mot., at 25-34.  He argues that in the absence of the

7   misstatements and omissions, there would be no probable cause to believe Infratech was using FLIR

8   TAU cores, no probable cause to believe the Defendants supplied those cores, and no probable cause to

9   believe the Defendants exported Janos lenses.

10       In support of his argument, Mr. Morgovsky has included dozens of pages of highly technical

11   information in the Motion, his accompanying Declaration, and exhibits appended to the Declaration.  As

12   discussed in some detail above, the mere inclusion of the highly technical data militates against a finding

13   that SA Rezaizadeh intentionally misrepresented or omitted anything.  While a highly diligent and

14   competent investigator with a technical background in other engineering disciplines, SA Rezaizadeh is

15   not an optical or electrical engineer.  If there was a piece of information tending to negate probable

16   cause buried in the information Mr. Morgovsky highlights in his motion, it is highly unlikely that SA

17   Rezaizadeh, the Magistrate, or many other people of more than average intelligence would have

18   recognized it.  If she and the Magistrate both relied on the information available to them during their

19   probable cause determination in good faith, there is no cause for exclusion.

20       Even if that were not the case, Mr. Morgovsky's technical arguments, which were likely

21   proffered to either impress or confuse, succeed at neither.  His arguments do not support his conclusion

22   that SA Rezaizadeh's and the Magistrate's probable cause determination was flawed.  For all of their

23   jargon and bewildering detail, Mr. Morgovsky's technical arguments boil down to two uncomplicated

24   assertions: (1) the correlation between the resolution of the FLIR TAU cores he cited in his emails to

25   Janos and the resolution of the rifle scopes to Infratech does not mean what SA Rezaizadeh thought it

26   meant; and (2) just because he was asking for products compatible with FLIR TAU cores does not mean

27   he was actually using FLIR TAU cores.  Even if the two assertions are completely true, there was still

28   probable cause to believe the Defendants were willfully exporting both Janos lenses and FLIR TAU

1   cores to Infratech at the time of the 2015 and 2016 affidavits, and there remains so today.

2       In both her 2015 and 2016 affidavits, SA Rezaizadeh mentioned that Mr. Morgovsky emailed

3   Janos seeking lenses that were compatible with FLIR Tau cores of a certain resolution, 640x480.  She

4   also mentions that Infratech advertised the sale of thermal imaging rifles scopes with 640x480

5   resolution.  She correlated the two facts to support the extremely reasonable inference that Mr.

6   Morgovsky was supplying Infratech FLIR Tau cores for incorporation into its products.  Mr. Morgovsky

7   has presented voluminous information tending to show that just because a thermal imaging core of a

8   certain resolution is incorporated into a thermal imaging device, does not mean that the final product

9   with have the same resolution.  This is an argument without consequence because whether or not the

10  resolutions Morgovsky requested from FLIR "reflected the normal industry standards for video

11  displays," Mr. Morgovsky nonetheless concedes that at least one of the resolutions he requested from

12  FLIR matches at least one of the resolutions on a scope sold by Infratech.  Not coincidentally, this also

13  supports the Confidential Informant on the issue of the FLIR TAU core in the Infratech scope.

14      Even if Mr. Morgovsky is correct, and SA Rezaizadeh's good-faith inferences were incorrect,

15  there is still overwhelming evidence within the four corners of the affidavits to support probable cause

16  that the Defendants were supplying FLIR Tau cores and Janos lenses to Infratech: (1) Mr. Morgovsky

17  held himself out as a night vision and thermal imaging designer and manufacturer, but had no

18  identifiable production facilities in the United States at the time of his illegal exports; (2) Mr.

19  Morgovsky told FLIR he had acquired T3/ATN platforms containing FLIR Tau cores prior to soliciting

20  FLIR for direct sales; (3) Mr. Morgovsky specifically told a FLIR representative that he was designing

21  products "utilizing TAU-1 and TAU-2 sensors" – not "compatible with" FLIR Tau cores, not "similar

22  to" FLIR Tau cores – "**utilizing**" FLIR Tau cores; (4) Mr. Morgovsky's subsequent emails tend to show

23  he acquired at least 50 more FLIR Tau cores from ATN after soliciting FLIR for the same products; (5)

24  Mr. Morgovsky has an ownership interest in Infratech; (6) the Defendants were unequivocally providing

25  materials to Infratech which could be used to assemble night vision scopes; (7) a confidential informant

26  took pictures of a FLIR Tau core from an Infratech product; (8) the recovered FLIR Tau core had an

27  obliterated serial number.  Simply put, the affidavit overwhelmingly "supports a finding of probable

28  cause" even "without the allegedly false information."  *Reeves*, at 1044.

