CHRISTOPHER J. CANNON, State Bar No. 88034
Sugarman & Cannon
737 Tehama St., No. 3
San Francisco, CA 94103
Telephone: 415-362-6252
Facsimile: 415-362-6431

Attorney for Defendant MARK MIGDAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARK MIGDAL,<br><br>Defendant. | Case No. 16-CR-00411-VC<br><br>**DEFENDANT MARK MIGDAL'S SENTENCING MEMORANDUM**<br><br>Date: January 9th, 2018<br>Time: 9:30 a.m.<br>Judge: Hon. Vince Chhabria |

# TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. WHO IS MARK MIGDAL .......... 1

III. A DEFENSE VERSION OF THE FACTS .......... 3

IV. MARK MIGDAL'S GUIDELINES ARE NOT REFLECTIVE OF HIS CRIMINAL CONDUCT AS THEY OVERSTATE HIS CRIMINAL LIABILITY AND LIKELIHOOD OF RECIDIVISM.......... 6

A. A Variance is Appropriate Under 18 U.S.C. § 3553.......... 6

B. The Nature and Circumstances of the Offense and the Offender Indicate that a Mitigated Sentence is Appropriate in this Case.......... 7

C. Mr. Migdal's Guidelines Are Not Reflective of his Criminal Conduct, Overstate his Criminal Liability and Likelihood of Recidivism .......... 8

D. Absent the Plea Agreement, Probation is Available as a Sentence in this Case and Probation would be an Appropriate Sentence in this Case. .......... 9

E. The Years of Uncertainty and Financial Penalties in this Case are Sufficient to Deter Migdal and Others. .......... 10

F. There is Little Chance of Recidivism in this Case. .......... 10

V. CONCLUSION.......... 11

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

Gall v. United States,
552 U.S. 38 (2007) ....................3

Kimbrough v. United States,
552 U.S. 85 (2007)....................3

United States v. Booker,
543 U.S. 220 (2005)....................3, 4

United States v. Whitehead,
532 F.3d 991 9th Cir. (2008) ....................5

**Statutes**

18 U.S.C. § 3553....................3, 4

U.S.S.G. § 2B1.1....................8

**Other Authorities**

http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf....................4

David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 587, 33 Criminology 1995 ....................6

Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 421, 448-49, Cardozo J. 8th ed. 2007 ....................6

Fed. Reg., Vol. 60, No. 69, 18378. ....................8

## I. INTRODUCTION

Mark Migdal is a 72-year-old man who was literally born in the Gulag. As a Russian dissident and Refusenik he lost his Russian citizenship in 1974 and initially went to Israel. He moved to Canada in 1976. In 1985 he signed a 5-year work contract with a German corporation, Bopp & Reuther Messtechnik GmbH and moved to Germany to be in charge of all North American business for that corporation. Mr. Migdal came to the Bay Area in 1991 and became a United States citizen in 2012. Mr. Migdal has led a very rich life with a wide variety of experiences and jobs. He has always worked incredibly hard but has also devoted substantial time to assist other Refuseniks in Russia, refugees in the United States, and United States Intelligence agencies. After coming to the West, Migdal became a successful petroleum engineer. He then used the knowledge he obtained regarding logistics and construction in petroleum to become a successful developer, at least until the Real Estate crash of 2008-2011. This is his first criminal conviction.

If not for a possible aggravated identity theft charge, we would be asking this Court to sentence Migdal to probation. Because of his wife's upcoming operation and his own scheduled knee replacement surgery, which must be kept apart so that they can take care of each other and their daughter, we will be requesting a longer than usual stay of execution so that the family medical and child care issues may be resolved.

## II. WHO IS MARK MIGDAL

As the letters from his friends and family attest, Migdal is a highly educated, very kind, intelligent and supporting person, who spent the first 30 years of his life in the former Soviet Union, where his own life, the life of his parents and of many close relatives and friends were subjected to the terror of Joseph Stalin. His father, arrested as a political prisoner in the 30's, spent virtually his entire adult life in the Gulag of Siberian labor camps. When Migdal's mother tried to track down her husband, she herself was arrested for trying to locate her husband, and

was sent to the same prison camp where her husband was confined. It was in that prison, Migdal was born in July of 1945. Although his mother was released from the Gulag to take her infant son back to Leningrad, Mark's father was re-sentenced for life and was sent deeper into the Gulag, to a foreboding region of Siberia known as "Kolima." Letter from Mordechai Rabinowitz.

