ALEX G. TSE (CABN 152348)
Acting United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

JOHN H. HEMANN (CABN 165823)
COLIN SAMPSON (CABN 249784)
ERIN CORNELL(CABN 227135)
Assistant United States Attorneys
  450 Golden Gate Ave., Box 36055
  San Francisco, CA 94102
  Telephone:  (415) 436-7020
  Facsimile:  (415) 436-7009
  Email:       colin.sampson@usdoj.gov

JASON B.A. McCULLOUGH (NYBN 4544953)
Trial Attorney, National Security Division
  950 Pennsylvania Ave, NW
  Suite 7700
  Washington, D.C. 20530
  Telephone: (202) 233-0986
  Email: jason.mccullough@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:16-cr-00411-VC |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE "OTHER CRIMES EVIDENCE" |
| v. | |
| NAUM MORGOVSKY; and IRINA MORGOVSKY, | Pretrial Conference: May 30, 2018 |
| Defendants. | Time:              1:30 p.m. |
| | Place:            Courtroom #4, 17th Fl. |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................1

II.     ARGUMENT ..................................................................................................1

A.      The Elements of Counts 9 – 11 ....................................................................1

B.      The Evidence Cited by the Government is Inextricably Intertwined with Defendants' Violations of Counts 9 – 11 ....................................................................3

       1.      Categories One and Two: Exports of Controlled Night Vision Items and Components to Russia and other Countries, including The Netherlands, Spain, Germany, Macedonia, Bulgaria and Poland. ....................................................................4

       2.      Category Three: Evidence that Mr. Morgovsky Was Carrying ControlledNight Vision Components When Stopped by U.S. Customs on or about March 14, 2001....................................................................6

       3.      Category Four: Naum Morgovsky and Irina Morgovsky and other unindicted coconspirators sought to evade detection of night vision goods, items and components being imported into Russia through smuggling and other means, in order to avoid Russian import tariffs, including evidence of a 2013 administrative action against Naum Morgovsky by customs authorities in Russia for failing to declare several instruments for calibrating rifle sights imported by him to Russia on October 4, 2013. ....................................................................7

       4.      Category Five: Evidence that Defendant Naum Morgovsky committed identity theft with respect to other deceased persons (J.E., E.H., and J.F.) and also used assumed names (E.J and A.P.) to conduct night vision business, rent a Hayward, California storage locker that housed night-vision related materials, to travel to Russia, and assist in the criminal defense of a defendant in a separate AECA prosecution. Such evidence includes Naum Morgovsky's 2008 conviction for identity theft related to the J.F. identity................................................8

       5.      Category Six: Evidence that Defendant Naum Morgovsky used the G.P. identity to travel within the United States and to lease a storage locker in the Chicago, IL area that housed a machine controlled for export from the United States. ....................................................................9

       6.      Category Ten: Evidence that Defendant Naum Morgovsky used the an e-mail account opened in the name of Infratech owner, S.S., to ship packages and communicate with individuals regarding night vision.........................................................10

       7.      Category Eleven: Evidence that Irina Morgovsky used a stolen identity with the initials V.F. in furtherance of the AECA conspiracy, including travel to Moscow, Russia and renting a storage locker in Hayward, California prior to the rental of the storage locker opened under the name Edward Joseph. .........................11

       8.      Categories Twelve and Thirteen: Evidence that Naum Morgovsky used other businesses, such as Global Vision, to hold title to his assets, including a vehicle.  Evidence that Defendants Naum and Irina Morgovsky, as well as their companies, have failed to file federal income tax returns since at least 2001......................................................................12

1

C.      The Evidence Cited by the Government is Also Properly Admissible Under F.R.E.
        404(b)...................................................................................................................................12

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

Cases

3

*Huddleston v. United States*,
    485 U.S. 681 (1988)..................................................................................... 13

4

*U.S. v. Curtin*,
    489 F.3d 935 (9th Cir. 2007) .................................................................. 3, 13

5

*U.S. v. Preston*,
    873 F.3d 829 (9th Cir. 2017) ................................................................ 13, 15

6

*United States v. Alfonso*,
    759 F.2d 728 (9th Cir. 1985) ................................................................ 12, 13

7

*United States v. Beck*,
    615 F.2d 441 (7th Cir. 1980) ....................................................................... 1

8

*United States v. Bradley*,
    5 F.3d 1317 (9th Cir. 1993) ....................................................................... 14

9

*United States v. Chi Mak*,
    683 F.3d 1126 (9th Cir. 2012) ................................................................ 2, 12

10

*United States v. Conforte*,
    624 F.2d 869 (9th Cir. 1980) ....................................................................... 2

11

*United States v. DeGeorge*,
    380 F.3d 1203 (9th Cir. 2004) ................................................................ 3, 12

12

*United States v. Durrani*,
    290 Fed. Appx. 39 (9th Cir. 2008)................................................... 2, 3, 5, 9

13

*United States v. Jackson*,
    84 F.3d 1154 (9th Cir. 1996) ..................................................................... 13

14

*United States v. Posey*,
    864 F.2d 1487 (9th Cir. 1989) ................................................................. 1, 2

15

*United States v. Vizcarra–Martinez*,
    66 F.3d 1006 (9th Cir. 1995) ....................................................................... 3

16

*United States v. Woodley*,
    9 F.3d 774 (9th Cir. 1993) ........................................................................... 2

