Pages 1 - 61

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
     vs.                           )   No. CR 16-0411 VC
                                   )
NAUM MORGOVSKY and IRINA           )
MORGOVSKY,                         )
                                   )   San Francisco, California
            Defendants,            )   Wednesday
                                   )   May 30, 2018
_____    )   1:30 p.m.

                    <u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

**For Plaintiff:**          ALEX TSE
                           United States Attorney
                           450 Golden Gate Avenue
                           San Francisco, California  94102
                    BY:    **COLIN SAMPSON**
                           **ERIN CORNELL**
                           **ASSISTANT UNITED STATES ATTORNEYS**


**For Defendant**           LAW OFFICE OF WILLIAM L. OSTERHOUDT
**Naum Morgovsky:**         135 Belvedere Street
                           San Francisco, California 94117
                    BY:    **WILLIAM L. OSTERHOUDT, ESQ.**
                           **FRANK MOORE, ESQ.**


**For Defendant**           LAW OFFICES OF RICHARD MAZER
**Irina Morgovsky:**        99 Divisadero Street
                           San Francisco, California 94117
                    BY:    **RICHARD B. MAZER, ESQ.**



*Reported By:*    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

**Wednesday - May 30, 2018**                              **1:37 p.m.**

P R O C E E D I N G S

---oOo---

(Defendants present, out of custody.)

           **THE CLERK:**  Calling Case No. 16-CR-00411, USA versus

Naum Morgovsky and USA versus Irina Morgovsky.

      Counsel, please state your appearances for the record.

           **MS. CORNELL:**  Good afternoon, your Honor.  Erin

Cornell for the United States.

           **THE COURT:**  Good afternoon.

           **MR. SAMPSON:**  Good afternoon, your Honor.  Colin

Sampson for the United States.

           **MR. McCULLOUGH:**  Good afternoon, your Honor.  Jason

McCullough for the United States.

           **MR. OSTERHOUDT:**  William Osterhoudt for

Mr. Morgovsky.

           **THE COURT:**  Hello, Mr. Morgovsky.

           **THE DEFENDANT:**  Naum Morgovsky, good afternoon.

           **MR. OSTERHOUDT:**  With me is Frank Moore.

           **MR. MAZER:**  Richard Mazer for Irina Morgovsky.  She

is present in court, your Honor.

           **THE COURT:**  Hello, Mrs. Morgovsky.

      Okay.  I don't care whether you stand or sit.  I'm

guessing it might be easier for you all to sit, but whatever

you prefer is fine.

So let's go through a couple of things before we get to the Motions in Limine.  Have a seat, please.

First of all, Jury Instructions.  I have not had a chance to go through Jury Instructions.  My Law Clerk tells me that what you all submitted is in pretty good shape and isn't going to give us a bunch of problems.  So, but is there -- is there any dispute on Jury Instructions that needs to be resolved before opening statements?

**MS. CORNELL:**  Let me just think about this for a second, your Honor.

(Brief pause.)

**MS. CORNELL:**  I think, yes.  I think so.  Because the disputed ones include -- well, there is evidence of other crimes.  Although that is written in the past tense, so I think it might have been intended to be given after the close of evidence; unindicted co-conspirators, the definition of willfully.

**THE COURT:**  I mean, evidence of other crimes or other acts I would either give in the middle of trial and/or at the end.

**MS. CORNELL:**  Right.  And unindicted or unnamed co-conspirators, definition of willfully, definition of knowingly.

**THE COURT:**  Yeah.  That stuff will come at the end.

**MS. CORNELL:**  Okay.

**THE COURT:**  The beginning will just be the prefatory instructions about, you know, direct and circumstantial evidence and taking notes and, you know, things like that.  I wouldn't -- I wouldn't give any of the substantive instructions until the end.

**MS. CORNELL:**  Okay.  Then to answer your question, no, I don't think there is anything that needs to be sorted out right now.

**THE COURT:**  Okay.  Good.  Then we'll do that.

The way I do it usually is I put out a -- I look at yours. I look at what you submit.  Then I put out a Court's draft instructions and I ask you to review those and compare them against what you've submitted.  Then we'll spend some time talking about it.  And usually we do a couple different iterations of that.

**MS. CORNELL:**  Okay.

**THE COURT:**  So I will put out a Court's draft Jury Instructions probably at some point before trial and then we'll find a time during trial to talk about it.

**MS. CORNELL:**  Okay.

**THE COURT:**  I'll take your input, I'll put out a second Court's draft Jury Instructions, and we'll find some time to talk about it during trial.

**MS. CORNELL:**  All right.

**THE COURT:**  Okay.

**MS. CORNELL:**  Thank you, your Honor.

**MR. OSTERHOUDT:**  That's fine, your Honor.

**THE COURT:**  Okay.  So that's that.

Stipulations.  How is it going with stipulations?  I was reading some of the pretrial filings, joint pretrial statement and all that, and I got the sense that there was still a fair amount of work that could and should be done on stipulations.

**MR. SAMPSON:**  Your Honor, I agree.  We have entered into, I think, 11 stipulations.  These are mostly related to bank records and DHL and FedEx records, as well as one night vision seller, Aurora Tactical.

As I said a couple weeks ago, that's about 300 or 400 exhibits.  Not that we agree that they are admitted, but if the government satisfies that they are relevant, they don't dispute that no custodian need to be called.

**THE COURT:**  Okay.

**MR. SAMPSON:**  So I would say that's substantial headway, but in the last two weeks we have started to discuss stipulations related to -- well, we had proposed awhile ago stipulations relating to where a piece of evidence was found; that is, was it found at the storage locker or was it found in their residence.  We have not reached a stipulation.  We think that would necessitate the calling of several of the FBI finder witnesses that we did notice on our list, but did not discuss on the 17th.

Additionally, we discussed --

**THE COURT:**  In other words, those were *may call*
witnesses.

**MR. SAMPSON:**  They were *may and* several of them are
now *will call* because we'll have to say:  This document was
found in the house.  This document was found in the storage
locker.  This was found on the computer.

**THE COURT:**  Okay.

**MR. SAMPSON:**  Additionally, the Court had brought up
the possibility of stipulating to translations.  As the Court
knows, there are a good -- a very good number of translations
from Russian to English and we have not reached a stipulation
about the accuracy of those translations.

**THE COURT:**  You're talking about exhibits that are --
that have writing in the Russian language to be translated to
English?

**MR. SAMPSON:**  Yes, sir.

**THE COURT:**  Okay.  And is there any -- is there any
hangup with reaching stipulations or -- on those or have you
just not gotten to it yet?

**MR. SAMPSON:**  I have discussed a stipulation, but we
have not had that conversation about whether they agree that
they are accurate translations.

**MR. OSTERHOUDT:**  I think we will though, your Honor,
have that agreement probably.

**THE COURT:**  Okay.  I mean, I'm -- I want to make sure I don't need to, like, force you to go sit in a room, the witness room, and work it out.

**MR. OSTERHOUDT:**  I don't think that will be necessary.

**THE COURT:**  You know, under my watch or something like that.  I want to make sure it gets done.

I mean, there are a lot of things that if they don't get done will be a waste of the community -- of these members of the community's time, right, the jurors.  They are very conscientious members of the community who come to serve on these juries.

And I understand that you know you can't be required to stipulate to everything and, you know -- and there are legitimate reasons not to stipulate to some things.

The only concern I have is I want to make sure both sides are putting in an appropriate effort to stipulate where it is appropriate to stipulate so that we're not wasting any time of these people who are already scheduled to be coming in for, hopefully, less than three weeks.

**MR. OSTERHOUDT:**  Understood.

**THE COURT:**  And that -- you know, that's a big deal to me.  I don't care when people exercise their right to trial, but if people don't do a good job of making sure they are not wasting the jury's time, that is something I care about.

**MR. OSTERHOUDT:**  Understood, your Honor.

**THE COURT:**  Good.  You brought -- that was going to be my next topic, was the translation of documents.

Okay.  Juror questionnaire and proposed voir dire questions to the jury.  You all have received my questionnaire that I propose to give to the jury?

**MR. OSTERHOUDT:**  Yes.

**THE COURT:**  Any objections to that?  With the understanding that you will have time to do -- I will, you will have time to do additional voir dire in the courtroom of the prospective jurors who we bring back after reviewing the questionnaire.

