William L. Osterhoudt (SBN 43021)
Frank S. Moore (SBN 158029)
Law Offices of William L. Osterhoudt
135 Belvedere Street
San Francisco, CA 94117
Telephone: (415) 664-4600
Email: osterhoudt@aol.com

Attorneys for Defendant
NAUM MORGOVSKY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NAUM MORGOVSKY, et. al,<br><br>Defendants. | Case No. Cr-16-0411 VC<br><br>**DEFENDANT NAUM MORGOVSKY'S SENTENCING MEMORANDUM**<br><br>Date: October 23, 2018<br>Time: 3:00 p.m.<br>Place: Honorable Vince Chhabri |

**INTRODUCTION**

Naum Morgovsky stands convicted, on his pleas of guilty, to violating the Arms Export Control Act (22 U.S.C. §§ 2778 and 2778(c)), and money laundering (18 U.S.C. § 1956(a)(1)(B)). Mr. Morgovsky pled "open" to two counts charging money laundering and one count charging conspiracy to violate the Arms Export Control Act without any plea agreement regarding his sentencing. Sentencing is scheduled for October 23, 2018. The government's choice to charge Mr. Morgovsky with conspiracy under § 2778 rather than the general conspiracy statute (18 U.S.C. § 371)

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

1

appears to be unprecedented. § 2778 does not include any conspiracy provision and such a provision is found only in a regulation adopted under the statute. Our research has not disclosed a single export act prosecution wherein a defendant was charged with conspiracy under this regulation rather than pursuant to the § 371, the recognized vehicle for charging federal criminal conspiracies. The significance of this choice from a sentencing standpoint is that it enlarges Mr. Morgovsky's maximum sentence from five years under § 371, to 20 years under § 2778, based on precisely the same conduct. Mr. Morgovsky respectfully submits this memorandum for the court's consideration in sentencing.

## NAUM MORGOVSKY

Because of the protracted pre-trial proceedings in this case, the court has considerable knowledge at its disposal regarding the nature of the charges and the general thrust of the government's evidence. We believe some of the government's calculations, particularly in relation to the Morgovskys' finances and expenditures, are open to question, and his personal expenses in particular are exaggerated. As far as appears, the Morgovskys live a relatively modest life and are not extravagant in their lifestyle. However, while we will touch upon such matters in the course of this memorandum, we believe the most important aspect of the case is Naum Morgovsky himself, and because there was no trial, the court has not been appraised of many important facts concerning his life and his history. Therefore, we take up first the subject of defendant, Naum Morgovsky.

Undersigned counsel has known Mr. Morgovsky for a considerable period of time, meeting him first in connection with the 2008 misdemeanor conviction involving a false identity that has been referred to in the course of these proceedings. Mr. Morgovsky is a unique individual and his case, perhaps more than any other within our memory, requires individualized sentencing considerations. Some of these find expression in the sentencing guidelines or in § 3553, but some are simply unique to Mr. Morgovsky. In the course of the lengthy pre-trial proceedings, the government castigated Mr.

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

Morgovsky, often in harsh terms, for his conduct in exporting controlled night vision components without a license. We would like to put these familiar accusations to one side, for Mr. Morgovsky has pled guilty to these charges and, as the probation officer notes, has accepted responsibility for his conduct. Mr. Morgovsky has truly accepted responsibility and is extremely remorseful for having violated the law in this manner.

