Pages 1 - 78

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
    VS.                        )        NO. CR 16-00411-1 VC
                               )
NAUM MORGOVSKY,                )
                               )
          Defendant.           )
_____)

                         San Francisco, California
                         Thursday, November 13, 2018

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

                    ALEX G. TSE
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
          BY:   **COLIN C. SAMPSON**
                **ASSISTANT UNITED STATES ATTORNEY**


                    ALEX G. TSE
                    United States Attorney
                    1301 Clay Street
                    Oakland, California  94612-5217
          BY:   **ERIN A. CORNELL**
                **ASSISTANT UNITED STATES ATTORNEY**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**



REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

 1 | **APPEARANCES**:   (CONTINUED)

 2 | For Plaintiff:

 3 | NATIONAL SECURITY DIVISION
   | 600 E Street, N.W.
   | BICN Building - Suite 10606
 4 | Washington, D.C.  20530
   | BY:  **JASON McCULLOUGH**
 5 | **ASSISTANT UNITED STATES ATTORNEY**

 6 | For Defendant:

 7 | LAW OFFICE OF WILLIAM L. OSTERHOUDT
   | 135 Belvedere Street
   | San Francisco, California  94117
 8 | BY:  **WILLIAM L. OSTERHOUDT**
   | **ATTORNEY AT LAW**

 9 |

10 | LAW OFFICES OF ALAN ELLIS
   | 80 Pinheiro Circle
   | Novato, California  94945
11 | BY:  **ALAN ELLIS**
   | **ATTORNEY AT LAW**

12 |
   | Also Present:        **Catheryn Grier, U.S. Probation**
13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

 1    <u>**Thursday - November 13, 2018**</u>                      <u>**9:07 a.m.**</u>

 2                          P R O C E E D I N G S

 3                             ---000---

 4          **THE CLERK:**  Calling Case Number 16-cr-00411, U.S.A.

 5    versus Naum Morgovsky.

 6        Counsel, please step forward and state your appearances

 7    for the record.

 8          **MR. SAMPSON:**  Good morning, Your Honor.  Colin

 9    Sampson, Jason McCullough, and Erin Cornell for the

10    United States.

11          **THE COURT:**  Good morning.

12          **MR. OSTERHOUDT:**  Good morning, Your Honor.  William

13    Osterhoudt.  Mr. Alan Ellis is here also on behalf of

14    Mr. Morgovsky.  Mr. Morgovsky is present.

15          **THE COURT:**  Good morning.

16        Good morning, Mr. Morgovsky.

17          **THE DEFENDANT:**  Good morning.

18          **THE PROBATION OFFICER:**  Catheryn Grier with

19    United States Probation.

20          **THE COURT:**  Good morning.

21        So number one is I've received a couple of things this

22    morning.  The Government filed something Friday night.  I was

23    out of town this weekend so I did not receive it myself until

24    about half an hour before the sentencing hearing began, and

25    I've not read it and my inclination would be to not consider it

1  because if everybody keeps filing things at the last minute,

2  the sentencing is never going to happen.  So my inclination is

3  not to consider that.

4        Also about 15 minutes ago Mr. Osterhoudt delivered a video

5  to my chambers, and that video apparently contains a number of

6  statements by Mr. Morgovsky's family and friends, which I

7  assume are very similar to what is already in writing in the

8  submissions that I've received.  The audio does not work on

9  most of that video.  My inclination would also be to not

10 consider that.

11       So let me first ask the Government.  I mean, if you want

12 me to consider this, what you submitted on Friday night, I

13 think it means that the hearing is going to be continued yet

14 again.  Do you want me to consider what you submitted Friday

15 night?

16       **MR. SAMPSON:**  We're happy to proceed just with

17 argument, Your Honor.

18       **THE COURT:**  Okay.  All right.

19       **MR. OSTERHOUDT:**  Your Honor, may I address our recent

20 submission?

21       I feel it's a very powerful submission.  I know you've got

22 things in writing.  For many years I also have filed documents

23 and letters from people, but I believe that the power of seeing

24 what some of the people on this video think about Mr. Morgovsky

25 and --

1          **THE COURT:**  Well, then you should have submitted it

2     more than 15 minutes --

3          **MR. OSTERHOUDT:**  I know --

4          **THE COURT:**  -- before the sentencing hearing.

5          **MR. OSTERHOUDT:**  -- but we didn't, and I apologize.

6          **THE COURT:**  I'm not considering the video.  I'm not

7     going to consider it.  You can say whatever you want about it,

8     but I'm not considering the video.  It was submitted too late.

9          **MR. OSTERHOUDT:**  So what I'll say about it, if you

10    will permit me, is that there's several people who testified of

11    Mr. Morgovsky's extraordinary kindness to them when they came

12    to this country from Ukraine, from Russia; the manner in which

13    he gave employment to people when he couldn't afford to do so;

14    when he always with a selfless attitude contributed to people,

15    helped them get cars, taught them how to get driver's licenses.

16         **THE COURT:**  Okay.  And I'm happy to let you continue,

17    but the upshot of all of that is in the written submissions,

18    the lengthy written submissions, I've received from

19    Mr. Morgovsky's family and friends in the weeks leading up to

20    this sentencing hearing; right?

21         **MR. OSTERHOUDT:**  Yes, but the one thing I'd like you

22    to see is his daughter's testimony on the video because --

23         **THE COURT:**  I actually saw that.  That was the one

24    part, as far as I can tell, that was not -- where the audio

25    worked was her statement at the beginning.

1          **MR. OSTERHOUDT:**  Good.  I wanted you to kind of see

2     that because I thought it was very powerful myself.  Of course,

3     she's his daughter, but also she's observed him for very many

4     years and he's had a strong influence on her life and brought

5     her, she believes, to a position of being a strong woman in

6     business; and she thinks she relies heavily and gives him so

7     much credit for that.

8          And it's powerful, and I just wish we could have gotten it

9     to you earlier, but I hope you had an opportunity to view that

10    aspect of it because I think it is very strong, and we hope

11    that it would affect Your Honor's viewpoint of who this person

12    is as distinguished from what the evidence may show he did in

13    the case.

14          **THE COURT:**  What the evidence may show that he did?

15          **MR. OSTERHOUDT:**  I beg your pardon?

16          **THE COURT:**  What the evidence may show that he did?

17          **MR. OSTERHOUDT:**  Well, yeah.  One can argue about the

18    detail, the edges.  He's pled guilty, of course, but, you know,

19    along the edges, there's a lot of fuzz, you know, how far that

20    goes.

21          **THE COURT:**  Yeah.  And you'll have more of an

22    opportunity to discuss that.

23          Let me give you -- I think maybe I will start with the

24    Government, and let me give you some preliminary thinking and

25    you can address that and, of course, Mr. Morgovsky will have a

1    chance to address that.

2        First of all, on the issue of the guideline calculation,

3    you know, there are a number of references in the Government's

4    submissions to -- there are a number of statements along the

5    lines of "The Government stands ready to prove," "The

6    Government was ready to prove at trial."

7        You know, the issue here is what has the Government proved

8    in connection with sentencing and although I think that some of

9    these, you know, guideline questions are close questions, my

10   tentative thinking is that, you know, we have a base Offense

11   Level of 26, which I believe everybody agrees on.  We have an

12   increase of two for the 1956 conviction, which I think

13   everybody agrees on.  So that puts us at a base Offense Level

14   of 28.

15       Role in the offense, my tentative inclination is to go

16   with Mr. Morgovsky on that and say that he increased the

17   Offense Level by two points for his role in the offense.

18       And then there is the question of acceptance of

19   responsibility.  My inclination is to conclude that

20   Mr. Morgovsky is not entitled to a reduction for acceptance of

21   responsibility because my conclusion, based on everything I've

22   seen so far, is that Mr. Morgovsky either continues to believe

23   he did absolutely nothing wrong or believes he did something

24   wrong and thinks he can talk his way out of it.  One of those

25   two things.

1        And so I think that my inclination again at this point,

2   based on everything I've seen so far, is that he's not entitled

3   to a reduction for acceptance of responsibility.  So that would

4   put us at an Offense Level of 20 -- excuse me -- 30.

5        And I would be tentatively inclined to say that his

6   Criminal History Category should be I.  And one of the things

7   that makes me a little uncomfortable about assigning him a

8   Criminal History Category of II is that -- I'm trying to think

9   exactly how to put this, but it seems like the criminal conduct

10  for which he was convicted was part of the overall course of

11  conduct that he's here in court being sentenced for today, and

12  it feels a little strange to say that that's part of his prior

13  criminal history.

14       It's also his only conviction and it's a misdemeanor

15  conviction and it happened, like, 10 years ago or something

16  like that.

17       So when you consider all of that in its totality, I'm

18  happy to hear argument from you on the issue but it makes me --

19  it seems a little strange to ding him in terms of criminal

20  history for this conduct that is sort of part of the overall

21  course of conduct that he's currently in court for.

22       So assuming I am right about that, and I may not be, but

23  assuming I'm right about that, that leaves us at an Offense

24  Level of 30 with a Criminal History Category of I, which has us

25  in a guideline range of 97 to 121 months.  And this

1   certainly -- based on everything I've seen so far, this seems

2   like -- you know, if you were to apply all the 3553(a) factors,

3   and we can talk more about them, this seems like it should be a

4   guideline sentence.  This does not seem like the kind of case

5   where I should vary upward or that I should vary downward; that

6   it seems like it probably should be a guideline sentence.

7        And he could argue -- I mean, I'm happy to hear arguments

8   for upward variance and downward variance, and we can argue

9   about where, you know, the sentence should fall within the

10  range, but that is at least my initial tentative thinking.

11       So why don't I start with the Government.

12       **MR. SAMPSON:**  Your Honor, if you don't mind, I'll

13  address the criminal history issue first.

14       **THE COURT:**  Sure.

15       **MR. SAMPSON:**  And we'll sort of reserve argument on

16  where in the guidelines Mr. Morgovsky's conduct should be.

17       With respect to his criminal history, Your Honor, yes, he

18  gets one point for the misdemeanor, which is appropriate, but I

19  do disagree with Your Honor in that the two-point enhancement

20  for committing some of the acts in the underlying crime is

21  appropriately added here.

22       Mr. Morgovsky, while on probation in front of Judge Spero,

23  really pivoted.  He stopped using the Fradel passport, which he

24  was caught with, and then he opened up a bank account in the

25  name of Gary Piper.  That's an account he used to launder

1    $200,000.  That's Count 10.

2        So Mr. Morgovsky, also during this one-year time frame, he

3    purchased numerous image intensifier tubes, in the hundreds; he

4    made numerous shipments to Infratech in Moscow during that

5    period; and he received approximately I think it's just under

6    $1 million during that period in foreign wires, many of which

7    reference optical goods, optical parts and accessories.

8        So, Your Honor, the conspiracy and the conduct continued

9    unabated from before that time through this probation

10   undeterred and into what has led to his conviction.

11       Under those circumstances, Your Honor, the two-point

12   enhancement is entirely appropriate.  It's contemplated by the

13   guidelines.  It appropriately balances the conduct for which he

14   is being sentenced with the fact that he was under supervision

15   for another offense, and it's a very specific two-point

16   enhancement when that's the case.  We believe it applies here.

17       **THE COURT:**  I understand the argument.  Anything else

18   the Government wants to add?

19       **MR. McCULLOUGH:**  Your Honor, the only thing I would

20   add is that it appears to me that as you're interpreting the

21   facts, that you are viewing this as a broad and wide-ranging

22   conspiracy both in terms of the amount of time that the

23   conspiracy covered as well as the amount of products and money

24   that this conspiracy covered.