1

7.   The Constitutionality of the Trash Retrieval.

2

Nowhere in his Motion or Declaration does defendant assert that the evidence obtained in a

3

garbage retrieval was within the curtilage of his home and thus protected by the search warrant

4

requirement.  Even if Mr. Morgovsky had properly framed an argument challenging the legality of the

5

trash pull, he has the burden of making an initial showing that he had an expectation of privacy over the

6

place from which the evidence was recovered.  *See United States v. Kovac*, 795 F.2d 1509 (9th Cir.

7

1986) (defendant has burden of establishing that, under totality of the circumstances, search or seizure

8

violated his legitimate expectation of privacy in a particular place).  Rather, defendant merely asserts

9

that the search warrant was invalid because the affiant failed to affirmatively state in her affidavit "that

10

the trash was abandoned for collection outside the curtilage of the defendants' residence."  Def's Mot.,

11

at 44.  ust as the affiant is not required to establish the *bona fides* of every piece of evidence she includes

12

in her search warrant, she was not required to opine on the constitutionality of the trash retrieval.

13

Indeed, the pictures attached to the Affidavit show that there was no such fence.  Pursuant to

14

*California v. Greenwood*, the Supreme Court held that a defendant's Fourth Amendment rights are not

15

violated where an agent searches and seizes garbage which a defendant left on a curb in front of his

16

home for collection, as the expectation of privacy in his abandoned garbage was not reasonable.  108 S.

17

Ct. 1625 (1988); *see also United States v. Espriella*, 781 F.2d 1432 (9th Cir. 1986) (same). Defendant's

18

bald assertion of government wrongdoing constitutes another mere denial which fails to meet his burden

19

of establishing an expectation of privacy in the evidence seized, and should be summarily rejected.

20

21

8.   Claimed Mistranslations of Documents Abandoned in the
Morgovskys' Trash.

22

As part of her discussion of the illegal export of thermal imaging components to Infratech, in

23

Paragraph 29 of the 2015 Affidavit and Paragraph 72 of the 2016 Affidavits, SA Rezaizadeh discussed a

24

document she found in the Morgovskys' trash mentioning a "[r]oot module with dimensions 38x38

25

unifies thermal imaging module with FLIR module."  Mr. Morgovsky has two issues with the

26

discussion.  His first issue is that the document was actually four pages rather than the two, as mentioned

27

the affidavits, and that the pages were out of order.  His second issue is that the document was

28

imprecisely translated.

That pages of document might have separated in trash hardly requires explanation.  That SA Rezaizadeh may have failed to recognize that separated pages of a document belonged together is completely understandable.  Mr. Morgovsky does not even attempt to explain how that failure could have changed her analysis of the portions upon which she relied in her investigation.  For that matter, SA Rezaizadeh' s mention of where in the document she found the language upon which she relied was superfluous, it did nothing to further the analysis that the Defendants were communicating with someone in Russian about the design of a thermal imager involving a FLIR component.  Mr. Morgovsky's observations about the order and total number of pages is simply irrelevant.

That the meaning of a document could change with an improper translation is a more cogent argument, but does not overcome his burden to show error.  At the investigative stage, investigators are permitted to rely on less precise translations than later in criminal prosecutions; and the quoted language was of limited value in light of the other evidence cited in the affidavit.  Inclusion of an imprecise translation in a search warrant affidavit is not a material omission requiring a *Franks* hearing where the content of the communication is corroborated by other evidence, *see e.g. United States v. Gonzalez*, 365 F.3d 656, 663 (8th Cir. 2004).  SA Rezaizadeh quoted a mere sentence fragment from the translated document, only that which was necessary to support the inference that the Defendants were communicating about thermal imaging technology involving a FLIR components with someone who spoke Russian.  She quoted no more and did not need to prove any more to establish probable cause.  Further, her inference that the Defendants were exporting FLIR thermal imaging components to Russia was supported by ample additional information already discussed.  There is simply no way that a more precise translation could have resulted in an absence of probable cause.[5]

        9.  Supposed Omission Regarding the Obliteration of Serial Numbers on a FLIR TAU Core.

In Paragraphs 4(c)(4) and 54-55 of the 2015 Affidavit and Paragraphs 5(d)(4) and 76-77 of the 2016 Affidavits, SA Rezaizadeh highlighted that a confidential source found an obliterated serial

---

[5] This assumes that the Court gives credit to the Defendant as a truthful interpreter and language expert.