While in Russia, Migdal graduated from a community college and then from Leningrad University and became an engineer. After coming to the West, Migdal received Masters Degrees in Electrical and Mechanical Engineering. From his earlier student years in the former Soviet Union Migdal followed the footsteps of his parents and became a dissident and a human rights activist. In the early 70's he became a friend and a close supporter of such prominent Soviet dissidents as Academic Sakharov and the writer and Nobel Lauriat Alexander Solzhenitsyn. After his Russian citizenship was revoked for his activities in support of democracy, and Migdal was expelled from Russia, Migdal eventually settled in the United States, where he continued to support the Russian dissident community and sponsored a very successful art exhibit designed to highlight Soviet Union's underground artists' protest against deprivation and a lack of freedom in the Communist Russia. See letter from painter Bella Marsky and attachments.

In addition to his political activities, which included months being debriefed by United States Intelligence officials following his departure from the Soviet Union, Migdal had a successful career as an engineer in the petroleum industry before he became a real estate developer.

Until the real estate crash of 2008-2011, Migdal was a successful builder/developer. He had a great reputation in the community and completed many successful projects. See letter from architect Andrei Urazov. When the market crashed, however, Migdal suffered huge financial losses. Those financial losses, coupled with a recent marriage, a baby daughter, and the death of his mother, placed Migdal under tremendous stress. See Letter from Ellen Morozoff. Mr. Migdal tried to deal with that stress, and even sought out psychiatric treatment.

Shortly before Migdal was charged in this case, his wife, Anetta was diagnosed with breast cancer. Mr. Migdal has been thrust into the role of caregiver, and has done an excellent job, both for his wife and their 9-year-old daughter, Rachel. Anetta's cancer has been baffling to her doctors and the family. Since the first part of 2016, she has endured 4 surgeries, radiation, chemotherapy, and probably even more challenging, uncertainty. She has another surgery scheduled to take place at Kaiser Hospital shortly after sentencing on or around Jan 30, 2018.

Anetta writes: "Mark has been my main support through the bouts of despair, fear, through surgeries, recoveries, the debilitating fatigue of radiation, the slew of medication and treatment side effects. He never stopped encouraging me, driving me to the appointments, helping after the surgeries and during the treatment, taking care of everything. All this while taking care of our daughter in the manner we agreed upon when I got diagnosed. He has postponed his own knee surgeries because [my surgeries] were more urgent."

For the last two years, Migdal has been a hands-on father to their child and a caregiver to his wife. Incarceration will punish not only Migdal, but his very ill wife and child. Accordingly, we request the Court be flexible in setting a reporting date for Migdal, so that he may continue to carry out his responsibilities as a husband and father. His family should not be punished for his crime.

## III. A DEFENSE VERSION OF THE FACTS

While we are not contesting the charges to which Migdal entered a guilty plea and is exceedingly sorry for, we would like to provide some background facts to put Migdal's actions in context. This was not a fraudulent scheme to take the money and run. Mr. Migdal bought these two condos in Hawaii in 2006. He made substantial out of pocket down payments of more than $180,000.00 on those purchases. He thought the condos would be nice vacation properties for his family, including his older children from his previous marriage, and would be good investments. Mr. Migdal could not have been more wrong.