17

18

Statutes

19

18 U.S.C. § 1956(a)(2)(A) ................................................................................ 2

U.S.C. § 2778 ................................................................................................... 1

20

Rules

21

<u>F.R.E. 404(b)</u>.............................................................................................. ii, 12, 15

22

F.R.E. Rule 401................................................................................................. 3

F.R.E. Rule 403............................................................................................ 1, 15

23

24

25

26

27

28

1    **I.    INTRODUCTION**

2        The United States (the "government") respectfully submits this opposition to Defendant Naum

3    Morgovsky's Motion in Limine to Exclude "Other Crimes Evidence" (ECF No. 211) as joined by

4    Defendant Irina Morgovsky (ECF No. 202) (together, "Defendants' Motion").  Defendants' contend that

5    the thirteen categories of evidence described in the government's January 30, 2018 Notice of Rule

6    404(b) Evidence (ECF No. 174) have "no legitimate place in the trial of the [Defendants]" and "have no

7    direct bearing on the charges" at issue in this trial.  (ECF No. 211, 2:17-19, 8:27-28).  Defendants'

8    contentions are simply wrong.

9        As described in detail herein, and as introduced in the government's January 2018 notice (ECF

10   No. 174), the evidence bears directly on elements of the offenses at issue in this trial—Defendants'

11   knowledge, intent, and willfulness in engaging in the conspiracy and the preparation and planning of the

12   conspiracy.  The evidence is not proffered to prove defendants' character, and the probative value of the

13   evidence far outweighs its potential for unfair prejudice.  Accordingly, neither F.R.E. Rule 403 nor 404

14   prohibit the use of this evidence in the government's case-in-chief.

15       The government provided the January 2018 notice in the interest of resolving any dispute

16   concerning such evidence in advance of the trial, and it welcomes the opportunity to do so here.

17   **II.    ARGUMENT**

18       **A.  The Elements of Counts 9 – 11**

19       Defendants are each charged in Count 9 with conspiracy to violate the Arms Export Control Act

20   (the "AECA"), in violation of Title 22, U.S.C. § 2778.  To establish a violation of the AECA, the

21   government must prove that (1) a defendant knowingly exported or attempted to export, (2) goods or

22   information subject to export control, (3) without first obtaining a license from the licensing agency, and

23   (4) that such defendant acted "willfully."  *See United States v. Beck*, 615 F.2d 441, 449-50 (7th Cir.

24   1980).  To establish conspiracy, however, it is not necessary that the government prove that the

25   defendant did actually export items.  *United States v. Posey*, 864 F.2d 1487, 1492 (9th Cir. 1989).

26   Rather, the government must prove (1) an agreement to accomplish an illegal objective, (2) acts in

27   furtherance of that objective, and (3) the requisite intent to commit the underlying substantive offense.

28

1    *Id.*  Accordingly, defendants' knowledge and intent is central to the analysis.  Since direct proof of a

2    defendant's state of mind is rarely available, circumstantial evidence and inferences drawn therefrom

3    function to establish willfulness.  *United States v. Woodley*, 9 F.3d 774, 779 (9th Cir. 1993); *United*

4    *States v. Conforte*, 624 F.2d 869, 875 (9th Cir. 1980); *United States v. Chi Mak*, 683 F.3d 1126, 1137-39

5    (9th Cir. 2012) (Explaining that the jury was properly charged with considering "the totality of the

6    circumstances" when considering the evidence and inferences that demonstrated defendant's state of

7    mind.)  The evidence at issue is probative of, among other things, Defendants' motive, knowledge,

8    planning, and willfulness in seeking to export controlled night vision items to Russia, and it is rightfully

9    admitted as direct evidence on that basis.  *See United States v. Durrani*, 290 Fed. Appx. 39, 40 (9th Cir.

10   2008) (Defendant's prior conviction for violating the Arms Export Control Act was properly admitted

11   because it was "'inextricably intertwined' with the evidence, because it showed knowledge of the

12   restrictions on exporting weapons materials and motive for operating the conspiracy[.]")

13          Further, Naum Morgovsky is charged with two counts of money laundering, in violation Title

14   18, U.S.C. § 1956(a)(1)(B)(i) and (2)(A).  To establish a violation of 18 U.S.C. § 1956(a)(1)(B)(i),the

15   government must prove that (1) the defendant conducted a financial transaction involving the proceeds

16   of the exportation of defense articles without first obtaining an export license from the Department of

17   State, Directorate of Defense; (2) the defendant knew that the property represented the proceeds of some

18   form of unlawful activity; and (3) the defendant knew the transportation was designed in whole or in

19   part to conceal or disguise the nature source ownership and control of the proceeds of the exportation of

20   defense articles without first obtaining an export license from the Department of State, Directorate of

21   Defense to avoid a transaction reporting requirement under state or federal law.  To establish a violation

22   of 18 U.S.C. § 1956(a)(2)(A),the government must prove that (1) the defendant transported money to a

23   place in the United States from or through a place outside the United States; and (2) the defendant acted

24   with the intent to promote the carrying on of exportation of defense articles without first obtaining an

25   export license from the Department of State, Directorate of Defense Trade Controls.  The evidence at

26   issue is probative of, among other things, Defendants' willfulness in concealing their activities through

27   the use of fictitious and stolen identities and their efforts to further the illegal export business without

28

detection.