**MR. OSTERHOUDT:**  Your Honor, on behalf of Mr. Morgovsky, we have no objection to the Court's questionnaire.  We did propose some additional questions.

**THE COURT:**  Yeah.  We'll talk about those in a second.

**MR. OSTERHOUDT:**  Good.

**THE COURT:**  I looked at both sides' proposed additional questions.  Determined that I didn't want to put them in the written questionnaire.  And we can have a discussion about which of those questions you should be allowed to raise during voir dire.

**MR. OSTERHOUDT:**  All right.

**THE COURT:**  Okay?

MR. OSTERHOUDT:  Fine, your Honor.

MS. CORNELL:  Your Honor, I did notice, I think, there a missing word in number 20 on the last sentence.

THE COURT:  Sorry?

MS. CORNELL:  Number 20 in the jury questionnaire that the Court filed I think there is a missing word.  It says:

"Is there anything about the nature of these accusations could affect your ability."

I think there should be a word "that" after accusations.

THE COURT:  Okay.

MS. CORNELL:  But other than that, the Government does not have an objection to this questionnaire.

THE COURT:  Okay.  We will fix that.

Then in terms of proposed questions, let's see, the Government's -- I didn't have any concerns with the Government's proposed questions.  So if the Government wants to ask those or versions of those, that's fine.

And it's not an exclusive list of questions you can ask, obviously.  You can ask -- you know, you can do voir dire, but you should -- anything that you think is going to be controversial, you should front with me.  And I gather that was your intent in this filing and those -- those look fine to me.

The questions -- most of the questions filed by Mr. Morgovsky should not be asked and may not be asked during voir dire, at least unless somebody volunteers something that,

you know, necessitates follow-up questions on those topics.

Let me go through them.  I mean, obviously, there is nothing wrong with -- there is nothing wrong with the first one, I don't think.

**MS. CORNELL:**  I think it is very similar to number 20, though, on the jury questionnaire.

**THE COURT:**  Yeah, so if they want to follow up with something along those lines, just -- I'm just looking for things that are objectionable in terms of voir dire, oral voir dire with the jury.

You know, number two I don't have a problem with asking if -- you know, this is a version of the question that we ask on the questionnaire, right?  Here are the charges.  It's about exports to Russia.  You know, is there anything about this case that makes you concerned that you would not be a fair juror?  I think that's fair game.

I think, you know, sort of a general question about the fact that it involves Russia and people from Russia, I think that that's -- that's fine if you want to ask a general question about that.

You just have to -- what you can't do is, like, argue your case or vouch for your clients by talking about them as sort of longstanding and upstanding members of the business community or whatever, things like that.

**MR. OSTERHOUDT:**  I don't think we put that in, did

we, your Honor?

THE COURT: It's not quite that, but it sort of dances up to that line.

Question number three I don't think is appropriate.

Question number four is not appropriate.

Question number five is not appropriate.  I don't think we need to be asking -- we should not be asking any questions about Russian efforts to steal the election.  Again, some -- some prospective juror might raise the issue and then it may be appropriate to ask them follow-up questions about it, but I don't think that's an appropriate topic to introduce.  It's too far afield from what we are doing here.

Same with question number six, not appropriate.

I think number nine -- numbers seven, eight and nine seem like they are fine.  Although -- let me correct that.  I mean, seven, eight and nine are generally fine, but I don't think it's appropriate to say:  Would you prefer not to sit as a juror?

You know, I think the question should be not about their preference, but about whether they believe they would be fit to be a juror in the case.  So "Would you prefer not to be a juror," I think is probably not an appropriate question.

MR. OSTERHOUDT: All right, your Honor.

THE COURT: So that's -- that's the -- that's it for voir dire.

**MR. OSTERHOUDT:**  Your Honor, if I may.  I'm sorry.

**THE COURT:**  Sure.

**MR. OSTERHOUDT:**  We think it's important to address the Russian questions and respectfully disagree.  In fact, we request that they be in the questionnaire itself.

If people are prejudiced against people from Russia right now in the present environment, which is very possible, then I think the correct place to explore that is actually in the questionnaire when the people won't be -- as in any racial prejudice situation.

**THE COURT:**  Well, I think -- I think that what you're saying is right, but I think the questionnaire is designed to give people an opportunity to express those concerns, both in the description of the case, which is about allegations of exports to Russia by people named Morgovsky, and then there is the sort of general question about race, national origin.  So people will have an opportunity to raise those issues in the questionnaire.

And I think that's -- I think that's adequate.  I think it's always a little bit of a balancing act.  You don't want to invite people to, you know, find a way to get out of jury duty, but you want to give people an opportunity to, you know -- to express those thoughts if they have them.  And I think the questionnaire gives them that opportunity.

**MR. OSTERHOUDT:**  All right, your Honor.  We're just

concerned because we feel there could be some bias there and the purpose of this whole exercise is to undercover it. Questions that address whether people know Russian people and have experiences or opinions about them do seem to us to be pertinent when trying to identify prejudice.  That's our position on that.

          THE COURT:  And I -- and you can -- you can follow up by asking, you know, sort of general questions about:  Do you have any concern about the fact that this involves Russia or that the defendants are Russian?  That's fine.

          MR. OSTERHOUDT:  Thank you, your Honor.

          THE COURT:  Just not the more specific ones that you -- you know, about things that Russia is or is not doing.

          MR. OSTERHOUDT:  Okay.

          THE COURT:  Those are not --

          MR. OSTERHOUDT:  Understood.  If somebody raises it, they raise it and we'll see about it.

          THE COURT:  Yeah.  Okay, so that's that.

    I gather there are no expert witnesses from the Defendants?

          MR. OSTERHOUDT:  That's correct.

          THE COURT:  Okay.  And then other than that, the only thing I have is Motions in Limine.  But before we dive into Motions in Limine, is there anything else that we should be talking about?

MR. OSTERHOUDT:  In our view, the most important thing that I know Mr. Mazer would like to address --

THE COURT:  Oh, the severance.

MR. OSTERHOUDT:  The severance.

THE COURT:  Yes.

MR. OSTERHOUDT:  Because it plays into the rest of the things.

THE COURT:  Yes.  Let's talk briefly about that.

I continue to believe that -- I continue to hold the position that I held previously, which is that we will proceed with the Government's case against both defendants and then Mrs. Morgovsky can make a renewed motion for severance at the close of the Government's case and I will decide that.

And I acknowledge the possibility that there may be -- maybe severance would be appropriate, but I think one of the things we need to do is after the Government's case comes in, we can take a look at Mr. Morvogsky's declaration that he filed.  And the declaration, of course, is not admissible at trial.

But we can take a look at the declaration that Mr. Morgovsky filed and we can put it up against the evidence that has come in in the case and we can have a better assessment of whether -- whether his proposed testimony would be substantially exculpatory, as that is defined by the Ninth Circuit, which will include an assessment of credibility and

things like that.

        **MR. MAZER:**  Respectfully, your Honor, I disagree, and let me --

        **THE COURT:**  Could I ask you one clarification question --

        **MR. MAZER:**  Yes.

        **THE COURT:**  -- first.  Then I'll give you a couple minutes to address this, but this is something -- I've now considered it twice.

        **MR. MAZER:**  Correct.  I understand that.

        **THE COURT:**  And you're, of course, free to make your record, but let me just ask one question.

        **MR. MAZER:**  Sure.

        **THE COURT:**  My understanding of the law is that you -- you're not allowed to have any input on who goes first; is that right?

        **MR. MAZER:**  Yeah, I believe that is right.

        **THE COURT:**  But, so if I decide -- if I decide to sever the case, is it your view that there is -- there is no restriction on my decision about who goes first?

        **MR. MAZER:**  Well, your Honor, I believe -- I think my assumption, and it's just an assumption, is that Mr. Morgovsky would go first, your Honor, and Irina would go second because Mr. Morgovsky said he is not intending to testify at his trial, but that he is willing to testify at a separate trial on behalf

of Irina and exculpate her.  And he has filed two declarations

in length that discuss how he is going to get her out of the

case because she was not a knowing, willful member of the

conspiracy.

    And so I think the problem would be if the Court decided

to try Irina first, then that places Mr. Morgovsky in a

situation where he would have to yield his Fifth Amendment

rights --

        THE COURT:  Well, I get -- I get all of that.