Mr. Morgovsky is 69 years old and in precarious health. Attached to this memorandum are exhibits reflecting his serious medical problems that could only be exacerbated by a prolonged incarceration. He is also a person who has exhibited throughout his life in this country an incredibly warm and compassionate side to his character, constantly performing good deeds for others without expecting anything in return. We have attached 24 letters (Exhibit 1) from persons from all walks of life, attesting to his generosity and kindness. Many, but not all of these, come from people who immigrated to this country from various places throughout the globe, including but not limited to immigrant families and refugees from the former Soviet republics. For years he employed refugees and immigrants, to provide them with comfort and security even when he could not afford to do so, recognizing the barriers to employment these people faced.  In countless ways he tried to ease the pain of transition for these families, and to lessen their burdens. Their letters of gratitude are effusive and heartfelt, and no picture of Mr. Morgovsky would be complete without including this pervading warmth and generosity. The Morgovskys' daughter, Patricia, emphasizes this quality in her letter:

> "That being said, he not only gave me strength, but also a strong moral compass. He taught me to be good and to do good, and he lead by example. When I was a child I thought the most normal thing in the world was helping those around you in every which way possible. I witnessed my dad give jobs to a countless number of immigrants. He lent and bought cars, rooms, money, clothes, and much more to those who needed his help. He even convinced several employees to go through drug and alcohol programs (paid for by him) and had jobs waiting for them when they completed them. His selflessness has never had any bounds, to the point of not sleeping or spending time on himself if anyone was in need of his help. Only when I got a bit older did I realize that this was not "normal" – and I greatly loved and respected the fact that he was such a great human being. And while his morals and values might be brought into question considering his crimes, I know him and I know

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

that he never intended to harm anyone. It's just not who he is as a person. And while I hold him responsible for his actions and how they have affected my mom, myself, and my family, I continue to love him and support him in any way I can because I know what a wonderful person he is."

These sentiments are borne out by all of the letters submitted to the court. Included among them is a commendation from the Jewish Vocational and Career Counseling Service of San Francisco, praising his leadership in the community "through hiring, training and employing individuals with barriers to employment." This letter goes on to say that the barriers referred to "may include foreign language, work experience, disability, age, or educational background." Because of these activities and his commitment to building a diverse workforce and to ongoing training, the service presented an award to Mr. Morgovsky, recognizing his contributions.

When Antonova Nabezhda found she had multiple sclerosis and suffered while attempting to fulfill her duties administrating a building where she lived, Naum helped her in numerous ways, particularly with her son, who was experiencing difficulties. Ms. Antonova writes "I have had a very hard life all my life and could never count on anyone but myself. Naum has changed that and has proven to be the most decent and compassionate person I have ever met. When I met Naum, my family and I were complete strangers to him, but he always helped me and my family without hesitation. Everybody I have met who knows Naum have described him as a person who helps many people without expecting anything back. I never heard anybody say a bad word about him."

When Naum had numerous employees, he established a practice of helping them with their affairs outside the business context. He helped them get an education by paying for classes that would benefit their development and career growth (letter of Igor Sundukovskiy). He and Mrs. Morgovsky taught many immigrant employees reading skills they would need in their new environment (letter of Irina Kostiovkovskaia). He sponsored new immigrants and helped them find and furnish apartments, buy a car, and prepare resumes when necessary (letter of Natasha Rabey). He helped them learn English, develop new skills, and find employment (letter of Yevgeny Guzhavin). He helped one

person, Alexander Shtromberg of San Francisco, learn to drive a car and to repair it, and stepped in to support people like Mr. Shtromberg, who were marooned in a strange land and had no other source of support.

Mr. Morgovsky's sister (Raisa Solovwova) writes emotionally about his care and attention to her family. She writes of his struggle with anti-Semitism in Ukraine as a youth and describes his hard work to graduate from college and support his family. Naum was a father figure to his older sister and she testifies to his tireless work with non-profit employment agencies, such as Jewish Vocational Service and the International Rescue Committee, giving jobs to virtually everyone with barriers to employment. Ms. Solovwova writes at length about the struggles of her grand-daughter, who has been diagnosed with several severe neuro-developmental disorders, including severe attention deficit hyperactivity disorder (ADHD) combined type; disruptive mood dysregulation (DMDD); anxiety disorder and autism spectrum disorder, among other debilitating conditions. The child, now 13, repeatedly tries to harm herself and runs away from all the facilities in which she has been placed. Naum has spent an enormous amount of time helping her to get placement and proper treatment, and initiating legal struggles to hold school districts accountable for their failure to support her adequately. Ms. Solovwova writes eloquently of her gratitude to her brother for his kindness and compassion.