25       And so with that in mind, I think, as my co-counsel said,

1  we reserve argument in terms of aligning where Mr. Morgovsky

2  falls in terms of the Sentencing Guidelines or whether an

3  upward departure is appropriate; but if that is the view with

4  which Your Honor is considering this, that certainly gives us

5  some --

6          THE COURT:  But let me ask you about that.  I mean,

7  you know, there's a dispute between the parties about whether

8  the conduct reaches back to 2008, and that dispute is couched

9  in discussion of what the appropriate criminal history should

10 be; right?

11        So I guess what I will ask you is, let's assume that I

12 resolve that dispute in Mr. Morgovsky's favor in the sense that

13 I put him in Criminal History Category I.  At that point does

14 it -- how much does it matter how far the conspiracy went back,

15 how much product was involved?

16        I mean, we know that this is a significant crime that

17 Mr. Morgovsky -- these are significant crimes that

18 Mr. Morgovsky committed, serious crimes; and, you know, once

19 we've resolved the Criminal History Category question, I'm

20 wondering how much that matters afterwards.

21         MR. McCULLOUGH:  As to what guidelines would be

22 appropriate, it is not -- it's not an issue.  I mean, the

23 guidelines --

24         THE COURT:  It would just be relevant to the 3553(a)

25 factors?

1          **MR. McCULLOUGH:**  That is correct, Your Honor.  And I

2     think it would be highly relevant if one were to look at the

3     extent of the criminal conduct here that's been shown through

4     the evidence that's been presented to Your Honor as we have

5     provided at an earlier motions hearing.  As you know, we

6     presented documents dating back to the late 1990s involving

7     similar conduct, exporting this equipment.  As Your Honor has

8     explained, that conduct appears to have gone unabated through

9     most of this time period of this conspiracy.

10         In addition, Your Honor --

11         **THE COURT:**  But the guideline range is the guideline

12    range; right?  So what you're saying is it wouldn't affect the

13    guideline range and that would -- and so it would primarily be

14    relevant to where Mr. Morgovsky was sentenced within the

15    guideline range; or potentially if the conduct was particularly

16    serious or particularly benign, I guess, within the range of

17    violations of these statutes, it might be relevant to whether

18    there should be an upward or downward variance.

19         **MR. McCULLOUGH:**  I think that's -- I think that's

20    right, Your Honor.  And the other consideration here is, under

21    the 3553(a) factors, the consideration of actually whether any

22    of this -- whether the sentence will appropriately educate the

23    defendant as to the wrong -- his past wrongdoing.

24         And I think that that is -- I think when you view what may

25    be a misdemeanor in light of the overall course of conduct, I

1    think it is something that Your Honor should seriously consider

2    as to whether there is a -- there would be a risk of recidivism

3    with an unfortunate low sentence here.

4         **THE COURT:**  Do you believe -- and, by the way, you

5    keep making reference to reserving discussion of where the

6    sentence should be within the guideline range until later.  I

7    want to hear everything you have to say now.

8         So do you think there is any sentence that would -- you

9    made reference to educating the defendant, educating

10   Mr. Morgovsky.  Do you believe that there's any sentence that

11   will educate Mr. Morgovsky that what he did was illegal and

12   that he shouldn't do it again?

13        **MR. SAMPSON:**  Well, Your Honor, he certainly knew it

14   was illegal.  There's plenty to show that he knew exactly what

15   law he was violating.

16        That said, I think it's a fair question.  I am not sure

17   that any sentence is going to bring home the message that it's

18   something he couldn't do again if he thought he could get away

19   with it.

20        That said, Your Honor, in terms -- setting aside criminal

21   history, in terms of where Mr. Morgovsky's sentence should fall

22   within the guidelines, there is -- this is an exceptionally

23   egregious case in terms of willfulness.  Essentially it's a 10

24   out of 10 on willfulness.  He knew exactly what the law is.  He

25   had studied it.  He had apparently assisted another person who

was charged with exporting night vision to Russia with his
criminal defense; and so Mr. Morgovsky absolutely knew the
risks he was taking, including with his wife, and he took them.

    And so, Your Honor, for those reasons I'm not sure that a
departure or variance upward would be appropriate.  We're
asking only for a sentence at the top of the guidelines to
reflect the length of the conspiracy, the scope, the number of
tubes and lenses, the country, the destination, the potential
harm to the United States national security; and all those
matters reflect that a high-end guideline sentence is entirely
appropriate in this case.

    THE COURT:  When you say country or destination, one
of the points that Mr. Morgovsky made a number of times is that
Russia had most-favored nation status for most, if not all, of
the time that he was exporting these products to Russia.

    MR. SAMPSON:  I'm not aware of any difference that
that makes in terms of the licensing requirements for --

    THE COURT:  Well, but you make reference to the
country of destination.

    MR. SAMPSON:  Well --

    THE COURT:  That's why I was asking.  Legally I don't
think it matters.

    MR. SAMPSON:  Sure.

    THE COURT:  But you were the one who invoked the fact
that he sent this stuff to Russia.

1          **MR. McCULLOUGH:**  Your Honor, to put a finer point on

2     it, the evidence that's been presented to Your Honor

3     demonstrates that Mr. Morgovsky was providing these materials

4     to the Russian military, to the Russian government.  That was

5     the intent of his conspiratorial scheme.

6          And in addition to sending it to Russia, which is a clear

7     violation of the statute itself, the intended recipient of the

8     controlled items is --

9          **THE COURT:**  Can you point me to -- in the materials

10    that you submitted before Friday night -- and, again, I haven't

11    reviewed whatever you submitted Friday night -- point me to the

12    material that you say stands for the -- proves that

13    Mr. Morgovsky intended to send these materials to the Russian

14    military.

15          **MR. McCULLOUGH:**  Your Honor, Exhibit 1 of our filing

16    on -- which number is this?

17          **MR. SAMPSON:**  329.

18          **MR. McCULLOUGH:**  -- ECF 329.

19          **THE COURT:**  Okay.  Wait.  Hold on a second.

20                         (Pause in proceedings.)

21          **THE COURT:**  Okay.  I have Exhibit 1.

22          **MR. McCULLOUGH:**  This is a certificate from military

23    testing of devices that were provided to the Russian military.

24    These include Infratech thermal vision --

25          **THE COURT:**  Wait.  Hold on.  Let me just sort that out

1    and get my bearings here.

2              **MR. McCULLOUGH:**  Sure.

3              **THE COURT:**  You said this is a certificate of testing

4    provided to the Russian military?

5              **MR. McCULLOUGH:**  By the Russian military, Your Honor.

6              **THE COURT:**  Okay.  So this is a Russian military

7    document and it's a certificate of testing.  It reflects that

8    night vision equipment was tested by the Russian military.

9              **MR. McCULLOUGH:**  Both thermal and night vision

10   equipment were tested by the Russian military.

11             **THE COURT:**  Okay.

12             **MR. McCULLOUGH:**  These are the same products into

13   which we contend that Generation 3 image intensifier tubes were

14   placed with respect to night vision equipment --

15             **THE COURT:**  Okay.

16             **MR. McCULLOUGH:**  -- as well as the Janos lenses that

17   went into the thermal-imaging equipment.

18             **THE COURT:**  Okay.  But do you know that these were --

19   that it was Infratech that provided the particular equipment

20   that this document reflects was being tested by the Russian

21   military?

22             **MR. McCULLOUGH:**  Your Honor, not with respect to the

23   particular items that are here.

24             **THE COURT:**  In other words, we don't know whether the

25   Russian military got this equipment that is the subject of this

1   certificate from Infratech or somewhere else; is that right?

2          **MR. McCULLOUGH:**  Your Honor, we know that it is --

3   these are Mr. Morgovsky -- the companies that Mr. Morgovsky is

4   affiliated with that were providing these items for testing to

5   the Russian military, Infratech and TPK Argus, its successor.

6          **THE COURT:**  Right.  Okay.

7          **MR. McCULLOUGH:**  Your Honor, we have charged --

8          **THE COURT:**  Okay.  So where -- and so this certificate

9   does not prove that.  So show me the evidence that proves that

10  Infratech and the other companies -- I want you to walk me

11  through all the evidence -- again, anything you submitted

12  before Friday night -- walk me through the evidence that shows

13  that Mr. Morgovsky intended for this equipment to be used by

14  the Russian military.

15         **MR. SAMPSON:**  Your Honor, so as an initial matter,

16  Mr. Morgovsky was involved in discussions with I believe it was

17  Vadim Pavlov, who worked at Infratech in Moscow, over the

18  magazines that Infratech should advertise in.  And in addition

19  to the magazine *Safari* --

20         **THE COURT:**  Show me the evidence.  First, point me to

21  a piece of evidence and then you can give me an explanation for

22  it.

23         **MR. SAMPSON:**  Yes.  Why doesn't Your Honor go to

24  Exhibit Number 5, which is an Infratech 406 brochure.  It's

25  3291, page 26.

1          THE COURT:  Page 26, okay.

2          MR. SAMPSON:  Your Honor, and it's translated on --

3          THE COURT:  Wait a minute.  Hold on.  Hold on.  Hold

4     on.  You have it all in one document so it's going to take me

5     awhile to evolve all your exhibits in one document here.

6          MR. SAMPSON:  Sure.

7          THE COURT:  Okay.  All right.

8          MR. SAMPSON:  Your Honor, this is an IT-406.  The

9     first image is a soldier in a ghillie suit.  On the next page

10    there's a Humvee, a tank, and a soldier all with -- all in the

11    crosshairs of these night vision scopes, Your Honor.

12         THE COURT:  Okay.

13         MR. SAMPSON:  The 406 in particular, if you keep going

14    to Exhibit Number 6, Your Honor --

15         THE COURT:  What page is that?

16         MR. SAMPSON:  That's two more pages -- three more

17    pages.

18         THE COURT:  Okay.

19         MR. SAMPSON:  Your Honor, this is the medium -- this

20    is the -- I believe it's the large scope that was seized from

21    Mr. Morgovsky's residence.  You will see that that is a visual

22    match for the 406 scope that Infratech's brochure reflects,

23    Your Honor.

24         In addition, Special Agent Natalie Razai-Zadeh traveled to

25    Poland earlier this year as the Polish authorities were

1    executing a search warrant at the business of a man named

2    Henryk Cysewski (phonetic).

3          **THE COURT:**  Is this in reference to some evidence that

4    you submitted --

5          **MR. SAMPSON:**  Yes, Your Honor.

6          **THE COURT:**  -- in connection with this sentencing

7    hearing?

8          **MR. SAMPSON:**  So -- yes, Your Honor.

9          On page -- I believe it's on the next page there is an

10   image of an image intensifier tube.  That is the controlled

11   item, Your Honor, that cannot be exported.  So that is a

12   picture of the tube that came from the scope in Mr. Morgovsky's

13   residence.

14         Additionally, I will have to locate it here, but,

15   Your Honor, there was a scope seized by the Polish authorities

16   from an Infratech 406, the same scope we've been discussing,

17   that was in Poland.  It was outside the United States.  It had

18   a tube -- image intensifier tube in it that the serial number

19   had been scraped off.

20         The Polish authorities gave that to the United States.  We

21   took it to the manufacturer Harris Corp.  Harris Corp. looked

22   at it.  They pulled it out.  There's an internal serial number.

23         **THE COURT:**  Okay.  But is this in the evidence that

24   you've submitted --

25         **MR. SAMPSON:**  Your Honor, I believe it is, and we've

1  walked through it in the brief.

2          **THE COURT:**  -- in connection with the sentencing

3  hearing?

4       I don't want to hear your narrative.  I want to look at

5  the evidence and I want to hear your explanation of the

6  evidence that you've submitted.