1   number on the FLIR Tau core found within an Infratech thermal imaging rifle scope.  Mr. Morgovsky

2   avers that the statements were incomplete because they did not include that "[s]erial numbers are affixed

3   by FLIR to its TAU cores with tiny paper adhesives label which can be easily removed with a fingernail.

4   . . ." Def's Mot., at 34. Mr. Morgovsky exhibits a great deal of knowledge about the inner workings of

5   the very components that he claims he didn't know or realize were controlled for export by ITAR.

6       The statements in the Affidavits regarding the obliterated serial numbers found by the

7   confidential source are in no way intentional or recklessly false statements or misleading omissions.  In

8   fact they are completely accurate.  The Serial Numbers for FLIR Tau Camera Cores are etched into the

9   camera frame as well as embedded into the operating software in order to identify them for warranty and

10  tracking purposes.  *See* FLIR Website,

11  http://www.flir.com/cvs/cores/knowledgebase/index.cfm?CFTREEITEMKEY=327&view=35697 (Sep.

12  21, 2017, 8:42 PM EDT).  FLIR does serialize some of its other products with adhesive labels, but not

13  the ones at issue here.  From this there are no other conclusions that can be drawn besides that Mr.

14  Morgovsky is either not as knowledgeable of night vision as he thinks himself to be, or that he has

15  blatantly lied in order to confuse or misled the Court.  Nor does the Defendant's declaration establish

16  that, even if the serial numbers were adhered to the units, they couldn't be obliterated through

17  scratching- his claims are simply protestations that it would be illogical to scratch something that could

18  be peeled, which in no way renders it impossible or diminishes probable cause.

19      Though the United States has not pursued it a part of its case theory, there was at the time the

20  warrants were sworn-out -- and remaining today -- probable cause to believe that Mr. Morgovsky and

21  his coconspirators acquired EAR-controlled FLIR Tau cores and unlawfully exported them to Russia for

22  incorporation into thermal imaging scopes.  Not the least of which was the fact that the Defendants, by

23  Mr. Morgovsky's own admissions, regularly acquired night vision and thermal imaging components

24  from the United States for export to Infratech in Russia, and the fact that a FLIR Tau core with an

25  obliterated serial number was found in weapon sight manufactured and sold by Infratech.

26      Even if, by of stretch of the imagination, Mr. Morgovsky's claims that SA Rezaizadeh omitted a

27  material fact on this score, there is no possibility that it would have negated the Magistrates's finding of

28  probable cause.  The evidence within the four corners of each affidavit that the coconspirators were

engaged in the unlawful export of defense articles and that evidence of the crimes would be found in the places to be searched is overwhelming and speaks for itself.

///

///

### 10. The Affidavits Established Probable Cause that Evidence Would be Found in the Places To Be Searched.

In Paragraph 138 of the 2016 Affidavit, SA Rezaizadeh outlined the various evidence linking the Defendants' crimes to their residence.  In Paragraph 139, She outlined the various evidence linking the Defendants' crimes to Mr. Morgovsky's storage unit.  Mr. Morgovsky baldly asserts that the allegations in Paragraphs 138 and 139 were insufficient to establish a nexus between the Defendants's crimes and the home and storage unit.  Though he cites to ample, redundant case law for the principles underlying such an inquiry, he utterly fails to explain how they do or do not apply to allegations in Paragraphs 138 and 139.  The language of the 2016 affidavit requires no further elaboration, nor does Mr. Morgovsky's argument on this point require further discussion.

### 11. The Affidavits and Attachments Were Sufficiently Particular.

The Defendant also argues that the 2016 Affidavits did not sufficiently describe the place to be searched or the things to be seized.  His first complaint is that "The warrants in the present case required to seize [sic] many general categories of documents based on violations of long list of criminal statutes."  Def's Mot., at 52.  He compares his case with *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).  Though dated, *Spilotro* appears to remain good law.  It specifies that:

> In determining whether a description [of the items to be seized] is sufficiently precise, we have concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*Id.*, at 963 (internal citations omitted).  The description in *Spilotro* failed because:

> [T]he government could have narrowed most of the descriptions in the warrants either by describing in greater detail the items one commonly expects to find on premises used for the criminal activities in question, or, at the very least, by describing the criminal activities themselves rather than simply referring to the statute believed to have been

1   violated.