Mr. Migdal was caught up in a general downturn in the Real Estate market and sought to reduce the principal of his many business and construction loans which market conditions had put underwater. These actions were very similar to those of millions of people caught up in the great crash of 2008-2011. In 2009, in Hawaii, 23% of all property transactions were either bank owned (generally post foreclosure or property deeded back to the bank in lieu of foreclosure) or short sale transactions. https://www.hawaiilife.com/blog/june-2009-maui-real-estate-sales-statistics/. The figures were even worse nationally. According to Core Logic 34% of all residential real estate sales in 2009 were distressed sales. http://www.corelogic.com/blog/authors/molly-boesel/2016/05/distressed-sales-accounted-for-11-percent-of-homes-sold-nationally-in-february-2016.aspx#.Wk1nzlWnHb0

With 4 development projects in California and another in Italy falling into bankruptcy or foreclosure, Migdal understood that he would not be able to keep up with monthly mortgage payments for the Hawaii condos, which he had purchased at the top of the market. Realizing he would be unable to keep current with the loans, Migdal offered to quit claim in lieu of foreclosure both condos back to the banks. Mr. Migdal was prepared to lose his substantial down payments together with more than 2 and a half years of loans' interest payments, totaling more than $287,000.00, allowing both Migdal and the banks to simplify the process and move on expeditiously. The banks refused Migdals's offer, explaining that their REO inventory was already so massive, that they did not want to take back and manage any more properties. Instead the banks encouraged Mark to list the condos for sale with a local Real Estate company and seek a short-sale buyer, subject to the banks' approval.

Long before entering into the Piper deal and due to the banks' unwillingness to simply take those condos back from him, Migdal spent more than a year attempting to follow the banks' recommendation and arrange a short sale of both condos on the open market. Unit 404 was on the market for more than 320 days and Unit 305 was on the market for more than 430 days. During that period, 7 different written offers were presented to Migdal, but rejected by the banks

as insufficient. After the banks countered those offers requesting higher prices, all of those buyers walked away.

The short-sale prices the banks finally agreed to accept were completely consistent with the other 9 short sales of other, similar condos in the same building. The short-sale prices were set not by an agreement between the sellers and buyers or between Migdal and Morgovsky, but by what the sophisticated bank managers believed was all they could obtain. No matter what Migdal and Morgovsky agreed to do between themselves, the bank had veto power over the deal and the price. The bank examined the proposed short-sale offer, saw that it was consistent with other short sales and their independent appraisal, and decided to go through with the sale.

An examination of other short sales of similar units in the building summarized below shows that the short sale to Piper was in line with other short sales in the building at the same time, and even higher in same cases: Units #302, #202, #301, #304 and #204 were sold much cheaper than Migdal's Unit #404 was sold to Morgovsky/Piper.

| Unit No | Days on the Market | Price | Date of sale |
|---|---|---|---|
| 404* | 324 | $228,000.00 | Sept 25, 2009 |
| 305* | 436 | $207,000.00 | Jan 15, 2010 |
| 302 | 418 | $220,000.00 | Aug 18, 2010 |
| 202 | 100 | $224,000.00 | Sept 3, 2010 |
| 301 | 115 | $216,000.00 | Oct 8, 2010 |
| 304 | 135 | $207,000.00 | Oct 8, 2010 |
| 202 | 43 | $242,000.00 | Jan 21, 2011 |
| 204 | 112 | $221,000.00 | Dec 23, 2011 |
| 203 | 86 | $244,000.00 | Mar 2, 2012 |

The loss to the banks on Migdal's short sale was no different than the losses banks experienced with the other identical condos in the building. The only real difference was Migdal's impatience to move on from an unsuccessful transaction. That impatience is costing him dearly. If these two condos had been bought by any other buyer, even by Morgovsky himself, but in his own name, Migdal would not be in the troubles he is in now.

## IV. MARK MIGDAL'S GUIDELINES ARE NOT REFLECTIVE OF HIS CRIMINAL CONDUCT AS THEY OVERSTATE HIS CRIMINAL LIABILITY AND LIKELIHOOD OF RECIDIVISM.

A. A Variance is Appropriate Under 18 U.S.C. § 3553.

In Booker, the Supreme Court held that district courts must consider the guideline range as advisory, not mandatory, and that they must also consider the other directives set forth in 18 U.S.C. § 3553(a). United States v. Booker, 543 U.S. 220 (2005). A district court "may not presume that the Guideline range is reasonable," but instead "must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 50 (2007). The Supreme Court has expressly rejected the notion that "extraordinary" circumstances are required to justify a sentence outside the advisory range of the Guidelines. Id. at 47.