**B.   The Evidence Cited by the Government is Inextricably Intertwined with Defendants' Violations of Counts 9 – 11**

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." F.R.E. Rule 401.  It need not be "conclusive proof" of such fact, nor must the fact to be proved concern the "ultimate" issue, so long as such fact is "of consequence in the determination of the action." *U.S. v. Curtin*, 489 F.3d 935, 948 (9th Cir. 2007), citing The Advisory Committee Notes to the 1972 Proposed Rules of Evidence.  "Relevancy boils down to what our human experiences tell us, sometimes called common sense." *Id.*, 489 F.3d 935, 948 (9th Cir. 2007).

Evidence of other acts may be directly admitted if either (1) the evidence "constitutes a part of the transaction that serves as the basis for the criminal charge" or (2) the government finds it necessary in order "to offer a coherent and comprehensible story regarding the commission of the crime." *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004) (citing *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995)).  When evidence is "inextricably intertwined" with the charges, the court need not consider its admissibility under Rule 404(b).  *Id.*

In *DeGeorge*, the Ninth Circuit held that defendant's previous loss of three insured vessels at sea was necessary (under the second prong of the test) to understand the "transactions and concealment" that defendant engaged in during the commission of yet another insurance scam involving a scuttled ship at sea.  *Id.*   In the context of an export violation, where concealment is the *sine quo non*, a defendant's prior conduct is necessary to explain the method and means of a scheme that is, by design, intended to appear innocuous.  It is this logic that invariably drove the Ninth Circuit to conclude that the admission of a defendant's decades-old conviction for violating the Arms Export Control Act was "'inextricably intertwined' with the evidence, because it showed knowledge of the restrictions on exporting weapons materials and motive for operating the conspiracy as [defendant] did." *United States v. Durrani*, 290 Fed. Appx. 39, 40 (9th Cir. 2008).

Here, Defendant Naum Morgovsky has stated his intention to defend this case on the basis that

1   his exports of optical and night vision devices were "lawful activity."  Mr. Morgovsky asserts that the

2   descriptions on his invoices will vindicate him—they contain "very particular descriptions of all items

3   included" in his exports.  ECF 116 at 4:20.  It is therefore all the more necessary to provide the jury with

4   context in order to present a coherent and comprehensible explanation as to Defendants' execution of

5   the conspiracy.

6          1.      **Categories One and Two: Exports of Controlled Night Vision Items and
                   Components to Russia and other Countries, including The Netherlands,**
7                  **Spain, Germany, Macedonia, Bulgaria and Poland.**

8          Evidence of the Morgovskys' business operations and association with Infratech in the late

9   1990s and throughout the 2000s bears directly on the manner and means by which the Morgovskys

10  carried out the conspiracy during the period identified in the Superseding Indictment.  Among other

11  things, the Superseding Indictment states that Infratech "communicated lists of components necessary

12  for the Russian night vision business to manufacture certain finished night vision devices" whereafter

13  the Defendants "used their U.S. businesses to ship the components to the Russian night vision

14  manufacturer."  Mr. Morgovsky had been affiliated with the Russian night vision business (i.e.,

15  Infratech) since the 1990s—Mr. Morgovsky himself asserted that he has had a "long-term" business

16  relationship with Infratech since the early 1990s.[1]  ECF 116 at 2:18-22.  The manner and means

17  employed by the Morgovskys and Infratech throughout this "long-term" business relationship provide

18  necessary context in order to offer a coherent and comprehensible story regarding the commission of the

19  crime.

20         In a letter to an overseas customer, dated October 26, 1998, Mr. Morgovsky (on Hitek letterhead)

21  explained that a Second Generation (aka, "Gen. 2") scope by a known manufacturer was "restricted for

22  export" and that it was "very risky for us to export a sizeable quantity of these scopes."  Mr. Morgovsky

23  went on to offer an alternative, a Hitek model scope with a Third Generation image intensifier tube (i.e.,

24  a tube having higher performance specifications than Gen. 2).  Mr. Morgovsky explained that "[i]t will

25

26         [1] *See also*, Attachment O, Trial Exhibit 173, in which co-conspirator Vadim Pavlov writes,
27  "[S]ince 1991 [Infratech] night vision devices, known under the trademark 'RETRON,' have been
    recognized as the best…on the U.S. Market."  Hitek marketed the RETRON scope in the U.S.  (*See*
28  Attachment E, Trial Exhibit 27).

1   be completely safe to ship the parts to Russia, assemble them there, and ship them to you from Russia."

2   Mr. Morgovsky provided wiring instructions for payment to a U.S. account, held in the name of

3   "INFRATECH".  (Attachment N, Trial Ex. 164).

4          Mr. Morgovsky also explained to a Macedonian customer how he ships night vision scopes in

5   component parts via commercial shippers in "different company name[s]" with a "very short

6   description" and "low values" of the parts on the invoices.  (Attachment M, Trial Ex. 162) ("I can send

7   [a Hitek employee] to Macedonia to install the tubes as soon as you receive the product and the tubes.