        MR. MAZER:  Okay.

        THE COURT:  I get all of that.  But what I'm asking

is, is there -- is there any restriction on my decision -- I

mean, I think there is an argument that as a matter of common

sense, you know, perhaps Mr. Morvogsky's trial should go first.

Maybe there is an argument that as a matter of fairness to the

Government, Mrs. Morgovsky's trial should go first.  And all

I'm asking you --

        MR. MAZER:  There's no restrictions.  Your decision,

Judge.

        THE COURT:  No restrictions on my decision who goes

first?

        MR. MAZER:  That's correct.

    Hold on.  Hold on.  What?

    (Discussion held off the record between the Defendant

     and his counsel.)

MR. OSTERHOUDT:  May I say something, your Honor, very briefly, if I may?

The cases that I'm familiar with say that we -- the person seeking the severance on this ground is not to condition, you know, on the Courts trying the person first that's asserting the Fifth Amendment.

So you're right about that.  There is no restriction that says that.

THE COURT:  Do you understand why that is?

MR. OSTERHOUDT:  Well, I think the Courts want to be careful, to be careful that these are genuine motions and that they are not restricted.

In this case, for example --

THE COURT:  So does that mean that Mr. Morgovsky will testify even if Mrs. Morgovsky is tried first?

MR. OSTERHOUDT:  His position is not conditional upon the order of trials.

THE COURT:  Are you telling me that Mr. Morgovsky will testify if -- if rs. Morgovsky trial goes first?

MR. OSTERHOUDT:  Yes, we do say that.

MR. MAZER:  Your Honor, I also think that an Echeles severance, which is what this is, is very --

THE COURT:  A what severance?

MR. MAZER:  An *Echeles*, under *United States versus Echeles*.  The first of these cases that came out was in the

Seventh Circuit.  And now there is a number of circuits,
including the Ninth Circuit, *Byrd versus Wainwright* and other
cases that have picked up on this.

An *Echeles severance* is different in kind than a general
severance in which a defendant claims that he needs a severance
because some evidence may come into the case against him from a
co-defendant or by the Government that does not apply to him
and, therefore, he will be prejudiced.

In the way you suggested the issue be handled, the general
way is that Courts begin the case with both Defendants and then
during the time that if it turns out that the prejudice
actually occurs and the Court thinks it's sufficient to sever
the case, then the severance gets granted.  But if it doesn't
occur or it's not sufficient, then the case continues.

That's not true of a severance -- an *Echeles severance*.
There is no case that holds that.

And Mr. Weinberg spoke to you about that back in 2017, and
he said he has read every single *Echeles* case that has been
decided and in no case did the Court defer the decision til the
close of the Government's case.

       **THE COURT:**  But is there anything wrong with doing
that?

       **MR. MAZER:**  Yes.

       **THE COURT:**  What?

       **MR. MAZER:**  I think there's very much wrong.

Because, first of all, it subjects -- first of all, you know right now what Mr. Morvogsky's testimony is going to be.  It's not something you're going to learn during the trial.  His declarations are what the testimony is going to be.

And so waiting serves no purpose other than to subject Irina Morgovsky to the possibility of going through two trials.

THE COURT:  But here is the other reason for waiting. I have some serious concerns, right, that -- first of all, there is the interest in the economy of a joint trial, right?

And I have some serious concerns about the credibility of Mr. Morvogsky's testimony and the weight of Mr. Morvogsky's proposed testimony.  And I -- I think there is a lot of evidence that we saw in connection with the Motion to Suppress and that we're seeing a description of now in the Motions in Limine that seem like they could -- there is a real chance that they could undermine the credibility of Mr. Morvogsky's declaration.  And depending on how the evidence comes in at trial, it seems like there is a fairly good chance that his proposed testimony will not be substantially exculpatory to Mrs. Morgovsky.

And so what's wrong -- in light of those concerns, what's wrong with waiting until the close of the Government's case?

MR. MAZER:  I understand the Court's question. Obviously, the Court does have the right to judge the credibility of Mr. Morvogsky's declaration.

However, there are standards that govern that.  It's not:
I heard it, I don't believe it.

      **THE COURT:**  Well, that's not what I said.

      **MR. MAZER:**  Okay.  I'm not saying that's what you did
say.

      **THE COURT:**  I said it seems like it is -- it could be
contradicted -- it seems like it is likely to be contradicted
by the evidence that comes in at trial based on what I've seen
so far.

      **MR. MAZER:**  Well, I think that the standards for
assessing the credibility is -- must be based on objective
standards as to whether the testimony is inherently credible --
incredible.  And the testimony in this case --

      **THE COURT:**  But that depends on the -- on the facts,
right?  And we're going to have a much better grip on the facts
after the close of the Government's case.

      **MR. MAZER:**  The second factor is whether the witness
was in a position to have the knowledge he claims, and clearly
he is because these are mainly conversations that took place
between Irina and Naum Morgovsky without other witnesses.  And
to explain -- he can explain certain calls.  He can explain
certain incidents where things were packaged and sent to
different places and/or circumstances.

    And, also, the question is:  Is there -- is the testimony
substantially refuted by other evidence that is available

pretrial?

Now, I think that under -- using those circumstances, I believe the preferable way to do it is to have a separate trial for Mrs. Morgovsky and not to go through both trials because the question ultimately is going to be not whether the Court or the jury in Mr. Morvogsky's case believes Mr. Morgovsky, but whether the jury in Irina's separate case believes Mr. Morgovsky sufficiently --

THE COURT:  Well, the real question --

MR. MAZER:  -- to exculpatory her.

THE COURT:  The real question is whether his proposed testimony is substantially -- would be substantially exculpatory.

And that, by the way, I assume will include, you know, an assessment of Mr. Morvogsky's prior conduct that may go to his credibility, whether it be a prior conviction for identity theft or any other conduct that goes to credibility.  So that -- you know, and that's something we'll have a better grip of, too, after the Government's case, I gather.

So I understand your arguments.  The motion is denied without prejudice to re-raising it at the end of the Government's case.

MR. OSTERHOUDT:  May I -- I'm not arguing that point, but I just -- I want to be careful here.

I don't think that the Court has a basis to draw negative

inferences about Mr. Morvogsky's credibility based on anything
the Government has submitted.

        **THE COURT:** I think there are -- as I said, I think
there are concerns about it and I will be much -- we already
have a lot of information that calls into question the
credibility of Mr. Morvogsky's declaration, and I will be in a
much better position to assess Mr. Morvogsky's declaration
after the close of the Government's case.

        **MR. OSTERHOUDT:** But a jury --

        **THE COURT:** I'm not pre-judging anything, I assure
you.

        **MR. OSTERHOUDT:** It seemed like you were when you
said about his credibility.  That's what I was concerned about.

        **THE COURT:** Yeah.  There is -- a number of things
have been submitted by the Government that call into question
his credibility, and we'll make a final assessment of all of
the factors that relate to whether a severance should be
granted after the close of the Government's case.

        **MR. OSTERHOUDT:** Isn't the question whether the jury
should hear it and not what you think of it?

        **THE COURT:** Oh, I understand.  I understand.

        **MR. OSTERHOUDT:** Okay.

        **MR. MAZER:** And I think, your Honor --

        **THE COURT:** And what the jury would hear in a
separate trial against Mrs. Morgovsky.

MR. OSTERHOUDT:  Yes.

THE COURT:  I totally understand that.

MR. OSTERHOUDT:  Thank you.

THE COURT:  I think a lot of what we've learned so far would come in in a separate trial against Mrs. Morgovsky if Mr. Morgovsky took the stand.

But, anyway, we'll have further discussion of that, if necessary, at the close of the Government's case.

MR. MAZER:  One final point, your Honor.

We intend to take a writ of mandate on this issue.  We would ask the Court to stay the trial.  We will get the writ of mandate on file with the Court of Appeals by Monday.

THE COURT:  I don't think that's necessary for me to stay anything.  When does trial start?

MR. MAZER:  It starts on the 11th, the jury selection begins on then.

THE COURT:  Jury selection begins on the 11th and trial begins when?

MR. MAZER:  The 13th.

THE COURT:  Get it on file.  I mean, you have had -- you know, Mrs. Morgovsky has had notice for months that my intention was to try both Defendants together, and so Mrs. Morgovsky has had months to take this to the Ninth Circuit, and I don't think it's necessary in light of that to stay the case.