One could literally quote endlessly from these testimonials and we respectfully urge the court to review them. They show Naum Morgovsky to be a person who, despite his flaws, is fundamentally good and well intentioned. We believe it is impossible to fully evaluate Mr. Morgovsky, considering his expansive qualities of warmth and compassion and also the qualities exhibited in the offense conduct here, without understanding where he came from and the forces that shaped him as a youth. Having observed Mr. Morgovsky at some length, we can say with some assurance that his social attitudes and perception of the state and its claims to authority over the individual were formed in his

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

hardscrabble youth in what was then the Soviet republic of Ukraine. There, anti-Semitism was rife and Jews struggled with a daily regimen of humiliation and discrimination. Mr. Morgovsky resisted this treatment and was constantly forced into fights to defend himself. There is no doubt that Mr. Morgovsky was deeply affected by this discrimination and by the quotas imposed on Jews pursuing higher education in Ukraine. His father's death at a relatively young age thrust him into a position of responsibility at just 16, when he began working to support the family, but he was dogged by discrimination and developed a deep distrust of the old Soviet regime in his early childhood. His knowledge that his grandparents had been murdered by Nazis in Kiev in 1941 only increased his sense of alienation from the state and distrust of its institutions.

Those deeply ingrained attitudes can be seen in the Naum Morgovsky who appears before the court for sentencing. Alongside his enormous compassion and positive qualities these writers describe, Mr. Morgovsky is a damaged human being in many respects. His guarded and sometimes secretive behavior and his seemingly life-long need to ward off impending doom, whether in the form of financial disaster, betrayal by persons close to him, or threats of physical retribution or even death at the hands of powerful individuals he has offended, are in many ways traceable to his background and the attitudes it engendered. The provocations faced by Mr. Morgovsky are not illusory and the threats are not non-existent, for there is abundant evidence to support them. But the pattern of unstable business and monetary relationships, reckless borrowing practices resulting in acute and seemingly hopeless financial distress, and a tendency to try to escape this desperate condition by overstepping laws and regulations he regards as oppressive, arbitrary and ill-conceived, all speak to a world view formed long ago in a place where life was always in danger and the law was an instrument of oppression.

In the course of this prosecution, Mr. Morgovsky has become more aware of these tendencies in himself, and of his responsibilities to his family. The fact that he has accepted responsibility for the

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

offense conduct here is important because it shows that he has insight into the problems giving rise to his situation. We can say with confidence, in light of this experience, that he will not be a recidivist. He has a strong capacity for helping needy and deprived members of his community and is at a stage of his life where he wants to perform these beneficial acts and does not wish to revisit the conduct that gave rise to this prosecution. At the age of 69 and in failing health, there is little to be gained by imposing a harsh or punitive sentence on Mr. Morgovsky. We respectfully invite the court's attention to all of these testimonials to his kindness and generosity. It is not too much to say that Mr. Morgovsky has made it his mission in private life to help other people.

## CONSIDERATIONS OF AGE AND HEALTH
## UNDER 18 U.S.C. § 3553(a)(2)(D)

Mr. Morgovsky is over 69 years old, with multiple health problems having potentially serious consequences if not treated properly and timely. He requires medical treatment on an ongoing basis. His physical health problems are unlikely to be adequately treated in in prison, much less in the most effective manner.

As is evident from the letter from Mr. Morgovsky's cardiologist Dr. Jeffrey J. Guttas, M.D., F.A.C.C.[1], he is being seen weekly due to "proximal atrial fibrillation" (an irregular heartbeat) and due to abnormally rapid heart rate known by the term of "tachycardia". He is receiving medicinal therapy and being followed closely, which includes regular EKGs, due to the potential dangers associated with these conditions of his heart. Tachycardia increases the risk of congestive heart failure or angina. Mr. Morgovsky's prescription for medicine intended to reduce his heart rate was recently changed to Bystolic. According to Dr. Guttas, Mr. Morgovsky's atrial fibrillation may

---

[1] A copy of the letter is attached as Exhibit 2. The "F.A.C.C." designation stands for "Fellow of the American College of Cardiology".