7          **MR. SAMPSON:**  Yes, Your Honor, I do believe that it is

8  in here, and I will have to point it out to Your Honor.

9       There is -- there should be in here a certificate from

10  Harris Corp. which authenticates that that tube was purchased

11  by Night Vision Depot from Harris directly.  Night Vision Depot

12  is a middleman that Mr. Morgovsky purchased from.

13       We then have the invoice, which I believe is not from

14  Friday's filing, I believe it's from the 5th, which states --

15          **THE COURT:**  Show me.  Show it to me.

16          **MR. SAMPSON:**  I will.  Okay.

17                    (Pause in proceedings.)

18          **MR. SAMPSON:**  Your Honor, so that's -- so, Your Honor,

19  Exhibit 4 --

20          **THE COURT:**  Page what?

21          **MR. SAMPSON:**  Page 23.

22          **THE COURT:**  Okay.

23          **MR. SAMPSON:**  -- should be the picture of the tube

24  4288 I believe it's 347.

25          **THE COURT:**  Yes.

1          **MR. SAMPSON:**  And on the next page is Harris Corp.'s

2    analysis of that tube.

3          **THE COURT:**  Okay.

4          **MR. SAMPSON:**  Harris Corp. indicates that this is a

5    tube that they sold to Night Vision Depot in June 2011.

6          **THE COURT:**  Okay.

7          **MR. SAMPSON:**  Now, I believe, and I'm looking for it

8    now, Your Honor, the Government has also submitted it's

9    Doc. 347, that's toward the end of that document, 347-1,

10   page 43 of 44.

11         **THE COURT:**  Wait.  Hold on.

12                        (Pause in proceedings.)

13         **THE COURT:**  Page what?

14         **MR. SAMPSON:**  43 of 44.

15         **THE COURT:**  Okay.

16         **MR. SAMPSON:**  There's a highlighted serial number for

17   a SLG9815, which is a controlled image intensifier tube,

18   showing that Hitek International, Mr. Morgovsky's company,

19   purchased it from Night Vision Depot along with about 30 other

20   controlled image intensifier tubes.

21        So, Your Honor, the Government has shown that these tubes

22   were actually exported and that they were found in Infratech

23   night vision scopes, Your Honor.

24        Now, circling back to the Russian military --

25         **THE COURT:**  Yeah, that's what I was going to ask.

1          **MR. SAMPSON:**  -- back to Exhibit 1, Your Honor, the

2  406 is one of the items that was tested --

3          **THE COURT:**  Wait.  Hold on.  I've got to go back to

4  Exhibit 1.

5                      (Pause in proceedings.)

6          **THE COURT:**  Okay.

7          **MR. SAMPSON:**  At the bottom of the list is night

8  vision sight IT-406.

9          **THE COURT:**  Okay.

10          **MR. SAMPSON:**  So, Your Honor, Infratech is having the

11  Russian military test these items in live-fire drills in 2015,

12  and the 406 is made with image intensifier tubes that

13  Mr. Morgovsky himself purchased here in the United States and

14  which are controlled for export.

15          **THE COURT:**  But how do we know -- forgive me.  This

16  might be an ignorant question.  But how do we know that the

17  406 -- it seems like what you're saying is the night vision

18  sight IT-406 ties back to the photos of the tubes that you were

19  just showing me.  Is that what you're saying?

20          **MR. SAMPSON:**  Yes, Your Honor.  It houses --

21          **THE COURT:**  How do we know that?  How do we know that?

22          **MR. SAMPSON:**  One of the 406s, which was seized in

23  Poland, was disassembled here in the United States and the

24  manufacturer of the tube determined it was one that they had

25  made.

1          **THE COURT:**  Okay.  But a night vision sight IT-406, is

2     that a -- I assume -- maybe this is incorrect but I assume that

3     there's not only one product that's called -- there's not only

4     one item that's called night vision sight IT-406 --

5          **MR. SAMPSON:**  No.

6          **THE COURT:**  -- that that is a description of a type

7     of --

8          **MR. SAMPSON:**  It is a model.

9          **THE COURT:**  It's a model; right?

10         **MR. SAMPSON:**  Yes, Your Honor.

11         **THE COURT:**  So how do we know that this model ties

12    back to the stuff that Mr. Morgovsky shipped?

13         **MR. SAMPSON:**  It contained tubes that Mr. Morgovsky

14    had purchased.

15         **THE COURT:**  Well, the particular ones that the Russian

16    military had?

17         **MR. SAMPSON:**  No, Your Honor.  We don't have that

18    evidence.

19         **THE COURT:**  Okay.  Just the product, the night vision

20    sight IT-406, Infratech had those.  Mr. Morgovsky shipped tubes

21    that were used in those products, and then the Russian military

22    got night vision sight IT-406 products from Infratech?

23         **MR. SAMPSON:**  They tested them, yes.

24         **THE COURT:**  Tested them.

25       Okay.  And then what about purchase or use?  Is there any

```
 1    evidence that the Russian military -- I mean, in the end I
 2    don't know how much this matters for sentencing, I will tell
 3    you, but since the assertion seems to be that Mr. Morgovsky
 4    intended for this stuff to be used by the Russian military, I
 5    want to drill down and see what your evidence is of that.
 6           MR. SAMPSON:  Yes, Your Honor.  And I will say he
 7    certainly wanted to sell this to whoever would buy it,
 8    Your Honor.  I'm not sure that he made a distinction between
 9    selling it to the military, selling it to individual hunters.
10    This was an operation that made money.  The military buys in
11    bulk.
12           MR. McCULLOUGH:  And, Your Honor, I mean,
13    Mr. Morgovsky has -- the Government has alleged that
14    Mr. Morgovsky has engaged in a conspiracy to export these items
15    to Russia in furtherance of the Infratech and TPK Argus
16    business.
17        We have demonstrated that Mr. Morgovsky had correspondence
18    related to the testing of these devices by the Russian
19    military.
20           THE COURT:  And where is that?
21           MR. McCULLOUGH:  That is the Exhibit 1 that we --
22           THE COURT:  Okay.  So that was one thing that you
23    hadn't mentioned.  So Exhibit 1 is -- this was in
24    Mr. Morgovsky's possession?  This was seized from his computer
25    or something?
```

1          **MR. McCULLOUGH:**  Correct.

2          **THE COURT:**  Okay.  Tell me where it was seized from.

3    Give me the details.

4                    (Pause in proceedings.)

5          **THE COURT:**  All right.  Here's what I'm going to do.

6    I'm going to let you look for that while I turn to allow

7    Mr. Morgovsky's lawyers and Mr. Morgovsky, if he wishes, to say

8    whatever they want to say.

9          But there has been a lot of noise about Russian military,

10   Russian military; and when you read the Government's papers, it

11   sounds like Mr. Morgovsky was plotting to send this stuff to

12   the Russian military, and I didn't quite see that in the

13   material that the Government submitted.

14         Certainly Mr. Morgovsky should have known that it could

15   have been used by the Russian military at a minimum, but I

16   didn't necessarily see in the materials that the Government

17   submitted evidence from which you could draw a conclusion that

18   Mr. Morgovsky specifically intended for these products to be

19   used by the Russian military.

20         Again, we can have a discussion about how much that

21   matters but, you know, that's -- you know, it's a significant

22   allegation and one that, you know, we would want to look

23   carefully at the evidence before we reached that conclusion.

24         So, in any event, what I'd like to do now is hear from the

25   Defense on whatever the Defense wishes to present.  I'll give

1   the Government a brief opportunity for rebuttal, and then I'll

2   hear from Mr. Morgovsky if he wishes to speak.

3            **MR. OSTERHOUDT:**  Your Honor, may I ask Your Honor to

4   hear Mr. Ellis initially?

5            **THE COURT:**  I'm happy to hear from anybody, yes.

6            **MR. ELLIS:**  Your Honor, bear with me one second while

7   I pull up this case.

8            **THE COURT:**  I'm sorry.  I couldn't hear you.  Could

9   you pull --

10           **MR. ELLIS:**  Yes.  Bear with me one second while I pull

11   up this case.

12           **THE COURT:**  Oh, sure.

13           **MR. ELLIS:**  Using an iPad is very new to me.  I'm

14   from the old school.

15           **THE COURT:**  Take your time.

16           **MR. ELLIS:**  So I'll find it here in just one second,

17   please.

18                          (Pause in proceedings.)

19           **MR. ELLIS:**  Your Honor, I speak at this point not as a

20   representative for Mr. Morgovsky but, rather, as an officer of

21   the court.  I'm concerned --

22           **THE COURT:**  But you are representing Mr. Morgovsky.

23           **MR. ELLIS:**  I am, yes.

24           **THE COURT:**  Okay.  I just wanted to make that clear.

25           **MR. ELLIS:**  Yeah, but I -- I sat through the

proceedings last time where Mr. Osterhoudt moved to withdraw

and Mr. Morgovsky moved to discharge him, and I was concerned.

     I know the Court found that Mr. Osterhoudt had provided

effective assistance of counsel, asked me if there was anything

that he may have left out.  I pointed out disparity.  The Court

continued the sentencing.  We provided the disparity of

information.

     But, even so, I just -- there's a Supreme Court case that

I think says unfortunately no harm, no foul, as they say in

basketball, doesn't really apply to this kind of case where

there's a right to counsel of your choice.  And it's *U.S.*

*versus Gonzalez-Lopez*, 548 U.S. 140 2006, a Justice Scalia

opinion, wherein the defendant was denied the right to bring in

paid retained counsel of his choice.  The case went to trial.

     **THE COURT:**  Okay.  Well, you're hear representing

Mr. Morgovsky now as well; right?

     **MR. ELLIS:**  Yeah.  Yeah.  But I'll respond.

     But essentially this case went to trial.  The

court-appointed lawyer did a fine job, and the Government

argued harmless error.  And Justice Scalia writing for the

court said there can be no harmless error, it's structural, and

he reversed the conviction, and it's pointed out to this Court.

     **THE COURT:**  I understand what you're saying, but we

had -- I actually continued -- first of all, this was a

sentencing hearing, not a trial.

1              **MR. ELLIS:**  Yes.

2              **THE COURT:**  Number two, I had an hour-long in camera

3    discussion with you-all about the nature of the apparent

4    conflict, and I continued the sentencing hearing and I gave

5    Mr. Morgovsky an opportunity to bring you in.  So I think there

6    are a lot of differences between this case and that one.  And I

7    also made a number of findings with respect to Mr. Morgovsky's

8    attempt to manipulate the proceedings, which I think make this

9    case different from that one as well.

10         So how would you like to help Mr. Morgovsky on his

11   sentencing hearing now?

12             **MR. ELLIS:**  Oh, so I made my point regarding the

13   motions that were denied.

14             **THE COURT:**  Okay.

15             **MR. ELLIS:**  I just want to essentially renew those

16   motions --

17             **THE COURT:**  Okay.

18             **MR. ELLIS:**  -- and point that out for the record.

19        As far as sentencing, where is -- do you want -- I'll

20   address acceptance if I may, but --

21             **THE COURT:**  Great.

22             **MR. ELLIS:**  -- and disparity.

23             **THE COURT:**  Do you want to go ahead and address it now

24   while you're up?