2   *Id.*, at 964.

3       There is a sizable, material distinction between the descriptions of the items to be seized in

4   *Spilotro* and here.  In *Spilotro*, the description consisted of nothing more than:

5
6       [N]otebooks, notes, documents, address books and other records; safe deposit box keys,
        cash, gemstones and other items of jewelry and other assets; photographs, equipment
7       including electronic scanning devices, and other items and paraphernalia, which are
        evidence of violations of 18 U.S.C. § 1084, 1952, 1955, 892–894, 371, 1503, 1511, 2314,
8       2315, 1962–1963 which constituted evidence, contraband, or instrumentalities of the
        enumerated offenses.

9
    *Id.*, at 961, 962.  Both of SA Rezaizadeh's Affidavits contained an itemized list of 28 categories of
10
    evidence to be seized, each linked to at least one of various offenses the Defendants committed.  The
11
    description was written in single-spaced, 10 point font and still occupied five pages of text.  Though
12
    admittedly, the warrant did seek evidence of a long list of crimes, it was only because the Defendants
13
    were involved in a dizzying panoply of criminal activity, demonstrated by probable cause in other
14
    sections of the affidavit.
15
        Mr. Morgovsky also claims that the description of the items to be seized was defective in that it
16
    did not specify a timeframe for the documents to be seized.  *See* Def's Mot., at 53.  He cites to *United*
17
    *States v. Kow*, 58 F.3d 423 (9th Cir. 1995), for the proposition that a warrant must contain a particular
18
    timeframe for the documents to be seized.  Mr. Morgovsky misstates the holding in *Kow*.  *Kow* did not
19
    impose a requirement that law enforcement officers limit the scope of items to be seized to a particular
20
    timeframe, it merely opined that a timeframe was one of the several ways in which the insufficiently
21
    particular description at issue might have been constrained.  The holding in *Kow* was limited to its facts
22
    and inapposite to this case.
23
                        12. The Reliability of the Confidential Source.
24
        As already discussed, in Paragraphs 4(c)(4) and 54-55 of the 2015 Affidavit and Paragraphs
25
    5(d)(4) and 76-77 of the 2016 Affidavits, SA Rezaizadeh referred to a confidential source ("CS") who
26
    found a FLIR Tau core with an obliterated serial number in an Infratech thermal imager.  Ignoring any
27
    burden he possesses, Mr. Morgovsky argues that the statements of the CS should not have been
28

considered because they lack sufficient indicia of reliability.  *See* Def's Mot., at 53-56.  Mr. Morgosky

cites to numerous cases, none on point, outlining a variety of ways in which the government could have

enhanced the reliability of the CS's statements but did not.  His complaints with the reliability of the

CS's statements distill to the following: (1) that SA Rezaizadeh stated the CS "previously provided the

FBI with substantial and corroborated information," (2016 Affidavit, ¶ 30), but did not elaborate; and (2)

that the information provided by the CS was insufficiently corroborated to be reliable. Both can be

disarmed with one fell swoop.

It is perhaps appropriate that, here at the end, we return to where we once began: the Seminal

case of *Illinois v. Gates*, 462 U.S. 213 (1983).

> [An] informant's "veracity" or "reliability" and his "basis of knowledge[]" . . . are better
> understood as relevant considerations in the totality-of-the-circumstances analysis that
> traditionally has guided probable cause determinations: a deficiency in one may be
> compensated for, in determining the overall reliability of a tip, by a strong showing as to
> the other, or by some other indicia of reliability.

*Id.*, at 233; *see also United States v. Dozier*, 844 F.2d 701, 706 (9th Cir. 1988).  FBI agents do not

elaborate on specific instances of a confidential source's reliability for one critical reason – attributing

them to specific facts may lead to them no longer being "confidential."  Nevertheless, the fact of the

matter is that there were a multitude of reasons to believe the confidential informant at issue here, most

of which have already been discussed in detail: (1) Mr. Morgovsky held himself out as a night vision

and thermal imaging designer and manufacturer, but had no identifiable production facilities in the

United States at the time of his illegal exports; (2) Mr. Morgovsky told FLIR he had acquired at least

three FLIR Tau cores prior to soliciting FLIR for direct sales; (3) Mr. Morgovsky specifically told a

FLIR representative that he was designing products "utilizing TAU-1 and TAU-2 sensors"; (4) Mr.