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in Section 3553(a)(2):

> (a) retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");
> (b) deterrence;
> (c) incapacitation ("to protect the public from further crimes"); and
> (d) rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").

The sufficient-but-not-greater-than-necessary requirement is often referred to as the "parsimony provision." The parsimony provision is not just another factor to be considered along with the others set forth in Section 3553(a) – it sets an independent limit on the sentence a court may impose. Kimbrough v. United States, 552 U.S. 85, 101 (2007) (referring to the clause as an "overarching provision" that, post-Booker, "permits the court to tailor the sentence" to the individual defendant and crime in light of the goals of the Sentencing Reform Act of 1984).

The Sentencing Commission itself has recognized the need for alternative sentences that do not involve a prison term stating:

> Effective alternative sanctions are important options for federal, state, and local criminal justice systems. For the appropriate offenders, alternatives

> to incarceration can provide a substitute for costly incarceration. Ideally, alternatives also provide those offenders opportunities by diverting them from prison (or reducing time spent in prison) and into programs providing the life skills and treatment necessary to become law-abiding and productive members of society.

http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf.

In this case, if not for the plea agreement, the available alternative sanction of probation would be more than sufficient to satisfy the goals of sentencing.

In determining if the sentence is minimally sufficient to comply with Section 3553(a)(2) purposes of sentencing, a court should consider several factors listed in Section 3553(a). These are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the kinds of sentence available;
> (3) the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range;
> (4) the need to avoid unwarranted sentencing disparity; and
> (5) the need to provide restitution where applicable. 18 U.S.C. § 3553(a)(1), (a)(3), (a)(5)-(7).

Neither the statute itself nor Booker suggests that any one of these factors is to be given greater weight than any other factor. However, it is important to remember that all factors are subservient to Section 3553(a)'s mandate to impose a sentence not greater than necessary to comply with the four purposes of sentencing.

Here, all of the Section 3553 factors call out for a mitigated sentence in this case.

B. The Nature and Circumstances of the Offense and the Offender Indicate that a Mitigated Sentence is Appropriate in this Case.

Mr. Migdal's crimes occurred 8 years ago when Migdal's real estate projects, like many real estate investments at the time, were crashing around him. Mr. Migdal bought two condos that plummeted in value. Mr. Migdal listed the condos for sale and received several short-sale offers, but the bank refused to take them. Mr. Migdal, then, with the assistance of Naum Morgovsky submitted a slightly higher short-sale offer in the name of the deceased Gary Piper. Mr. Morgovsky's initial offer was not accepted and banks asked for more money. Mr.

Morgovsky raised the price to meet banks request. Only then was that offer approved by the banks and the sale completed and Migdal began to manage the properties. It is worth noting, however, that the banks independently from Migdal and Morgovsky decided on the price and approved the offers, and that Migdal did not initiate the sale of the condos with the idea of taking the money and running. In the end, Migdal lost a huge amount of money on these two condos. An identical short sale, but to any real person, even to Morgovsky himself in his own name, would have been fine with the banks and would not have brought Migdal before this Court. The short sale to Piper was a stupid and unforgivable decision, and Migdal has already paid a serious financial price for his errors.

This was not a violent crime and the loss was caused by the crash of the real estate market rather than any criminal intent. The letters from Migdal's friends, family and supporters provide evidence that Migdal was not and is not a threat to the community. To the contrary, he is an asset. He has always worked and helped his family and others. For the last several years, Migdal has been under great stress, knowing that this day will come. His performance during that time shows he can stay out of trouble and he has learned from the mistakes he made.

In United States v. Whitehead, 532 F.3d 991, (9th Cir. 2008) (per curiam), the Ninth Circuit affirmed a probationary sentence despite a guideline range of 41-57 months for creating counterfeit access devices, explaining that the district court had properly "[taken] into account its finding that Whitehead's [nonviolent] crime '[di]d not pose the same danger to the community as many other crimes.'" Id. at 993. This is also a nonviolent crime, and Migdal is paying a huge financial penalty. Mr. Migdal is a contributing member of the community. He does not pose a danger to it. Lengthy incarceration is simply not required to meet any of the goals of sentencing.