8   The 2nd and 3rd gen. tubes and some other items including one sample of each 2nd and 3rd gen. unit . . .

9   will be sent separately by Federal Express under a different company name . . . Invoices will only be

10  included with the shipments of parts made by Federal Express, and they will have a very short

11  description of the included items and low values.")  Other documents from the late 1990s show the

12  language Mr. Morgovsky elected to use to disguise image intensifier tubes on Hitek invoices: "modular

13  optical-electronic converter[s]."  (Trial Ex. 164).  In addition to providing a coherent and

14  comprehensible story to the jury, this evidence squarely addresses the element of willfulness in

15  demonstrating Mr. Morgovsky's knowledge of export laws and intent to violate them.  *See Durrani*, 290

16  Fed. Appx. at 40 (9th Cir. 2008).

17         The evidence will show that Defendants continued to use the same manner and means to advance

18  the conspiracy leading up to and during the relevant time period.  For example, the Morgovskys, doing

19  business as "Commercial Optics" with an address of 1851 Noriega Street in San Francisco,[2] issued five

20  invoices to Gero Trading for "Optical Converter[s]" in late 2011 and early 2012.  (Attachments G-K,

21  Trial Exs. 128 – 132).  The unit prices were given an artificially "low value," ranging from $12 - $25 per

22  unit.  The government will present evidence to show that Naum Morgovsky asked individuals in Europe

23  (including Echtermeijer and Dr. Mazo) to hold packages for him to pick up when he traveled through

24  Europe, which the government alleges was for the purpose of conducting Infratech business in

25  furtherance of the conspiracy, as alleged in the Superseding Indictment.  (SI at ¶ 37).  The government

26

27         [2] On information and belief, 1851 Noriega Street has been the address of Congregation Adath

28  Israel since the 1960s.

1   should be permitted the opportunity to address why none of Defendants' invoices or shipping records

2   listed "image intensifier tubes," and the Morgovskys' communications on behalf of Hitek and Infratech,

3   which address the same type of components charged in the indictment (i.e., image intensifier tubes and

4   night vision devices), directly address that issue.

5          **2.      Category Three: Evidence that Mr. Morgovsky Was Carrying
                      ControlledNight Vision Components When Stopped by U.S. Customs on or
6                     about March 14, 2001.**

7          Likewise, in order to provide a coherent and comprehensible explanation to the jury as to why

8   defendants used shell companies such as "Commercial Optics," one must see Mr. Morgovsky's interest

9   and intent to use "different company name[s]" to export controlled equipment.  (See, e.g., Trial Ex. 162

10  and 164).  The evidence will show the use of multiple companies in connection with the invoicing and

11  shipment of "optical converters" and other equipment that the Defendants asked to procure on behalf of

12  the Russian business.  For example, Defendants also used "Video King" to ship "optical converters" in

13  March 2011.  (Attachment L, Trial Ex. 138).  Exports of other night vision components were sent by the

14  Morgovskys under the names of additional companies, to include:

15       • Video Source (2006 shipment to Spain of "used optical monoc body/w lens");

16       • Best Buy Camera (2006 shipment to Henryk Ciecierski in Poland of "photo relay lens – 6

17          pcs");

18       • Systemline, Inc. (2008 shipment to Russia of "monocular viewer retron");

19       • Discount Camera (2009 shipment to Finland of "monocular");

20       • VisionTech Co. (2010 and 2014 shipments to Russia of "optical parts and accessories");

21       • Optics Express (2012 shipments to Roy Echtermeijer of "mini scope 4x, mini scope 6x");

22       • Tradeline (2012 shipment to Dr. Mazo in Germany); and

23       • AIT-USA (2015 shipment to Dr. Mazo in Germany).

24         Other evidence, including that offered by Dr. Mazo, will show that goods and equipment used in

25  furtherance of the conspiracy were carried by hand from Germany into Russia.  The evidence will show

26  that Irina Morgovsky was aware of and assisted with the facilitation of this delivery route.  (*See, e.g.*,

27  Attachment P, Trial Ex. 970).  As described below, the government intends to show that Defendants

28

1   personally engaged in this conduct in their own travels in furtherance of the conspiracy and understood

2   that hand delivery of sensitive products was a viable means to export night vision devices and

3   componentry.  Specifically, records of U.S. Customs and Border Patrol ("CBP") show that, upon arrival

4   on a flight from Germany on March 14, 2001, Mr. Morgovsky was stopped by CBP at San Francisco

5   International airport and found to be carrying a night vision scope, five image intensifier tubes, and

6   $10,108.  This evidence shows that, in addition to the various companies and shipping routes used to

7   ship items overseas, Mr. Morgovsky personally carried night vision products and components when

8   traveling overseas.

9        A jury can properly conclude that this incident, at least in part, led to the Morgovskys' decision

10   to create a constellation of identities (and companies) to be used in furtherance of the conspiracy.  As a

11   result of the March 14, 2001, incident, CBP had reason to suspect Mr. Morgovsky and the company

12   Hitek for export control violations.  A jury can properly conclude that Mr. Morgovsky knew or should

13   have known that he was more likely to be subject to secondary inspection when traveling.  A jury can

14   properly conclude that the Defendants also recognized that shipments of night vision equipment

15   associated with the Morgovskys, Hitek,[3] or the Morgovskys' addresses could be subject to heightened

16   screening for export violations.  Moreover, the use of multiple identities and trade names makes the

17   entire scheme more difficult for investigators to connect if any one shipment or company is scrutinized.