So you can -- and you can file a motion for emergency relief with the Ninth Circuit, obviously, and, you know, the Ninth Circuit can consider it.

        **MR. MAZER:**  Understood, your Honor, but we didn't think the ruling was final until today, until you ruled on it, because we were given permission to renew it.

        **THE COURT:**  Yeah.  I vaguely recall saying we can talk about it further at the pretrial conference or something like that, but I think -- it's possible that I was ambiguous about that.  I'll grant you that.  But I don't remember.  The record is what the record is.

        **MR. MAZER:**  Correct.

        **THE COURT:**  And the record says what the record says. And we're going to trial.  We're picking a jury on the 11th.

    So anything else before we turn to Motions in Limine?

        **MR. OSTERHOUDT:**  I don't believe so, your Honor.

        **THE COURT:**  Okay.

        **MR. OSTERHOUDT:**  Thank you.

        **THE COURT:**  So on Motions in Limine -- why don't we first go through -- I think the -- let's go through the ones that do not relate to other acts or other crimes or whatever. Why don't we start with those?

    Okay.  So this motion seeking documents related to Mazo.

        **MR. OSTERHOUDT:**  Yes, a witness named Mazo.

        **THE COURT:**  That is denied, and I don't need to hear

argument on that.

The motion by Mr. Morgovsky relating to electronic surveillance is denied, and I don't need to hear argument on that.

**MR. SAMPSON:**  I would just argue, your Honor, that it's moot because the Government did respond.

**THE COURT:**  Right.  It's denied.

**MR. OSTERHOUDT:**  They denied there is electronic surveillance.

**THE COURT:**  Sorry?

**MR. OSTERHOUDT:**  They denied, I believe, that there is electronic surveillance.

**THE COURT:**  Right.

**MR. OSTERHOUDT:**  They did disclose one conversation of his that was recorded consensually after we filed the motion.

**THE COURT:**  Okay.

**MR. OSTERHOUDT:**  But, yes, they did -- I understand that --

**THE COURT:**  So that motion, as it stands now, is denied.

**MR. OSTERHOUDT:**  Counsel has denied, yeah.

**THE COURT:**  So Mrs. Morgovsky's motion regarding Count Six, the -- I don't need to hear argument on that either. The motion is denied except for reference to Count Six.

So in other words, the -- you know, the conduct, you know, misuse of a passport, that comes in, but the fact that she's charged with that separately does not come in.  Is that clear?

  **MR. McCULLOUGH:**  Understood, your Honor.

  **THE COURT:**  Okay.  So the -- the motion to -- the Government's motion to preclude evidence that hasn't been produced that should have been produced, I should just grant that motion as unopposed?

  **MR. OSTERHOUDT:**  Yes.

  **THE COURT:**  Okay.  So that's granted.

Okay.  So these communications, emails and text messages between the two Defendants are -- I don't see how those could be excluded.  They are statements of a party opponent.

Statements made by co-conspirators, I mean, I guess the -- probably the best way to deal with this is to say so long as the Government lays the evidentiary groundwork at trial that this -- there is a conspiracy and that this person was part of a conspiracy, those statements would be admitted, too, but I don't think it would be appropriate to admit them right now.  So that's the ruling on that motion.

The motion -- I think it was Government's motion number three about the Defendant's offering their own statements, I have had -- I've gotten this motion before.  I have always had a little bit of conceptual difficulty with it.

So I understand the idea that a Defendant shouldn't be

allowed to put in their own statement for the rule of completeness, but if the Government is attempting to offer a statement of the Defendant and sort of cherrypicks aspects of the Defendant's statement that puts it out of context, then that statement should be excluded under Rule 403.

So does anybody disagree with what I just said?

MR. SAMPSON:  No, your Honor.

MR. OSTERHOUDT:  No.

THE COURT:  Okay.  So with that understanding, I guess the motion is granted, but with the understanding that -- and, of course, it's incumbent upon Defense counsel to be on top of it if the Government attempts to offer a statement of a Defendant that is sort of out of context or whatever and, therefore, is misleading, but any such statement would be excluded under Rule 403 --

MR. SAMPSON:  And, your Honor --

THE COURT:  -- or the Government would have the opportunity to offer a more complete version of the statement to make it admissible under Rule 403.

MR. SAMPSON:  I would agree with the Court.  I don't imagine that the Court's concern is going to be a problem because we are admitting whole email chains or full documents and not partial documents.

THE COURT:  Okay.

MR. SAMPSON:  For the most part.

THE COURT:  Okay.  Well, so that motion is granted with that understanding.

I mean, I think regarding the Government's fourth motion regarding the spousal communication privilege, I think we're already sort of pretty darn close to a ruling that those statements are -- that the privilege does not apply given what I've seen, but I think that the -- probably the most appropriate thing to do would be to defer that question and, you know, allow the Defendants to assert the spousal communication privilege if the Government does not adequately establish an evidentiary basis for concluding that the statements were in furtherance of a crime.

MR. SAMPSON:  Yes, your Honor.

MR. OSTERHOUDT:  We agree.

THE COURT:  The Government's motion number six regarding coded language is granted, essentially subject to the caveat that the Defense provides, which is that witnesses like that should only be testifying matter of factly about what something means, how a term is used, not, you know, suggesting that the Defendants intended to use the term in a particular way.

MR. OSTERHOUDT:  That was our concern.

MR. McCULLOUGH:  And that was our intent in drafting that motion.

THE COURT:  So that's granted with that

understanding.

Government's number seven is granted.  I gather that's not really contested, right?

      **MR. OSTERHOUDT:**  Yes.  We don't intend to do that.

      **THE COURT:**  Okay.  Oh, the deferred prosecution agreement.  I -- I mean, I don't think -- there is little question in my mind that the Defendants should be able to get information about the deferred prosecution agreement.

      **MR. McCULLOUGH:**  Your Honor, the guilty plea and deferred prosecution agreement have been filed publicly in court.  They are filed in the Western District of Virginia.  I can give -- I can offer the --

      **THE COURT:**  Yeah, but the Government must be in possession of other materials, documents that describe the conduct that gave rise to the deferred prosecution agreement?

      **MR. McCULLOUGH:**  Your Honor, there is a full and agreed statement of facts that is filed in connection with the deferred prosecution agreement and guilty plea.  They are appended in the record.

      **THE COURT:**  Have you all seen the actual deferred prosecution agreement and guilty plea?

      **MR. OSTERHOUDT:**  I saw some -- part of it, but I didn't realize the entire matter was there.  And we'll have to explore that.

      **THE COURT:**  So the Government is required to turn

that over to the Defense.  I understand it's publicly
available, but I'll just require you to turn it over to the
Defense.

        **MR. McCULLOUGH:**  Yes, your Honor.

        **THE COURT:**  And I --

        **MR. McCULLOUGH:**  Your Honor, if I may?

        **THE COURT:**  Well, what I was going to say is that
it's not clear to me that Harris Corp.'s conduct is not
relevant to this trial.  You know, it's -- I think this might
be one of those that is sort of too difficult to pin down, to
rule on in limine.  And it kind of depends on how the Defense
comes in and it depends on how the Government's evidence comes
in.

    But sorry, what were you going to say?

        **MR. McCULLOUGH:**  I was going to just mention, your
Honor, that the conduct relates to conduct by ITT from 1980
through 2006.  It relates to the export of technical data
primarily as opposed to the export of items.

    There is no kind of consistent feature between the
indictment of the Morgovskys here, the counts under which the
Morgovskys are --

        **THE COURT:**  I get that, but that sort of goes to -- I
assume that the Defense is going to be sort of mistake, these
things are complicated, you know, that sort of thing.  And
depending on how that evidence comes in and how the evidence

comes in from the Government and to blunt that sort of defense, maybe this could become relevant.

But I feel like, you know, we can have a discussion about the differences -- I mean, when is this witness going to testify, this Harris Corporation witness?

MR. McCULLOUGH:  That will be within the first three days of trial, your Honor.

THE COURT:  Okay.  Well, we will have heard opening statements.  We will have heard from a number of other witnesses and we'll have a better sense at that point as to whether it's appropriate to get into that.

MR. OSTERHOUDT:  Fine, your Honor.  Thank you.