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

7

require treatment such as Catheter Ablation[2] or Atrioventricular Mode (AV) Node Ablation[3]. The most common complications of atrial fibrillation are strokes and heart failure usually resulting from formation of blood clogs. Yet, due to Mr. Morgovsky's chronic duodenal ulcer, the use of blood thinners is dangerous to him. If his atrial fibrillation is not followed regularly and treated properly and timely, he is five times more likely to have a stroke than people who don't have atrial fibrillation, according to the Centers for Disease Control and Prevention.

The letter from Mr. Morgovsky's gastroenterologist, Anne Thai[4] M.D., to his primary care physician Dina Sverdlov M.D., shows that he has peptic ulcer disease, chronic gastritis, gastroesophageal reflux disease, or GERD, dyspepsia (indigestion), and acute heartburn. Mr. Morgovsky was diagnosed with duodenal ulcer at the age of 23, which precluded him from being subjected to the mandatory draft in the country of his birth. These diseases pertaining to his stomach require him to maintain a very strict diet without which his condition deteriorates rapidly and dramatically. He is also required to take probiotics, enzymes, and food supplements daily for his digestive system to function adequately.

Following his arrest on August 25, 2016, Mr. Morgovsky was incarcerated for several days in a county jail until he was released on bail. During his brief incarceration, due to his inability to maintain a strict diet and take the probiotics and enzymes, his condition rapidly deteriorated, and the physician available at the jail was unable to provide any effective remedy. As a result, Mr. Morgovsky lost almost 10 pounds during his brief incarceration, and the walls of

---

[2] A catheter delivers radio waves to the heart to destroy the abnormal tissue that sends out irregular impulses.

[3] Radio waves destroy the AV node, which connects the atria and ventricles. Then the atria can no longer send signals to the ventricles. A pacemaker is inserted to maintain a regular rhythm.

[4] A copy is attached as Exhibit 3.

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

8

his stomach and his ulcer became severely irritated. As a result, shortly after being released from jail, his ulcer opened up and he also suffered a perforation of his stomach wall resulting in severe internal bleeding accompanied by irregular heartbeat. He bled from his mouth and was taken to an emergency room by an ambulance, where he was kept on IV with multiple medicines for two days until his condition improved. The ambulance staff identified severe atrial fibrillation as the main danger to him at that time. A copy of his discharge document is attached as Exhibit 4.

Mr. Morgovsky's vision, which has required glasses since his early childhood, has been rapidly deteriorating over the last two years, and he has been diagnosed with nuclear cataract of both eyes which are steadily increasing, resulting in acute angle closure and optical hypertension in the right eye. His eyes are being regularly examined by ophthalmologists who have informed him that a failure to do so may result in a glaucoma resulting in complete vision loss. Copies of notes generated by two ophthalmologists between January and July of 2018 are attached as a collective Exhibit 5.

We ask the Court to take into account that Mr. Morgovsky had a significantly harder time in his short custody than other prisoners because of his age and health problems. In fiscal year 2011, judges cited age as a reason to sentence below the guideline 995 times; 72.8% of these below-range sentences were based on § 3553(a) alone and not on a "departure" in whole or in part. Judges cited family circumstances 2,000 times; 73.5% were based on § 3553(a) alone. Judges cited physical condition 815 times; 63.5% were based on § 3553(a) alone. See U.S. Sent'g Comm'n, 2011 Sourcebook of Federal Sentencing Statistics, tbls. 25, 25A, 25B. In response to a Commission survey in 2010, 67% of district court judges said that age is "ordinarily relevant," 64% said that physical condition is "ordinarily relevant," and 62% said that family circumstances are "ordinarily relevant." U.S. Sent'g Comm'n, Results of Survey of United States District Judges January 2010 through

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

March 2010, tbl. 13 (2010)[5]. Asked why they do not rely on departures, 76% of judges said that the "Guidelines Manual does not contain a departure provision that adequately reflects the reason for the sentence outside the guideline range," and 65% said the policy statements are "too restrictive." Id., tbl.14. Obviously, it is not the law that these policy statements, to the extent that they discourage or restrict consideration of any relevant factor, control variances.