25             **MR. ELLIS:**  Sure.  Thank you.

```
 1        Regarding acceptance of responsibility, I think I'd ask
 2   the Court to defer ruling on that until you hear from
 3   Mr. Morgovsky.
 4        THE COURT:  Which is why I said based on everything
 5   I've seen so far, I don't believe that Mr. Morgovsky is
 6   entitled to the reduction.
 7        MR. ELLIS:  I've learned over the past -- I've been
 8   doing a series of articles for Law360.  I've been interviewing
 9   your colleagues around the country.  I've done 30 interviews so
10   far, including Judge Breyer from this bench, who I know
11   Your Honor clerked for.
12        And one thing I'm hearing is that allocution is very
13   important, and judges want to see what's in a defendant's
14   heart.  Has he gotten it?  Has he internalized it?  You know,
15   and that's probably the best way to determine whether the
16   defendant has indeed accepted responsibility.
17        So I would ask the Court to defer its ruling -- of course,
18   that's a tentative ruling I know -- until you hear from
19   Mr. Morgovsky.
20        Regarding the guidelines of 97 to 121 months, again, the
21   only difference I would have with that would be the acceptance
22   issue, which would lower the guidelines; but based on our
23   research, the median sentence and the average sentence for this
24   offense is 60 months, and anything over 60 months may very well
25   amount to a life sentence or a death sentence in prison for
```

1   Mr. Morgovsky due to his age and due to his health.

2        Just yesterday Mr. Morgovsky got some bad news.  He went

3   to see his cardiologist.  I have a copy of that report.  I'm

4   not -- I'm handing a copy to the Government and to the Court.

5   I'm not a doctor.  I didn't go to medical school.  I was told

6   the definition of a lawyer is a Jewish boy that can't stand the

7   sight of blood so I didn't go to medical school, but it seems

8   to me he's in pretty bad shape and may need surgery.  He needs

9   surgery.

10       And I think based on the data we supplied, that his life

11  expectancy is -- as an inmate, is at 74 years.  So anything

12  over five years -- he's 69 now -- is going to essentially be a

13  life sentence.

14       I would also add that I do a lot of work with the Bureau

15  of Prisons regarding BOP issues --

16            **THE COURT:**  I'm sorry, what?

17        **MR. ELLIS:**  I do a lot of work with people who have an

18  issue with the Bureau of Prisons:  Designation issues,

19  programming issues, disciplinary issues, whatever.  So I've

20  learned a lot about the Bureau of Prisons in my years of

21  practice.

22       And I have at least five former relatively high-placed

23  retired BOP officials working as consultants for me.  And one

24  of them gave me a report indicating that he believes that

25  Mr. Morgovsky will be designated to a low-level security prison

as opposed to a minimum security Federal Prison camp, and he

gave reasons why that I'm happy to share with the Court.  But

he also told me in the memo what life would be like for an

elderly inmate at a low-level security prison.

And if I may, Your Honor --

(Pause in proceedings.)

**MR. ELLIS:**  And if I may, Your Honor, this came from

Michael Henderson.  Michael Henderson used to be the regional

designator for the western region when they had their offices

in Pleasanton.  They've now moved to Dublin.  Back then several

years ago designations were made by the regional offices.  Now

it's all been centralized in Grand Prairie, Texas, in an outfit

called the Designation and Sentence Computation Center.

Mr. Henderson says that all prison settings, regardless of

security level, deprive an individual of privacy and a quiet

environment.  However, in a minimum security setting, there is

more freedom of movement; for example, there are no cells or

locked secure rooms.  Whereas, in a low-security prison, inmate

living quarters and movement is more controlled and restricted

and so there is even less privacy.

Additionally, minimum security prisons are not surrounded

by a perimeter security fence and so when an inmate has free

time, he can be in an outdoor environment that is open space.

Minimum security prisons do not house offenders who are

known to present any serious threat of violence or escape.

1              THE COURT:  Could I ask you a quick question about

2    this?

3              MR. ELLIS:  Yeah.

4              THE COURT:  How is this relevant to the amount of time

5    Mr. Morgovsky is going to be sentenced?

6              MR. ELLIS:  Oh, a very good question.  The answer is I

7    think the Court needs to take into consideration the quality of

8    time.

9              THE COURT:  So you're telling me that I should assume

10   that Mr. Morgovsky will not be in a minimum security facility;

11   I should assume he will be in a low-security facility?

12             MR. ELLIS:  Yes.

13             THE COURT:  And what's the basis for that,

14   particularly if I conclude that he's a Criminal History

15   Category I?  On what basis would I -- should I be concerned

16   that Mr. Morgovsky will be in a low-security facility as

17   opposed to a minimum-security facility?

18             MR. ELLIS:  There are two factors in the PSR.  The

19   Court is right, the BOP largely relies on the Presentence

20   Report, any recommendations of the Court, and anything sent

21   along by the U.S. Marshal Service.

22        There are two factors, according to Mr. Henderson, that

23   could result in the BOP imposing a management variable of

24   greater security and they are, one, that Mr. Morgovsky was in

25   possession of a firearm that had been purchased illegally; that

law enforcement officers believe he has ties to Russian

organized crime; and that he has a history of sophisticated

international ties and finances.  And they could be concerned

that if he was in an open-air facility where he was with no

fence, that he could escape, and that would be their concern.

And even though the Court may grant voluntary surrender,

as I hope you will, they themselves will make their own call on

that one.

Additionally, he may well be assigned a greater severity

public safety factor because the case is involving exporting

sophisticated weaponry, and that is classified as a greater

severity public safety, which excludes camp placement at any

time forever.

**THE COURT:**  Okay.

**MR. ELLIS:**  So I think considering his health, his

life expectancy, which we believe will be 74 years old, his

health, the life he's going to have in a low-security facility

with the younger inmates who may very well extort him, as they

typically do with inmates they think are -- have funds and

resources, I think it's going to be a very difficult thing and

it's going to probably hasten his death, and that goes along

with not imposing a sentence that is greater than necessary.

**THE COURT:**  Mr. Osterhoudt?

**MR. ELLIS:**  And lastly, Your Honor, as far as --

**THE COURT:**  Oh.  I'm sorry.

1      **MR. ELLIS:**  We have one -- excuse me.  A rabbi from

2  Mr. Morgovsky's congregation is here today and would like to

3  address the Court regarding his good deeds.

4      **MR. OSTERHOUDT:**  Rabbi Margolin.

5      **THE COURT:**  I've received numerous written submissions

6  from Mr. Morgovsky's friends and family.  I don't think it's

7  appropriate to allow Mr. Morgovsky's friends and family to

8  stand up in his sentencing hearing and speak.

9      **MR. ELLIS:**  Okay.  I think that's all I have.  Thank

10  you.

11      **MR. OSTERHOUDT:**  Your Honor, since the matter of that

12  organized crime matter just came up, I wanted to specifically

13  object to and ask the Court to order stricken from the

14  Presentence Report the comment at paragraph 21 --

15      **THE COURT:**  Let me go there.  Hold on.

16      **MR. OSTERHOUDT:**  -- where an FBI agent allegedly

17  states that he thinks Mr. Morgovsky may have ties to Russian

18  organized crime.  There's no evidence of that.

19      **THE COURT:**  Paragraph 21?  I'm sorry.  I'm not seeing

20  that in paragraph 21.

21      **MR. SAMPSON:**  Your Honor, I believe that was removed

22  from the final PSR.

23      **THE PROBATION OFFICER:**  That was in the draft.

24      **THE COURT:**  Okay.

25      **MR. OSTERHOUDT:**  All right.  I thought that was still

```
 1   referred to, but that's fine.
 2           THE COURT:  Perhaps that will help with the prison
 3   designation issue that you're concerned with along with the
 4   fact that assuming that I continue to believe that
 5   Mr. Morgovsky should be designated Criminal History Category I.
 6           Sorry.  Continue.
 7           MR. OSTERHOUDT:  Thank you, Your Honor.
 8      Well, I appreciate Your Honor has given Mr. Morgovsky
 9   himself, as well as counsel, an opportunity to speak on his
10   behalf.
11      I really feel a responsibility and a need to do that
12   because I moved to withdraw from this case.  He moved to
13   discharge me because we had disagreements that were fundamental
14   in our view regarding the conduct of the case; but I never
15   stopped for an instant admiring Mr. Morgovsky's kindness,
16   generosity, and the way he's affected his community and the
17   love that his family professes for him.  Those things are
18   genuine.  And I think that I respectfully ask the Court to give
19   them appropriate weight in this sentencing process.
20      Another thing is that I don't think one can begin to
21   evaluate this man without focusing on his beginnings and how he
22   got to where he is and how he became the person that he is.
23      As you know from the pleadings that have been filed and
24   from the PSR, Mr. Morgovsky was born in the Ukraine.  He was
25   born in much poverty.  He was born -- he witnessed the
```

1  disintegrating years of the Soviet system in the Ukraine.  He

2  suffered mightily from the ravages of anti-Semitism, and the

3  Ukraine was absolutely known and -- absolutely known for this

4  quality, and it hurt him.  It hurt him fundamentally, Judge.  I

5  know that it did.

6          THE COURT:  Could I ask a question about that?

7          MR. OSTERHOUDT:  Yes.

8          THE COURT:  I mean, I guess one of the things that has

9  confused me about this case is I take at face value what you

10  say about, you know, Mr. Morgovsky's suffering --

11          MR. OSTERHOUDT:  Yes.

12          THE COURT:  -- in his childhood at the hands of the

13  country to which he was shipping all these dangerous items, but

14  the question is:  Why was he shipping all these dangerous items

15  to this country that subjected him to such a terrible

16  childhood?

17          MR. OSTERHOUDT:  We have --

18          THE COURT:  Why would you choose to engage in that

19  particular -- of all types of criminal conduct, why would you

20  choose to engage in that type of criminal conduct?

21          MR. OSTERHOUDT:  I would distinguish between Ukraine

22  and even the Soviet Union as it existed.  Mr. Morgovsky, the

23  great suffering that he suffered took place in Ukraine.  That's

24  where his grandparents were murdered by Nazis in Kiev.  His

25  grandparents were murdered by Nazis and he knew that.

1          And as he grew up in the Ukraine, he was bullied because

2    of his -- because he was Jewish, and he suffered injury as a

3    result, psychic injury that was deep; and when he began to --

4    he's an intelligent man -- apply his trade and become educated,

5    he found quota systems in force for Jews which would narrow his

6    opportunity, and it hurt him deeply.

7          I just say that, Your Honor, because I know it's true

8    because I know him.  I've talked to him for a long time.  There

9    are things about Mr. Morgovsky that are frustrating to people,

10   and how do you juxtapose the fact he engaged in conduct that is

11   unlawful against the fact that he's obviously a man of such

12   kindness and generosity in his private life and family affairs?

13         And I think there's a fundamental thing that happened to

14   him with respect to his relationship to the state, his

15   relationship to authority, and his relationship to compliance.

16         I don't say that to defend him legally.  I do say that I

17   think it explains much of his conduct.  When he went to Russia,

18   actually Russia was less discriminatory and he was able to get

19   more educational benefit there in the old Soviet Union, which

20   he deplored the system.

21         His problem with the Soviet Union, he deplored the system.

22   He thought that it was antihuman.  He thought it had stifled

23   initiative.  But he didn't feel the same kind of religious,

24   ethnic hatred that he had encountered in his growing period.

25   That's why he didn't have that attitude toward Russia

necessarily.

Now, you know, why he became involved in shipping these goods to Russia is complicated.  It's a long, complicated story of his businesses, how he tried to sustain himself and his family after the collapse of his closet business that you've heard about and his beginnings in the night vision period.

And Russia was at that time a source and a producer of these goods that he knew something about.  He became involved with people there not in the criminal sense, but he became involved with what they were doing.

You know, you talk about PK Argus -- TPK Argus.  That company I think did have -- you know, seek to have Russian connections, but that was after Infratech.  They were a successor to Infratech around 2014 or so when the thing was complete, between 2012 and 2014.