Morgovsky's subsequent emails tend to show he acquired at least 50 more after soliciting FLIR; (5) Mr.

Morgovsky has an ownership interest in Infratech; (6) the Defendants were unequivocally providing

materials to Infratech; (7) a confidential informant recovered a FLIR Tau core from an Infratech

product; (8) a FLIR engineer used photographs the confidential informant took of the core to corroborate

that it was a FLIR Tau; (9) the recovered FLIR Tau core had an obliterated serial number, indicating

someone in the production chain intended to obfuscate its source.  There totality of the circumstances

1  indicate that the CS's statements were eminently reliable.

2      13.  <u>Alleged Deficiencies in the 2015 Warrants and their Effect on the 2016 Warrants.</u>

3

4      In conclusory fashion, Morgovsky asserts at the end of his brief that the 2015 affidavit failed to

5  establish probable cause to search his email accounts, to the extent that it asserted facts that were

6  repeated in the 2016 affidavit.  He argues, in effect, that if there were sufficient defects in the 2015

7  warrants to exclude the evidence obtained therefrom, the 2016 is necessarily defective both because it

8  relies on many of the same allegations and is tainted by the supposed infirmed 2015 searches.  Mr.

9  Morgovsky's argument is absurdly vague.  Without knowing the specific ways in which the 2015 might

10  have failed – which tree may have born poisonous fruit -- it is impossible to analyze which fruits may be

11  cured by an independent source, attenuation, or inevitability.  He utterly fails to discuss why, given the

12  facts provided in the 2015 affidavit, a neutral and detached magistrate should not have found probable

13  cause to believe that evidence of the crimes under investigation were committed and that evidence of

14  those crimes would be found in Morgovsky's e-mail accounts as explained in Paragraphs 42-64. Given

15  the detail associating those e-mail accounts with vendors of night vision technology in the United States

16  (some of it controlled) and with Infratech and others outside of the United States, and Morgovsky's

17  failure to provide any cogent argument that the affiant lied or recklessly omitted any information, his

18  challenge to the 2015 search warrant should be rejected.

19      **c.  Defendant is not Entitled to a *Franks* Hearing.**

20      In order to obtain a *Franks* hearing, a defendant must "make a substantial preliminary showing

21  that 'the affidavit contained intentionally or recklessly false statements, and … [that] the affidavit

22  purged of its falsities would not be sufficient to support a finding'" of probable cause.  *United States v.*

23  *Meling*, 47 F.3d 1546, 1553 (9th Cir. 1995 (quoting *United States v. Lefkowitz*, 618 F.2d 1313, 1318 (9th

24  Cir. 1980)).  *Franks* applies to intentional or reckless omissions as well as affirmative false statements.

25  *United States v. Ippolito*, 774 F.2d 1482, 1486-87 n.1 (9th Cir. 1985).  "A defendant is entitled to a

26  Franks hearing only if he makes a two-fold showing: intentional or reckless inclusion or omission, and

27  materiality."  *United States v. Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000).  The defendant needs to

28  show the affidavit, less its falsities, does not support a finding of probable cause.  *Id.*  Only when

1   material facts are omitted from (or included in) an affidavit with the intent to mislead, or with reckless

2   disregard for whether they would mislead, are *Franks* and its progeny implicated.  *See, e.g., Franks*, 438

3   U.S. at 171; *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1988).  There is "a presumption of

4   validity with respect to the affidavit supporting the search warrant."  *Franks*, 438 U.S. at 171.  Applying

5   these tests, the Ninth Circuit has repeatedly upheld district court denials of *Franks* hearings.

6           SA Rezai-Zadeh's affidavit was neither false or reckless.  "[W]e must judge the constitutionality

7   of [law enforcement officers'] conduct in light of the information available to them at the time they

8   acted.  Those items of evidence that emerge after the warrant is issued have no bearing on whether or

9   not a warrant was validly issued."  *Maryland v. Garrison*, 480 U.S. 79, 85 (1987).

10                      **d.   The Executing Officers Relied in Good Faith on the Validity of the Search**
                             **Warrants.**

11

12           Even if the search warrant affidavit failed to establish probable cause, evidence obtained

13   pursuant to the warrant should not be suppressed because the agents reasonably relied upon the search

14   warrant in good faith.  Under the good faith exception to the exclusionary rule, evidence seized pursuant

15   to a search warrant lacking in probable cause remains admissible if law enforcement officers act in

16   "objective and reasonable reliance" on a warrant issued by a "detached and neutral magistrate."  *United*

17   *States v. Leon*, 468 U.S. 897, 926 (1984).  In *Leon*, the Supreme Court held that there is a strong

18   presumption that a law enforcement officer acting pursuant to a warrant is acting in good faith.  *See Id*.