C. Mr. Migdal's Guidelines Are Not Reflective of his Criminal Conduct, Overstate his Criminal Liability and Likelihood of Recidivism

Application note 20(C) of § 2B1.1, addressing loss, acknowledges that "there may be cases in which the offense level determined under this guideline substantially overstates the

seriousness of the offense." The combined loss to the banks of $460,000.00 results in an increase of 12 Specific Offense level points and leads to a Total Offense Level of 16. Although we agree that the banks' loss in this case for guideline calculation is $460,000.00, this loss is not the result of Migdal's wrong doing, but rather is a direct result of the market condition and the collapse of the real estate prices during that time. The loss calculation vastly overstates Migdal's criminal responsibility because, as indicated above, in a time of financial desperation, he fraudulently arranged a short sale, but that short sale was for the same amount as many other short sales of identical units in the building at the same time. A large part of the loss in this case was created by market factors rather than any criminal plan. The short-sale price of the Migdal condos was completely consistent with the short-sale price of other units in the building. Mr. Migdal made false statements, but the loss in this case was caused by market forces rather than Migdal's false statements.

D. Absent the Plea Agreement, Probation is Available as a Sentence in this Case and Probation would be an Appropriate Sentence in this Case.

Although the maximum statutory penalty available in this case is twenty years, there is no statutory or guideline provision forbidding probation. Research regarding white-collar offenders found no difference in the deterrent effect of probation and that of imprisonment. See David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995); see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). Sending Migdal to prison for a lengthy period of time would simply be a waste of societal resources.

E. The Years of Uncertainty and Financial Penalties in this Case are Sufficient to Deter Migdal and Others.

Mr. Migdal is paying a huge financial penalty which will go a long way toward deterring others from similar conduct. That financial penalty is more than sufficient to deter others in the future. In addition to that financial penalty is the price his wife and daughter will pay, and Migdal's realization that the price his family will pay is his fault. The people who wrote on Migdal's behalf recognize that "Mark is [a] good husband and father. He has prioritized his family over all else and taken remarkable care of his wife throughout her illness and been a present and positive parent to his young daughter. Mark consistently thinks of others, strives to act fairly and pursues self-improvement." Letter from Scott Rogers. This prosecution and the penalties Migdal has paid and will pay have already sent a strong message that there are real penalties for providing false information to banks. There is simply no need for incarceration to send a message to others. That message has already been sent and heard.

F. There is Little Chance of Recidivism in this Case.

Finally, Migdal's age reduces the chances of recidivism. Every study on recidivism and crime, and the Bureau of Prison's own parole guidelines, recognize that there is a "burnout factor" as inmates get older and they become less likely to re-offend[1]. This was really a one-off event, and for all our sakes, we hope the market conditions of 2009 will never be repeated. Mr. Migdal has learned his lesson. He will not be in criminal court again.

---

[1] The Parole Commission has long recognized that many criminal offenders eventually "burn out" as the aging process catches up with them. In recognition of this factor, the Parole Commission recomputed the parole eligibility of older, parole eligible, inmates. In a 1984 study by the Commission's Research Office entitled "Burnout-Age At Release From Prison and Recidivism," the Parole Commission acknowledged that recidivism rates do decline with increased age. Federal Register, Vol. 60, No. 69, 18378.

## V. CONCLUSION

As the probation report recognizes, Mark Migdal is 72 years old and extraordinarily successfully overcame his birth in a Russian prison camp. Mr. Migdal was a good father to his first family and despite the issues that led to their divorce, gets along well with his ex-wife and their children. Mr. Migdal is a great father to his young daughter, Rachel, and has supported his wife Anetta through her excruciating medical experiences. This is Migdal's first criminal conviction and he has tremendous remorse and real insight into the price his actions have cost his family. A lengthy prison sentence will not right any wrongs or serve any interest but will only hurt Migdal's family, and all of society.

Accordingly, we join with the probation department and request that the Court vary from the Sentencing Guidelines in this case and impose the most lenient sentence possible.

Dated: January 3, 2018

Respectfully submitted,

/s/
Christopher J. Cannon
Attorney for Mark Migdal