18   Here again, in addition to providing a coherent and comprehensible story to the jury—an explanation as

19   to why the constellation of alias and companies were used—this evidence squarely addresses the

20   element of willfulness in demonstrating Defendants' efforts to conceal their identity and avoid detection

21   of the scheme.  If the evidence appears multi-layered and complex, it is because the Defendants

22   intentionally made it so.

23        **3.    Category Four: Naum Morgovsky and Irina Morgovsky and other**
**uninuindicted coconspirators sought to evade detection of night vision goods,**
24   **items and components being imported into Russia through smuggling and**
**other means, in order to avoid Russian import tariffs, including evidence of a**
25   **2013 administrative action against Naum Morgovsky by customs authorities**
**in Russia for failing to declare several instruments for calibrating rifle sights**
26   **imported by him to Russia on October 4, 2013.**

27   ─────────────
        [3] Based on information provided by Naum Morgovsky, CBP associated Naum Morgovsky with
28   Hitek.

The evidence related to the 2013 administrative action further demonstrates that Naum Morgovsky continued to personally carry devices and components related to the night vision business when traveling between the U.S. and Russia.  Significantly, this evidence is directly relevant and inextricably intertwined with the conspiracy charged in the Superseding Indictment.  In a signed statement, dated November 23, 2013, Naum Morgovsky provides information related to his business activities in Russia during 2013 and 2014.  Mr. Morgovsky explains that in late 2013, he was engaged in testing and calibrating U.S.-made thermal imaging components for use in thermal imaging devices to be manufactured by a Russian company (i.e., Infratech).  (Attachment Q, Trial Ex. 976).  Simultaneous with these activities, Naum and Irina Morgovsky were engaged in the purchase and export of controlled lenses (i.e., defense articles) to be used in thermal imaging devices to be manufactured by Infratech in Russia.  (*See*, SI at ¶ 40(d) – (s)).  This evidence is not simply evidence of another unrelated crime, but rather is a direct admission of his involvement in export of night vision to Russia. It is therefore necessary to present such evidence in order to provide the jury with the appropriate context and a complete and coherent description of the conspiracy.

                **4.**        **Category Five: Evidence that Defendant Naum Morgovsky committed identity theft with respect to other deceased persons (J.E., E.H., and J.F.) and also used assumed names (E.J and A.P.) to conduct night vision business, rent a Hayward, California storage locker that housed night-vision related materials, to travel to Russia, and assist in the criminal defense of a defendant in a separate AECA prosecution. Such evidence includes Naum Morgovsky's 2008 conviction for identity theft related to the J.F. identity.**

The Morgovskys' use of multiple identities and trade names is central to the charged conspiracy, and the manner and means of the conspiracy cannot be explained without providing the jury with a description of the constellation of false identities and shell companies used by the Morgovskys in furtherance of the scheme.  It is not possible to attribute conduct by these fake personas to the Defendants without providing the jury with a basis from which to make the connection.  The fake personas were intentionally created by Defendants to obscure the misconduct at issue in this case, and the government should not be denied the opportunity to attribute such conduct to the Defendants and explain the motive and intent behind such acts of deception.

The Morgovskys conduct while using these identities was in furtherance of the conspiracy.  To

wit, by mid-2000 when the association between Hitek and Infratech was well-established, Mr. Morgovsky had engaged in identity theft with respect to other deceased persons (J.E., E.H., and J.F.) and also used assumed names (E.J and A.P.) in furtherance of the conspiracy.  Among other actions, Mr. Morgovsky used these identities to rent a Hayward, California storage locker that housed night-vision related materials and to travel to Moscow, Russia, in 2007.  In particular, Naum and Irina Morgovsky traveled to Russia as J.F. and V.F. in late 2007.  (See, e.g., Trial Ex. 16).  In a letter to the Russian Consulate, dated September 17, 2007, Mr. Morgovsky (operating as J.F.) explained that the purpose of this trip was business.  "J.F." explained that he was conducting "business with two of his business partners" and required a new visa in order to return to Russia "to fulfill his business plans."  (Trial Ex. 16).  Evidence will show that Ms. Morgovsky had already been involved in the business relationship with Infratech by the date of this trip.  (*See, e.g.*, Attachment A, Trial Ex. 13).  Notably, Ms. Morgovsky (operating as V.F.) traveled on the same flight as "J.F." in August 2007.  (See, e.g., Attachment B, Trial Ex. 16).

Many shipments, as well as rental fees for mail boxes, were paid out of the Citybest Construction Management bank account that Irina Morgovsky controlled.  Citybest was a company opened by a friend of the Morgovskys, and he did not give permission to the Morgovskys to open or use the name of his business to open an account.

In addition to the need to attribute the relevant conduct to the Morgovskys, evidence concerning the use of various identities also addresses the question of intent.  It is readily apparent that the use of multiple identities and trade names makes the entire scheme more difficult for investigators to detect and connect to the Morgovskys.  A jury can properly conclude that the Defendants engaged in these acts of deception for precisely this purpose.  Accordingly, this evidence squarely addresses the element of willfulness in demonstrating Defendants' efforts to conceal their identity and avoid detection of the scheme.  *See United States v. Durrani*, 290 Fed. Appx. 39, 40 (9th Cir. 2008).