THE COURT:  So I would defer ruling on that.

Government's nine is granted.

MR. OSTERHOUDT:  This is the one about --

THE COURT:  Punishment.

MR. OSTERHOUDT:  -- penalties?

THE COURT:  Yeah.

MR. OSTERHOUDT:  I totally disagree with that.

THE COURT:  Oh, I'm sorry.

MR. OSTERHOUDT:  No, I -- I'm sorry to take time up, but Judge Kozinski wrote an incisive piece about this point, saying that what's so bad about letting juries know the stakes, depending upon their verdict.

I know the law is the other way and I understand your

Honor's ruling will grant this, but --

    **THE COURT:**  I'm compelled to rule the other way.

    **MR. OSTERHOUDT:**  The only place on the record -- my feeling is to say every day we trust judges with all kinds of information and there is no reason we can't trust juries.

    **THE COURT:**  Appreciate that.

  I have in past trials allowed limited reference to punishment when appropriate based on the peculiar facts of the case, but so far I don't see any such facts in this case that would warrant it.  So number nine is granted.

  And, of course, all these Motions in Limine, as you -- you all know better than I do, all these rulings, you know, how a trial goes may require revisiting of some of these rulings.

  Okay.  So number ten is moot, right?

    **MR. OSTERHOUDT:**  Yes.

    **THE COURT:**  Number 11.  Government's motion is denied.  I don't -- I don't see how it would be appropriate to -- to introduce -- I mean, the one case you cited was Judge Breyer's case, where he denied -- he refused to allow the declaration to go before the jury but considered it later, right?

    **MR. SAMPSON:**  Yes, your Honor.  I believe that's correct.  The same considerations do apply, however, *Simmons* and the choosing between your Fifth and Sixth Amendment rights. And so the Defendant waived that when he submitted the

declaration in favor of his co-defendant.  He's now submitted two.

These are substantially inculpatory as to Mr. Morgovsky. They admit his role in a lot of conduct described and implicate steps he took to conceal and even use his wife to conceal his activities.

THE COURT:  I think it raises serious Fifth Amendment and Sixth Amendment concerns, but at an absolute minimum under 403 I would exclude it.  So that's excluded.

Now, again, the door could be opened, you know, depending on -- obviously, you know, if Mr. Morgovsky testifies, then you have a different situation and, you know, the door could be opened.

Number 12 is granted.  It's not opposed, right?

MR. OSTERHOUDT:  Yes, your Honor.  My only concern was it doesn't stray into argument, but as long as it doesn't, there is no objection.

THE COURT:  As long as you don't stray into argument either.

MR. OSTERHOUDT:  We never do that.

THE COURT:  Okay.  So now let's go to the other acts evidence.

Before we get into each act or set of acts, I think we need sort of a background understanding here.  My background understanding -- and the Defense, you can correct me if I'm

wrong, but my background understanding is that, you know, the Government is going to be put in a position by the Defense of needing to argue intent, absence of mistake, knowledge, right?

       **MR. OSTERHOUDT:**  Those issues will be present in the case --

       **THE COURT:**  Your Defense --

       **MR. OSTERHOUDT:**  They may be overshadowed by other factual issues.  Whether something has occurred at all, you know, will be important.

       **THE COURT:**  Okay.  But your defense is going to include lack of intent, lack of knowledge and mistake, correct?

       **MR. OSTERHOUDT:**  We would not absolve the Government of the need to prove those things, along with other aspects of the case.

       **THE COURT:**  Of course.

       **MR. OSTERHOUDT:**  Elements of the case, yeah.

       **THE COURT:**  But that's going to be part of your pitch to the jury.  I mean, only -- only a really unintelligent person could not figure that out at this point, right?

       **MR. OSTERHOUDT:**  None of us fall into that category. I understand, your Honor.  It's just that I wanted to make clear that while those things are always in the case as the Government's burden on elements, this case will also involve factual questions about whether things occurred, notwithstanding the --

THE COURT:  I understand that, but I'm -- so I am
operating -- in going through these, you know, other acts, I'm
operating under the assumption that part of what the Defense is
going to be doing at trial is undermining the idea that the
Defendants intended to do this, that -- and that they wouldn't
have any knowledge that they were violating the law and that
there may have been some mistakes made.  I'm operating under
that assumption as I go through these.

MR. OSTERHOUDT:  With a caveat, your Honor.  The
Government has consistently taken the position that
Mr. Morgovsky is knowledgeable about the statutes and we have
not denied that.

THE COURT:  Okay.

MR. OSTERHOUDT:  So that part of it may not be an
issue.

THE COURT:  Okay.  So the part of it -- you mean the
defense may not -- may not imply that any of this conduct
was -- the alleged conduct may have happened, but was a
mistake?

MR. OSTERHOUDT:  Well --

THE COURT:  Did I not say that clearly?

MR. OSTERHOUDT:  I understand your question, and I --
standing here, I hate to take cards out of the deck, you know,
that they might be there.

I guess -- I guess I was just questioning the idea that

the whole case is about state of mind.  I'm saying, yes, that is in the case.  Like, for example, the act in question, the legislation in question, one may disagree with it.  One may wish that it were presented differently than -- that the method for controlling was very different.  Mr. Morgovsky may have that view, too, but that doesn't mean that he doesn't know what it says.

And so I was just saying that that part may not be the question.  That may not affect your Honor's judgment as to whether's those prior things having to do with intent get in.

I just wanted to -- as you go through these, it strikes me we're saying that the Government is offering two bases, different bases for this admission.  They are saying these things are inextricably intertwined.  They are part of the conspiracy.  And if they are not, they are 404(b) evidence of intent and the rest of it.  And I think it's necessary and desirable.

THE COURT:  In particular, intent, knowledge, absence of mistake.

MR. OSTERHOUDT:  Right.  But I think as far as the first one of those goes, we have difficulty with the effort of the Government, as we see it, to expand this conspiracy way back into the past.

In different places the indictment says -- we had a debate about this when we moved to dismiss Count Nine.  And my -- my

take on what the Government was said was that we're looking at

April 2012 probably as the time forward.

Now, they said we obviously did things in the past.  We

understand that, but that isn't even part of this conspiracy.

And we say they are not and they shouldn't be considered that

way.

Now, if the Court wants to consider them under 404(b),

intent, motive, design, modus operandi, your Honor can do that,

but there are rules for that, too.  And I know you're aware of

those.

       **THE COURT:**  And so, for example, the evidence from

the -- well, I think the way the Government describes it is:

           "Evidence that beginning as early as the late

           90's, the Morgovskys and other unindicted

           co-conspirators conspired to and exported items in

           violation of the statute in these other countries."

           Right?

       **MR. OSTERHOUDT:**  Right.

       **THE COURT:**  And I'm operating under the assumption

that that is not sort of intertwined with this conspiracy, but

I -- but it's easier for me to do that because I don't think it

matters, because I think that stuff clearly comes in under

404b.

       **MR. OSTERHOUDT:**  But what stuff are we talking about,

not this accusation.

The Government has to have evidence, solid evidence that it presents and proffers to the Court that this was done.  So I don't see how you can judge that unless you have that before you, what they do in violation of the statute involving the Netherlands, Spain, Germany, Macedonia, Bulgaria and Poland, none of which is alleged in the indictment.  So how is your Honor supposed to --

**THE COURT:**  It doesn't have to be alleged in the indictment.

**MR. OSTERHOUDT:**  It should be more specific than this.  It should be concrete.  It should be -- if not sworn, it should be --

**THE COURT:**  Well, so what does the Government -- do you want to describe the evidence that you want to put in in support of your assertion that the Morgovskys conspired to violate the statute by -- and/or the regulations by exporting materials to these other countries?

**MR. McCULLOUGH:**  Yes, your Honor.

And just to be clear, the Government -- the Government is entitled to submit proof of the full scope of the conspiracy beyond that that are listed as the overt acts.

And I think what we had said previously was that we had to prove one overt act during the period of the conspiracy as charged in the indictment.

**THE COURT:**  But it seems to me that regardless -- I'm

not sure how much it matters, whether this is part of the same conspiracy or not because, you know, assuming -- because it seems to me that evidence that fits into this category comes in, clearly comes in under 404(b).