One of the goals of the Sentencing Reform Act was to provide for proportionality in punishment among offenses of different seriousness. S. Rep. No. 98-225, at 45-46 (1983). Indeed, the same prison sentence for an older offender amounts to harsher punishment than that for a young or middle-aged offender, because the sentence is a greater proportion of an older offender's remaining life and can amount to a life sentence. See Hannah T.S. Long, The "Inequality" of Incarceration, 31 Colum. J. L. & Soc. Probs. 321, 343-44 (1998) (suggesting that prison sentences be adjusted for life expectancy due to age and illness). For example, the three-year prison sentence that Brian Gall was facing in his mid-twenties that the district court reduced to probation, *see Gall*, 552 U.S. at 41-45, pales in comparison to a similar sentence for a defendant like Mr. Morgovsky who is 69 years old and has multiple health problems with potentially serious consequences if not followed closely and treated properly and timely. Offenders' health problems before and during incarceration "accelerate their aging processes to an average of 11.5 years older than their chronological ages after age 50." U.S. Dep't of Justice, National Institute of Corrections, Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, at 10 (2004), available at http://www.nicic.org/pubs/2004/018735.pdf.

Offenders who committed their first crime after the age of 50 "have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress-

---

[5] Available at
http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf.

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

10

related health problems," and they are "easy prey" for more experienced inmates. *Id*. at 10. For older prisoners who are unfamiliar with prison culture, "the prison sentence represents nothing short of a disaster, a catastrophe, and, in consequence, they are often in a psychological state of trauma." Elaine Crawley & Richard Sparks, Older Men in Prison: Survival, Coping, and Identity, in The Effects of Imprisonment 343, 346-47 (Alison Liebling & Shadd Maruna eds., 2005). It is highly unlikely that Mr. Morgovsky can receive adequate medical health treatment inside prison. A 69-year-old inmate with his health problems is likely to suffer greater punishment than the average inmate because the Bureau of Prisons often fails to provide adequate or even necessary medical treatment. An audit by the Office of the Inspector General found that the Bureau of Prisons often does not provide "required medical services to inmates." U.S. Dep't of Justice, Office of the Inspector General, Audit Division, The Federal Bureau of Prisons' Efforts to Manage Health Care 32, 34 (2008). As one example, an inmate was referred to the chronic care clinic upon intake, but was not seen until five months later, and although an EKG performed at that time showed abnormal results, the results were not reviewed by a doctor until two days later, the day the inmate died of a heart attack. *Id.* at 33. Currently, Mr. Morgovsky's cardiologist performs EKG's for him almost weekly.

Preventive services are often not provided in prison, chronic conditions and medication side effects are often not monitored, and unqualified persons are providing services. *Id*. at ii-xx, 32-34, 51-52. *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence"). § 5H1.1 has always provided that "[a]ge may be a reason to depart downward in a case

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

in which the defendant is elderly and infirm and where a form of punishment such as home confinement might equally be efficient as and less costly than incarceration."
USSG § 5H1.1.