Argus took over the assets of Infratech.  Infratech when it existed before that, I do not believe that it had the capacity or the necessary licenses to deal with Russian military.  That's what Mr. Morgovsky always believed.

His association with Infratech was with Vadim Pavlov and others there.  He didn't have any kind of relationship that would require that anything go to the military, and we believe he didn't have anything to do with that.

But as far as Russia goes, he's shipping things that often have many uses, and the manner in which these things are

categorized and designated as controlled items in this country
is not free from ambiguity.  I'm not saying that to defend him.
I'm just saying it's the truth.

Often the system, the way it operates in practice is that
the manufacturer winds up designating itself something as
controlled; and in the large companies such as Harris or such
as the company manufacturing lenses, there's a very -- pressure
to make sure you don't make a mistake.  If you have any
question, you designate it control.  The system for getting
that reversed is complicated and difficult and cumbersome.

My only point here is that many of these lenses, like the
regulation governing lenses, says that they're controlled but
then it has a provision "except for normal commercial use."
And there is a large area of normal commercial use for these
kinds of lenses, even lenses that otherwise control.

And so what I'm trying to get to Your Honor, his shipments
to Russia -- when it became Russian, his shipments to Russia do
not necessarily indicate that he's trying to ship anything
dangerous or that he's trying to injure the United States,
which is his adopted country he loves.

He loves the United States.  He's a naturalized citizen,
he and his wife, for many years.  He wouldn't do anything
consciously to hurt this country.  He wouldn't do it.  That's
the way he feels.  I've had hours of discussions with him where
we disagree about everything almost, but that is what he

1  absolutely states all the time.

2      He's fiercely patriotic towards this country.  He never

3  thought and never intended to do anything that would harm this

4  country.  And he for that reason, I guess, took it upon himself

5  to act with such kindness and such benevolence, such generosity

6  to people he could identify with who came here because they

7  didn't like the situation in which they were living, and they

8  needed a taste of freedom and they needed to, you know, fulfill

9  their hopes and dreams and have opportunity.

10     That's what he found here, Your Honor.  That's what he

11 found here and that's what he wanted others to experience.

12 That's why he was as kind, as generous as he was.

13     He's not going to do this again.  You know, he's 69 years

14 old.  He's gone through the lash of this prosecution for how

15 long now?  He's not going to ever do this again.  He's not

16 going to touch this business.

17     And I sincerely ask that you consider a substantial

18 downward variance in the case, as would the probation officer I

19 think, so that he can live out his life and be with his

20 grandchildren.

21     You know, his daughter now is pregnant.  She lost her

22 first child when she was pregnant, but now she -- live out his

23 life with his grandchildren.  He's in ill health.  He has

24 heart -- he has serious heart problems.  He has other issues

25 that you've heard about.  He's -- he is faced with an aging

1    situation in custody.

2        He's learned his lesson.  He does accept responsibility in

3    his own way regardless -- it may be hard to see sometimes

4    because he's around the fuzzy edges of the case he'll argue,

5    "No, I didn't do that, but I did" -- but in the center of it

6    all he knows -- and he says that he's guilty, and he knows he

7    shouldn't do it and he won't do it anymore.

8        Because he only had one prior misdemeanor here, because he

9    learned his lesson, because he's been through this, because of

10   the support he has, I ask Your Honor to give him a chance, give

11   him a chance, give him a sentence that's substantially lower

12   than the guideline but a sentence that is still a shock to him,

13   a shock to him that he won't forget.

14       It will be a lesson, and then he'll emerge from it knowing

15   that he's been punished for his conduct but still an

16   opportunity to live his life among the people he loves.  That's

17   what I would say.

18           THE COURT:  You know, one more question I guess I have

19   for you is you reference the people he loves.  I mean, one of

20   the people he loves is his wife.  How could he have done this

21   to his wife?

22           MR. OSTERHOUDT:  Well, you saw --

23           THE COURT:  How could you do that to somebody you

24   love?

25           MR. OSTERHOUDT:  Well, his remorse is profound, and

1   you saw the things he filed before you in an effort to drive

2   that point home, and the way he pled guilty when he did and the

3   way that he did on the eve of trial or in trial.

4        He can answer it more clearly maybe and he'll have an

5   opportunity to speak to Your Honor I know, but I know the

6   remorse and grief he felt about that and guilt and

7   responsibility, and he's tried to make it right.  He's tried to

8   tell anyone who would listen that it was him that was

9   responsible for that, and he's sorry.

10       And his wife, I think, clearly forgives him in the sense

11  that their love has persisted and it's real love between these

12  two people.

13       If you read all these e-mails, the Government was looking

14  for, you know, incriminating e-mails, but a lot of it is just

15  love expressed electronically between them, and that still

16  exists.

17       So I think in answer to Your Honor's question, it's a

18  legitimate question, but I think that, you know, Mr. and

19  Mrs. Morgovsky had an opportunity to work this out, and I think

20  she accepts his contrition and grief and wants him in her life

21  anyway.

22            **THE COURT:**  Okay.  Is there anything the Government

23  would like to wrap up on or respond to?

24            **MR. McCULLOUGH:**  Your Honor, on the point of a

25  possible downward variance, I think a downward variance would

1   basically demonstrate to not only Mr. Morgovsky but others in

2   the night vision industry that exporting night vision

3   technology is simply a cost of doing business and that it is

4   worth a gamble if one sees a financial upside to it.

5       As to whether these items and Mr. Morgovsky was aware that

6   these items had an intended use that could harm other people,

7   we turn you simply to Exhibits 2 and 5, which identified the

8   Infratech scopes IT-404 and IT-406, both of which we've

9   previously discussed here.

10      Turning to page 16, Your Honor --

11          THE COURT:  Of?

12          MR. McCULLOUGH:  -- of 329-1, the exhibits.

13          THE COURT:  Okay.

14          MR. McCULLOUGH:  (reading)

15          "Distinctive Features:  Shock-proof design" --

16      "Shock-proof scope design to withstand recoil force of the

17      highest caliber weapons."

18      If one turns back simply two pages, one sees the IT-404

19  mounted on what appears to be a high-caliber weapon.

20      I think, Your Honor, there is -- the suggestion that the

21  image intensifier tubes have a variety of uses that may be

22  simply benign is hard to -- it's hard to support given the

23  evidence in this case.

24          THE COURT:  Okay.  Anything further?

25          MR. SAMPSON:  Very briefly, Your Honor, regarding

acceptance.

I think the Court would be hard-pressed to find in all of the many statements that Mr. Morgovsky has submitted a statement complying with the guideline for an acceptance of responsibility, Your Honor, which is a clear demonstration of acceptance of responsibility, Your Honor, and it specifically excludes false and frivolous denials.

Mr. Osterhoudt is correct that Mr. Morgovsky, as he has a right to do, has attempted in every respect to chip away at the edges of the case, relevant conduct, criminal history, and other things, which he has an absolute right to do; but, Your Honor, what he doesn't have a right to do is to falsely deny what he did, and there is really no statement from him -- other than statements about managing his wife, there's really no statements from him about how he actually accomplished the crimes he pled guilty to.

In fact, he said he never used a false identification for any of these crimes.  Well, the Gary Piper account proves that's false.

And in addition, Your Honor, there's no statements about, and he's not required to do it, but if he wants acceptance, there's no statements about how he actually accomplished the export of the thousand-plus tubes and lenses that he purchased.

And so, Your Honor, I think the Court is well-supported in its finding that there's no acceptance in this case.

1              **THE COURT:**  Okay.

2          **MR. OSTERHOUDT:**  Your Honor, he has accepted

3   responsibility.  He says so in a lot of different ways to the

4   Court.  It's his nature to disagree with things that were said

5   when he doesn't believe they're true.

6          For example, I think that based on my contacts with him,

7   if the Court is going to consider the business of Russian

8   military, that should be the subject of an evidentiary hearing

9   devoted only to that because he denies vehemently any such

10  intention.  I urge you not to consider it or if you were to do

11  so, to have an evidentiary hearing directed simply to that

12  matter.

13         The other thing I wanted to say, Your Honor, is that

14  deterrence, you know, a sentence of -- a 48 months sentence,

15  let's say, to a 69-year-old man is a very noticeable and very

16  convincing admonition to people who might be inclined to do the

17  same thing.  It doesn't have to be a life-crushing sentence of

18  years and years and years to have that resolved.

19         And I think, as Mr. Ellis has pointed out in filings of

20  comparative cases, I think judges have kind of seen that.  And

21  even though these are serious offenses, the average that's been

22  given out is substantially lower than anything we're discussing

23  here.  It's actually 60 months.  60 months.

24         But even that, I just think if you were to impose a

25  48-month sentence to Mr. -- I mean, he has -- he would have

1  suffered a great disability.  He would be separated from family

2  for that period of time.  He would lose the freedom that he

3  obviously loves to indulge.  He would lose his opportunities to

4  do so many things in his life.  He wouldn't see that -- his

5  family, his grandchildren during that period.

6       It would be a very strong incentive -- disincentive for

7  anybody else to follow his path; and, yet, it would allow him

8  the ability to live, allow him the ability to get out and prove

9  to this Court and the Government and everyone that he realizes

10  the error of his ways and he's not going to do this again.

11           THE COURT:  I'm going to ask you -- could I ask you

12  one other question --

13           MR. OSTERHOUDT:  Of course.

14           THE COURT:  -- issue that we haven't covered yet,

15  which is the fine?

16       You heard me during Mrs. Morgovsky's sentencing hearing

17  and you heard me during Mr. Morgovsky's sentencing hearing last

18  time that we continued to today.  I am not at all convinced

19  that Mr. Morgovsky lacks the ability to pay a fine, nor am I

20  convinced that Mr. Morgovsky will lack the ability to pay a

21  fine in the future given his level of intelligence and his

22  level of education.

23       And so, you know, my inclination would be to disagree with

24  the Probation Office that Mr. Morgovsky lacks the ability to

25  pay a fine and disagree with the recommendation to waive the

```
 1    fine and to impose a fine sort of commensurate with where the
 2    sentence comes out on the guidelines.
 3        Do you want to -- does anybody want to address that before
 4    I turn to Mr. Morgovsky?
 5            MR. ELLIS:  I would, yes.
 6        In our recommendations to the Court, we recommended 48
 7    months plus supervised release with the special condition of an
 8    additional one year of home confinement, and we took no
 9    position on the fine.  That's up to the Court.
10            THE COURT:  Okay.
11            MR. OSTERHOUDT:  The other thing I would say,
12    Your Honor, is I don't think any fine should be based on a
13    finding that he's hiding assets because I don't think there's
14    evidence of that.  I don't think that --
15            THE COURT:  Well, I mean, it's either way.  It's that
16    he -- even if he lacks the ability to pay now, he's not, it
17    seems to me, not likely to lack the ability to pay in the
18    future.
19            MR. OSTERHOUDT:  I understand.  I just didn't like
20    that implication that he's doing that.
21            THE COURT:  And then one other question since you
22    mentioned supervised release.  Maybe this is a question for
23    Probation.
24        My understanding, correct me if I'm wrong, my
25    understanding is that each count carries with it a maximum
```

1    three-year term of supervised release and that those terms of

2    supervised release cannot be consecutive.   They have to be

3    concurrent.

4            THE PROBATION OFFICER:   They must be concurrent.

5            THE COURT:   So the maximum amount of supervised

6    release there could be in this case is three years.

7            THE PROBATION OFFICER:   Correct, Your Honor.

8            THE COURT:   Okay.

9        And, now, before I turn to Mr. Morgovsky, is there

10   anything else that you wish to add?