19   at 922-23.  "'Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness.'"

20   Id. at 922 (*quoting Illinois v. Gates*, 462 U.S. 213, 267 (1983) (White, J., concurring in judgment)).

21   "'[A] warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has

22   'acted in good faith in conducting the search.'"  *Id*. (*quoting United States v. Ross*, 456 U.S. 798, 823

23   n.32 (1982)).  Thus, the Court's good-faith inquiry is confined to the objective question whether a

24   reasonably well-trained officer would have known that the search was illegal despite the magistrate's

25   authorization.  *Leon*, 468 U.S. at 922 n.23; *see also Illinois v. Krull*, 480 U.S. 340, 349 (1987) ("It is the

26   judicial officer's responsibility to determine whether probable cause exists to issue a warrant, and, in the

27   ordinary case, police officers cannot be expected to question that determination.").

28           Here, the search was conducted based on a warrant obtained from a neutral and detached

1   Magistrate.  The affidavit is amply supported by sufficient probable cause.  There is no deficiency in the

2   warrant.  No false information was included in the affidavit, and there is nothing to indicate that false

3   statements were included or that other facts were omitted with reckless disregard for the truth.  Nothing

4   omitted from the affidavit would have affected the Magistrate's finding of probable cause.  In short, the

5   search warrant affidavit was not, on its face, "so lacking in indicia of probable cause as to render official

6   belief in its existence entirely unreasonable."  *Leon*, 468 U.S. at 923 (citations and quotations omitted).

7   Thus, the warrant could reasonably be relied upon, even if it was somehow flawed.

8              **e.   The Search Warrants Were Not Overbroad.**

9            Defendant provides caselaw regarding overbreadth and argues that "[t]he warrants in the present

10  case required to seize many general categories of documents based on violations of long list [sic] of

11  criminal statutes," however he fails to make any allegation that any particular evidence was seized in

12  violation of the search warrant on this theory. Motion to Suppress, p. 58. Defendant does not identify a

13  single piece of seized evidence that was subject to his overbreadth challenge.  The Court should reject

14  Defendant's bare allegation.

15     **IV.     CONCLUSION**

16           None of Mr. Morgovsky's critiques of the 2015 and 2016 Search Warrants are legitimate.

17  Defendant's Declaration attempts to bury the Court in an avalanche of argument and irrelevant "context"

18  that has nothing to do with whether the affidavit contained any false or misleading evidence. Even if

19  there were minor flaws, they were certainly made in good faith and therefore do not require exclusion of

20  the evidence obtained from the Warrants.

21           Furthermore, any supposed errors in this investigation pale in comparison to the egregious

22  abandonment of the truth in filing Mr. Morgovsky's motion.  Though it was subsequently approved by

23  the court, the motion exceeded the local 25-page filing limit by over 100% – not including the additional

24  125 pages of materials the Defendant included in his Declaration.  The additional materials were not

25  included in a good faith effort to discuss serious, nuanced legal issues.  They were at best a highly

26  inappropriate manifestation of the Defendant's delusions of grandeur, and at worst an intentionally

27  dilatory tactic designed to obstruct justice by tying up the resources of the prosecution team and its

28  investigators.  The Motion was rife with bare denials, backflips of logic, obfuscatory arguments meant to

1  divert the United States into rhetorical cul-de-sacs, egregious misstatements of the law, and blatant lies

2  about the facts of the case at bar.  Further, at least one of the Defendant's exhibits to his Declaration was

3  both a piece of ITAR-controlled technical data and a company's propriety data, the posting of which to a

4  public forum like PACER likely constituted an additional substantive violation of the Arms Export

5  Control Act to say nothing of the company's intellectual property rights.

6        The Defendant is not entitled to the relief he seeks. For all the foregoing reasons, the Motion to

7  Suppress should be denied in its entirety.

8                                                    Respectfully submitted,

9                                                    BRIAN J. STRETCH
                                                     United States Attorney
10

11  Dated:  October 10, 2017.                        /s/ Colin Sampson
                                                     JOHN H. HEMANN
12                                                   COLIN SAMPSON
                                                     Assistant United States Attorneys

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28