5.     **Category Six: Evidence that Defendant Naum Morgovsky used the G.P. identity to travel within the United States and to lease a storage locker in the Chicago, IL area that housed a machine controlled for export from the United States.**

The Morgovksys' conduct while using the G.P. identity is inextricably intertwined with the

1   charged conspiracy.  Among other things, the G.P. identity is associated with payments to bank accounts

2   controlled by the Morgovskys for "optical goods."  (See, e.g., Attachment F, Trial Ex. 56).  Mr.

3   Morgovsky also used the G.P. identity to lease a storage locker to house a machine that Mr. Morgovsky

4   discussed exporting to Russia in furtherance of the scheme.

5        Moreover, Naum Morgovsky has indicated his intention to explain away Defendants' identity

6   theft and use of fake identities by introducing a tale of intrigue.  Defendants would have this court

7   believe that their "use of aliases and false identification documents in past years was occasioned by real

8   and substantiated fears about [] personal safety . . . in the face of danger posed by violent Russian money

9   men who were angry with [Naum]" and made "credible threats against him and his wife."  (ECF No.

10  208 at 3:11-17).  Accordingly, in anticipation of this defense, it is appropriate for the government to

11  introduce certain purely domestic conduct using fake identities that was undertaken by Defendants in

12  furtherance of the conspiracy (and, reciprocally, Naum Morgovsky and Irina Morgovsky's use of their

13  real identities internationally).[4]  Such conduct includes, but is not limited to, Defendants' renting of

14  storage lockers in Chicago and California and Naum Morgovsky's domestic travel to Chicago in

15  connection with the storage and maintenance of a controlled piece of machinery.  (*See, e.g*., Attachment

16  D, Trial Ex. 25).

17
18        **6.    Category Ten: Evidence that Defendant Naum Morgovsky used the an e-mail
             account opened in the name of Infratech owner, S.S., to ship packages and
             communicate with individuals regarding night vision.**

19        The evidence will show that Naum Morgovsky used the S.S. name, persona and email address

20  when communicating with individuals concerning the purchase of night vision and shipping packages,

21  including packages sent to Vadim Pavlov at Infratech in Moscow and Dr. Mazo in Frankfurt.  (*See, e.g*.,

22  Attachments T-U, Trial Ex. 920 and 923).  It will be necessary to provide the jury with a basis to

23  attribute certain conduct of "S.S." to Naum Morgovsky.  Accordingly, the government intends to

24  introduce evidence of Mr. Morgovsky's use of the "S.S." email account in furtherance of the conspiracy,

25  including the export of night vision components by Naum Morgovsky as well as his communications

26
27        [4] It should be noted that Defendants have produced no reciprocal discovery to "substantiate" the
28  claim that they stole identities to evade Russian enemies.

1   with individuals regarding night vision.  In addition to the need to attribute the relevant conduct to Naum

2   Morgovsky, the use of various identities also addresses the question of intent.  The use of multiple

3   identities made the scheme more difficult for investigators to detect and attribute to the Defendants.  A

4   jury can properly conclude that the Defendants engaged in these acts of deception for precisely this

5   purpose.  Thus, this evidence squarely addresses the element of willfulness in demonstrating

6   Defendants' efforts to conceal their identity and avoid detection of the scheme.

7            **7.      Category Eleven: Evidence that Irina Morgovsky used a stolen identity with
                 the initials V.F. in furtherance of the AECA conspiracy, including travel to
8                Moscow, Russia and renting a storage locker in Hayward, California prior to
                 the rental of the storage locker opened under the name Edward Joseph.**

9        The disguise of Irina Morgovsky's identity in connection with Defendants' business dealings is

10   not isolated to the conduct described in the response set forth in the government's description of the

11   evidence related to Category Five.  *See* § B(4), *supra*.  The evidence will show that, from 2010 to 2014,

12   Irina Morgovsky also rented a storage locker in Hayward, CA under the name of V.F., and did so at the

13   same location that Naum Morgovsky rented storage lockers under the name E.J.  (Attachment C, Trial

14   Ex. 54).  Evidence will show that while the "V.F." storage locker was closed, the "E.J." storage locker

15   remained open and it contained a trove of evidence related to Infratech and evidence of the purchase of

16   numerous controlled night-vision devices, as well as V.F.'s passport and state identification cards.

17        The government plans to present evidence at trial that Ms. Morgovsky also held herself out as

18   the wife of G.P. (i.e., Naum Morgovsky) in connection with the rental of a storage unit in the Chicago

19   area that contained items that Naum Morgovsky indicated might be shipped to Russia.

20        The use of these aliases and fictitious companies are direct evidence of the operation of the

21   scheme and further demonstrate that both Naum and Irina Morgovsky were knowing and willful

22   participants in the conspiracy and understood its objectives and unlawful character.  A jury can properly

23   infer that Defendants engaged in this conduct in furtherance of the conspiracy, and it is thus direct

24   evidence that provides a complete and coherent story to the jury.  Moreover, this pattern of concealing

25   her identity in connection with the Morgovskys' business dealings squarely addresses the element of

26   willfulness—a necessary element of the AECA conspiracy.