   **MR. McCULLOUGH:**  Agreed, your Honor.

   **THE COURT:**  So what -- let's talk about that.

   **MR. McCULLOUGH:**  We offered a -- we offered a description in our opposition papers.  We offer letters that were written by the Defendant himself, Naum Morgovsky, that are dated in the late 1990's and early 2000s that describe the export of image intensifier tubes to a variety of countries, including in one of the examples we provided your Honor to Macedonia.  The descriptions in those letters include the idea that parts would be exported to Russia and assembled there, which is consistent, if not identical --

   **THE COURT:**  So which one -- are you referring, like, to your Attachment M and N?

   **MR. McCULLOUGH:**  That's correct, your Honor.  Those are the exhibits --

   **THE COURT:**  Okay.  So let's look a little more closely at those and you can --

   **MR. McCULLOUGH:**  Sure.  I would be happy to do that.

   **THE COURT:**  Pick your favorite one and point me to the language you want me to look at.

   **MR. McCULLOUGH:**  I would be happy to do that, your

Honor.

So as I was just describing, this is in Attachment M.

**THE COURT:**  Okay.

**MR. McCULLOUGH:**  We discuss about Mr. Morgovsky in the second paragraph.

**THE COURT:**  Remind me who Jovanovsky is.

**MR. McCULLOUGH:**  Mr. Jovanovsky is a customer who is, I believe, in Macedonia, who is believed to be in Macedonia based on the context of this letter.

**THE COURT:**  Okay.

**MR. McCULLOUGH:**  And Mr. Morgovsky explains that he plans to include cyberized scopes and the 24-hour day/night rifle scopes from Hitek without tubes, with connectors inside, making it easy to install the tubes in Macedonia.

"I can send Marlon to Macedonia to install the tubes.  As soon as you receive the product and the tubes, the second and third generation tubes -- third generation tubes being controlled tubes, items controlled for export under U.S. laws -- and some other items, including one sample of each second and third generation unit, so you can get them more quickly for your presentation."

**THE COURT:**  Okay.  And talk to me -- go through the --

**MR. McCULLOUGH:**  Mr. Morgovsky further explains that

those items will be sent under a different company name.  Those
items will be devalued and will be given short descriptions,
which, again, is consistent with what we have charged, your
Honor.

    In addition to that --

        THE COURT:  Are you turning to Attachment N or are
you looking at something else?

        MR. McCULLOUGH:  I can turn to Attachment N, your
Honor.

        THE COURT:  No.  What are you --

        MR. McCULLOUGH:  No.

    (Brief pause.)

        MR. McCULLOUGH:  Your Honor, Attachment N on the
second page --

        MR. OSTERHOUDT:  This is M still, correct?

        MR. McCULLOUGH:  Attachment N, as in Nancy.  Second
full paragraph:

        "It will be completely safe to ship the parts to
    Russia, assemble them there, and ship them to you from
    Russia.  Though it will take a couple of extra days,
    there will be no additional cost."

        THE COURT:  Okay.  And so these are a couple examples
of items of evidence that you want to bring in?

        MR. McCULLOUGH:  Yes, your Honor.  These are examples
of the manner and means by which Naum Morgovsky was sending

material -- export controlled items overseas to various customers in Europe, as well as sending parts to Russia to be assembled there and then distributed throughout Europe.

Mr. Morgovsky explains his knowledge or indicates his knowledge and awareness of the U.S. export laws in the ways that he describes efforts to export these items out of the United States.

THE COURT:  And so why -- why shouldn't items of evidence -- these items and items of evidence like this come in, at least under 404(b)?

MR. OSTERHOUDT:  Very confusing to a jury, I think. We don't know the circumstances under which it occurred, his relationship with the person to whom he wrote.  They don't on their face, in my opinion, describing illegality.  There is probably a lot of nuance about it.

All the reasons why people should be charged, included in their charges, and not bring in other criminality that does has to be proven beyond a reasonable doubt as a charge.

It's confusing.  It's not clear --

THE COURT:  So it's 403.

MR. OSTERHOUDT:  Under 403, certainly.  I don't think it fits 404(b).

THE COURT:  Why doesn't it fit 404(b)?  What's your --

MR. OSTERHOUDT:  Well, because even there the aspect

of confusion and the aspect of it not be clearly incriminating
and make the case of showing intent relevant to this case is
present.   403 is more clear.

       **THE COURT:**  I mean, it pretty clearly reflects an
intent to conceal what you are shipping and where you are
shipping it too, right?  So why --

       **MR. OSTERHOUDT:**  There could be other reasons for
doing that.

       **THE COURT:**  There could be.

       **MR. OSTERHOUDT:**  There could be.  And so the jury is
going to be asked to embark on a voyage of discovery as to what
it means.  And that's true with a lot of this stuff.  And 403
is a clear basis on which to exclude things.

       **THE COURT:**  I think on the 403 issue, certainly,
we -- you know, the amount of time that the Government will be
permitted to spend on it is going to be limited.

    I mean, we're not going to devolve into a mini trial on
what they did in the Netherlands, but I believe that it's
admissible, you know, at least under 404(b) and under 403, or
not precluded by 403.  Maybe it's also admissible as part of
the same conspiracy, I don't know, but I don't think it
matters.

    So that's the stuff -- that is, you know, documents like
this that -- that go to violations with co-conspirators in
other countries, in these other countries that you listed.

MR. OSTERHOUDT:  Your Honor, I think it does matter or should matter whether it's conceived to be part of this conspiracy.

THE COURT:  Because we would have to instruct separately on it otherwise?

MR. OSTERHOUDT:  Right.  And a conspiracy is a, as your Honor knows, agreement.  It's something that's intangible.

THE COURT:  Fair enough.  But we can deal with that -- we can deal with that in the Jury Instructions.  We don't need to decide that in the middle of trial.

But we can certainly instruct, if it -- if it becomes apparent that it's not part of the same conspiracy and there needs to be a limiting instruction.  You know, we'll give them, of course, the other acts instruction.  And if we want to call out the other acts in this way, we can -- you know, and if this falls within other acts evidence and not within this conspiracy, we can call that out in the instructions.

I think the same analysis applies to -- the next item is Mr. Morgovsky being stopped by Customs for unlawfully importing a controlled night vision component from Germany along with the $10,000.  I think the same analysis applies.

MR. OSTERHOUDT:  I'm sorry.  Which one is that, your Honor?  Number two?

MR. McCULLOUGH:  I think we referred to it as category three.

THE COURT:  Category three, with the -- the first two
categories being the two different categories of items that you
allege that they conspired to export to other countries.

MR. McCULLOUGH:  Correct, your Honor.  We allege in
category one that the items were controlled by the USML and,
therefore, violative of the AECA.

In category two we allege that they may be dual use items
that would be controlled by the EAR.

THE COURT:  Yeah.  And so for precision, I'm going to
pull up your motion.  Hold on a second.

Which Motion in Limine is the other crimes, other acts?

MR. McCULLOUGH:  So, your Honor, our opposition is
document 244.

THE COURT:  Your opposition?

MR. McCULLOUGH:  Yes.

THE COURT:  Okay.

MR. McCULLOUGH:  And Defendant Naum Morgovsky's
Motion in Limine is document 211.

THE COURT:  Okay.  I think I've got it here.

Okay.  So category one and two, the Government's -- so
this is a -- these are motions to exclude these categories of
evidence?  Is that what we're -- technically what we're dealing
with here?

MR. OSTERHOUDT:  That's what we made, motions to do
that.

THE COURT:  So the motion to exclude categories one and two is denied for the reasons discussed.

The motion to exclude category three, I think, is denied for the same reason, unless you can give me some strong reason why we shouldn't be thinking about it in the same way.

MR. OSTERHOUDT:  We don't see the relevance that he stopped for anything.  It says in March 14th, 2001 he was stopped entering the United States by Customs.

Well, I think that Customs looked into that.  They never charged him.  I don't think they were controlled, quite frankly.  And I think they decided that there was no basis to proceed against him.

So the fact that he's stopped by Customs --

THE COURT:  So what will the evidence be about this incident?

MR. McCULLOUGH:  The evidence will show that Naum Morgovsky was stopped.  He was carrying five -- I believe the number was five image intensifier tubes on his person, and he explained to the -- those items were seized.  He explained to Customs and Border Patrol that he was Naum Morgovsky and that he was associated with Hitek.