Naum's age and physical impairment "may be a reason to depart downward only if and to the extent permitted by" USSG § 5H1.1 and USSG § 5H1.4. See USSG § 5K2.22. That is, they "may be relevant in determining whether a departure is warranted, if . . . individually or in combination with other offender characteristics, [they] are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." See USSG § 5H1.1, USSG § 5H1.4. His age "may be a reason to depart downward" if he is "elderly and infirm and where a form of punishment such as home confinement might be equally efficient and less costly than incarceration." USSG § 5H1.1. His physical impairment would have to be "extraordinary." USSG § 5K2.22(2). In *Gall*, however, the Supreme Court upheld a variance to probation based on factors the Commission's policy statements prohibited, i.e., voluntary withdrawal from a conspiracy and discontinuing the use of drugs, or deemed "not ordinarily relevant," i.e., age, education, and employment. 552 U.S. at 51-60. In approving the judge's reliance on these factors, the Supreme Court disregarded the Commission's policy statements and imposed no requirement that district courts consider them. In doing so, the majority rejected Justice Alito's argument in dissent that the policy statements should be given "some significant weight." *Id*. at 61-68 (Alito, J., dissenting).

Clearly, Mr. Morgovsky's advanced age and deteriorated physical condition is an appropriate consideration in this sentencing proceeding. A substantial variance is warranted.

### NEED FOR ADEQUATE DETERRENCE UNDER 18 U.S.C. § 3553(a)(2)(B)

A severe sentence in Mr. Morgovsky's case would not serve the sentencing goal of adequate deterrence under 18 U.S.C. § 3553(a)(2)(B).

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

12

The empirical evidence fails to establish a relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995). The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004) ["U.S. Sent'g Comm'n, Measuring Recidivism"]. *See also* Part IV.A.3, *infra*. And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011).

Indeed, Mr. Morgovsky's history and characteristics make him a low risk to re-offend. In fact, while it is alleged in the Superseding Indictment that the conspiracy "continuing until at least August 25, 2016", the evidence provided by the Government demonstrates that his last purchase of the controlled image intensifier tubes listed in the Superseding Indictment was in July of 2013 and the last purchase of the controlled Janos lenses was in March of 2014. The extraordinary burden of

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

prosecution in this case, including the harm inflicted on Mrs. Morgovsky and the entire family, has had a profound effect on Mr. Morgovsky. He accepts responsibility and is genuinely remorseful for his conduct, the reasons for which he addressed in his lengthy statement to probation (included in the Presentence Report). Mr. Morgovsky, under no circumstances, would put himself and his family through this again, nor would he again violate the laws of a country to which he turned in search of freedom and justice.

According to the Commission, recidivism rates in general (defined to include technical supervised release violations) "decline relatively consistently as age increases," from 35.5% for offenders under age 21, down to 12.7% for offenders age 41 to 50, and down to 9.5% for offenders over age 50. U.S. Sent'g Comm'n, Measuring Recidivism at 12 & Exh. 9. The only factors found relevant to sentencing decisions that also affected the likelihood of recidivism were age and marriage. The finding that age reduced the likelihood of committing subsequent offenses is consistent with the body of research that finds that offenders 'age out' of crime. The finding that marriage has a significant effect on recidivism also is consistent with other research which has found that marriage is associated with lower crime rates." Tina L. Freiburger & Brian M. Iannacchione, An Examination of the Effect of Imprisonment on Recidivism, 24 Crim. Just. Stud. 369, 377 (2011). The cost of incarcerating prisoners age 50 and older has been estimated to be two to four times that of the general inmate population. "In addition to the economic costs of keeping older prisoners incarcerated, it is important to consider whether the infringement upon the liberty interest of an older prisoner who is no longer dangerous is justified." The Commission's research also demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, see U.S. Sent'g Comm'n, Measuring Recidivism at 12-13 & Ex. 10; U.S. Sent'g Comm'n, Recidivism and the "First Offender" 8 (2004), as does substantial other research. Fn12: See Miles D. Harer, Federal Bureau of Prisons, Office of Research and Evaluation, Recidivism Among Federal Prisoners Released in 1987,

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

14

at 5-6, 54 (1994),

http://www.bop.gov/news/research_projects/published_reports/recidivism/oreprrecid87.pdf.