11           THE PROBATION OFFICER:   No, Your Honor.

12           THE COURT:   Okay.

13       All right.   Mr. Morgovsky, now is the time in your

14   sentencing hearing where you have the opportunity to speak.

15   It's not a requirement and there's no penalty if you prefer not

16   to speak, but you have the right to do so and if you wish to do

17   so, now is the time.

18           THE DEFENDANT:   Thank you.

19           THE COURT:   And if you could please move closer to the

20   microphone.

21           THE DEFENDANT:   Your Honor, as Mr. Osterhoudt said, I

22   have a tendency to -- when I disagree with something, I have a

23   tendency to argue that point; and I've been advised by my

24   attorneys under no circumstances to do it in speaking to you

25   because it would be interpreted as my lack of contrition and

1    lack of acceptance of responsibility and that I should just

2    say, "Yes, I'm guilty.  I'm remorseful."  Nothing else.

3        Some issues came up in the colloquy between you and the

4    Government and my attorneys where I sensed that there were some

5    things you would like to hear, some things you were -- you may

6    be unaware of, and I would like to do something unusual and ask

7    you a question.

8        Would you like me to give you a short version of my speech

9    or would you like me to elaborate on those things which were

10   discussed?

11           **THE COURT:**  Mr. Morgovsky, you are entitled to say as

12   little or as much as you like at this sentencing hearing.

13           **THE DEFENDANT:**  I understand.

14       First I would like to say that I pleaded guilty to

15   violating the Arms Exports Control Act and the two counts of

16   money laundering, and at no point I have done or said anything

17   which would contradict that I admit that I'm guilty of those

18   crimes.

19       Not only that I admit that I'm guilty of those crimes, but

20   I believe that I should be punished for those crimes and that I

21   have no excuse for doing so.  I'm not asking to be forgiven for

22   that.

23       It has been very difficult time for everybody around me,

24   and I'm not talking about myself.  I always care about other

25   people around me, and it's impossible to imagine that I would

1  ever do something like this again.

2      If I say I am sorry for what I've done, it will not even

3  begin to express what I feel -- how terrible I feel about what

4  I've done, what damage I inflicted on my family, my friends,

5  and families of my friends, which has been just enormous.

6      I would like to point out to the Court that I withdrew

7  from the conspiracy years before I was arrested.  The

8  Government claims that after that, I manufactured things in

9  Russia for Russian military and I didn't need to export

10  anything, which, you know, this notion is just -- you know, I

11  can't even explain how wrong it is.

12      In any event, I am so sorry and so remorseful, and I would

13  like to apologize to the Court, to my family, to my friends,

14  and to the Government for committing those crimes.  I

15  understand that an apology may be empty word, but this apology

16  comes from the bottom of my heart.

17      I have been -- since my arrest, it has been over two

18  years.  These two years have been hell for me, for my family,

19  and everybody around me, and it is not possible for anybody

20  under this pressure and under these circumstances to even think

21  about doing something like this again or ever doing something

22  criminal again, and I certainly don't intend to do it.

23      I immigrated to the United -- I hated the Soviet regime as

24  Mr. Osterhoudt said, and I -- from my childhood, and I was

25  fortunate enough to immigrate to the United States and be

1    accepted as a refugee in 1979.

2        After working for -- after washing dishes in Chinese

3    restaurant and working for large corporations, I started my own

4    business out of my garage; and for 20 years I conducted very

5    legitimate business, serviced many customers, serviced them to

6    death.  There was not a customer who was not thrilled with my

7    product and service.

8        And when my business -- during those years, I -- every

9    waking moment of my life, I was doing whatever I could to help

10   other people.  My main mission in life has been to help other

11   people.

12       And my business was actually built on that premise and not

13   making a profit.  I generally don't care about money, and my

14   business was a vehicle to help other people to find place in

15   life.

16           THE COURT:  Mr. Morgovsky, I have a suggestion for

17   you.  Maybe move a little bit back from the microphone --

18           THE DEFENDANT:  Okay.

19           THE COURT:  -- so that we can hear you a little bit

20   better.

21           THE DEFENDANT:  Yes.  Can you hear me?

22           THE COURT:  Yes.  That's fine.  It's just it was

23   popping because you were so close to the microphone.

24           THE DEFENDANT:  Okay.

25       It was not the only reason why my business failed, but I

just extended the ability to work with so many people with so
many problems that my business was not profitable.

    I also had a family dispute which resulted in huge
financial losses.  As a result, at some point it would be wise
for me to close the business and just move on.

    The thought of all those people losing their jobs and not
being able to find another one, it was unbearable to me, and I
struggled for a number of years trying to save the business.  I
couldn't save the business just, you know, in its regular
course; and I made a number of very bad, very wrong, boring
decisions, very reckless, boring decisions, which, when I was
unable to meet them, posed a danger to my life, to the life --
not only my life but the life of my wife.

    I found a way to obtain new identities for me and my wife,
which was totally unrelated to night vision business, and for a
number of years we were hiding from the danger.  It actually
was resolved eventually in the early 2010, after which I admit
I occasionally used another name and accounts in another name;
but from that point on, we lived under our own names and just
nothing was done after that time in any way other than
occasional use of that identity, which I totally consider
improper.

    So this false identity business was only connected to the
danger to our lives and nothing else.  As a matter of fact,
when I was convicted of a misdemeanor in 2008, I cooperated --

1   I assisted the Department of State to close the loophole I used

2   to obtain those identities.  I explained to them what I did and

3   how to prevent it in the future.  So it's no longer possible

4   for anybody to do what I did, and Department of State was

5   actually very grateful to me for that because they said it was

6   very important for them to close that loophole.

7       So the notion that I somehow can go ahead and just obtain

8   another identity and flee not only is something which I would

9   not do, I've been extremely compliant with Pretrial.  I've been

10  just following every rule.  And during this over two years,

11  I've demonstrated that I'm not a flight risk.

12      And Pretrial actually on their own initiative established

13  a curfew for me, and they recently asked for me to be removed

14  from monitoring at all, and I actually told them that I don't

15  request that.  If they want to do it on their own initiative,

16  they could do it, but I told them that I would prefer to be on

17  monitoring in order to just for nobody to think that I'm a

18  flight risk.

19      During the time which I have been on curfew, I actually

20  have gone out very little.  I've been in prison in my home.  I

21  imprisoned myself in my home.  I had no desire to go somewhere,

22  to come out.  I just have been -- I put myself in a cocoon just

23  filled with remorse.

24      I have not conducted any social life.  I've practically

25  not gone out, and I confine myself to sort of I started

inflicting punishment on myself even before the real punishment started.

    After making those terrible, reckless, boring decisions, I became very desperate and at some point I started violating export laws in order to solve those financial problems out of desperation.

    As time went by, I became more and more terrified by what I was doing, but I can say with complete confidence that I've always loved this country.  I've always helped other people to realize how great this country is.  I would never do anything to harm this country or national security.

    And one of the excuses I gave to myself, which, of course, was a lame excuse, that I was -- it was a victimless crime and I was not doing any harm to anybody because whatever I provided to Infratech was being used for hunters and Infratech had no connection with Russian military.  It was not licensed to provide anything to Russian military, and actually Russian military does not allow components like this to be provided to it in whatever is provided to Russian military because in Russia they have their own products and actually high-performance products, which are completely comparable to those which are listed in the Indictment.

    As a matter of fact, the Government mentioned that it was designed for high-caliber weapons.  In Russia hunters use high-caliber rifles or shotguns unlike hunters in the

 1   United States.  So in Russia it's more important for hunters to

 2   have night vision equipment to withstand high-caliber than it

 3   is in the United States.

 4         In fact, in Russia, they made those image -- third

 5   generation image intensifiers specifically designed to

 6   withstand impact.  And in the United States, those tubes which

 7   are listed in the Indictment are not designed to withstand high

 8   caliber.  So actually it would be against -- against technical

 9   rules and common sense to use U.S. tubes for high-caliber

10   weapons as the Government suggested.

11         Aside from that, whatever testing the Government is

12   talking about, whatever connections with the Russian military

13   the Government is talking about occurred after Infratech was

14   acquired by TPK Argus and after TPK Argus applied for a license

15   to do business with Russian military, which was at the time

16   when I was no longer exporting any of those items.

17         As a matter of fact, when I saw the light at the end of

18   tunnel in resolving my financial problems and actually I

19   guaranteed some loans, which were made by people who could not

20   be -- not be repaid, as soon as I saw the light at the end of

21   the tunnel, I immediately withdrew from the conspiracy and I

22   stopped buying those tubes at all, I stopped buying those

23   lenses at all.

24         And when the Government talks about Russian military,

25   whatever events the Government is talking about occurred

totally after the time when I -- not only I stopped exporting those things but I stopped buying them.  Okay.  So it was impossible for me to actually supply them.

The Government claims that those whatever model numbers and whatever tube they saw inserted in that model number show that those models must have American-made tubes.  Any night vision scope can house any tube made worldwide by many different countries because those tubes are of the same size. They have standard size so it can house a Russian-made tube, second generation, third generation; American-made, second generation, third generation; Indian made; German made; French made; Chinese made; Japanese made.  It would all be the same model number of scope but it would have a different tube.  So it's impossible for somebody to say, "Oh, this model number has a tube exported by Mr. Morgovsky."  Okay?

The Government mentioned -- referenced a 2011 -- two purchases by me in 2011, and they claim that it's proof that in 2015 Russian military was testing a scope or scopes which must have contained those tubes; but in 2015 or long time before that, I was not even in a position to supply those tubes because I didn't buy them.

Aside from that, under no circumstances I would ever, ever do anything which would be against the interests of the United States.  The excuse I have given myself that it was going to hunters and there was no victim is not a valid excuse

1   for my violation of export laws, but I really -- even the

2   thought that somebody thinks that I did something to harm this

3   great country, which I really just love and admire, is really

4   the most upsetting thing in this for me.  It's more upsetting

5   for me than potential punishment.

6         Aside from that, my father died when he was 54 years old

7   when I was not 17 yet.  He had the same health problems I have

8   now.  I've outlived him now by over 15 years.  If I remained in

9   the Ukraine, I would probably be dead by now.

10        I'm not afraid of death and I'm not afraid of dying in

11  prison.  The only concern I have is for my wife and my daughter

12  and other members of my family.

13        The report, which my attorney handed to you, was given to

14  me by my cardiologist yesterday.  On October 31 when my wife

15  was sentenced, I was still wearing a patch which monitored my

16  heart rate and regularity of my heartbeat.  After I stopped

17  wearing it, my cardiologist sent it for evaluation and then he

18  received the results of the evaluation yesterday.

19        The progress report which was given to you shows that

20  25 percent of the time I have irregular heart rate and that my

21  heartbeat goes as high as 208 beats a minute.  The normal heart

22  rate is 60.

23        There are studies showing that the life expectancy is

24  inversely proportional to the heart rate.  The higher the heart

25  rate, the shorter the lifespan.

My heart rate reaching 208 beats a minute is extremely high, and it means that my life expectancy is very short and I don't expect to outlive my father for much longer.  So possibly any sentence, no matter how long it will be, may end up being a life sentence.

Do I want to have a life sentence?  No.  Do I accept it?  Yes.  I hope it will not affect my family to a large degree because I myself, I'm at peace with that.

My cardiologist said yesterday that in order to -- and not only yesterday but before, that irregular heart rate often results in a stroke and that's how my father died actually.  He had the same heart problems and then he died of a stroke.

He says that a way to attempt preventing a stroke when you have irregular heartbeat is to take, like, blood thinners that he prescribed to me.  But as he reflected in the report that was given to you, if I take blood thinners, it causes my ulcer to bleed.  So my doctor believes that taking blood thinners causes significant -- can cause significant problems with my ulcer and not taking them cause -- presents a potential of a stroke.