27   //

28

1  //

2      **8.    Categories Twelve and Thirteen: Evidence that Naum Morgovsky used other**
3              **businesses, such as Global Vision, to hold title to his assets, including a**
               **vehicle.  Evidence that Defendants Naum and Irina Morgovsky, as well as**
4              **their companies, have failed to file federal income tax returns since at least**
               **2001.**

5          With regard to Category Twelve, the government does not plan to present such evidence in its

6  case-in-chief.  With regard to Category Thirteen, the government hereby incorporates its argument in its

7  Opposition to Defendants' Motion in Limine to Preclude Evidence of Income Tax Violations, including

8  Failure to File Returns as if set forth in full herein.  (ECF No. 208).

9          For the foregoing reasons, the evidence listed in categories 1 – 6 and 10 – 11 and 13 of the

10  United States Notice of Rule 404(b) Evidence should be admitted as direct evidence that is inextricably

11  intertwined with the charged conspiracy.  Evidence of other acts may be directly admitted if either (1)

12  the evidence "constitutes a part of the transaction that serves as the basis for the criminal charge" or (2)

13  the government finds it necessary in order "to offer a coherent and comprehensible story regarding the

14  commission of the crime."  *DeGeorge*, 380 F.3d at 1220 (9th Cir. 2004).  Such is the case with the

15  evidence identified in the government's 404(b) notice and described in further detail herein.  The

16  evidence describes the manner and means of the conspiracy, without which Defendants' peculiar

17  behavior is void of context.  It is therefore necessary to present such evidence in order to provide the

18  jury with the appropriate context and a coherent description of the conspiracy.  Such evidence also

19  provides circumstantial evidence of Defendants' motive, intent, and state of mind, which evidence

20  addresses the critical element of willfulness to violate the export control laws that will be at issue in this

21  trial.  *See, e.g., Chi Mak*, 683 F.3d at 1137-39 (9th Cir. 2012) (Explaining that the jury was properly

22  charged with considering "the totality of the circumstances" when considering the evidence and

23  inferences that demonstrated defendant's state of mind.)

24      **C.  The Evidence Cited by the Government is Also Properly Admissible Under F.R.E.**
            **404(b)**

25          The evidence of other crimes, wrongs, or acts of Defendants is also admissible under Rule

26  404(b).  The Ninth Circuit explains that "Rule 404(b) is a rule of inclusion."  *United States v. Alfonso*,

27  759 F.2d 728, 739 (9th Cir. 1985).  "Thus, evidence of past wrongful acts is admissible if it is relevant to

28

1    an issue other than the defendant's character or criminal propensity." *Id.* In other words, "[u]nless the

2    evidence of other crimes tends only to prove propensity, it is admissible." *United States v. Jackson*, 84

3    F.3d 1154, 1159 (9th Cir. 1996).

4           As described in detail herein, and as introduced in the government's January 2018 notice (ECF

5    No. 174), the evidence is not proffered to prove Defendants' character.  Rather, the evidence bears

6    directly on elements of the offenses at issue in this trial—Defendants' knowledge, intent, and willfulness

7    in engaging in the conspiracy and the preparation and planning of the conspiracy.  Thus, the other acts

8    are introduced to address material issues, including planning of the conspiracy, identity of the actors,

9    and the central issue of "willfulness" with respect to AECA violations—i.e., the Defendants' motive,

10   intent and knowledge.

11          Rule 404(b) specifically references at least three categories of other acts aimed at providing

12   insight into the inner workings of the mind: motive, intent and knowledge.  It is thus unremarkable that

13   the Supreme Court has explained that "[e]xtrinsic acts evidence may be critical to the establishment of

14   the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only

15   means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United*

16   *States*, 485 U.S. 681 (1988).  Here, Defendants have repeatedly indicated that they intend to deny

17   motive, intent and knowledge.  (See ECF No. 103-2 (asserting that Irina Morgovsky lacked the

18   knowledge and intent to violate the AECA); see also ECF No. 208 (asserting that Naum Morgovsky had

19   an expert understanding of the AECA and did not intend to violate the law)).  When defendants make

20   knowledge and intent a central issue in dispute, the probative value of the circumstances surrounding the

21   criminal conduct in question is heightened.  *Curtin*, 489 F.3d at 950 (9th Cir. 2007) (Explaining that "the

22   nature of the defense heightened the probative value of the stories because they not only tended to prove

23   Curtin's intent, but to demonstrate also that his aggressive defense was not credible."); *accord, U.S. v.*

24   *Preston*, 873 F.3d 829, 840 (9th Cir. 2017) (denying the use of other acts evidence from five years *after*

25   the alleged crime when defendant did not put intent at issue and the conduct at issue in the other act was

26   not substantially similar).

27          Moreover, the other acts presented by government in the instant case plainly satisfy the four part

28

1    test used in this circuit: 1) sufficient evidence must exist for the jury to find that the defendant

2    committed the other acts; (2) the other acts must be introduced to prove a material issue in the case; (3)

3    the other acts must not be too remote in time; and (4) if admitted to prove intent or knowledge, the other

4    acts must be similar to the offense charged. See, *United States v. Bradley*, 5 F.3d 1317 (9th Cir. 1993).