And subsequent to that, your Honor, the Morgovskys, both Naum and Irina, began to disguise and conceal their identity throughout the 2000s.  And that's what gave rise to a constellation of both personal and company identities that were

no longer associated with Naum Morgovsky and Hitek and Irina.

MR. OSTERHOUDT: That's just the Government's opinion about what gave rise to their doing that, and it's disputed.

The fact is, the fact that he was stopped here and under what circumstances doesn't seem evidentiary at all to us.

THE COURT: Well, I think this is probably intrinsic to the crimes charged, but I also think that it is appropriate to come in under 404(b) and it is not unduly prejudicial under 403. So the motion to exclude that is denied.

I think the category -- let's see what category are we on, four?

MR. McCULLOUGH: Four.

THE COURT: Category four, it's confusing because you -- you attached the number three to category four. So, and that's on Page 7.

MR. McCULLOUGH: Yes, your Honor. Yes, your Honor. We combined categories one and two into a single number one in the brief, which was a clear error.

THE COURT: So be patient with me.

But category four, it strikes me, that the same analysis applies. This is, I think, very likely to be inextricably intertwined with the charged conduct given its timing, but, in any event, under 404(b) I think it has to come in.

So is there anything different about that that, you know, Mr. Osterhoudt, compared to the other evidence that we've

discussed so far that should make my analysis different?

        **MR. McCULLOUGH:**  Your Honor, the Government would add for the record that this relates to the export of thermal devices to Russia and thermal devices -- the Janos lenses identified in the indictment are associated with the thermal devices that are described here.

        **MR. OSTERHOUDT:**  They are different and they are devices.  They are lenses, a type of devices, is that correct?  These different Janos devices.

     But, again, I don't see that they prove anything.  They are certainly not intrinsic to -- to the alleged conspiracy.

     The allegation is they were trying to avoid Russian import tariffs, which is a whole different constellation of wrongdoing if true.  I don't know how that would be proven in any event.

     So we think it is a little different and we think it shouldn't be admitted.

        **MR. McCULLOUGH:**  Your Honor, we respectfully disagree.  We are offering this evidence to show that Naum Morgovsky in a sworn statement indicates his business in Russia and the purpose by which he was carrying night vision and thermal vision equipment into Russia and that is the reason that we are offering the statement.  It does relate to a tax charge or a tax avoidance charge in Russia, but that is not the purpose of this evidence.

        **MR. OSTERHOUDT:**  Carrying things into Russia per se

is not unlawful.

THE COURT:  I understand the arguments.  This -- I think the same analysis applies to this.  It is likely intrinsic, but even if it's not, it should be admitted under 404(b) and is not unduly prejudicial under 403.

Category five, identity theft.  I think the answer here is that, again, it's -- the conviction doesn't come in, most likely.  And I would keep the conviction out under 403 even if it is -- even if it were appropriate to admit it under 404(b).  And, of course, that could change if Mr. Morgovsky testifies.

But the rest of it -- and I could imagine a scenario where it should come in, depending on the Defense's case, the case that the Defense puts on.  But for now the conviction is out, but everything else is in.

MR. McCULLOUGH:  Your Honor, that would include the stop at the -- the stop of the identity J.F. at the airport in 2007?

THE COURT:  Yes.

MR. OSTERHOUDT:  Your Honor, these identity theft allegations, I mean, they are not all identity theft.  The conviction wasn't for that, for one thing.  It was handled as a misdemeanor before the magistrate.

THE COURT:  The conviction isn't coming in, as least as of now.

MR. OSTERHOUDT:  I understand.  But Mr. Morgovsky

explained at the time the basis for his use of other names
having to do with --

        **THE COURT:**  And was that explanation successful?

        **MR. OSTERHOUDT:**  Yes.

        **THE COURT:**  In the conviction -- in the case before
the magistrate?

        **MR. OSTERHOUDT:**  Well, it wasn't presented as a
defense.  It was an explanation and no one said it was wrong at
the time.

    Items were filed under seal.  He had a legitimate concern
about his safety and that of his wife.  That's why he used
these IDs.  He got them at the same time basically.  The ID
that was used in the 2007, 2008 case, it was acquired in the
same manner and at the same time as the identity that came up
in this particular case.

        **THE COURT:**  And there's an opportunity, if the
Defense wishes, to put on evidence to that effect and submit it
to the jury, but it is also supportive of -- of the
Government's case and I just don't see why it shouldn't come in
under 404(b).

        **MR. OSTERHOUDT:**  Because we shouldn't need to get off
into these areas of inquiry that are not directly relevant to
the charge.

        **THE COURT:**  Well, I think there -- I think the
problem is that they are fairly relevant to the charges and

relevant to intent and knowledge and absence of mistake.

        **MR. OSTERHOUDT:**  These alternative explanations that we think are legitimate as for that, I don't see why the jury should be diverted in this case into that inquiry.  That's why I think that it should be excluded under 403.

        **THE COURT:**  Well, and I understand your position and -- but -- but you -- you know, you have the right to divert the jury to a certain degree into that inquiry if you want to do it, but the evidence is coming in.

    Category six.  Yes, that same analysis applies.

        **MR. OSTERHOUDT:**  Understood.

        **THE COURT:**  And so that -- the motion to exclude category six is denied.

    So then we go somehow to category ten.

        **MR. McCULLOUGH:**  Yes, your Honor.

    Your Honor, without prejudicing its right to do so, we do not intend to advance categories seven through nine that were noticed in the 404(b) motion in our case-in-chief.

        **THE COURT:**  Okay.

        **MR. McCULLOUGH:**  And we're just now testing you.

        **THE COURT:**  So category ten, I think the same analysis applies.  So tell me -- if you want, tell me why the same analysis should not apply to this.

        **MR. OSTERHOUDT:**  I just -- I don't know, your Honor. I just feel that the use of a name of a person, S.S. in this

case, to ship packages regarding night vision, I don't see how that in itself is a wrongful thing that contributes to the Government's case.

If they can prove that the package was -- that it was violative and that he used the -- that name to evade the law and to do it, then I think there may be something here. Otherwise, it's just kind of throwing him in a bad light, putting him in a bad light by saying that he used S.S.'s name to do this.  There is no crime in doing that.  He's never been prosecuted for it.  So we don't think it belongs in the case.

THE COURT:  Okay.  I understand your argument.  I think the same analysis applies to this evidence and so the motion to exclude that is denied.

Category 11 -- by the way, I should also mention with respect to category ten, I think I said this about some of the prior categories.  It's even more clear, I think, that category ten is inextricably intertwined conduct, but at a minimum it would be relevant under -- it would be admissible under 404(b) and not excludable under 403.

We will sort out, you know, which of these should be considered inextricably intertwined either during the trial or at the end of the trial when we do Jury Instructions.

MR. OSTERHOUDT:  Thank you.

THE COURT:  So I just want to be clear about that.

MR. OSTERHOUDT:  You're on 11 now?

THE COURT:  Number 11.  The same analysis applies to number 11.  Do you have anything new to offer about category 11?

MR. OSTERHOUDT:  Well, Irina Morgovsky's alleged use of the V.F. initials traveling.  I think a motion was filed to exclude on her behalf that -- that particular name.

THE COURT:  Right.  I can't remember, but I think I already denied it.  Did I deny that earlier?  It's all kind of blurring together.

MR. MAZER:  The Court said could not mention Count Six, but the conduct would come in.

THE COURT:  Yes, yes, yes.  Yes.  Thank you.

(Discussion held off the record amongst defense counsel.)

MR. OSTERHOUDT:  I'm sorry.  Thank you.

There is an objection to that, but I think it is covered by your ruling of the prior.

THE COURT:  Okay.  Thank you.

And does that get us to 12 and 13?

MR. OSTERHOUDT:  Yes.

MR. McCULLOUGH:  Yes, your Honor.

THE COURT:  Item number eight on Page 12 is categories 12 and 13.  So we're talking about categories 12 and 13, and this is --

MR. OSTERHOUDT:  Absolutely legal conduct of using

his business, such as Global Vision, to hold title to assets, including a vehicle.

       **MR. SAMPSON:**  Well, your Honor, I think Gary Piper is Global Vision.  But, your Honor, it's the Government's intent not to paint the Defendants as tax evaders, although that may be.