Naum Morgovsky presents a long history of employment and strong family ties, while furthering his education and not abusing drugs. Further, "[r]ecidivism rates decline relatively consistently as age increases," from 35.5% of offenders under age 21, to 12.7% over age 40. *See*, U.S.S.C., "Criminal History Computation" at 12 and 28 (showing recidivism rates of just 6.9% for offenders aged between 40 and 50 in Criminal History Category I. Mr. Morgovsky turned 69 in September. We recognize that respect for the law, just punishment, and deterrence demand supervision. But, too harsh a sentence fails to respect the law just as much as too lenient a sentence,[6] and it violates the statute requiring this sentence to be no greater than necessary. This defendant's age, long marriage, strong family support, in addition to evidence that he is no longer involved in the charged conspiracy for a considerable period prior to indictment and his sincere remorse and acceptance of responsibility strongly support the conclusion that he will not reoffend.

## AN APPROPRIATE SENTENCE

In admitting his guilt and expressing his remorse, Mr. Morgovsky acknowledges that he deserves a punishment of incarceration. He is only seeking that the incarceration be not as extensive as is recommended in the PSR. Where a defendant is advanced in years, has accepted responsibility for his offense, and does not pose a danger to others in the community "the interests of the society as a whole, as well as individual victims of crime can continue to be served through the imposition of alternative sentences such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98

---

[6] See Justice Anthony Kennedy, Testimony before the Senate Judiciary Committee, February 14, 2007 ("Our sentences are too long, our sentences are too severe, our sentences are too harsh. . . there's no compassion in the system. There's no mercy in the system.")

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

Sat.1987, 2039 (1984). Prison overcrowding remains a serious problem in the federal system and incarceration of older and infirm inmates exacerbates this problem, casting the burden of elder medical and psychological care on the system, and ultimately on the taxpayers. The court's task in Mr. Morgovsky's case, as in all cases, is to fashion a sentence sufficient but not greater than necessary to achieve the sentencing goals in Section 3553(a). Under all the circumstances, we respectfully submit that a sentence of 18 months incarceration and a comparable period of home confinement will provide a just punishment for Mr. Morgovsky. Home confinement and supervised release, while infinitely preferable to lengthy incarceration, can be a severe punishment, hugely restrictive of liberty, effective in deterring misconduct and amply retributive. In fact, during his pretrial release, Mr. Morgovsky has already sustained home confinement for over 17 months without being permitted to do even grocery shopping. He has been completely compliant with these conditions, but has felt the sting of this loss of liberty and freedom of movement. The Supreme Court, in the *Gall* case, agreed with United States District Judge Pratt that probation is a "'substantial restriction of freedom,'" 552 U.S. at 48, stating: "We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *See United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987))).

    A split sentence of a combination of 18 months incarceration and 18 months home confinement is appropriate in this case. It punishes Mr. Morgovsky for his actions and serves the interests of deterrence and protection of the public. There is very little likelihood of Mr. Morgovsky reoffending. He has minimal criminal history and strong family support. Nor has he been involved in unlawful conduct in recent years. Evidence provided by the government demonstrates that his last

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC

purchase of the controlled image intensifier tubes listed in the superseding indictment was in July of 2013 and his last purchase of controlled Janos lenses was in March of 2014. Since charges were brought in this case, Mr. Morgovsky has resolved not to re-offend, but to devote his efforts to his family and to the good work he has been doing and will continue to do in the community.

## CONCLUSION

We respectfully request that this court sentence Mr. Morgovsky to 18 months incarceration and 18 months home confinement, followed by a term of supervised release. We also request that, as recommended by the probation officer, he be allowed to self-report to any institution designated by the Bureau of Prisons. This requested sentence is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. Section 3553(a)(2).

Date: October 16, 2018                                             Respectfully submitted,

                                                     /s/ *William L. Osterhoudt*
William L. Osterhoudt, Esq.,
Attorney for Defendant Naum Morgovsky

*Defendant's Sentencing Memorandum,* Case No. Cr-16-0411 VC