So he recommends to do a surgical procedure in which -- I think it's called ablation -- in order to try to get rid of irregular heartbeat altogether, and he referred me to a specialist in that regard.

I would like to have an opportunity to at least remove

that -- at least that one obstacle which can possibly be removed.  I don't know if I can do much about my increased heartbeat, though I'm taking medications for it but they are not working too well so far; but at least trying to get rid of that atrial fibrillation, irregular heartbeat, will be -- would help to prevent a stroke and would not impose a danger for my ulcer.

As far as my ulcer is concerned, when I was arrested and spent five days in jail, I was shortly hospitalized on emergency basis with bleeding ulcer with blood coming out of my mouth and severe atrial fibrillation.  So if it happened after five days, I can imagine what can happen after 10 years, and I don't believe that I can survive 10 years or close to that anywhere.  And I don't believe I can survive 10 years even if I'm not in prison.

So I prefer that I'm not given a life sentence.  I would be in peace with this if I will.  I deserve to be punished.  I hope I will not be punished excessively.

My only hope -- I'm not planning to -- I mean, based on whatever happened to me and whatever happened to others in this entire process, I cannot imagine that I would do anything illegal ever again.

I would like to stress the fact that I withdrew from that conspiracy years before I was arrested.  So why would I reoffend if I withdrew from the conspiracy before I knew that I

1    would be caught?  It came from my personal decision, not from

2    law enforcement, to withdraw from the conspiracy.

3        At this point the only thing I hope that will happen to me

4    is that at some point I will still have a few years left to

5    spend with my family and with my grandchild or grandchildren,

6    who are not yet born, and with my grandchildren from my

7    stepson's side who are two boys whom I love dearly.

8        So my hope is that the sentence imposed on me considering

9    the problems -- my health problems and my age, that the

10   sentence imposed on me will not be a life sentence and I will

11   have a few years left.  If not, sobeit.

12       Thank you very much.  I appreciate you giving me the

13   opportunity to speak to you.

14           **THE COURT:**  Thank you.

15       Mr. Ellis, were you trying to say something?

16           **MR. ELLIS:**  Yes, Your Honor.  Some housekeeping here.

17       Your Honor, I have the final PSR in front of me.

18   Page 10 --

19           **THE CLERK:**  Sir, could you please speak in the

20   microphone?

21           **MR. ELLIS:**  Yes.

22       Your Honor, I have the final PSR in front of me and

23   page 10, paragraph 2, states --

24           **THE COURT:**  Paragraph 2?

25           **MR. ELLIS:**  Yeah.  Paragraph 22.

1          THE COURT:  Okay.

2          MR. ELLIS:  -- includes the organized crime reference

3  (reading):

4          "The agent stated Naum Morgovsky is not an active

5      member of a gang but agents believe he may have ties to

6      Russian organized crime."

7          THE COURT:  Any objection to removing that sentence?

8          MR. SAMPSON:  No, Your Honor.  We didn't object in the

9  papers.

10          THE COURT:  Okay.  I'll order that stricken.

11          MR. ELLIS:  And may I, if I may, sum up?

12      If the Court grants Mr. Morgovsky acceptance of

13  responsibility, and I think if there is a close call, I think

14  the Court should give him the benefit of the doubt, you've

15  heard him today, that would give him a guidelines from 78 to 97

16  months.

17      The median sentence imposed on similarly situated

18  offenders is about 60 months.  These people are average 44.9

19  years or 55 -- 40 -- they're 50 years old.  He's got -- 50

20  years old.  He's got 24 years on these people if my

21  calculations are right.

22      I really do believe that even a five-year sentence would

23  be a death sentence, which is why we proposed four years plus

24  one year of home confinement as a condition of supervised

25  release.

1    Now, I know the Government made much about the fact that
2  they said he was looking at perhaps an additional two years
3  consecutive with the aggravated identity theft; but, as a
4  practical matter, everyone knows that in federal court
5  93 percent of the people plead guilty and of those who go to
6  trial, the Government wins anywhere from two thirds to three
7  quarters of the cases.
8       So it's often said, if you're charged by the Feds, you've
9  got a 99 percent chance of winding up in front of a sentencing
10  judge.
11      So all this means is that he's probably looking at -- if
12  you give him four years plus a year supervised -- a year of
13  home confinement as a condition of supervised release, he's
14  also looking at two more years with the aggravated identity
15  theft.  That's a long time.  He may not make it.
16      **THE COURT:**  All right.  Obviously this is a pretty
17  complicated matter, and so first let me talk about the
18  guideline calculation and the PSR.
19      I believe -- I think it's a very close question.  I think
20  that the Government could have gotten a four-level enhancement.
21  I think that it's -- you know, there is a reasonable argument
22  for the three-level enhancement.  I think there is a reasonable
23  argument that one -- even though it might not -- it might not
24  specifically affect the guideline calculation, I think there's
25  a reasonable argument that Mr. Morgovsky intended to -- knew

1    full well and intended for these arms to reach the hands of the

2    Russian military.

3         But I think that, you know, the record on all of these

4    issues is murky enough that it is appropriate to sort of

5    resolve the tie in favor of the defendant, if you will.

6         And so I am going to stick with the guideline calculation

7    that we discussed at the outset, which is a base Offense Level

8    of 26, a two-point increase for the 1956 conviction, a

9    two-level increase for the role in the offense as Mr. Morgovsky

10   has argued for.

11        I continue to believe that Mr. Morgovsky is not entitled

12   to a reduction for acceptance of responsibility.  I think there

13   is an argument that some of Mr. Morgovsky's comments today sort

14   of reinforce the idea that he has not adequately accepted

15   responsibility.

16        I further think that, to the extent that his comments

17   reflect an acceptance or that the words that he uttered suggest

18   an acceptance of responsibility, it's too little too late, it's

19   too contrary to Mr. Morgovsky's conduct throughout this case,

20   and I do not believe -- I believe that Mr. Morgovsky either

21   thinks that he didn't do anything wrong or thinks that he can

22   get away with doing wrong whenever he wants.

23        And so I do not believe that Mr. Morgovsky is entitled to

24   a reduction for acceptance of responsibility.  That leaves us

25   at an Offense Level of 30.

1          I am, again, sort of -- I think the evidence is almost in

2     equipoise about this, so I'm going to, again, rule in favor of

3     Mr. Morgovsky on the issue of criminal history.  I'm going to

4     put him in a Criminal History Category I.  And so that leaves

5     us at 30 and that leaves us with a guideline range of 97 months

6     to 121 months.

7          I've stricken the provision from the PSR that references

8     ties to organized crime.  Other than that and other than what

9     I've said here just now, I'll adopt the Presentence Report.

10          So now the question is we have a sentencing guideline

11    range of 97 months to 121 months, and we have to apply the

12    factors under the sentencing statute, Section 3553(a), and

13    decide whether this guideline sentence is -- a guideline

14    sentence is an appropriate sentence or something higher than

15    the guideline range or something lower than the guideline

16    range.  And think when you apply all of the 3553(a) factors,

17    some cut one direction, some cut the other direction.

18          I understand the arguments about Mr. Morgovsky's age and

19    his health on the one hand, and they do cut in the direction of

20    a lower sentence.

21          I will assume for purposes of this discussion that

22    Mr. Morgovsky did not specifically intend to send arms to the

23    Russian military.  How much that matters, I'm not sure, because

24    anybody who is involved in this should know of the significant

25    likelihood that these materials would end up in the hands of

1  the Russian military.

2      But to the extent that specific intent matters, I'm going

3  to assume for the purposes of discussion that Mr. Morgovsky

4  didn't intend to help the Russian military.

5      Nonetheless, on the other hand -- oh, I'll say one other

6  thing.

7      I considered all of the arguments about sentencing

8  disparity and the Government's presentation and Mr. Morgovsky's

9  presentation, and I'm left to conclude that on the facts of

10  this case, a guideline sentence would not result in an

11  unwarranted sentencing disparity.

12      All of that said, in the end, Mr. Morgovsky was exporting

13  arms to Russia.  He knew he was exporting arms to Russia.  He

14  concealed his operation exporting arms to Russia, he laundered

15  money from his operation, and he has continued to fail to

16  adequately accept responsibility for this very serious crime

17  that he's engaged in.

18      General deterrence is an important factor here.  As the

19  Government said, people who export night vision products and

20  other arms to countries like Russia need to know that there

21  will be a serious penalty for that.

22      And, finally, based on everything I've seen, everything

23  I've received in connection with both sentencing hearings and

24  everything I've seen and heard in this case, I am concerned

25  that there is a significant risk that Mr. Morgovsky will engage

1   in criminal conduct in the future.  And I believe, therefore,

2   that protecting the safety of the public is an important factor

3   in the list of sentencing factors that Section 3553(a)

4   provides.

5        And so considering all of those factors, I believe that a

6   guideline sentence is appropriate and I believe a sentence

7   within the middle of the guideline range is appropriate.  So

8   the sentence for Mr. Morgovsky will be 108 months.  That is

9   9 years.  And I will also fine Mr. Morgovsky $1 million for his

10  conduct.  That will be the sentence.

11       Pursuant to the Sentencing Reform Act of 1984, it's the

12  judgment of the Court that Naum Morgovsky is hereby committed

13  to the custody of the Bureau of Prisons to be imprisoned for a

14  term of 108 months.  This term consists of terms of 108 months

15  on each of Counts 9, 10, and 11, all counts to be served

16  concurrently.

17       Upon release from imprisonment, the defendant shall be

18  placed on supervised release for a term of three years.  The

19  term consists of terms of three years on each of Counts 9, 10,

20  and 11, all such terms to run concurrently.

21       Within 72 hours of release from the custody of the Bureau

22  of Prisons, the defendant shall report in person to the

23  Probation Office in the district to which the defendant is

24  released.

25       While on supervised release, the defendant shall not

commit another federal, state, or local crime; shall comply
with the standard conditions that have been adopted by this
Court, except that the mandatory drug testing provision is
suspended; and shall comply with the following additional
conditions.  These are your conditions of supervised release,
Mr. Morgovsky:

One, you must pay any special assessment that is imposed
by this judgment and that remains unpaid at the commencement of
the term of supervised release.

Two, you must not open any new lines of credit and/or
incur new debt without the prior permission of the probation
officer.

Three, you must provide the probation officer with access
to any financial information, including tax returns; and shall
authorize the probation officer to conduct credit checks and
obtain copies of the income tax returns.

Four, you must not possess any false identification and
shall provide your true identity at all times.

Five, you must cooperate with the collection of DNA as
directed by the probation officer.

Six, you must not own or possess any firearms, ammunition,
destructive devices, or other dangerous weapons.

Seven, you must submit your person, residence, office,
vehicle, or any property under your control to a search.  Such
a search shall be conducted by a U.S. probation officer at a

1  reasonable time and in a reasonable manner based upon

2  reasonable suspicion of contraband or evidence of a violation

3  of a condition of release.  Failure to submit to such a search

4  may be grounds for revocation.  You must warn any residents

5  that the premises may be subject to searches.

6       It's further ordered that the defendant shall pay to the

7  United States a special assessment of $300.  Payment shall be

8  made to the Clerk of the U.S. District Court at 450 Golden Gate

9  Avenue, Box 36060, San Francisco, California 94102.

10      During imprisonment, payment of criminal monetary

11 penalties are due at a rate of not less than $25 per quarter

12 and payment shall be through the Bureau of Prisons Inmate

13 Financial Responsibility Program.

14      And as I mentioned, I find that the defendant does have

15 the ability to pay the fine or will likely have the ability to

16 pay the fine in the future and, therefore, I order a fine of

17 $1 million -- impose a fine of $1 million.