5    Defendants are charged with a conspiracy to violate the AECA through the export of night vision

6    components to co-conspirators in Russia.  This conspiracy has its origins in the 1990s when the

7    Defendants first associated Hitek and Infratech.  Mr. Morgovsky himself asserted that he has had a

8    "long-term" business relationship with Infratech since the early 1990s.[5]  ECF 116 at 2:18-22.  The

9    nature of that relationship is explained by Naum Morgovsky, in letters authored by Naum Morgovsky in

10   the 1990s.  In a letter to an overseas customer, dated October 26, 1998, Mr. Morgovsky explained that a

11   second generation (aka, "Gen. 2") scope by a known manufacturer was "restricted for export" and that it

12   was "very risky for us to export a sizeable quantity of these scopes."  Mr. Morgovsky went on to offer

13   an alternative, a Hitek model scope with a third generation image intensifier tube (i.e., a tube having

14   higher performance specifications than Gen. 2).  Mr. Morgovsky explained that "[i]t will be completely

15   safe to ship the parts to Russia, assemble them there, and ship them to you from Russia."  Mr.

16   Morgovsky provided wiring instructions for payment to a U.S. account, held in the name of

17   "INFRATECH".  (Attachment N, Trial Ex. 164).

18        The manner and means of the conspiracy are fundamentally unchanged since the 1990s.

19   Accordingly, the other acts are similar, if not identical, to the offense charged.  As established by Naum

20   Morgovsky's declaration in this case[6] and communications to Hitek/Infratech customers, such conduct

21   forms part of the same conspiracy to export controlled night vision components and equipment (e.g.,

22   image intensifier tubes) for benefit of Hitek/Infratech.  In a 2001 letter to an overseas customer, Mr.

23   Morgovsky explained how he ships night vision scopes in component parts via commercial shippers in

24

25        [5] *See also*, Attachment O, Trial Exhibit 173, in which co-conspirator Vadim Pavlov writes,
     "[S]ince 1991 [Infratech] night vision devices, known under the trademark 'RETRON,' have been
26   recognized as the best…on the U.S. Market."  Hitek marketed the RETRON scope in the U.S.  (See
     Attachment E, Trial Exhibit 27).

27        [6] Mr. Morgovsky asserted that he has had a "long-term" business relationship with Infratech
     since the early 1990s.  ECF 116 at 2:18-22.
28

1 "different company name[s]" with a "very short description" and "low values" of the parts on the

2 invoices.  (Attachment M, Trial Ex. 162) ("I can send [a Hitek employee] to Macedonia to install the

3 tubes as soon as you receive the product and the tubes.  The 2nd and 3rd gen. tubes and some other items

4 including one sample of each 2nd and 3rd gen. unit . . . will be sent separately by Federal Express under a

5 different company name . . . Invoices will only be included with the shipments of parts made by Federal

6 Express, and they will have a very short description of the included items and low values.")  Other

7 documents from the late 1990s show the language Mr. Morgovsky elected to use to disguise image

8 intensifier tubes on Hitek invoices: "modular optical-electronic converter[s]."  (Attachment N, Trial Ex.

9 164).

10     The overwhelming weight of the evidence shows that the other acts cited by the government

11 form part of the same conspiracy, thus the other acts are neither "remote" nor different in character to

12 the offense charged.  Among other things, the Defendants continued to establish and use "different

13 company names" to export image intensifier tubes.  They continued to use "very short descriptions" and

14 "low values" on invoices.  They further obscured their involvement in their illegal activities by using

15 various personas and traveled under false identities.  Defendants' use of fake identities in furtherance of

16 the conspiracy is a direct extension of their stated intent to use "different company names."[7]

17     Under FRE 403, other acts evidence should only be excluded if the probative value is

18 "substantially outweighed" by the danger of "unfair prejudice."  *See, U.S. v. Preston*, 873 F.3d 829, 840

19 (9th Cir. 2017).[8]  No such danger is present here.  Any prejudice that may result from Defendants' use of

20 fictitious companies and false identities is the result of Defendants' design and intent to conceal their

21 identity, all of which was intentionally done by Defendants in furtherance of the scheme.  Such evidence

22 is highly relevant and its probative value far outweighs its potential for unfair prejudice.  Accordingly,

23 neither F.R.E. Rule 403 nor 404 prohibit the use of this evidence in the government's case-in-chief.

---

[7] It should be noted that FRE 404(b) specifically identifies "identity" as an admissible purpose for other acts evidence; however, the court need not rely on this admissible purpose to find that evidence of Defendants' use of false personas and identities is properly admitted here.

[8] Defendants' Motion in Limine cites *Preston* for the proposition that evidence admissible under Rule 404(b) "may be excluded if the Court finds its relevance outweighed by prejudice."  (ECF No. 211 at 3:13-15, citing *Preston*, 873 F.3d at 840).  This misstates the language of the *Preston* court.  The *Preston* opinion does not suggest any such deviation from the standard set forth in FRE 403.

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE TO EXCLUDE "OTHER CRIMES EVIDENCE,"
3:16-cr-00411 vc          15

1                                        *                    *                    *

2          Without conceding its right to do so, the government hereby gives notice that it does not intend

3    to introduce the evidence listed in categories 7 – 9 and 12 in its case in chief.  The government reserves

4    the right to raise such issues in the cross examination of defense witnesses for impeachment or other

5    purposes.

6          Respectfully submitted this 23rd day of May, 2018.

7                                                           ALEX G. TSE
                                                            Acting United States Attorney
8

9                                                           _/s/ Jason McCullough_____
                                                            JOHN H. HEMANN
10                                                          COLIN SAMPSON
                                                            ERIN CORNELL
11                                                          Assistant United States Attorneys
                                                            JASON B.A. McCULLOUGH
12                                                          Trial Attorney, National Security Division

13                                                          Attorneys for United States of America

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28