       But the Government is intending to demonstrate that none of the many companies that the Defendants had, VisionTech, Hitek, Nightsight, Global Vision, VisionTech Company, all -- Discount Camera, Video King, all of these companies did not file tax returns.  And the Morgovskys did not either.  That was part of their attempt to avoid scrutiny of their conspiracy.

       And it may have had the ancillary benefit of avoiding taxes, but the Government isn't planning on getting into numbers, just the failure to file.  And that evidence essentially comes from search warrant evidence and California EDD statements.

       **MR. OSTERHOUDT:**  All this says is that he used Global Vision and others to hold title to assets.  Why should that come in?

       **MR. SAMPSON:**  Well, your Honor, we're not intending to go into Global Vision.  They own the Morgovsky's cars that we drive, but we're not going to get into that.

       **THE COURT:**  Okay.  So the -- it sounds like what the ruling should be is -- I mean, again, the failure to file tax

returns on behalf of themselves and all these entities, that clearly can come in.

And it sounds like -- it sounds like all I need to rule with respect to these categories, is that right?

MR. OSTERHOUDT:  Well, I don't think you ruled that before, the failure to file tax returns can come in.

THE COURT:  Right.  I'm ruling it now.

MR. OSTERHOUDT:  So we're objecting to the ruling, because it says -- I think as we set forth in one of our own Motions in Limine, it's not a tax case.  They have had every opportunity to bring one and haven't.  And it's a complicated area of law that I don't pretend to be competent to defend as a tax prosecution.

So I don't think that they should be allowed to come in the back door and just introduce it here, that they didn't file tax returns.  I don't think the relevance is strong at all. There is all kinds of reasons for them.

Mr. Morgovsky -- they have a statement, I think, that they want to put in where he says that he had legitimate reasons not to do that; that he wasn't obligated to file tax returns.  And they are prosecuting him for it, which gives some credence to what he thinks.

So why should we litigate that in this case?  So I want to pose a really strong objection to that, if I may.

THE COURT:  I understand the objection, but I think

it's relevant.  I think it's part of the -- in fact, I think it
is intrinsic conduct and is also relevant under 404(b).  And I
don't think it's unduly prejudicial and I don't think it's
going to take a particularly large amount of time to put that
stuff in.  So that's my ruling on that.

I think that may cover all the Motions in Limine, is that
right?

MR. SAMPSON:  I believe so.  We believe, so, your
Honor.

MR. OSTERHOUDT:  I believe so.

THE COURT:  Okay.  Is there anything else we need to
discuss?

MR. OSTERHOUDT:  The arrangement we have here to
conduct the case, I understand the structures go for large
numbers of Defendants.

Is it necessary for us -- I'm just posing the question.
It makes us feel a little bit pushed off to the corner.  Me, at
least.  Whereas, the forthright Government, you know, is
staring straight ahead, proudly looking at the Court.  I don't
know why we wouldn't be in a similar position.

THE COURT:  I understand what you're saying and I
have sympathy for what you're saying, but I think it's just
really problematic.

It wasn't that long ago that I was a lawyer and the idea
of, you know, putting on a trial and having the opposing side

sit right behind me would not have been acceptable to me, and I don't think it's fair to put the Government through that.

So this is the configuration of our courtroom and, unfortunately --

MR. OSTERHOUDT:  I promise not to assault the Government, if that would help.

THE COURT:  It's unfortunate, but every criminal trial has proceeded that way.

MR. OSTERHOUDT:  Oh, okay.

THE COURT:  For what it's worth, I've never -- I've never heard any comment from a juror about it.  I always invite the jurors back to talk to me in Chambers after the case and I've never heard so much as even a passing comment about that from jurors in my trials.

MR. OSTERHOUDT:  I don't think it's a bad thing.  I just was puzzled by it a little bit.

THE COURT:  I understand.  I understand what you're saying.

MR. OSTERHOUDT:  Thank you.

THE COURT:  Anything else for now?

MR. OSTERHOUDT:  May I consult briefly?

THE COURT:  Of course.  And then we should talk logistics about the case.  Like, what time they should come and everything.

(Discussion held off the record amongst defense

counsel.)

MR. OSTERHOUDT:  Your Honor, thank you.  We don't
have anything further thing to raise now.

THE COURT:  Kristen and I are chatting about a
logistical issue relating to jury selection, so give me a
second.

(Discussion held off the record between the Court and
    the Court Clerk.)

THE COURT:  Okay.  So on the jury questionnaires,
Kristen informed me that we need to -- so we're doing our first
day -- on the first day they are just coming in and filling in
the questionnaires.  Then we're going to review them and decide
who is -- which jurors need to come back the next day and which
jurors don't need to come back the next day.  Kristen has
informed me that the jury office needs that information no
later than 4:00 p.m.

So I think that we had made a plan to meet at 2:00 p.m. to
go over the questionnaires.  I think we should accelerate that
to 1:00 p.m.  So we should accelerate that to 1:00 p.m.

MR. OSTERHOUDT:  On the 11th?

THE COURT:  On the whatever day it is.

MR. MAZER:  On the 11th.

THE COURT:  And the other thing that I think I may
not have mentioned is that those questionnaires are not leaving
this courtroom.

So the jurors will come in at 8:00 in the morning or whatever.  They will fill out the questionnaires.  The jury office will do its best possible job of making a copy set of the questionnaires for everybody, okay?

**THE CLERK:**  One for each party.

**THE COURT:**  One for each Defendant and one for the Government and one for us.

**THE CLERK:**  Right.

**THE COURT:**  Two for us, probably, I think.

So they will do their best to get those questionnaires done quickly.  They will be brought to the courtroom and you all can look through them in the courtroom.  When you leave the courtroom, the questionnaires stay here.  Presumably you may want to go grab some lunch something, quick bite.  Leave the questionnaires here.  Come back at 1:00 and we will start -- we will all start going through the questionnaires together to decide who should be excused for hardship and cause and all on the papers.

And then at the end of the day you'll return the questionnaires to Kristen and you'll get them back the next morning when you come in for voir dire.

**MR. SAMPSON:**  And peremptories will be on Tuesday?

**THE COURT:**  Correct.  On Tuesday we'll bring the remaining jurors back in.  I'll probably -- I'll probably ask them each to introduce themselves just so you can get a little

bit of a feel for them.  You know, you've only seen what they have written on paper.

I'll ask them to introduce themselves, answer a series of ten questions or something about who they are, where they work, where they live and stuff like that so that you can at least get a little bit of a feel for them.  That will help weed out any English language issues, also.

And then I'll probably ask one or two raise-your-hand questions.  And then I'll just turn it over to the lawyers to do voir dire.  And what I would propose is 45 minutes -- 45 minutes for the Government and half hour for each Defendant.

MR. OSTERHOUDT:  That's fine.

THE COURT:  Which is probably more than you're used to, at least in Federal Court.

MR. OSTERHOUDT:  Thank you, your Honor.

THE COURT:  And then we should have a jury picked before lunch time, I would guess.  So -- and I can't remember. Are we going straight into evidence on that Tuesday or are we doing openings on Wednesday?

MR. SAMPSON:  The plan was Wednesday morning.

THE COURT:  Wednesday morning?  Okay, that's fine.

And we have our criminal calendar in the afternoon and CMCs and stuff on calendar on Tuesday, is that right?

THE CLERK:  We canceled the CMCs.

MR. OSTERHOUDT:  So it's 8:30 to 2:30 or so?

THE COURT:  I aim for a lunch break at about 11:45, 45 minutes.  Usually one or two short breaks in the morning and a short break in the afternoon.  And sometime between 2:00 and 2:30 get them out of here.

MR. SAMPSON:  Your Honor, Ms. Cornell observed that the Court's questionnaire indicated that the first Thursday, the first week Thursday, the 14th, is going to be a trial day?

THE COURT:  Oh, yeah.  Sorry I didn't share that with you more explicitly.  But, yeah, we cleared our law and motion calendar for that Thursday, so we can have a trial day that Thursday.

MR. SAMPSON:  8:00 to 2:00?

THE COURT:  Yeah, same thing.

Okay.  Anything else?

MR. OSTERHOUDT:  No, sir.

MR. SAMPSON:  No, your Honor.

THE COURT:  Great.  Thank you very much.  We'll see you on the 11th.

(Proceedings adjourned.)

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, June 1, 2018