18           **THE PROBATION OFFICER:**  Your Honor, two things.

19           **THE COURT:**  Yes.

20           **THE PROBATION OFFICER:**  Then can we modify the

21 recommendation condition one to say "special assessment and

22 fine"?

23           **THE COURT:**  Yes.

24           **THE PROBATION OFFICER:**  And then --

25           **THE COURT:**  So condition one of the special conditions

1    of supervised release will be that Mr. Morgovsky must pay any

2    special assessment that is imposed or fine that is imposed by

3    this judgment and that remains unpaid at the commencement of

4    the term of supervised release.

5            THE PROBATION OFFICER:  And to set a payment schedule

6    for that fine and use the standard language that we would use,

7    and that would be about $28,000 a month.

8            THE COURT:  $28,000 a month?

9            THE PROBATION OFFICER:  (Nods head.)

10           THE COURT:  Okay.  The payment schedule will be

11   $28,000 a month.  That's upon supervised release; is that

12   correct?

13           THE PROBATION OFFICER:  Correct.

14           THE COURT:  Okay.

15           MR. OSTERHOUDT:  When would that take effect,

16   Your Honor?  I'm sorry.

17           THE COURT:  Upon release.

18       Is that correct?

19           THE PROBATION OFFICER:  Correct, Your Honor.  They

20   will start collecting during the time of imprisonment but at a

21   rate of not greater than $25 per quarter.

22           THE COURT:  Got it.

23       Okay.  Is there anything else?  Are there any

24   recommendations you want me to make?

25           MS. CORNELL:  Your Honor, if I may just jump in --

1        **THE COURT:**  Yes.

2        **MS. CORNELL:**  -- for the forfeiture provision on the

3   last page of the PSR.

4        **THE COURT:**  Yes.  Thank you.

5      So finally on forfeiture, the defendant's interest in the

6   following property shall be forfeited to the United States:

7      $222,929.61.

8      Three Infratech night vision rifle scopes seized by the

9   FBI from Naum Morgovsky's residence on August 25th, 2016, and

10  identified in the United States Bill of Particulars as follows:

11     One, one optic lens, size small, tube Serial

12  Number 4654898, tube type F9815SLG.

13     Two, one optic lens, size medium, tube Serial

14  Number 4656232, tube type F9815SLG.

15     And, three, one optic lens, size large, tube Serial

16  Number 4732440, tube type F9815SLG.

17     Okay.  Are there any placement recommendations or anything

18  that the defendant would like me to make?

19       **MR. ELLIS:**  Yes, Your Honor.  Can I have until

20  tomorrow to send you requested recommendations and language for

21  the judgment?

22       **MR. SAMPSON:**  Your Honor, we've sought remand and we

23  think remand at the earliest date is appropriate.  We defer to

24  the Court on designations.

25       **MR. ELLIS:**  Yeah, well, I'll provide -- if the Court

1    will -- I'll provide the Court our requested recommendations

2    and language in support.   Should I e-mail that to the Court or

3    does the Court --

4         **THE COURT:**  Well, what about the issue of remand?

5         **MR. ELLIS:**  Well, yeah, I'll get to that in a minute;

6    but is it okay --

7         **THE COURT:**  Why don't we start with that.

8         **MR. ELLIS:**  Okay.  Very good.

9       Mr. -- Bill.

10        **MR. OSTERHOUDT:**  Your Honor, Mr. Morgovsky has been

11   unfailingly faithful to his obligations, and I mean that

12   because ever since I've known him, he hasn't been late even a

13   moment for an appearance.

14        **THE COURT:**  He has, but let me be honest with you, try

15   to be as transparent as I can with you about my thinking and

16   give you an opportunity to respond to it.

17      I am somewhat concerned that this may be one of those rare

18   cases where the defendant has simply been operating under the

19   assumption that he was going to beat the system and that now --

20   you know, every time you get a little bit closer to the final

21   point in the proceedings, which is sentencing, you know, there

22   may be somewhat of an increased flight risk.

23      Now, I'm concerned that it's at least possible that

24   Mr. Morgovsky was operating under the assumption that he was

25   going to beat the system, and now maybe feels like he was

1    unsuccessful in beating the system and may be a flight risk

2    now.

3        So what can you say to me about that?

4            MR. OSTERHOUDT:  Please let me assure you that that's

5    not the case.  We have talked about this a lot.  He knows he

6    didn't beat the system.  He pled guilty.  He's read the

7    Presentence Report.  He knows what the Government has

8    recommended.  He knew that he was going to get a substantial

9    sentence today.  He didn't know exactly what it was, and he

10   never wavered in his determination to come forward and to

11   accept the judgment of the Court.

12       He's just --

13           THE COURT:  I guess that's a fair point.  I mean,

14   particularly given that we had the sentencing hearing

15   previously --

16           MR. OSTERHOUDT:  Right.

17           THE COURT:  -- and sort of -- and then even in this

18   sentencing hearing -- for this sentencing hearing --

19           MR. OSTERHOUDT:  Right.

20           THE COURT:  -- the Defense at the lowest point I think

21   argued for 48 months or something like that.

22           MR. OSTERHOUDT:  That's right.

23           THE COURT:  Okay.  So that's a fair point.

24           MR. OSTERHOUDT:  That's the way he feels.  He doesn't

25   feel that he beat the system.  He knew this morning he would be

1    sentenced.

2         But I think that there's a lot of strong equities favor

3    allowing him to self-surrender.  One of them, of course, is the

4    practical issue that it will avoid disadvantage to him within

5    the system.  As the Bureau of Prisons in assessing security

6    levels and the like, they --

7              THE COURT:  Well, except I don't think that it's

8    appropriate for me to consider that in -- I mean, the question

9    for me is:  Is there clear and convincing evidence that he will

10   not present a danger to the community or be a flight risk

11   between now and his self-surrender date; right?

12             MR. OSTERHOUDT:  Yes.  And I think that -- I think

13   that there is because of his record of achievement in always

14   coming here.  We've talked about that.

15        Also, I can assure you that he -- you know, he's always

16   been consistent in his determination to see this through and

17   obey the orders of the Court.

18        I think that the matter can be accommodated by conditions

19   of release until he turns himself in.

20             THE COURT:  Well, right now -- I mean, right now he's

21   on lockdown in his house; right?

22             MR. OSTERHOUDT:  And that should continue.

23             THE COURT:  He's on electronic monitoring and he's not

24   permitted to leave the house.

25             MR. OSTERHOUDT:  That should continue.

1          **THE COURT:**  Okay.  Is there anything else that can be

2     done?

3          **MR. OSTERHOUDT:**  That can be he may have regular

4     contact he may require with Pretrial Services, if that would be

5     more helpful.

6          Also in assuring that, he has assurances given by his

7     family, his wife, and the rest that he's not -- you know, that

8     he's not going to run away; he's going to see this through.

9          He's not -- he's incapacitated really from doing any

10    violations by his lockdown status.  He doesn't have the

11    wherewithal to export things or to engage in any criminal

12    activities.  He's really disabled, Your Honor.

13         And although it may stray a little bit from what your

14    focus is, there are two things I want to resolve with him prior

15    to this next case.  I've moved to withdraw from it, but I want

16    to talk to him about it and be very sure where we're going.

17    It's much more difficult if he's in custody this period.

18         Secondly, I think that the medical records shown this

19    morning indicates that he be given a short opportunity to take

20    care of those things before he embraces a 9-year sentence.

21         And with those things in mind, Your Honor, I hope that you

22    will grant him voluntary surrender as the Probation Office

23    recommended.

24              **THE COURT:**  Okay.  Anyone from the Government want to

25    respond in any way?

1              **MR. SAMPSON:**  Briefly.

2         The Court just found a few moments ago that

3    Mr. Morgovsky's actions constitute a potential danger to the

4    community, the actions that led to his conviction, and his

5    sentence today.

6         In addition, his name is not on the car he drives.  His

7    name is not on the house he owns.  We don't know where his

8    money is.

9         He was just imposed with a very significant fine.

10        Mr. Morgovsky's wife will be reporting to prison on

11   January 4th.

12        And, additionally, Your Honor, it sounds like there will

13   be potentially delay or not a trial on the additional matters.

14   We don't think it's appropriate to delay the imposition of a

15   sentence beyond that point.

16        So the Government believes that a reporting date in the

17   very near future, which may allow him to obtain the immediate

18   medical care he needs but that ensures that he reports very,

19   very soon so that he does not pose a danger to the community or

20   potential risk of planning to flee, be imposed.

21            **THE COURT:**  Well, why don't we impose a reporting

22   date -- the same reporting date as that of his wife, which is,

23   I believe, January 4th.  Is that what you said?

24            **THE PROBATION OFFICER:**  January 4th, Your Honor.

25            **THE COURT:**  Okay.  I will permit Mr. Morgovsky to

self-surrender in light of this discussion that we've had.

It is true that Mr. Morgovsky has been scrupulous in his compliance with the terms of pretrial release for the last two years; and when you combine that with the medical situation that Mr. Morgovsky has, I'm comfortable saying that he can self-surrender and that the standards have been met and he can self-surrender on January 4th.

**MR. OSTERHOUDT:**  Thank you very much.  Thank you, Your Honor.

**MR. ELLIS:**  Your Honor, one other housekeeping item, if I may.  One other housekeeping item, if I may.

**THE COURT:**  And, yes, you can.

By the way, to respond to your question, you can submit a letter, and I want you to file it on the docket so that the Government can have an opportunity to respond to it if it wishes.

**MR. ELLIS:**  Very good.

**THE COURT:**  Submit a letter tomorrow requesting that I make certain recommendations for Mr. Morgovsky's placement to the Bureau of Prisons.

**MR. ELLIS:**  Yes, thank you.

One last housekeeping item.

I reviewed the PSR.  It indicates that he is -- that's correct -- a naturalized U.S. citizen but sometimes the Bureau can get sticky on these things and they like to see it

 1   verified.

 2        So all I would ask is that, I have here copies of his

 3   passport -- it's been seized, of course -- that the Court

 4   direct Probation to indicate that if he -- and put in the PSR,

 5   the final PSR, the information from the passport and show that

 6   it's verified that he is a U.S. naturalized citizen.

 7             THE COURT:  Why don't you go ahead and attach that to

 8   the letter you submit tomorrow.

 9             MR. ELLIS:  Sure.  Will do.

10             THE COURT:  And then it will be part of the record and

11   the Bureau of Prisons will have access to it.

12             MR. ELLIS:  Very good.

13             THE COURT:  All right.  Anything further?

14             MR. SAMPSON:  No, Your Honor.  Thank you for your

15   time.

16             MR. OSTERHOUDT:  No, Your Honor.

17             THE CLERK:  Just point of clarification.  The

18   surrender time is 2:00 p.m. and it's to the designated Bureau

19   of Prisons facility.  If one has not been designated by that

20   time, it's directly to the U.S. Marshals Office on the

21   20th Floor in this building.

22             THE DEFENDANT:  Thank you.

23             THE COURT:  And we will take a break before we begin

24   our regular criminal calendar.  Why don't we begin the regular

25   criminal calendar at 11:15.

1        **MR. ELLIS:**   Thank you.

2            (Proceedings adjourned at 11:08 a.m.)

3                     ---oOo---

4

5

6              **CERTIFICATE OF REPORTER**

7        I certify that the foregoing is a correct transcript

8   from the record of proceedings in the above-entitled matter.

9

10  DATE:   Monday, November 26, 2018

11

12

13

14   _____

15      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             U.S. Court Reporter

16

17

18

19

20

21

22

23

24

25